AVINASH B. KULKARNI
E-mail: avik_101@yahoo.com
826 Applewilde Drive
San Marcos, California 92078
Phone: 858.344.0237
PLAINTIFF PRO SE

FILED

13 NOV 29 PM 3: 22

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _KW_          DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AVINASH B. KULKARNI,<br>    Plaintiff Pro Se<br>V.<br>DOES 1 - 10, inclusive<br>    Defendants | CASE NO.: **'13 CV 2857 JLS KSC**<br><br>COMPLAINT FOR:<br>CONSPIRACY TO ABDUCT AND<br>ALIENATE PLAINTIFF'S CHILD OUTSIDE<br>THE UNITED STATES; CONSPIRACY TO<br>CONCEAL THE IDENTITY OF THE<br>ABDUCTORS AND FACTS OF ABDUCTION<br>TO PERPETUATE THE ALIENATION;<br>NEGLIGENCE PER SE FOR VIOLATION OF<br>LAW; INTENTIONAL INFLICTION OF<br>EMOTIONAL DISTRESS; NEGLIGENT<br>INFLICTION OF EMOTIONAL DISTRESS;<br>TORTIOUS INTERFERENCE WITH<br>PARENTAL RIGHTS; PUNITIVE DAMAGES<br><br>DEMAND FOR JURY TRIAL<br><br>**APPLICABLE AUTHORITY:**<br>42 U.S.C. § 1985; THE FIRST AND NINTH<br>AMENDMENTS TO THE UNITED STATES<br>CONSTITUTION |

**Table of Contents**

I.    SYNPOSIS OF CLAIMS ................................................................1

II.   THE COURT'S JURISDICTION AND APPLICABLE LAWS ........................1

III.  LEAVE TO NAME FICTITIOUSLY NAMED DEFENDANTS ....................2

IV.  GENERAL ALLEGATIONS ...........................................................5

V.   GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION....5

VI.  FIRST CAUSE OF ACTION..........................................................10

VII. SECOND CAUSE OF ACTION......................................................12

VIII.   THIRD CAUSE OF ACTION ......................................................14

IX.  FOURTH CAUSE OF ACTION......................................................15

X.   FIFTH CAUSE OF ACTION ........................................................16

XI.  CONCLUSION .........................................................................19

**Exhibits**

1. California Penal Code §§ 277-280 ................................................. 21

2. Plaintiff's E-mail Communication with the District Attorney's Office in September 2008 ........................................................................ 27

3. Plaintiff's E-mail Communication with the District Attorney's Office in December 2008 Requesting Contact Information for his Son ......................... 30

4. DA's Response to Plaintiff's Request for Contact Information for his Son .... 32

5. E-mail from the Abducting Parent's Criminal Defense Attorney to Plaintiff . 34

6. E-mails between Plaintiff and his Son .......................................... 36

7. Guilty Plea of the Abducting Parent under Cal. Penal Code § 278.5(a) ........ 38

8. Excerpts of Deposition of the Abducting Parent ............................. 44

9. Affidavit of Rajesh Nerurkar ..................................................... 59

10. U.S. Government's Official Findings on International Child Abduction to India ........................................................................................ 64

i

COMPLAINT

Now comes Plaintiff, MR. AVINASH B. KULKARNI, (hereinafter "Plaintiff") and for causes of action herein claims and alleges as follows:

## I.    SYNPOSIS OF CLAIMS

1.  Plaintiff's son was born in Mission Viejo, California in 1990, and is a United States citizen.  The infant child lived with Plaintiff in El Toro, California when the child was abducted outside the United States by the child's mother who was aided and abetted by her family and friends.  The abducting parent ("AP") was convicted for the *continuous* felony crime of child abduction under California Penal Code ("CPC") § 278.5(a) in 2009.  (Exhibit 1, pp. 21-26, CPC 277-280.)  The brainwashing and forced alienation of Plaintiff's son from Plaintiff started in 1990 and continues even today.  Further, the criminal and civil conspiracy to conceal the identity of the coconspirators and to perpetuate the alienation continues even today.  Plaintiff seeks relief from this Court in the form of award for damages arising out of the abduction and alienation of his only child and the ongoing conspiracy.

## II.    THE COURT'S JURISDICTION AND APPLICABLE LAWS

2.  Plaintiff submits that this Court has jurisdiction over this matter pursuant to 28 USC § 1331 and 42 USC § 1985(3).  See <u>Wasserman v. Wasserman, 671 F.2d 832 (4th Cir.), *cert. denied,* 459 U.S. 1014, 103 S.Ct. 372, 74 L.Ed.2d 507 (1982)</u> (federal court competent to decide torts of child enticement and intentional infliction of emotional distress in case where custody of child was not in issue).

3.  Plaintiff further submits that various individuals have committed crimes and civil torts, based on his gender and ethnicity, to deny Plaintiff equal protection of the laws.  These acts have directly resulted in violation of Plaintiff's inalienable parental rights as well as due process rights guaranteed by the First, Ninth, Fifth and Fourteenth Amendments to the United States Constitution.

1

COMPLAINT

4.   Plaintiff lived in the County of Orange in the State of California between 1989 and 1994.  Plaintiff lived in Salt Lake City, Utah in 1994-95, and in Phoenix, Arizona between 1995 and 1999.  Plaintiff has lived in and continues to be a resident of the County of San Diego from 1999 until present, thus establishing the jurisdiction of this Court under 28 USC § 1331.

5.   Plaintiff further submits that Defendants in this action, once properly identified and named, are likely to be residents of other counties in the State of California, other states in the United States and/or other countries, which will also establish diversity jurisdiction (28 USC § 1332).

**III.       LEAVE TO NAME FICTITIOUSLY NAMED DEFENDANTS**

6.   Plaintiff has attempted to establish the identity of the coconspirators throughout the years, but has been unable to do so conclusively.  As a victim of a heinous crime, Plaintiff has urged both state and federal authorities to conduct a proper investigation and establish facts in the interest of both victims – the child and the left-behind parent ("LBP").  Plaintiff failed in his attempts as those agencies ignored his requests.

7.   The Orange County District Attorney's office ("OCDA") filed criminal charges against the AP in 2008 – seventeen years after the abduction started. When the AP came to the United States later that year, she was arrested. During her criminal prosecution, Plaintiff once again urged the OCDA to establish facts, a step he found necessary to overcome his child's brainwashing and alienation, and also in the interest of justice.  He also attempted to seek counseling and assistance through the National Center for Missing and Exploited Children (NCMEC).  (See Exhibit 2, pp. 28-29, Plaintiff's e-mail communication with Mr. Paul Litchenberg, Investigator with the OCDA's Office, and Mr. James Bacin, the Deputy District Attorney in charge of the prosecution.)  Plaintiff failed on both counts.

8.   Soon thereafter, Plaintiff asked the OCDA if it had contact information for his

2

COMPLAINT

son. (Exhibit 3, p. 31.)  The OCDA forwarded Plaintiff's request to the AP's criminal defense attorney. (Exhibit 4, p. 33.)  Soon thereafter, Plaintiff received an e-mail from the AP's criminal defense attorney who, Plaintiff believes, attempted to blackmail Plaintiff by holding hostage Plaintiff's relationship with his son. (See Exhibit 5, p. 35.)  Plaintiff's subsequent effort to reach out directly to his son was rebuffed as Plaintiff's son asked Plaintiff to talk to the attorney. (Exhibit 6, p. 37.)  Plaintiff alleges that these actions amounted to witness tampering, and worse, resulted in further perpetuation of the child's alienation.  Plaintiff does not have any knowledge of who paid the attorney.

9.  The AP pleaded guilty to the felony crime of child abduction. (Exhibit 7, pp. 39-43.)  While the AP was serving her sentence in the custody of the Orange County Sheriff's Department, her deposition was taken on behalf of Plaintiff on December 29, 2009. (Excerpts attached as Exhibit 8, pp. 45-58.)  As the AP had lived in India between 1990 and 2008, this was Plaintiff's first opportunity to depose her.  The AP admitted that she acquired the infant's passport in 1990 for the purpose of abduction and that she kept Plaintiff in the dark. (p. 51, 103:12-17; pp. 52-53, 104:23 - 105:1.)  When asked about assistance by other individuals in the abduction, the AP initially "refused to tell," and then claimed that she did not remember.  Her attorney, Ms. Kiran Nair (who worked for the AP's criminal defense attorney), acknowledged that the AP would not cooperate in the court-ordered deposition for the fear of criminal prosecution of her coconspirators. (pp. 48-49; p. 50, 55:10-22.)  Plaintiff's efforts to establish the identity of the coconspirators failed due to the AP's non-cooperation.

10.  Plaintiff received an affidavit from Mr. Rajesh Nerurkar ("Nerurkar"), the former husband of the AP's sister, in March 2011. (Exhibit 9, pp. 60-63.)  Nerurkar provided specifics of involvement of coconspirators (such as

3

COMPLAINT

unlawful passport acquisition, providing the AP with money, airline tickets and transportation, etc.)  (Exhibit 9, ¶¶ 3, 8.)  This was the first time Plaintiff came to know about many details of the abduction and actions of specific individuals, including unlawful assistance in passport acquisition for the infant.  Coconspirators named in Nerurkar's affidavit have explicitly denied any knowledge or participation in any of the acts alleged.

11.  Plaintiff contacted the Passport Office within the United States Department of State ("USDOS") to request passport records from 1990 to establish veracity of Nerurkar's account.  Plaintiff filed a Privacy Act / Freedom of Information Act request for information with the USDOS for disclosure of pertinent information.  While the USDOS has denied Plaintiff's request, it has identified that the said passport application in 1990 involved an applicant (presumably the AP), an Identifying Witness and an Emergency Contact.  The USDOS has refused to identify any of these individuals.  Plaintiff received this general information in June and August of 2013.

12.  Plaintiff submits that he requires initial discovery through this Court's subpoena powers, discovery provisions of Fed. R .Civ. P. 26 as well as the Court's authority under 5 USC § 552a(b)(11) (disclosure of Government records "pursuant to the order of a court of competent jurisdiction")  to ascertain the true identity of coconspirators.  Plaintiff prays leave that at such time as the true names and capacities of such fictitiously named Defendants ("Does") as well as elements of the ongoing conspiracy have been ascertained through discovery, Plaintiff may be permitted to insert the same herein with appropriately amended allegations (First Amended Complaint).  Plaintiff also prays leave that at such time as the true capacities of these Defendants have been ascertained, Plaintiff may be permitted to present the amount for damages claimed (Civil Cover Sheet, Form JS-44, Sec. VII).

4

COMPLAINT

## IV.   GENERAL ALLEGATIONS

13. Plaintiff submits that the true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 10, inclusive, and each of them, are unknown to Plaintiff at this time, and Plaintiff therefore sues said Defendants, and each of them, by such fictitious names. Plaintiff prays leave that at such time as the true names and capacities of such fictitiously named Defendants have been ascertained, Plaintiff may be permitted to insert the same herein with appropriate allegations.

14. At all times mentioned in the causes of action into which this paragraph is incorporated by reference, each Defendant was the alter-ego, coconspirator, agent/employee of each and every other Defendant. In doing the things alleged in the causes of action to which this paragraph is incorporated by reference, each and every Defendant was acting within the course and scope of this conspiracy, agency or employment, and was acting with the consent, permission and authorization of each of the other Defendants. All actions of each Defendant alleged in the causes of action into which this paragraph is incorporated by reference were ratified and approved by the coconspirators, officers or managing agents of every other Defendant.

## V.   GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

15. Plaintiff lived at 21141 Canada Road #13D, El Toro, California 92630 in Orange County in 1990 with his then wife, NEELAM KULKARNI (a.k.a. NEELAM THAKUR) ("Neelam"). Their son, SOUMITRA, was born in March, 1990 in Mission Viejo, California and resided with his parents (Plaintiff and Neelam) in El Toro, California.

16. Soon after the child's birth, Neelam and her coconspirators secretly plotted and made arrangements to abduct Soumitra and remove Plaintiff's infant son from the lawful custody of Plaintiff (herein referred to as "the abduction"), and

5

COMPLAINT

have the child taken permanently to India with Neelam.  In furtherance of this conspiracy, the coconspirators applied for and acquired Soumitra's U.S. passport, unbeknownst to Plaintiff, with the intent to abduct the child outside the United States.[1]  These coconspirators further facilitated the abduction by providing Neelam with money, transportation, assistance in fraudulently obtaining a duplicate birth certificate for the child, and arranging and paying for airline tickets from Orange County to India for Neelam and Soumitra.

17.  Soon thereafter, on October 15, 1990, Neelam abducted six-month old Soumitra, Plaintiff's only child, to India using the said passport, without Plaintiff's knowledge or consent.  Plaintiff never saw his child again.

18.  India does not recognize child abduction by a parent as a crime, and refuses to accede to the international law on child abduction, namely, the Hague Convention on the Civil Aspects of International Parental Abduction of 1980 ("Hague Convention").  Plaintiff's attempts to have his child returned to the United States, or, in the alternative, to establish a relationship with and custodial/visitation rights to his son, failed as a result.  Plaintiff's experience is typical for child abduction to India.  The Office of Children's Issues ("OCI") within the USDOS is statutorily designated as the Central Authority ("CA") for the United States for the Hague Convention.  Based on hundreds of cases of child abduction to India and per its statutory responsibility to provide country-specific findings for the purpose of the Hague Convention, the OCI has posted the following observations on its web site. (Exhibit 10, p. 65; *Emphasis added.*)

> "India is not a signatory of the Hague Convention on the Civil Aspects of International Parental Abduction; therefore, left-behind parents must rely on other avenues to recover their children from

---

[1] Plaintiff learnt in 2011 (for the first time) that the infant's passport was mailed to a third-party coconspirator in 1990.  Plaintiff learnt in 2013 (for the first time) from the USDOS that the 1990 passport application involved a passport applicant and an Identifying Witness.

6

COMPLAINT

India. *Once a child has been abducted to India, remedies are very few.* India does not consider international parental child abduction a crime, and the Indian courts rarely recognize U.S. custody orders, preferring to exert their own jurisdiction in rulings that tend to favor the parent who wants to keep the child in India. For these reasons, *it is often very difficult for left-behind parents in the United States to obtain any access to a child who has been abducted to India.* In the rare scenario that a case is resolved, it is usually due to an agreement between the parents, rather than the result of court orders or arrest warrants. The State Department can help by attempting welfare and whereabouts visits; however, these visits may only be conducted with the consent of the child's physical guardian."

19. The OCI managed this case as international child abduction starting in about 1996. Per its statutory duties under the Hague Convention, it conducted welfare checks on Soumitra in India on multiple occasions and provided reports to Plaintiff as the left-behind parent ("LBP").

20. In about 1998, Neelam applied for and received a visitor visa to the United States at the U.S. Consulate in Mumbai, India. Her coconspirators knowingly and intentionally sponsored and/or facilitated this visit with full knowledge that Neelam had abducted the child and was in violation of CPC § 278.5(a) and 18 USC § 1204, both continuous crimes. (See Exhibit 1, p. 25, CPC § 279.1.) The coconspirators were thus in violation of federal visa statutes. (See 8 USC § 1182(a)(3)(A)(ii); 8 USC § 1324(a)(1)(A)(iii) and (v); 8 USC § 1327.)

21. Upon receiving the said visa in 1998, Neelam secretly returned to Orange County in 1998 and brought then eight-year old Soumitra with her. She concealed Soumitra's and her whereabouts from Plaintiff. In spite of Plaintiff's attempts to find out his child's whereabouts in the United States, the coconspirators knowingly and deliberately concealed that information. They were fully aware of the criminal as well as civil aspects of this ongoing abduction, and that Plaintiff was entitled to the custody of his child. Neelam returned to India after about two months and took Soumitra with her. The coconspirators failed their statutory duty to inform Plaintiff and the law

COMPLAINT

enforcement agencies about the whereabouts of the abducted child in the United States. Plaintiff believes and alleges that the coconspirators deliberately acted in furtherance and facilitation of the conspiracy to continue the abduction and alienation of Soumitra from Plaintiff, and in aiding and abetting Neelam in her tortious acts.

22. The OCDA filed criminal charges against Neelam in 2008. Neelam came to the U.S. later that year and was arrested at the Los Angeles Airport. She pleaded guilty to the felony crime of child abduction on July 24, 2009 under CPC § 278.5(a) stating that she unlawfully took, kept and withheld the child, and that she maliciously and unlawfully deprived Plaintiff of his right to custody. (Exhibit 7, p. 41.)

23. Plaintiff continues to seek reunification with his son, but without success. The young man's brainwashing and alienation are very difficult to overcome. During Neelam's plea offer hearing on June 12, 2009, after reviewing the entire file and Neelam's defense, and after listening to Soumitra and Plaintiff as the crime victims, the Honorable Thomas M. Goethals of the Superior Court of Orange County remarked that "the son would have been far better off with long-term legitimate unpolluted exposure to his father." While commenting on Soumitra's alienation, Judge Goethals repeatedly remarked that "the well has been grossly poisoned." He summed up Plaintiff's loss as below.

> "The victim [Plaintiff] ... has been deprived of a gift as a parent; which I can say is probably the most precious gift that any parent has, which is time to raise and get to know his son. And he's never going to get that back. That's destroyed. And that was destroyed by the Defendant's [the abducting parent] conduct in this case."

24. Plaintiff believes and alleges, and will establish during the course of this action, that the emotional and psychological damage to Plaintiff due to the abduction and continuing alienation of his son is ongoing, will last through the

8

COMPLAINT

1   remainder of his life, and will potentially be multi-generational.

2   25. Plaintiff believes and alleges, and will establish during the course of this

3   action, that the motive behind the abduction of his child was to have the child's

4   custody determined by the corrupt, persecuting and discriminatory legal

5   system (both civil and criminal) in India, to deny Plaintiff equal protection of

6   the American law and due process rights established under the American law,

7   and to deny Plaintiff any meaningful access to the child by abusing the Indian

8   legal system. Plaintiff believes and alleges, and will establish during the

9   course of this action, that the original conspiracy included permanent

10   alienation of Plaintiff's son from Plaintiff, and to conceal facts pertaining to

11   the abduction in order to perpetuate and continue the alienation.

12   26. Statements in Neelam's deposition cited earlier (Exhibit 8) admit to multiple

13   crimes, including fraudulent passport acquisition for the child in 1990 for an

14   unlawful activity[2], child abduction[3], a conspiracy with other individuals to

15   commit those crimes and a continuing conspiracy to conceal their identity[4].

16   Coconspirators in the continuous crime of child abduction can be prosecuted

17   under 18 USC §§ 1201(g), 1204. Statutory limits for prosecution never

18   expire. (18 USC §§ 3283, 3299.) Damages sought here for the criminal acts

19   of coconspirators during the ongoing conspiracy are for the past as well as

20   present distress caused to Plaintiff.

21   27. From the date the abduction started through the present, Neelam and her

22   coconspirators have concealed the true identity of the coconspirators.

23   Accordingly, these Does are estopped by their conduct in asserting the statute

24   of limitations. Plaintiff further believes and alleges, and will establish during

25   the course of this action, that the coconspirators' ongoing actions continue to

26

---

27   [2] 18 USC §§ 1542, 1544, 1546

    [3] 18 USC § 1204; CPC § 278

28   [4] 18 USC § 373

COMPLAINT

1   directly perpetuate the alienation, and the original conspiracy continues.

2   28. Plaintiff filed a civil complaint against Neelam and her mother, Mrs.

3   URMILA THAKUR ("Urmila") in the Superior Court of Orange County in

4   2000 for the abduction of his child. After service of defendants in India,

5   Plaintiff obtained a default civil judgment against each of them in the amount

6   of $965,340.44 by the Honorable Kim G. Dunning on about March 28, 2001.

7   Plaintiff has been unable to enforce this judgment as both women live in India.

8   At that time, due to lack of knowledge and/or evidence of other

9   coconspirators' actions, Plaintiff was unable to pursue any action against them.

10  29. Based on information he received in 2009, Plaintiff pursued a civil action

11  against some of the alleged coconspirators mentioned in Nerurkar's affidavit

12  (Exhibit 9) in the Superior Court of Orange County. Plaintiff was

13  unsuccessful in that litigation due to failure to establish the roles and

14  capacities of those defendants in the abduction and alienation.

## VI.   FIRST CAUSE OF ACTION

**(Tortious Interference with Plaintiff's Parental Rights Guaranteed by the First and Ninth Amendments to the United States Constitution – Against All Defendants)**

19  30. Plaintiff hereby incorporates by reference paragraphs 13 through 29 of this

20  Complaint as if fully set forth herein.

21  31. Soon after Soumitra's birth in 1990, Neelam and her coconspirators conspired,

22  facilitated, participated, and engaged in the act of abduction of Soumitra from

23  Plaintiff. The abduction continued throughout Soumitra's entire childhood.

24  Neelam and her coconspirators conspired, facilitated, participated, and

25  engaged in further perpetuation of the abduction during Neelam's stealthy trip

26  to the United States in 1998. Soumitra's alienation from Plaintiff, which was

27  part of the original conspiracy, has continued throughout Soumitra's childhood

28  and continues even today. Defendants continue to conceal facts of this

10

COMPLAINT

1    abduction and to otherwise act in a manner that directly perpetuates the
2    alienation.

3    32. Defendants  knowingly and intentionally aided and abetted Neelam in the
4        continued abduction and alienation of Plaintiff's child.   In this regard,
5        Defendants knowingly, willfully and maliciously conspired and agreed with
6        the other Defendants, and each of them, to assist in the abduction and
7        alienation of Soumitra, and to deny Plaintiff the custody of his son and a
8        parental relationship with his son to the detriment of Plaintiff.

9    33. Pursuant to their conspiracy and agreement, and in furtherance thereof,
10       Defendants  performed and continue to perform unlawful acts to the detriment
11       of Plaintiff.  In this regard, Defendants knew that Plaintiff had a custody right
12       of his son and that assisting Neelam in the abduction would deprive Plaintiff
13       of that right, and of the care and comfort of his son.  Despite this, Defendants
14       knowingly and actively participated in the abduction of Plaintiff's son.
15       Further, Defendants knew that brainwashing of Plaintiff's son and concealment
16       of facts pertaining to the abduction would lead to the child's alienation from
17       Plaintiff.  Despite this knowledge, Defendants continue to actively participate
18       in unlawful acts that directly contribute to such alienation and concealment.

19   34. Plaintiff believes and thereon alleges, and will establish during the course of
20       this action, that Defendants knew the above listed actions of the Defendants
21       and Neelam, and each of them, constituted the unlawful abduction and
22       alienation of Plaintiff's child.   Nevertheless, Defendants  actively participated
23       in and  gave Neelam and the other Defendants, and each of them, substantial
24       assistance and encouragement to so act.

25   35. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff
26       has suffered the permanent loss of the care, custody and companionship of his
27       child, and the permanent loss of a parental relationship with his son.

28   36. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff

11

COMPLAINT

has suffered and continues to suffer from loss of his child, grief, humiliation, embarrassment, and mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

37. As a further direct, foreseeable, and proximate result of Defendants' tortious conduct, Plaintiff has incurred substantial loss of earnings as well as legal and other expenses incurred as the result of the abduction of his son in seeking to obtain his son and vindication of his parental rights.

38. Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this action is based, constitutes the commission of multiple criminal felony offenses.

39. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur the additional expense of attorney fees and litigation costs, the precise amount of which will be proven at trial.

40. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's parental right with his son under the United States Constitution (the First and Ninth amendments), Plaintiff's due process rights under the United States Constitution (the Fifth and Fourteenth amendments), and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

## VII.      SECOND CAUSE OF ACTION
### (Negligence Per Se For Violations of Law – Against All Defendants)

41. Plaintiff hereby incorporates by reference paragraphs 13 through 40 of this Complaint as if fully set forth herein.

12

COMPLAINT

42. Defendants, and each of them, had a duty to not facilitate the abduction of Plaintiff's son, to not participate in the ongoing conspiracy to conceal the identity of the abductors and facts regarding this abduction, and to not participate in the ongoing alienation of Plaintiff's son from Plaintiff. Defendants, and each of them, negligently caused harm to Plaintiff while violating Plaintiff's constitutional rights to the custody of his son as well as while violating provisions of CPC §§ 277-280, 18 USC § 1204 and various passport/visa statutes cited and alleged herein, causing economic, compensatory, and special damages as alleged herein and in an amount to be established at trial.[5]

43. At all times mentioned herein, Plaintiff was amongst the class of persons sought to be protected by the above referenced statutes.

44. The harm suffered by Plaintiff, as alleged herein, as a direct and proximate result of the acts of Defendants, as alleged herein, was the type of harm sought to be prevented by the above referenced statutes.[6]

45. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered the permanent loss of the care, custody and companionship of his child, and the permanent loss of a parental relationship with his son.

46. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer from loss of his child, grief, humiliation, embarrassment, and mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount

[5] Plaintiff prays leave that at such time as any further violations of statutes by Defendants are identified through discovery, Plaintiff may be permitted to amend the Complaint with appropriate allegations.

[6] For example, see *US v. Ventre*, 338 F. 3d 1047, 1053 (9th Cir. 2003). ("The purpose of the IPKCA [18 USC § 1204] is to 'deter the removal of children from the United States to foreign countries in order to obstruct parental rights.'" Citing H. Rep. No. 103-390, at 1.)

13

COMPLAINT

1    of which will be proven at trial.

2    47. Defendants' conduct as alleged herein and/or to be established through

3    discovery, and upon which this action is based, constitutes the commission of

4    multiple criminal felony offenses.

5    48. As a further direct, foreseeable, and proximate result of Defendants' conduct,

6    Plaintiff has been forced to incur the additional expense of attorney fees and

7    litigation costs, the precise amount of which will be proven at trial.

8    49. Defendants further committed the actions alleged herein with malice and

9    oppression, in that Defendants, and each of them, intentionally and willfully

10   engaged in despicable conduct which subjected and continues to subject

11   Plaintiff to cruel and unjust hardship.  Defendants, and each of them,  further

12   acted with willful and conscious disregard of Plaintiff's parental right with his

13   son, Plaintiff's due process rights under the United States Constitution (the

14   Fifth and Fourteenth amendments), and Defendants' duties and obligations

15   under various statutes cited herein.  Defendants' conduct warrants the

16   assessment of punitive damages from Defendants in an amount according to

17   proof.

18                    **VIII.        THIRD CAUSE OF ACTION**

19        **(Intentional Infliction of Emotional Distress – Against All Defendants)**

20   50. Plaintiff hereby incorporates by reference paragraphs 13 through 49 of this

21   Complaint as if fully set forth herein.

22   51. The actions of Defendants, and each of them, as alleged herein, constitute

23   outrageous conduct which is so beyond the bounds of human decency that no

24   reasonable person in the place of Plaintiff could reasonably be expected to

25   bear it.

26   52. In doing the acts alleged herein, Defendants, and each of them, acted with the

27   intent to cause Plaintiff severe emotional distress, or acted with reckless

28   disregard as to the probability of causing severe emotional distress to Plaintiff.

53. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff suffered and continues to suffer severe emotional distress.

54. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur the additional expense of attorney fees and litigation costs, the precise amount of which will be proven at trial.

55. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's parental right with his son, Plaintiff's due process rights under the United States Constitution (the Fifth and Fourteenth amendments), and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

## IX.    FOURTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress – Against All Defendants)

56. Plaintiff hereby incorporates by reference paragraphs 13 through 55 of this Complaint as if fully set forth herein.

57. Defendants, and each of them, had a duty to not cause, aid, abet, conspire in or facilitate the abduction of Plaintiff's son, the ongoing conspiracy to conceal the identity of the abductors and facts regarding this abduction, and the ongoing alienation of Plaintiff's son from Plaintiff.

58. Plaintiff believes and thereupon alleges that Defendants, and each of them, knew or should have known that their failure to perform their obligations, as set forth above, would cause Plaintiff severe emotional distress, and with that knowledge Defendants, and each of them, negligently performed their duties

15

1  and obligations owed to Plaintiff, thus directly and proximately resulting in
2  severe emotional distress to Plaintiff.

3  59. As a direct and proximate result of Defendants' conduct, as alleged above,
4  Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental
5  anguish, and has further suffered great psychological and emotional pain, all
6  to Plaintiff's general damage in an amount in excess of the minimum
7  jurisdiction of this court, the precise amount of which will be determined
8  according to proof at the time of trial.

9  60. As a further direct, foreseeable, and proximate result of the conduct of
10  Defendants, and each of them, Plaintiff has been forced to incur the additional
11  expense of attorney fees and litigation costs, the precise amount of which will
12  be proven at trial.

13  **X.      FIFTH CAUSE OF ACTION**
14  **(Alienation of Plaintiff's Child – Against All Defendants)**

15  61. Plaintiff hereby incorporates by reference paragraphs 13 through 60 of this
16  Complaint as if fully set forth herein.

17  62. The actions of Defendants, and each of them, beginning in 1990 and
18  continuing even today, as alleged herein and/or to be established through
19  further discovery, constitute wrongful conduct which is so beyond the bounds
20  of human decency that no reasonable person in the place of Plaintiff could
21  reasonably be expected to bear it.

22  63. In doing the acts alleged herein, Defendants, and each of them, acted with the
23  intent to cause extreme alienation of Plaintiff's son from Plaintiff. By
24  removing the child not only from Plaintiff's custody but from the country,
25  Defendants permanently and irreversibly erased any possibility of even a
26  single visitation. By removing the child at the tender age of six months,
27  Defendants terminated the possibility of a single image of Plaintiff in the
28  child's mind. These acts go above and beyond a short-term abduction. See

16

COMPLAINT

CPC § 278.6(a). ("(4) The child was taken, enticed away, kept, withheld, or concealed outside the United States... (9) The length of the abduction. (10) The age of the child.")

64. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff and his son were deprived of creating *any* bond during the most formative years of the child's life and beyond.  Plaintiff never saw his child take the first step or teethe.  The child never experienced his father holding him when the child was sick or doing homework together. The father and the son were deprived of hundreds of events and gestures, big or small, that a parent and a child experience together on a daily basis and never even think about their meaning.

65. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff suffered from loss, grief, loneliness, anxiety, bitterness and anger through most of his adult life. (Plaintiff was twenty-five when the abduction started.)  Instead of getting school report cards, Plaintiff received welfare reports from the OCI.  Instead of lovingly and proudly attending Little League games or school graduation, Plaintiff wrote to Senators and the Indian Prime Minister begging for justice, and attended court hearings.

66. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff's child never had the opportunity to get to know his father and form opinions of his father based on personal knowledge and experiences.  Instead, as Plaintiff will establish during the course of this action, the child was exposed to extreme brainwashing, and presented with entirely false and malicious image of Plaintiff and Plaintiff's entire family (mother, father and sister).  The child was raised with the improbable painting of the entire family as monsters, thus stealing a significant part of the child's identity and poisoning the child's mind.  Even though the child is a grown man now, his alienation prohibits him from seeking a relationship with his father.

COMPLAINT

67. Plaintiff will further establish that, as a direct, foreseeable, and proximate result of Defendants' *continuing* conduct, Plaintiff's son (a perfect Manchurian Candidate) is being manipulated to take unethical and unlawful actions that are detrimental to the young man. Plaintiff will further establish that, as a direct, foreseeable and proximate result of Defendants' *continuing* conduct, alienation of Plaintiff's son is further perpetuated, and that any possibility of establishing a relationship between the father and the son is further diminished. Defendants' wrongful conduct has directly resulted in Plaintiff's loss of consortium, and in Plaintiff's current and future loss of a relationship with his son.

68. Defendants, and each of them, had a duty to not cause, aid, abet, conspire in or facilitate the actions, abduction and alienation alleged herein.

69. Plaintiff is believes and thereupon alleges that Defendants, and each of them, knew or should have known that their failure to perform their obligations, as set forth above, would cause Plaintiff severe emotional distress, and with that knowledge Defendants, and each of them, negligently performed their duties and obligations owed to Plaintiff, thus directly and proximately resulting in severe emotional distress to Plaintiff due to the ongoing alienation of his son.

70. As a direct and proximate result of Defendants' conduct, as alleged above, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be determined according to proof at the time of trial.

71. As a further direct, foreseeable, and proximate result of the conduct of Defendants, and each of them, Plaintiff has been forced to incur the additional expense of attorney fees and litigation costs, the precise amount of which will be proven at trial.

COMPLAINT

72. Defendants further committed and continue to commit the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in and continue to engage in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted and continue to act with willful and conscious disregard of Plaintiff's parental right with his son, Plaintiff's due process rights under the United States Constitution (the Fifth and Fourteenth amendments), and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

## XI.   CONCLUSION

WHEREFORE Plaintiff Avinash B. Kulkarni prays for judgment against Defendants, and each of them, as follows:

1.  For compensatory damages, including lost wages, attorneys fees, and other expenses incurred as a direct result of the abduction and continuing alienation of Plaintiff's son, as well damages for emotional distress and other special and general damages according to proof;

2.  For an award of punitive damages;

3.  For costs of suit herein incurred; and

4.  For such other and further relief as the court deems proper.

Respectfully submitted,

DATED: November 29, 2013

AVINASH B. KULKARNI

PLAINTIFF PRO SE

19

COMPLAINT

1   //   **THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.**

2   //

3   //

4   //

5   //

6   //

7   //

8   //

9   //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

20

COMPLAINT

# EXHIBIT 1

Ex. 1
21

# PENAL CODE
# SECTION 277-280

277.  The following definitions apply for the purposes of this
chapter:
   (a) "Child" means a person under the age of 18 years.
   (b) "Court order" or "custody order" means a custody determination
decree, judgment, or order issued by a court of competent
jurisdiction, whether permanent or temporary, initial or modified,
that affects the custody or visitation of a child, issued in the
context of a custody proceeding.  An order, once made, shall continue
in effect until it expires, is modified, is rescinded, or terminates
by operation of law.
   (c) "Custody proceeding" means a proceeding in which a custody
determination is an issue, including, but not limited to, an action
for dissolution or separation, dependency, guardianship, termination
of parental rights, adoption, paternity, except actions under Section
11350 or 11350.1 of the Welfare and Institutions Code, or protection
from domestic violence proceedings, including an emergency
protective order pursuant to Part 3 (commencing with Section 6240) of
Division 10 of the Family Code.
   (d) "Lawful custodian" means a person, guardian, or public agency
having a right to custody of a child.
   (e) A "right to custody" means the right to the physical care,
custody, and control of a child pursuant to a custody order as
defined in subdivision (b) or, in the absence of a court order, by
operation of law, or pursuant to the Uniform Parentage Act contained
in Part 3 (commencing with Section 7600) of Division 12 of the Family
Code.  Whenever a public agency takes protective custody or
jurisdiction of the care, custody, control, or conduct of a child by
statutory authority or court order, that agency is a lawful custodian
of the child and has a right to physical custody of the child.  In
any subsequent placement of the child, the public agency continues to
be a lawful custodian with a right to physical custody of the child
until the public agency's right of custody is terminated by an order
of a court of competent jurisdiction or by operation of law.
   (f) In the absence of a court order to the contrary, a parent
loses his or her right to custody of the child to the other parent if
the parent having the right to custody is dead, is unable or refuses
to take the custody, or has abandoned his or her family.  A natural
parent whose parental rights have been terminated by court order is
no longer a lawful custodian and no longer has a right to physical
custody.
   (g) "Keeps" or "withholds" means retains physical possession of a
child whether or not the child resists or objects.
   (h) "Visitation" means the time for access to the child allotted
to any person by court order.
   (i) "Person" includes, but is not limited to, a parent or an agent
of a parent.
   (j) "Domestic violence" means domestic violence as defined in
Section 6211 of the Family Code.
   (k) "Abduct" means take, entice away, keep, withhold, or conceal.


278.  Every person, not having a right to custody, who maliciously
takes, entices away, keeps, withholds, or conceals any child with the

Ex. 1
22

intent to detain or conceal that child from a lawful custodian shall
be punished by imprisonment in a county jail not exceeding one year,
a fine not exceeding one thousand dollars ($1,000), or both that
fine and imprisonment, or by imprisonment in the state prison for
two, three, or four years, a fine not exceeding ten thousand dollars
($10,000), or both that fine and imprisonment.


278.5.  (a) Every person who takes, entices away, keeps, withholds,
or conceals a child and maliciously deprives a lawful custodian of a
right to custody, or a person of a right to visitation, shall be
punished by imprisonment in a county jail not exceeding one year, a
fine not exceeding one thousand dollars ($1,000), or both that fine
and imprisonment, or by imprisonment in the state prison for 16
months, or two or three years, a fine not exceeding ten thousand
dollars ($10,000), or both that fine and imprisonment.
    (b) Nothing contained in this section limits the court's contempt
power.
    (c) A custody order obtained after the taking, enticing away,
keeping, withholding, or concealing of a child does not constitute a
defense to a crime charged under this section.


278.6.  (a) At the sentencing hearing following a conviction for a
violation of Section 278 or 278.5, or both, the court shall consider
any relevant factors and circumstances in aggravation, including, but
not limited to, all of the following:
    (1) The child was exposed to a substantial risk of physical injury
or illness.
    (2) The defendant inflicted or threatened to inflict physical harm
on a parent or lawful custodian of the child or on the child at the
time of or during the abduction.
    (3) The defendant harmed or abandoned the child during the
abduction.
    (4) The child was taken, enticed away, kept, withheld, or
concealed outside the United States.
    (5) The child has not been returned to the lawful custodian.
    (6) The defendant previously abducted or threatened to abduct the
child.
    (7) The defendant substantially altered the appearance or the name
of the child.
    (8) The defendant denied the child appropriate education during
the abduction.
    (9) The length of the abduction.
    (10) The age of the child.
    (b) At the sentencing hearing following a conviction for a
violation of Section 278 or 278.5, or both, the court shall consider
any relevant factors and circumstances in mitigation, including, but
not limited to, both of the following:
    (1) The defendant returned the child unharmed and prior to arrest
or issuance of a warrant for arrest, whichever is first.
    (2) The defendant provided information and assistance leading to
the child's safe return.
    (c) In addition to any other penalties provided for a violation of
Section 278 or 278.5, a court shall order the defendant to pay
restitution to the district attorney for any costs incurred in
locating and returning the child as provided in Section 3134 of the
Family Code, and to the victim for those expenses and costs

Ex. 1
23

reasonably incurred by, or on behalf of, the victim in locating and
recovering the child.  An award made pursuant to this section shall
constitute a final judgment and shall be enforceable as such.


278.7.  (a) Section 278.5 does not apply to a person with a right to
custody of a child who, with a good faith and reasonable belief that
the child, if left with the other person, will suffer immediate
bodily injury or emotional harm, takes, entices away, keeps,
withholds, or conceals that child.
    (b) Section 278.5 does not apply to a person with a right to
custody of a child who has been a victim of domestic violence who,
with a good faith and reasonable belief that the child, if left with
the other person, will suffer immediate bodily injury or emotional
harm, takes, entices away, keeps, withholds, or conceals that child.
"Emotional harm" includes having a parent who has committed domestic
violence against the parent who is taking, enticing away, keeping,
withholding, or concealing the child.
    (c) The person who takes, entices away, keeps, withholds, or
conceals a child shall do all of the following:
    (1) Within a reasonable time from the taking, enticing away,
keeping, withholding, or concealing, make a report to the office of
the district attorney of the county where the child resided before
the action.  The report shall include the name of the person, the
current address and telephone number of the child and the person, and
the reasons the child was taken, enticed away, kept, withheld, or
concealed.
    (2) Within a reasonable time from the taking, enticing away,
keeping, withholding, or concealing, commence a custody proceeding in
a court of competent jurisdiction consistent with the federal
Parental Kidnapping Prevention Act (Section 1738A, Title 28, United
States Code) or the Uniform Child Custody Jurisdiction Act (Part 3
(commencing with Section 3400) of Division 8 of the Family Code).
    (3) Inform the district attorney's office of any change of address
or telephone number of the person and the child.
    (d) For the purposes of this article, a reasonable time within
which to make a report to the district attorney's office is at least
10 days and a reasonable time to commence a custody proceeding is at
least 30 days.  This section shall not preclude a person from making
a report to the district attorney's office or commencing a custody
proceeding earlier than those specified times.
    (e) The address and telephone number of the person and the child
provided pursuant to this section shall remain confidential unless
released pursuant to state law or by a court order that contains
appropriate safeguards to ensure the safety of the person and the
child.


279.  A violation of Section 278 or 278.5 by a person who was not a
resident of, or present in, this state at the time of the alleged
offense is punishable in this state, whether the intent to commit the
offense is formed within or outside of this state, if any of the
following apply:
    (a) The child was a resident of, or present in, this state at the
time the child was taken, enticed away, kept, withheld, or concealed.

    (b) The child thereafter is found in this state.
    (c) A lawful custodian or a person with a right to visitation is a
resident of this state at the time the child was taken, enticed

                            Ex. 1
                            24

away, kept, withheld, or concealed.


279.1.   The offenses enumerated in Sections 278 and 278.5 are
continuous in nature, and continue for as long as the minor child is
concealed or detained.


279.5.   When a person is arrested for an alleged violation of
Section 278 or 278.5, the court, in setting bail, shall take into
consideration whether the child has been returned to the lawful
custodian, and if not, shall consider whether there is an increased
risk that the child may not be returned, or the defendant may flee
the jurisdiction, or, by flight or concealment, evade the authority
of the court.


279.6.   (a) A law enforcement officer may take a child into
protective custody under any of the following circumstances:
     (1) It reasonably appears to the officer that a person is likely
to conceal the child, flee the jurisdiction with the child, or, by
flight or concealment, evade the authority of the court.
     (2) There is no lawful custodian available to take custody of the
child.
     (3) There are conflicting custody orders or conflicting claims to
custody and the parties cannot agree which party should take custody
of the child.
     (4) The child is an abducted child.
     (b) When a law enforcement officer takes a child into protective
custody pursuant to this section, the officer shall do one of the
following:
     (1) Release the child to the lawful custodian of the child, unless
it reasonably appears that the release would cause the child to be
endangered, abducted, or removed from the jurisdiction.
     (2) Obtain an emergency protective order pursuant to Part 3
(commencing with Section 6240) of Division 10 of the Family Code
ordering placement of the child with an interim custodian who agrees
in writing to accept interim custody.
     (3) Release the child to the social services agency responsible
for arranging shelter or foster care.
     (4) Return the child as ordered by a court of competent
jurisdiction.
     (c) Upon the arrest of a person for a violation of Section 278 or
278.5, a law enforcement officer shall take possession of an abducted
child who is found in the company of, or under the control of, the
arrested person and deliver the child as directed in subdivision (b).


     (d) Notwithstanding any other law, when a person is arrested for
an alleged violation of Section 278 or 278.5, the court shall, at the
time of the arraignment or thereafter, order that the child shall be
returned to the lawful custodian by or on a specific date, or that
the person show cause on that date why the child has not been
returned as ordered.  If conflicting custodial orders exist within
this state, or between this state and a foreign state, the court
shall set a hearing within five court days to determine which court
has jurisdiction under the laws of this state and determine which
state has subject matter jurisdiction to issue a custodial order
under the laws of this state, the Uniform Child Custody Jurisdiction

Ex. 1
25

Act (Part 3 (commencing with Section 3400) of Division 8 of the
Family Code), or federal law, if applicable.  At the conclusion of
the hearing, or if the child has not been returned as ordered by the
court at the time of arraignment, the court shall enter an order as
to which custody order is valid and is to be enforced.  If the child
has not been returned at the conclusion of the hearing, the court
shall set a date within a reasonable time by which the child shall be
returned to the lawful custodian, and order the defendant to comply
by this date, or to show cause on that date why he or she has not
returned the child as directed.  The court shall only enforce its
order, or any subsequent orders for the return of the child, under
subdivision (a) of Section 1219 of the Code of Civil Procedure, to
ensure that the child is promptly placed with the lawful custodian.
An order adverse to either the prosecution or defense is reviewable
by a writ of mandate or prohibition addressed to the appropriate
court.


280.  Every person who willfully causes or permits the removal or
concealment of any child in violation of Section 8713, 8803, or 8910
of the Family Code shall be punished as follows:
   (a) By imprisonment in a county jail for not more than one year if
the child is concealed within the county in which the adoption
proceeding is pending or in which the child has been placed for
adoption, or is removed from that county to a place within this
state.
   (b) By imprisonment in the state prison, or by imprisonment in a
county jail for not more than one year, if the child is removed from
that county to a place outside of this state.

Ex.1
26

# EXHIBIT 2

Ex. 2
27

Case 3:13-cv-02857-JLS-KSC   Document 1   Filed 11/29/13   Page 30 of 69

 **MAIL**
Classic

**RE: Follow up on Kulkarni Matter**                    Sunday, September 14, 2008 8:42 PM

**From:** "Avi Kulkarni" <avik_101@yahoo.com>
**To:** "Litchenberg, Paul" <Paul.Litchenberg@da.ocgov.com>
**Cc:** "Jim Bacin" <Jim.Bacin@da.ocgov.com>

Hi Paul,

I talked to Ms. Lanae Jones from the NCMEC on Thursday last week. She arranged for me to talk to Ms. Karen Strickland who is the Director of the organization Find The Children in Los Angeles. Ms. Strickland seemed to think that I can't do much at this time, especially since my son is already eighteen.

In the meanwhile, I talked to my son on Thursday. He was to leave for San Jose in a day or two, definitely by the weekend. He refused to see me before he left. So I do not have any way of contacting him today -- just the way things were for the majority of last eighteen years. He mentioned that he might contact me in November when he visits his aunt in Orange County. This aunt was very much involved in the abduction eighteen years ago. How should I accept this situation? That is why I keep talking about prosecution of those who aided and abetted the abduction. That would only be fair.

Thanks for your help,

Avi

--- On **Wed, 9/10/08, Litchenberg, Paul <Paul.Litchenberg@da.ocgov.com>** wrote:

> From: Litchenberg, Paul <Paul.Litchenberg@da.ocgov.com>
> Subject: RE: Follow up on Kulkarni Matter
> To: avik_101@yahoo.com
> Date: Wednesday, September 10, 2008, 12:23 PM
>
> Hello Avi,
> I have already made arrangements for counselor intervention. You should be contacted soon (if not already) by a representative of NCMEC to arrange some help for you and your son.
> At this point we are concentrating only on Neelam. The decision to pursue anyone else in this matter would rely on DDA Jim Bacin.
> Keep me informed of the counseling arrangements. If you have not heard from them by tomorrow, please let me know.
> Paul
>
> Paul Litchenberg
> Investigator
> Family Protection/Child Abduction
> (714)347-8832
>  Think before you print
>
> **From:** Avi Kulkarni [mailto:avik_101@yahoo.com]
> **Sent:** Tuesday, September 09, 2008 9:40 PM
> **To:** Litchenberg, Paul

*Ex. 2*
*28*

**Subject:** Follow up on Kulkarni Matter

Hi Paul,

A quick follow up on two items...

You had mentioned that you would arrange for a counselor for my son and I. I find very little chance for any progress on that front at this time. My son has been avoiding me. If I call his aunt's place and he actually answers the phone, he gets rid of me in a couple of minutes. He says he would call back, but never does. Or if his aunt answers the phone, she tells me that he isn't there. The only time he has called me is when he thought I might be able to help his mother. He has refused to see me. He'll be leaving for Stanford over the weekend. I do not expect to have any contact with him or even have his contact info (such as phone number or e-mail address). I'll still try my best to work on it. But I'm going to need some help.

On a different note... I have been mentioning to you the involvement of other people in my child's abduction. When you got a warrant for my ex-wife's arrest, you told me that you won't pursue any of them at the time. You were of the opinon that they would come out of the woodwork if and when she was arrested. Now that she has been arrested, would you be pursuing that angle? I believe that it will be important to do so in order to establish the truth. I truly need that to happen.

I appreciate your attention to this matter.

Thanks,
Avi

***CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.***

Ex. 2
29

# EXHIBIT 3

Ex. 3

30

RE: Contact my son - Yahoo! ii
Case 3:13-cv-02857-JLS-KSC   Document 1   Filed 11/29/13   Page 33 of 69
Page 1 of 1



**RE: Contact my son**                                    Monday, December 8, 2008 10:46 AM

**From:** "Litchenberg, Paul" <Paul.Litchenberg@da.ocgov.com>
  **To:** avlk_101@yahoo.com

Avi,
At this point I really don't have any resources to assist you. I only have the same contact information you have.
I will have Jim ask the defense attorney for updated info.
Paul

*Paul Litchenberg*
*Investigator*
*Family Protection/Child Abduction*
*(714)347-8832*

**From:** Avi Kulkarni [mailto:avlk_101@yahoo.com]
**Sent:** Thursday, December 04, 2008 5:59 AM
**To:** Litchenberg, Paul
**Subject:** Contact my son

Hi Paul,

Have you talked to my son as part of your investigation?  Would you hapen to have contact info for him?  And could you help me to contact him?

Since our interaction back in September, there has been no contact between us.  He had told me that once he settles down at Stanford, he would contact me to tell me about his new contact info.  He hasn't.  He also had told me that he would be visiting his aunt in Orange County in November (Thanksgiving, I suppose) and that he would call me then.  He didn't.

I sent an e-mail to his old e-mail address -- the one he used when he lived in India.  There was no response.  The e-mail didn't bounce, so the address still exists.

I just want to check on him.  Can you help?

Thanks,
Avi

***CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.***

Ex. 3
31

# EXHIBIT 4

Ex. 4

32

| | |
|---|---|
| **Subject:** | FW: Thakur |
| **From:** | Litchenberg, Paul (Paul.Litchenberg@da.ocgov.com) |
| **To:** | avik_101@yahoo.com; |
| **Date:** | Wednesday, December 10, 2008 10:05 AM |

Paul Litchenberg

Investigator

Family Protection/Child Abduction

(714)347-8832

**From:** Bacin, Jim
**Sent:** Tuesday, December 09, 2008 4:38 PM
**To:** Litchenberg, Paul
**Subject:** Thakur

Please tell Dad that I asked Mom's attorney to pass a message along to Soumitra, that Dad asked him (Soumitra) to contact him.

-Jim B

***CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.***

Ex. 4
33

# EXHIBIT 5

| Subject: | Meeting |
| --- | --- |
| From: | Fred Thiagarajah (fred@fredthia.com) |
| To: | Avik_101@yahoo.com; |
| Date: | Thursday, January 29, 2009 4:29 PM |

Dear Mr. Kulkarni,

My name is Fred Thiagarajah. I am the new attorney for your ex-wife, Neelam Kulkarni. My client has informed me that you may want to set up a meeting between you, your attorney, her and her attorney, to discuss the pending case and the future of your relationship with your son. If this is still your wish, then please notify me, either via email or phone (949-475-6800). If this is not your wish, then disregard this email.

Sincerely,

Fred Thiagarajah

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. LAW OFFICES OF FRED THIAGARAJAH Please visit our website at www.fredthia.com

Ex. 5
35

# EXHIBIT 6

Ex. 6
36

Case 3:13-cv-02857-JLS-KSC   Document 1   Filed 11/29/13   Page 39 of 69

Re: How are you? - Yahoo! M...                                                Page 1 of 1

**YAHOO!** MAIL
Classic

**Re: How are you?**                                                         Monday, February 9, 2009 2:06 AM
From: "soumitra kulkarni" <soumitra_90@yahoo.com>
  To:  avi_kulkarni_us@yahoo.com

Henceforth, please communicate through my mother's attorney.

--- On Sat, 2/7/09, Avi Kulkarni *<avi_kulkarni_us@yahoo.com>* wrote:

> From: Avi Kulkarni <avi_kulkarni_us@yahoo.com>
> Subject: How are you?
> To: "soumitra kulkarni" <soumitra_90@yahoo.com>
> Date: Saturday, February 7, 2009, 1:37 AM
>
> Hi Soumitra,
>
> How are you doing?  How is college?
>
> If you want to talk to me, give me a call.  I would like to talk to you, too.
>
> Take care.

Ex. 6
37

# EXHIBIT 7

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
## ADVISEMENT AND WAIVER OF RIGHTS FOR A FELONY GUILTY PLEA

Case No. 08CF1764 People v. Neelam Ramakant Thakur

1. __NT__ My true full name is _Neelam Ramankant Thakur_

   I am represented by _____

2. __NT__ I understand that I am pleading guilty, and admitting the following offenses, special punishment allegations, and prior convictions, carrying the possible penalties as follows:

| Ct. | Charge | Sentence Range | Enhancements | Yrs. | Term for Priors | Yrs. | Total Penalty Years |
|-----|--------|----------------|--------------|------|-----------------|------|---------------------|
| 1 | 278.5(A)PC | 16-2-3 | | | | | 3 |
| | | | | | | | |
| | | | | | | | |
| | | | | Maximum Total Punishment | | | 3 |

3. __NT__ In addition to time in custody, I understand the court may also order me to pay a fine as follows: up to $10,000 for most felonies [P.C. 672]; up to $20,000 for selected drug offenses [H&S 11372]; up to $50,000 for selected drug offenses [H&S 11352.5]; or other:

4. __NT__ I understand it is absolutely necessary that all plea agreements, promises of a particular sentence, and sentence recommendations be completely disclosed to the court on this form.

5. __NT__ **Right to an attorney:** I understand I have the right to be represented by an attorney at all stages of the proceedings until my case is completed. If I cannot afford an attorney, one will be appointed for me free of charge. However, I understand that at the conclusion of my case, the court may order me to reimburse the County of Orange for the cost of my attorney, according to my ability to pay.

6. __NT__ **Right to a preliminary hearing:** I understand I have the right to a preliminary hearing at which a judicial officer will determine if there is sufficient evidence to justify setting my case for trial. At this hearing, I have the right to be represented by an attorney as described in paragraph 5 above, the right to confront and cross-examine witnesses against me, the right to present evidence on my behalf, and the right to remain silent and not testify; but I may testify if I want to. I waive and give up my right to a preliminary hearing.

7. __NT__ **Jury trial rights:** I understand I have the right to a speedy and public trial by a jury. I waive and give up these rights.

8. __NT__ **Rights to confront and cross-examine witnesses:** I understand I have the right to confront the witnesses against me and to cross-examine them myself or have my attorney cross-examine them. I waive and give up these rights.

9. __NT__ **Right to testify or remain silent:** I understand I have the right to testify on my behalf. I also understand I have the right to remain silent, and I cannot be compelled to testify against my will. I waive and give up these rights.

10. __NT__ **Right to present evidence:** I understand I have the right to present evidence and to call witnesses to testify on my behalf. I further understand I have the right to invoke the compulsory process of the court to subpoena evidence and witnesses at no cost to me. I waive and give up these rights.

11. __NT__ **Immigration consequences:** I understand if I am not a citizen of the United States, my conviction for the offense charged will have the consequence of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States.

Ex. 7   39

Case No. _08CF-1764_____   People v. _Thakur_____

12. **Fourth Amendment waiver:** I understand under the Fourth and Fourteenth Amendments to the United States Constitution, I have a right to be free from unreasonable searches and seizures. I waive and give up this right, and further agree that for the period during which I am on probation I will submit my person and property, including any residence, premises, container or vehicle under my control to search and seizure at any time of the day or night by any law enforcement officer or probation officer, with or without a warrant, probable cause, or reasonable suspicion.

13. **Sentencing waiver:** I understand I have the right to a jury or court trial as to certain factors that may be used to increase my sentence on any count, sentencing enhancement, or allegation, to the upper or maximum term provided by law. I waive and give up the right to a jury or court trial on all of these factors. I agree the judge will determine the existence of any of these factors, within the judge's discretion, as allowed by law. I agree this waiver shall apply to any future sentence imposed following a probation revocation.

14. **Appeal waiver:** I understand I have the right to appeal from decisions and orders of the Superior Court. I waive and give up my right to appeal from any and all decisions and orders made in my case, including motions to suppress evidence brought pursuant to Penal Code section 1538.5. I waive and give up my right to appeal from my guilty plea. I waive and give up my right to appeal from any legally authorized sentence the court imposes which is within the terms and limits of this plea agreement.

15. **Parole after prison:** I understand if I am sentenced to state prison, upon my release I will be on parole for a period of time ranging from 3 years to life. I further understand I could be sent back to state prison for a period of up to one year for each violation of any term or condition of my parole.

16. ✗ **Mandatory state prison:** I understand I am not eligible for probation, and I will be sentenced to state prison in this case.

17. **Proposed disposition:** I understand the court will: (Circle and initial all that apply)

✗ (a) Sentence me to state prison for a period of _____ years and _____ months, credit for time served of _____ days actual custody and _____ days of good time/work time for a total credit of _____ days. I waive and give up my right to make application for probation and request immediate sentence.

✗ (b) Consider my application for probation before pronouncing sentence. I understand the court may deny my application for probation and sentence me to state prison for a maximum period of _____ years and _____ months.

(c) Grant me probation under the terms and conditions set forth on the attached page 5 that I have initialed and signed. I understand I have the right to reject probation and have the court impose a final sentence. However, I agree to accept probation on the terms and conditions set forth on the attached page 5. I further understand that if I am found in violation of any of the terms or conditions of probation, the court may sentence me to state prison on this case for a maximum period of __3__ years and __0__ months.

✗ (d) Order me to pay restitution on counts _____, even if any of these counts have been dismissed as part of the plea agreement, in the amount of _____, or in an amount to be determined by the Probation Department. If I disagree with the amount of restitution determined by the Probation Department, I may request a court hearing to determine the amount of restitution.

(e) Order me to pay the mandatory state restitution fine between $200 and $10,000 [P.C. 1202.4]. A second restitution fine in the same amount will also be ordered if I receive a sentence that includes probation, a conditional sentence, or parole. This second fine will be suspended and I will only have to pay it if the court later finds that I have violated the terms of my probation, conditional sentence, or parole [P.C. 1202.44 & 1202.45]. A twenty dollar court security fee must also be paid [P.C. 1465.8] as well as a thirty dollar court facility fee [G.C. 70373] on each count convicted.

(f) Order me to provide samples of my saliva, blood, and prints pursuant to P.C. 296 and P.C. 296.1.

(g) Order me to provide a DNA buccal sample, fingerprints and photograph to OCDA for analysis and retention in any law enforcement DNA database for law enforcement purposes.

White--Court File; Yellow--District Attorney; Pink--Defendant

Ex. 7
40

Case No. _08 CF 1764_      People v. _Thakur_

✗ (h)  Order me to register pursuant to the following: (Circle and initial all that apply)

    (1)_____  H&S 11590 – (narcotics offense)

    (2)_____  P.C.186.30 – (gang-related offense)

    .(3)_____  P.C. 457.1 – (arson-related offense) I understand I will have to register for the rest of my life.

    (4)_____  P.C. 290 – (sex offense) I understand I will have to register for the rest of my life if I work,

                     attend school, or reside in California.

✗ (i)  Order that my driver's license or driving privilege be suspended or revoked for a period of _____

(j)  The court will order that all monies paid will first be applied to restitution; and that the following terms are also part of this plea:

    NONE

18. _____ I acknowledge all other cases pending against me in Orange County and the proposed disposition:

    NONE

19. _____ I understand a plea of guilty in this case may constitute and admission I violated a previous grant of probation or parole in other cases and may result in additional penalties being imposed in those cases.

20. _____ I offer my plea of guilty freely and voluntarily, and with full understanding of all matters set forth in the accusatory pleading and this advisement and waiver of rights form. No one has made any threats or used any force against me, my family, or anyone else I know, in order to convince me to plead guilty in this case. Further, all promises that have been made to me to convince me to plead guilty are on this advisement and waiver of rights form.

21. _____ I offer the following facts as the basis for my guilty plea:

In Orange County, California, on + between October 15, 1990 + March 25, 2008, I unlawfully took, kept + withheld Soumitra K., a child, maliciously + unlawfully depriving Avinash Kulkarni, a lawful custodian, of his right to custody.

Ex. 7
41

Case No. _08CF1764_____   People v. _Thakur_____

22. ☒ I understand each and every one of the rights set forth above in this advisement and waiver of rights form. I waive and give up each of those rights in order to enter my guilty plea. I am entering a guilty plea because I am in fact guilty and for no other reason. I declare under penalty of perjury I have read, understood, and personally initialed each numbered item above, and I have discussed them with my attorney. I declare under penalty of perjury everything on this form is true and correct. I understand the signing and filing of this form is conclusive evidence I have pled guilty to the charges listed on this advisement and waiver of rights form.

Executed in Orange County, California.

Dated: _24 July 2008_   Signed: _Nkuilcem_____
                                                   Defendant

23.   **DEFENSE ATTORNEY'S STATEMENT:** I am the attorney of record for defendant. I have explained to defendant each of the rights set forth on this form. I have discussed the charges and the facts with defendant. I have studied the possible defenses to the charges and discussed those possible defenses with defendant. I have discussed the possible sentence ranges and immigration consequences with defendant. I also have discussed the contents of this form with defendant. I concur with defendant's decision to waive the rights set forth on this form and to plead guilty. No promises of a particular sentence or sentence recommendation have been made to defendant by me, or to my knowledge by the prosecuting attorney or the court, which have not been fully disclosed on this form. I agree that this form may be received by the court as evidence of defendant's advisement and voluntary, intelligent, knowing, and express waiver of the rights set forth on this form.

Dated: _7/24/09_   Signed: _____
                                              Attorney

24.   **INTERPRETER'S STATEMENT:**

I, _____, having been duly sworn as a court certified interpreter, state that I am fluent in the _____ language. I translated the contents of this form to defendant in that language. The defendant told me he/she understood the contents of this form and initialed and signed it in my presence.

Dated: _____   Signed: _____
                                                   Interpreter

25.   **FOR THE PEOPLE:**

Dated: _____   Signed: _____
                                              Deputy District Attorney

Plea to the Court ✓        (appearing: James F. Bacin)

Ex. 7
42

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
**TERMS AND CONDITIONS OF FELONY PROBATION**

Case No. 08CF1764     People v. _Neelam Ramakant Thakur_

1.  X   Sentenced to State Prison for _____ years and _____ months. Execution of sentence suspended. Placed on probation for _____ years.
2.  NU   Imposition of sentence suspended. Placed on probation for _2_ years.
3.  X   ~~Supervised Probation OR~~ | _____ Probation Department relieved of supervision. (Initial one) = 15
4.  NU   Serve _180 days_ in County Jail. Credit for _11_ days actual time served and _4_ days good time/work time. Stay granted until _____
5.  X   Pay fine of _____ plus penalty assessment.
6.  NU   Pay mandatory fee of $50.00 for each count convicted. [Court Safety- $20.00- P.C. 1465.8 and Facilities-$30.00-G.C. 70373].
7.  X   Pay mandatory laboratory analysis fee of $50 for each specified drug offense plus penalty assessment [H&S 11372.5 & P.C. 1464].
8.  X   Pay mandatory state restitution fine of _$1,000_ Min: $200; Max: $10,000 P.C. 1202.4]. If your sentence includes probation, a conditional sentence, or parole, the court will order you to pay a second restitution fine in the same amount, but it will be suspended and you will only have to pay the second fine if you are later found in violation of your probation, conditional sentence, or parole [P.C. 1202.44 & 45]. All monies paid by defendant for any purpose will first be applied to restitution until it is paid in full.[Cal.Const.]
9.  NU   Pay restitution on counts _____, even if any of these counts have been dismissed as part of a plea agreement, ~~in the amount of _____ or in an amount to be determined by the Court and as directed by the Probation Department.~~ You are also ordered to make all financial disclosures required by law in order to fulfill your responsibility to pay full restitution [P.C. 1202.4].
10. X   Register pursuant to: (Initial all those that apply)
    (a) _____ H&S 11590 [narcotics offense]              (c) _____ P.C. 290 [sexual offense-lifetime registration]
    (b) _____ P.C. 186.22 [gang related offense]         (d) _____ P.C. 457.1 [arson offense-lifetime registration]
11. NU   Provide samples of your saliva, blood, and prints pursuant to P.C. 296 and P.C. 296.1.
12. NU   Provide a DNA buccal sample, fingerprints & photograph to OCDA immediately or within 72 hours of your release if in custody.
13. X   Do not be in the presence of children under the age of 18, unless accompanied by a responsible adult 21 years of age or older and approved in advance by your probation officer.
14. NU   ~~Use no unauthorized drugs, narcotics, or controlled substances, and submit to drug or narcotic testing as directed by your probation officer or any peace officer.~~ stricken by court
15. NU   Submit your person and property, including any residence, premises, container or vehicle under your control, to search and seizure at any time of the day or night by any law enforcement officer or probation officer, with or without a warrant, probable cause, or reasonable suspicion. stricken by court.
16. NU   ~~Cooperate with your probation officer in any plan for psychological, psychiatric, alcohol, and/or drug treatment. Seek training, schooling, or employment, and maintain residence as approved by your probation officer.~~ Do not associate with persons known to you to be parolees, convicted felons, users or sellers of illegal drugs, or otherwise disapproved of by probation.
17. X   Do not possess any blank checks, write any portion of any checks, have any checking account, nor use or possess any credit cards or open credit accounts, unless approved in advance by your probation officer. Use only your true name. Do not possess any other persons' personal identifying information or personal financial information unless approved in advance by your probation officer.
18. NU   Do not own, use, or possess any type of dangerous or deadly weapon, including any firearm or ammunition.
19. NU   Obey all orders, rules, regulations, and directives of the Court, ~~Probation Department,~~ and jail.
20. NU   Violate no law.
21. X   Driver's license or driving privilege is suspended or revoked for a period of _____
22. X   All of the below apply unless lined out:
    a.  Do not drive a motor vehicle with a measurable amount of alcohol in your blood.
    b.  Submit to a chemical test of your blood on demand of any peace officer or probation officer.
    c.  Do not be present in any establishment where the primary items for sale are alcoholic beverages.
    d.  Do not consume any alcoholic beverages.
    e.  Do not drive a motor vehicle without a valid California Driver's License on your person.
23. X   Do not, in any manner, directly or indirectly, initiate contact with, nor have any communication with:
24. X   CVC 23593 Advisement: You are hereby advised that being under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, you can be charged with murder.
25. NU   Disclose your probation status and terms upon the request of any peace officer.
26. NU   Other conditions: * 90 days (of 180) may be served on electronic home confinement, before jail.
27. NU   ~~Pay cost of probation, according to ability to pay, as directed by your probation officer.~~ stricken by court.
28. NU   I understand that the Court ultimately determines the conditions of probation, and I have the right to request the Court to modify or eliminate any condition imposed by the Probation Department that I believe is unreasonable.
I have read and agree to all the terms and conditions of probation I have initialed above.

Dated: _7/24/09_          Defendant's Signature: _Thakur_
                                                          Defendant

F026-412.6 (R2/09) Page 5 of 5 DW          White--Court File; Yellow--District Attorney; Pink—Defendant

Ex. 7
43

# EXHIBIT 8

Ex. 8
4-4

Fred Thiagarajah
Principal
(949) 475-6800
Fax (866) 817-7238
E-mail: fred@fredthia.com

Law Offices of

# FRED THIAGARAJAH

5000 Birch Street • West Tower, Suite 3000
Newport Beach, CA 92660
www.fredthia.com

Kiran Nair
Associate
(949) 475-6802
Fax (866) 817-7238
E-mail: kiran@fredthia.com

January 20, 2010

Attn: Mr. Rodney L. Donohoo, Esq.
Law Offices of Rodney L. Donohoo
3110 Camino Del Rio South, Suite 314
San Diego, CA 92108

Re: *Avinash Kulkarn, Case No.: 30-2009-00322804*
Neelam Kulkarni's - Deposed Dec 29, 2009 – Transcript

Dear Mr. Donohoo:

　　　　With respect to the above matter, please see enclosed original transcript of Neelam Kulkarni's deposition conducted on Dec 29, 2009.

　　　　The front page documents states to return after review and signing within 5 days of date of the memo. However, it was received at my office on Jan 18, 2010 but our office is closed on national holidays. The earliest I could visit Ms. Kulkarni in custody was the following day, Jan 19, 2010. Therefore, it was mailed overnight on Jan 20, 2010. Thank you.

Yours truly,

Kiran Nair, Esq.

Cc:　　　Client

*Ex . 8*
*45*

1

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF ORANGE

AVINASH KULKARNI, an individual,

        Plaintiff,

    vs.

DOES 1 through 20, inclusive,

        Defendants.

CASE NO.
30-2009-00322804

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

NEELAM AVINASH KULKARNI

VOLUME I

December 29, 2009

10:20 a.m.

550 North Flower Street

Santa Ana, California

Traci K. Turner, CSR No. 7123



ESQUIRE
an Alexander Gallo Company

Ex. 8
46

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

Neelam Avinash Kulkarni                                    June 29, 2009

2

APPEARANCES OF COUNSEL

1

2  For Plaintiff:

3      LAW OFFICES OF RODNEY L. DONOHOO
       RODNEY L. DONOHOO, ESQ.
4      3110 Camino Del Rio South, Suite 314
       San Diego, California 92108
5      619.295.3200

6

7  For Witness Neelam Avinash Kulkarni:

8      LAW OFFICES OF FRED THIAGARAJAH
       KIRAN NAIR, ESQ.
9      5000 Birch Street, West Tower, Suite 3000
       Newport Beach, California 92660
10     949.475.6802
       949.817.7238 Fax
11     kiran@fredthia.com

12 Also Present:

13     Avinash Kulkarni

14

15

16

17

18

19

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Ex.8
47

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

53

1      A     Yes.

2      Q     You recall that your attorney was present,

3   Mr. Kulkarni was present?

4      A     Uh-huh.

5      Q     "Yes"?

6      A     Yes, uh-huh.

7      Q     And I asked you a series of questions about

8   debt.

9            Do you recall that?

10     A     Yes.

11     Q     Okay.  We're not going to go into your personal

12  assets.

13           I also asked you whether anyone assisted you in

14  helping bring Soumitra out of the country.

15           Do you recall that?

16     A     Yes.

17     Q     Your testimony was you refused to tell me.

18           Do you recall that?

19     A     Yes.

20     Q     Okay.

21           I'm asking you now who those people are.

22     A     No, I don't -- I don't think -- Only my parents

23  helped.  Other than that, I really don't recall anybody

24  helping me.

25     Q     All right.



ESQUIRE
an Alexander Gallo Company

Ex. 8
48

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

54

1          My question to you, ma'am -- and this is a

2   question of credibility.  It'll have to go back before

3   the judge.

4          When I asked you the question, you said, "I

5   won't tell you."  You were polite, but that was -- that

6   was the gist of it.

7          Do you agree with me?

8      A   Yeah, first I said that, yes --

9      Q   Okay.

10     A   -- uh-huh.

11     Q   If you didn't know the names, why would you

12   have told me that?

13     A   I didn't want to discuss that part.

14     Q   Oh.

15     A   I really don't want to discuss this part,

16   whatever happened 20 years back.

17     Q   I understand that you don't want to, but you

18   understand I'm here to take your deposition?

19     A   Yes.  So now I'm answering you.

20          And to tell you the truth, it has been

21   20 years, and I don't really remember many things.

22     Q   So now you're telling me -- When you told me at

23   the debtor's examination, you said that you refused to

24   give their identity.  Now you're telling me you don't

25   know their identity; is that right?



ESQUIRE
an Alexander Gallo Company

Ex. 8
49

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

55

1    A    I don't remember.  I really don't remember.

2    Q    Okay.

3         Is there any reason why you want to protect

4    these people?

5    A    No.  I'm not protecting anybody.  I just don't

6    remember.

7         I was under a lot of stress when it happened;

8    and right now, I'm also going through a lot of stress.

9    Q    Okay.

10         Are you aware that your attorney advised me

11   that you didn't want to discuss that because they've --

12   you feared that they would be criminally prosecuted?

13   Are you aware of that?

14         MS. NAIR:  That's off the record, Counsel;

15   that's improper.

16   BY MR. DONOHOO:

17    Q    Are you aware of that?

18    A    No, I'm not aware of that, no.

19         MR. DONOHOO:  Kiran, I'm glad you admit that

20   you said that to me, whether it was on the record or off

21   the record.  My concern is that we're harboring people

22   who assisted you.

23         So now we're going --

24         MS. NAIR:  It's irrelevant to the scope of your

25   examination for a debtor's examination.



ESQUIRE
an Alexander Gallo Company

Ex. 8
50

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

103

1    A    I don't really remember.

2    Q    Okay.

         Do you know where the tickets were sent?

4    A    I don't remember.

5    Q    Do you know how you picked up the tickets?

6    A    No, I don't remember.

7    Q    Do you know how many tickets were there?

8    A    Only two -- There must be only two tickets.

9    Q    That's makes sense.

10        One for you and one for Soumitra; correct?

11   A    Yes.

12   Q    When you sought to obtain the passport for

13   Soumitra, when you did that, had you intended on leaving

14   at that time?

15   A    When I obtained the passport?

16   Q    Yes, ma'am.

17   A    Yes, uh-huh.

18   Q    Okay.

19        Did you rush the passport?  I know there's a

20   procedure where you pay more money and you rush it.

21   A    No, I don't remember that.  I don't -- I

22   actually don't remember the whole procedure now.

23   Q    So you don't remember whether you rushed it?

24   A    I don't remember.

25   Q    You don't remember whether you requested an



ESQUIRE
an Alexander Gallo Company

Ex. 8
51

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

104

1     accelerated or rushed passport?

2          A     No, I really don't remember.

3          Q     Okay.

4                Do you remember where you applied?

5          A     No.

6          Q     You don't?

7          A     I don't.

8          Q     Do you remember whether you went down there in

9     person or did it by mail?

10         A     No, I don't remember.

11         Q     Do you know whether anybody went with you to

12    obtain the passport?

13         A     No, I don't remember.

14         Q     Could you drive?

15         A     No.

16         Q     So it's possible that you went down there; is

17    that right?

18         A     I don't remember --

19         Q     Okay.

20         A     -- but I don't recall going anywhere.

21               I -- I just -- Whenever I went out of the

22    house, it was always with my ex-husband.

23         Q     You didn't want -- It's fair to say that you

24    did not want your husband to know you were obtaining a

25    passport; right?



ESQUIRE
an Alexander Gallo Company

Ex. 8
52

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

105

1        A    Yes --

2        Q    Okay.

3        A    -- uh-huh.

4        Q    So it's also fair to say that you can't go get

5    a passport usually -- I mean, that I know of -- on site.

6    Usually you've got to fill out some paperwork, get a

7    photo; right?

8        A    Uh-huh, yes.

9        Q    And submit that to the United States --

10       A    Uh-huh.

11       Q    This was a U.S. passport?

12       A    Right.

13       Q    And they send you back a passport; right?

14       A    Yes.

15       Q    Okay.

16            Usually you can't do that in person; usually

17    not -- I'm not a passport expert.  In fact, your lawyer

18    probably knows much more about this than I do.

19            Do you recall whether or not that passport --

20    My assumption is you would not have had that passport

21    mailed to your house because you wouldn't want your

22    husband to know; right?

23       A    I don't remember.  I don't remember.

24       Q    Do you think that's possible that you would

25    have had it mailed to your house?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

106

1      A    I don't remember what I thought at that point
2   of time.
3      Q    So is it possible?  Yes or no.  I'm looking for
4   a yes or no.
5      A    What's the question again?
6      Q    That you had the passport mailed to your house.
7      A    Yeah, it is possible.  I don't remember.
8      Q    Thank you.
9      A    The answer is I don't remember, because I --
10      Q    New question:  Wouldn't that have been very
11   risky?  He comes home, opens the mail and sees a
12   passport and says what the heck's going on?
13      A    Uh-huh, yes.
14      Q    That would be risky; right?
15      A    Yes.
16      Q    Does that refresh your recollection as to
17   whether or not you had the passport mailed to a friend's
18   location?
19      A    No, I don't remember that.
20      Q    Okay.
21           Does this deposition that we've taken refresh
22   your recollection that, in fact, you did not take a taxi
23   to the airport or is that still your best recollection,
24   it was a taxi?
25      A    Yes, I took a cab to airport.



ESQUIRE
an Alexander Gallo Company

Ex. 8
54

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

142

DECLARATION UNDER PENALTY OF PERJURY

1

2

3       I, Neelam Avinash Kulkarni, do hereby certify under

4   penalty of perjury that I have read the foregoing

5   transcript of my deposition taken December 29, 2009;

6   that I have made such corrections as appear noted

7   herein, in ink, initialed by me; that my testimony as

8   contained herein, as corrected, is true and correct.

9

10      Dated this 19 day of January , 2010

11   at Santa Ana , California.

12

13

14

15

16

17                        Neelam Avinash Kulkarni

18

19

20

21

22

23

24

25

ESQUIRE
an Alexander Gallo Company

Ex. 8
55

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

143

REPORTER'S CERTIFICATION

I, Traci K. Turner, a Certified Shorthand Reporter,

in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn;

that the deposition was then taken before me at the time

and place herein set forth; that the testimony and

proceedings were reported stenographically by me and

later transcribed into typewriting under my direction;

that the foregoing is a true record of the testimony and

proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this

13th day of January, 2010.

/s/ _Traci K. Turner_

Traci K. Turner, CSR No. 7123



ESQUIRE
an Alexander Gallo Company

Ex. 8
56

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

144

DEPOSITION ERRATA SHEET

RE:                    Esquire Deposition Solutions

File No.  41620

Case Caption: AVINASH KULKARNI

vs. DOES 1 through 20, inclusive

Deponent: NEELAM AVINASH KULKARNI

Deposition Date: December 29, 2009

To the Reporter:

I have read the entire transcript of my Deposition taken

in the captioned matter or the same has been read to me.

I request that the following changes be entered upon the

record for the reasons indicated.  I have signed my name to

the Errata Sheet and the appropriate Certificate and

authorize you to attach both to the original transcript.


Page No._51_ Line No. _8_ Change to: _Meera_

_Correct spelling name is Meera_

Reason for change:_____

Page No._54_ Line No._4-8_ Change to: _I meant to say_

_"I don't need to tell you." b/c it's not relevant."_

Reason for change:_____

Page No._81_ Line No. _3_ Change to: _with help of both_

_my parents._

Reason for change:_____




# ESQUIRE
an Alexander Gallo Company

Ex. 8
57

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

145

1   Deposition of NEELAM AVINASH KULKARNI

2

3   Page No. 82 Line No. 13 Change to: Counsel Nair stated

4   No. 13

5   Reason for change: _____

6   Page No. 122 Line No. 4 Change to: did not sign this

7   petition, 72 pages long & filed in 1992, don't recall its contents.

8   Reason for change: _____

9   Page No._____ Line No._____ Change to: _____

10   _____

11   Reason for change: _____

12   Page No._____ Line No._____ Change to: _____

13   _____

14   Reason for change: _____

15   Page No._____ Line No._____ Change to: _____

16   _____

17   Reason for change: _____

18   Page No._____ Line No._____ Change to: _____

19   _____

20   Reason for change: _____

21

22

23

24   SIGNATURE: _N. Akulkarni_____  DATE: 01/19/2010

25        NEELAM AVINASH KULKARNI



# ESQUIRE
an Alexander Gallo Company

Ex. 8
58

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

# EXHIBIT 9

Ex. 9
59

# Affidavit of Rajesh Nerurkar

I, Rajesh Nerurkar, declare as follows:

1. I am over the age of 18, am competent to testify and if called to testify, would testify the statements contained. I agree to make myself available and to testify at deposition and trial concerning the topics contained herein.

2. I met Ms. Madhavi Thakur in September 1996 in Mumbai, India. We were soon engaged to be married. While Madhavi and I were dating in India, I came to know her family – her parents Mrs. Urmila and Mr. Ramakant Thakur as well as her sister, Ms. Neelam Thakur a.k.a. Ms. Neelam Kulkarni. I met the Thakurs on multiple occasions. I also came to know Neelam's son, Soumitra. Soumitra lived with Neelam and the Thakur family. Madhavi lived with them as well. I came to know that Neelam used to live in Orange County, California when she was married to Mr. Avinash Kulkarni and that Soumitra was born in Orange County in 1990. During this time, I came to know that Neelam was divorced from Avinash Kulkarni.

3. I specifically recall a meeting with Madhavi and Neelam in a restaurant in Mumbai in or about October 1996. At that time, in the presence of Madhavi, I asked Neelam about her divorce. She told me, with Madhavi present, that she left her marital home in Orange County for India in October 1990 without her husband's knowledge and that she brought with her their six-month old son, Soumitra. Neelam told me that she got help from her friends in Orange County during her return to India. Neelam identified Mrs. Meera Upasani and Mrs. Sunila Kulkarni of Orange County as very good friends. She identified those two women as friends who aided her during her return to India from Orange County with Soumitra. During this meeting in the restaurant, Neelam also told me that Mrs. Meera Upasani helped her in acquiring a passport for the infant son. Neelam told me that Mrs. Meera Upasani provided transportation to her while applying for Soumitra's passport. As per Neelam's account, Mrs. Meera Upasani provided her own address for the passport to be delivered and then handed it to Neelam after receiving it in mail. Neelam also told me that her parents and Mrs. Meera Upasani arranged for one-way airline tickets to India for Neelam and the infant son, Soumitra. Neelam also told me that, on October 15, 1990, Mrs. Sunila Kulkarni picked up Neelam and the infant son from their residence after Avinash had left for work. Neelam

informed me that Mrs. Sunila Kulkarni drove her to the Los Angeles International Airport for her flight to India.  Neelam also stated that Mrs. Meera Upasani and Mrs. Sunila Kulkarni were knowledgeable of her return described above.  Neelam told me that the two women were aware that Neelam was leaving without her husband's knowledge or consent.  Neelam told me that her parents, Mrs. Meera Upasani and Mrs. Sunila Kulkarni had planned not to let Avinash know about Neelam's whereabouts until she was half way through her journey to India.

4.  Madhavi was present during the entire October 1996 conversation with Neelam and was in a position to hear all of Neelam's statements.

5.  Madhavi and I were married in December 1996 and lived in Mumbai, India for a month.  My employment brought me to Orange County, California in January 1997.  Madhavi followed me to Orange County in April 1997.  Before we came to the U.S., Neelam gave us contact information for Mrs. Meera Upasani and Mrs. Sunila Kulkarni.  She asked us to get in touch with the two women for social purposes as they were her friends.

6.  Soon after I arrived in Orange County, I contacted Mrs. Meera Upasani and Mrs. Sunila Kulkarni over the phone.  I introduced myself as Neelam's brother-in-law.  I met the Upasani and the Kulkarni families in person.  After Madhavi arrived in the U.S. in April 1997, we started interacting with those two families socially.  We met them separately on several occasions.

7.  In one of our meeting at the Upasani's home, Mrs. Meera Upasani confirmed that Neelam was a very good friend of hers.  Mrs. Upasani told me that, when Neelam lived in Orange County in 1989-1990, the Upasanis and Neelam and her husband interacted and met regularly. According to Mrs. Upasani, all of them were part of a social group that got together on social events.

8.  In one of our get-togethers in 1997, Mrs. Meera Upasani confirmed Neelam's entire account of how Neelam returned to India in 1990.  Mrs. Upasani confirmed her role as well as Mrs. Sunila Kulkarni's role in helping Neelam and Soumitra to leave the United States for India without Avinash finding out.  She specifically discussed her role in acquiring a U.S. passport for the infant son, in helping to get one-way airline tickets for Neelam and the infant son, and Sunila Kulkarni's role in arranging transportation to drive Neelam to the LAX airport on the day of Neelam's departure.  Mrs. Upasani also told me that she helped Neelam obtain

Soumitra's passport and had the passport sent to her own home. Mrs. Upasani also told me that she later delivered the passport to Neelam without Avinash's knowledge as the plan was not to inform Avinash about Neelam's intention to return to India with Soumitra. Madhavi as well as Mr. Mohan Upasani were present at this 1997 get-together.

9. Neelam and Soumitra visited us in Orange County for about two months in 1998. Madhavi and I were living in Mission Viejo at the time.

10. Soon after she left for India in 1998, Neelam asked Madhavi and me to assist her in executing the divorce decree she got from an Indian court in a U.S. court. Avinash was paying her child support at the time, but Neelam wanted to collect alimony retroactively and permanently as well. I wanted to help Madhavi's family and agreed to be Neelam's attorney-in-fact. I arranged for an attorney (Ms. Bette Adelman) to represent Neelam in the Superior Court of Arizona. Avinash was a resident of Phoenix, Arizona at the time. Neelam executed a power of attorney in September 1999 and we filed the lawsuit in Arizona in February 2000. That lawsuit lasted about one year.

11. During the time lawsuit in Arizona was pending, I contacted Mrs. Meera Upasani, to assist in the lawsuit as she had supposedly witnessed Neelam's alleged mistreatment by Avinash. I expected her to help Neelam. But Mrs. Meera Upasani stayed away from this case.

12. Madhavi was aware of the Arizona lawsuit. She discussed its details regularly with Neelam as well as with me. She reviewed various documents filed on behalf of Neelam as well as documents filed by Avinash. Madhavi was in possession of some documents related to the lawsuit until 2007. I am not sure if she currently has those documents. The Superior Court of Arizona dismissed Neelam's petition with prejudice.

13. I learned that Mrs. Sunila Kulkarni visited Neelam in India between 1997 and 1998 and stayed with her.

14. I separated from Madhavi in 2007 and we were divorced in 2008.

15. On various occasions between 1998 and 2001, I have seen how Soumitra was kept away from his father. Neelam claimed that she did so because Avinash did not pay alimony and child support retroactively. Neelam and her parents have accused Avinash of abusing Neelam while she was living in the U.S with him in 1990. They have repeatedly told Soumitra that his father had mistreated Neelam. Soumitra has always called his grandparents "Jai" (Mom) and "Baba" (Dad).

I declare under the penalty of perjury under the laws of the states of California and North Carolina, and under the laws of the United States that the foregoing is true and correct.

*Rajesh*   03/25/2011

Rajesh Nerurkar

# EXHIBIT 10

# International Parental Child Abduction India

**GENERAL INFORMATION:** India is not a signatory of the Hague Convention on the Civil Aspects of International Parental Abduction; therefore, left-behind parents must rely on other avenues to recover their children from India. Once a child has been abducted to India, remedies are very few. India does not consider international parental child abduction a crime, and the Indian courts rarely recognize U.S. custody orders, preferring to exert their own jurisdiction in rulings that tend to favor the parent who wants to keep the child in India. For these reasons, it is often very difficult for left-behind parents in the United States to obtain any access to a child who has been abducted to India. In the rare scenario that a case is resolved, it is usually due to an agreement between the parents, rather than the result of court orders or arrest warrants. The State Department can help by attempting welfare and whereabouts visits; however, these visits may only be conducted with the consent of the child's physical guardian.

Cultural factors often impact child custody decisions in India. For example, Indian courts rarely grant custody to a parent residing outside of India, even if both the child and the taking parent are American citizens. Additionally, many fathers complain that the courts tend to favor mothers when determining custody.

India does require the signature of both parents for an Indian passport to be issued to children younger than 18 years. India also requires exit permits for children.

For information concerning travel to India, including information about the location of the U.S. Embassy and Consulates, health conditions, currency and entry regulations, and crime and security, please see the Department of State's Country Specific Information.

**LEGAL SYSTEM:** India uses a Common Law legal system. In this type of system, a court's decision on a legal principle becomes the controlling authority for future, similar cases heard by the same court and courts of equal or lower rank.

Searches for missing children in India generally begin with the local senior police officers. The Ministry of Home Affairs (MHA) Foreigners Division takes an interest in cases involving non-Indian citizen children or parents.

Absent a court order, married parents have equal rights of custody to their minor children. Absent a court order, the rights of either parent to custody of children born out-of-wedlock is based on the courts' determination of the welfare of the child, though mothers are generally given custody of children under the age of five.

Bangalore and Mumbai have designated family courts that handle divorce and custody. In other areas, the regular sessions or lower courts handle divorce and custody. India uses the term "custody order," but the term "sole custody" is not used or accepted.

**RETAINING AN ATTORNEY:** A list of attorneys in India is available from the U.S. Embassy or a

Ex. 10    65

U.S. Consulate in India.  The attorneys list will include those who specialize in family law.

India offers free or reduced fee legal aid services  to those who qualify. The Legal Aid Cells throughout the country determine whether a person qualifies for assistance. Lawyers for those who qualify are selected from a group of attorneys who volunteer to provide their services pro bono. Read more information about Legal Aid services in India.

**CITIZENSHIP & PASSPORT MATTERS:**  According to a provision of the Citizen Act of 1955, Indian citizenship can be acquired by birth, naturalization or descent. Normally, children automatically acquire Indian citizenship at birth, regardless of where they are born, if one parent is a citizen of India, though India does not recognize dual citizenship. A child born in a country where citizenship is automatically conferred at birth, such as the United States, could not claim Indian citizenship. The gender of the Indian parent does not make a difference.

Because India does not recognize dual nationality, as soon as a child is documented as a U.S. citizen, that child has no claim to Indian citizenship unless he or she renounces the U.S. citizenship upon reaching the age of eighteen.

A parent can prevent issuance of an Indian passport to their child by lodging a complaint with the passport office. However, the ultimate decision lies with the passport officer who will substantiate the grounds for the complaint. India does not allow a child to be entered on a parent's passport. Also, a child cannot travel through the region on a national ID card without processing through customs (i.e. travel through the EU).

**Exit Permits:**  An Indian visa covers both entry and exit.  The stamp placed in the passport by immigration authorities upon arrival indicates the amount of time that can be spent in India for a particular visit.  If the time limit is exceeded, the visitor must appear at the Ministry of Home Affairs and the Foreigners' Regional Registration Office (FRRO) to resolve payment of a fine and to request an extension that will permit exit from the country.

The consent of a non-traveling parent is not required for the child to depart India. Likewise, the father does not have to approve the children's departure from India.

**MEDIATION:**  Mediation is not a term or process used in custody disputes, though occasionally the court will appoint a non-governmental organization or a social agency to work with the families.

**HAGUE ABDUCTION CONVENTION:** India is not a party to the Hague Abduction Convention.

**CIVIL REMEDIES:** There is no formal process for registering a foreign custody order with the courts, and U.S. custody orders are not automatically enforced in India.  If one is presented, the Indian court is likely to take it into consideration; however, in practice, U.S. court decisions are almost never upheld in Indian courts.

With respect to conditions of custody, custody decisions are made "in the best interests of the child," using as the primary consideration the welfare of the child: the ability to support the child

*Ex. 10*  66

financially, any history of abuse, etc.  If a citizen of India marries an American citizen in a civil ceremony outside of India, a religious court does not have jurisdiction over custody matters. Hindus have no religious courts.

India has laws authorizing courts to award custody in the case of divorce, but the laws do not contain substantive guidance for custody determinations – case law does (see Sharma v. Sharma, Supreme Court of India – February 16, 2000).  For the laws related to custody, please see the India Code Legislation Web site  and search for "The Guardians and Wards Act" and "Hindu Minority and Guardianship Act" under "short title."

**CRIMINAL REMEDIES:**   Parental child abduction is not a criminal offense in India.  Although India will extradite its own citizens subject to an Interpol arrest notice if the crime is covered by the U.S. Extradition Treaty with India, which was signed in 1997 and went into effect in 1999, this is not an available remedy in parental child abduction cases because India does not recognize it as a crime. Interpol India indicates that it will search for a missing child based on a yellow notice.

**VISITATION RIGHTS:**  Family courts in Mumbai and Bangalore and sessions (or lower) courts in the other parts of India determine visitation/access rights. The safety and security of the child are taken into consideration in determining visitation/access rights.  If a parent is denied visitation rights which have been authorized, he/she can approach the court and will be supported.

**EMBASSY CONTACT INFORMATION:**

U.S. Embassy in New Delhi : http://newdelhi.usembassy.gov/

U.S. Consulate in Chennai: http://chennai.usconsulate.gov/

U.S. Consulate in Kolkata: http://kolkata.usconsulate.gov/

U.S. Consulate in Mumbai: http://mumbai.usconsulate.gov/

Embassy of India in Washington, DC: http://www.indianembassy.org

Ex. 10
67