1  AVINASH B. KULKARNI
2  E-mail: avik_101@yahoo.com
3  826 Applewilde Drive
   San Marcos, California 92078
4  Phone: 858.344.0237
   PLAINTIFF PRO SE
5
6
7
8



9            **UNITED STATES DISTRICT COURT**

10          **SOUTHERN DISTRICT OF CALIFORNIA**

11  AVINASH B. KULKARNI,          ) CASE NO.: **13-CV-2857-JLS-KSC**
          Plaintiff Pro Se        )
12                                )
                                  ) **FIRST AMENDED COMPLAINT (FAC)**
13  V.                            ) FOR:
                                  ) CONSPIRACY TO DEPRIVE PLAINTIFF'S
14  MEERA UPASANI,                ) CONSTITUTIONALLY GUARANTEED
15  MOHAN UPASANI,                ) PARENTAL AND DUE PROCESS RIGHTS,
    SUNILA KULKARNI,              ) AND EQUAL PROTECTION AND
16  MADHAVI NERURKAR,             ) PRIVILEGES UNDER THE LAWS;
    CRAIG MCKENZIE                )
17     NICHOLAS,                  )
18  TRACY JUNE JONES,             ) FRAUD AND CONSPIRACY TO COMMIT
                                  ) FRAUD ON THE COURT AND ON
19  NICHOLAS & BUTLER, LLP,       ) PLAINTIFF, FRAUD OF FACTUAL
20  LISA NICHOLAS NEAL,           ) MISREPRESENTATION, CONCEALMENT,
    CHELSEA A. EPPS               ) NON-DISCLOSURE AND DECEIT;
21  RUTAN & TUCKER, LLP,          ) CONSPIRACY TO OBSTRUCT JUSTICE;
22  NIRANJAN FRED                 ) INTENTIONAL MISCONDUCT; RECKLESS
       THIAGARAJAH,               ) MISCONDUCT;
23  KIRAN NAIR,                   )
24  LAW OFFICES OF                ) DEFAMATION (LIBEL AND SLANDER)
25     FRED THIAGARAJAH,          )
    UNITED STATES                 ) IMPROPER CLOUDING AND SLANDER OF
26     DEPARTMENT OF STATE,       ) PLAINTIFF'S TITLE TO HIS RESIDENCE
27  ORANGE COUNTY SOCIAL          )
28     SERVICES AGENCY            ) CONSPIRACY TO ABDUCT AND
    U.S. BANK NATIONAL            ) ALIENATE PLAINTIFF'S CHILD;

1  ASSOCIATION,                  )  TORTIOUS INTERFERENCE WITH
2  WEST COAST CAPITAL            )  PARENTAL RIGHTS;
      GROUP, INC.                )
3  UNITED STATES                 )  NEGLIGENCE PER SE FOR VIOLATION OF
4     INTERNAL REVENUE           )  LAW; INTENTIONAL INFLICTION OF
      SERVICE                    )  EMOTIONAL DISTRESS; NEGLIGENT
5  DOES 1 - 20, inclusive,       )  INFLICTION OF EMOTIONAL DISTRESS;
6     Defendants                 )  GENERAL, ACTUAL, EXEMPLARY,
                                 )  PUNITIVE AND SPECIAL DAMAGES
7                                )
8                                )  **<u>DEMAND FOR JURY TRIAL</u>**
9                                )
                                 )  **APPLICABLE AUTHORITY:**
10                               )  42 U.S.C. §§ 1983, 1985(2), (3), AND 1986;
11                               )
                                 )  THE FIRST, FIFTH, NINTH AND
12                               )  FOURTEENTH AMENDMENTS TO THE
13                               )  UNITED STATES CONSTITUTION;
14                               )
                                 )  THE COURT'S JURISDICTION IN EQUITY;
15                               )
16                               )  CAL. CIV. CODE §§ 49(a), 1708, 3281, 3294,
                                 )  3333, 45, 46
17                               )
18                               )  CAL. CODE OF CIV. PROC. § 760.020(a)
19  _____  )
20
21
22
23
24
25
26
27
28

## Table of Contents

I.    SYNOPSIS OF CLAIMS ................................................................1

II.   THE COURT'S JURISDICTION ...................................................5

III.  VENUE .....................................................................................9

IV.   NAMED DEFENDANTS .............................................................10

V.    LEAVE TO NAME FICTITIOUSLY NAMED DEFENDANTS, PRESENT
      ADDITIONAL CLAIMS AND DAMAGES ......................................12

VI.   STATEMENT OF FACTS AND GENERAL ALLEGATIONS COMMON TO
      ALL CAUSES OF ACTION ..........................................................12

VII.  CAUSES OF ACTION FOR FRAUD ON THE COURT IN THE STATE
      CIVIL ACTION .........................................................................97

      FIRST CAUSE OF ACTION ........................................................97

      SECOND CAUSE OF ACTION ....................................................102

      THIRD CAUSE OF ACTION .......................................................104

      FOURTH CAUSE OF ACTION ....................................................106

      FIFTH CAUSE OF ACTION ........................................................107

VIII.       CAUSES OF ACTION FOR EXTRINSIC FRAUD ON PLAINTIFF IN
      THE STATE CIVIL ACTION ......................................................108

      SIXTH CAUSE OF ACTION .......................................................108

      SEVENTH CAUSE OF ACTION ..................................................113

      EIGHTH CAUSE OF ACTION .....................................................114

      NINTH CAUSE OF ACTION .......................................................116

      TENTH CAUSE OF ACTION .......................................................117

IX.   CAUSES OF ACTION FOR DEFAMATION ...................................119

      ELEVENTH CAUSE OF ACTION ................................................119

      TWELFTH CAUSE OF ACTION ..................................................122

      THIRTEENTH CAUSE OF ACTION .............................................124

      FOURTEENTH CAUSE OF ACTION ............................................125

i

FIFTEENTH CAUSE OF ACTION ..........................................127

X.  CAUSES OF ACTION FOR IMPROPER CLOUDING AND SLANDER OF

TITLE ..........................................................................128

SIXTEENTH CAUSE OF ACTION..........................................128

SEVENTEETH CAUSE OF ACTION .......................................131

EIGHTEENTH CAUSE OF ACTION........................................132

NINETEENTH CAUSE OF ACTION ........................................134

TWENTIETH CAUSE OF ACTION..........................................135

XI. *BIVENS*-TYPE CAUSES OF ACTION FOR VIOLATION OF PLAINTIFF'S

CIVIL RIGHTS ................................................................136

TWENTY-FIRST CAUSE OF ACTION.....................................136

TWENTY-SECOND CAUSE OF ACTION..................................139

TWENTY-THIRD CAUSE OF ACTION ...................................140

TWENTY-FOURTH CAUSE OF ACTION..................................141

TWENTY-FIFTH CAUSE OF ACTION .....................................143

XII. 42 U.S.C. § 1983 CAUSES OF ACTION FOR DEPRIVATION OF

PLAINTIFF'S CIVIL RIGHTS ..............................................144

TWENTY-SIXTH CAUSE OF ACTION ....................................144

TWENTY-SEVENTH CAUSE OF ACTION ...............................147

TWENTY-EIGHTH CAUSE OF ACTION..................................147

TWENTY-NINTH CAUSE OF ACTION ....................................149

THIRTIETH CAUSE OF ACTION ..........................................150

XIII.      42 U.S.C. §§ 1985, 1986 CAUSES OF ACTION FOR DEPRIVATION

OF PLAINTIFF'S CIVIL RIGHTS ...........................................151

THIRTY-FIRST CAUSE OF ACTION ......................................151

THIRTY-SECOND CAUSE OF ACTION...................................154

THIRTY-THIRD CAUSE OF ACTION......................................155

THIRTY-FOURTH CAUSE OF ACTION...................................156

ii

THIRTY-FIFTH CAUSE OF ACTION .......................................................157

THIRTY-SIXTH CAUSE OF ACTION .....................................................158

XIV.      CONCLUSION ................................................................................160

**Exhibits**

1. The Abducting Parent's Guilty Plea in the Superior Court

2. Cal. Pen. Code §§ 277-280

3. The AP's check for acquiring the child's duplicate birth certificate

4. OCI's findings for child abduction to India

5. The AP's 1992 letter to the INS

6. Plaintiff's immigration attorney's 1992 note

7. Plaintiff's 1994 letter to the Indian Court

8. Plaintiff's e-mail communication with the AP

9. Plaintiff's communication with OCDA for counseling

10. Plaintiff's request to OCDA for his son's contact information

11. Fred Thiagarajah's e-mail to Plaintiff

12. Plaintiff's e-mail communication with his son Feb 2009

13. Plaintiff's communication with the probation officer

14. OCP's denial of Plaintiff's request for the pre-plea report

15. Excerpts of the AP's deposition taken on December 29, 2009

16. Rajesh Nerurkar Affidavit of March 25, 2011

17. USDOS e-mail to Plaintiff on November 14, 2011 RE: FOIA request

18. USDOS Denial of Plaintiff's FOIA request on December 19, 2011

19. Neal and Epps Motion Brief on June 17, 2011

20. Nicholas Motion Brief on June 17, 2011

21. Excerpts of State Reporter's Transcript (SRT) for June 20, 2011

22. Excerpts of SRT for Santosh Limaye testimony

23. Polygraph test of Avinash Kulkarni on January 5, 1999

24. Excerpts of SRT for Nikhil Limaye testimony

25. Affidavit of the Alternate Juror, Ms. Rebecca Murphy

26. Chelsea Epps 827 Petition on June 1, 2011

27. Excerpts of SRT for Rajesh Nerurkar testimony

28. Excerpts of SRT for June 30, 2011

29. Excerpts of SRT for July 1, 2011

30. Juvenile Court Order for 827 disclosure to Plaintiff on January 28, 2014

31. AAPL Ethics Guidelines for the Practice of Forensic Psychiatry

32. Plaintiff's letter to the Indian Prime Minister in 1998

33. State Trial Judgment on Jury Verdict

34. Neal and Epps State Appeal Brief on September 14, 2012

35. Nicholas and Jones State Appeal Brief on September 12, 2012

36. Epps Lien on Plaintiff's Home - 2012

37. Epps Lien on Plaintiff's Home - 2014

38. Neal Lien on Plaintiff's Home - 2014

39. Jones Lien on Plaintiff's Home - 2014

40. The AP's filing in the Indian Court in October 1993

iv

Now comes Plaintiff, MR. AVINASH B. KULKARNI, (hereinafter "Plaintiff") and for causes of action herein claims and alleges as follows:

## I.   SYNOPSIS OF CLAIMS

1. Plaintiff's son was born in Mission Viejo, California in March 1990. The infant child lived with Plaintiff in El Toro (now Lake Forest), California. The child's mother, her family in India and friends in the United States conspired, beginning no later than June 1990, to abduct the child outside the United States. The coconspirators abducted the child to India on October 15, 1990 without Plaintiff's knowledge or consent. Employees of state and/or federal agencies participated in and/or aided and abetted the conspiracy.

2. The continuous and ongoing conspiracy includes the conspiracy to deny Plaintiff due process under and equal protection of state and federal Constitutions and Laws. It includes the conspiracy to deny Plaintiff his constitutional rights during exercise and assertion of his parental rights as well as during court proceedings (criminal and civil) arising out of the abduction of his child. The denial of due process under and equal protection of the laws is based on prejudice against Plaintiff's race, nationality, ethnicity and gender, and continues even today.

3. Various private parties, United States federal agencies and their employees, and California state agencies and their employees have participated in and/or aided and abetted the ongoing conspiracy over the past twenty-four years.

4. The abducting parent (hereinafter "AP") fraudulently and unlawfully acquired a visa to the United States in 1998 and 2008. The AP misused the 1998 visa to perpetuate the ongoing abduction and to re-abduct the child to India. During those events, various coconspirators (private parties as well as federal officials) knowingly and deliberately acted in furtherance of the conspiracy to violate Plaintiff's constitutionally guaranteed parental rights and his rights to due process and equal protection of the laws.

1

5. The AP was arrested and prosecuted for the felony crime of child abduction by the Orange County District Attorney's office (hereinafter "OCDA") in 2008-09. The AP pleaded guilty to and was convicted for the *continuous* felony crime of child abduction under California Penal Code ("CPC") § 278.5(a) in the Superior Court of Orange County in 2009. (See Exhibit 1, the AP's Guilty Plea. See also Exhibit 2, text of CPC §§ 277-280.)

6. During the above-mentioned criminal proceeding, many coconspirators acted in furtherance of the ongoing conspiracy to impede, hinder, defeat and obstruct justice in the state court, and to deny Plaintiff equal protection of the laws. Plaintiff's rights included rights guaranteed under United States and California Constitutions as well as state and federal statutes.

7. Plaintiff pursued a state civil action against some of the alleged coconspirators in the abduction pursuant to California Civil Code ("CCC") § 49(a)[1] in 2009-13. (Case No. 30-2009-00322804 from the Superior Court of the State of California, County of Orange; and Case No. G045914 in the Court of Appeal of the State of California, Fourth Appellate District, Division Three, to be collectively referenced hereinafter as "the state civil action.")

8. Defendants in the state civil action and their attorneys (all of them Defendants here) conspired to falsely claim that Plaintiff abused his child and then-wife in 1990, that the Child Protective Services Agency (hereinafter "CPS") had records of this abuse, and that charges were filed against Plaintiff. They fraudulently acquired CPS records by misleading Plaintiff and the Juvenile Court, and then concealed those records from Plaintiff and the Superior Court in spite of the court's specific order to disclose them. They deliberately and maliciously concealed the AP from court proceedings. They committed and/or conspired to commit perjury regarding their involvement in the

---

[1] "The rights of personal relations forbid: (a) The abduction or enticement of a child from a parent, or from a guardian entitled to its custody." (CCC § 49(a).)

FAC                                                            Case No. 13-CV-2857-JLS-KSC

abduction.  They suborned perjured or manufactured testimonies of witnesses. In doing so, these Defendants conspired and perpetuated fraud of affirmative misrepresentation, concealment, nondisclosure and deceit on Plaintiff, the Superior Court and the Court of Appeal.  Defendants further presented, deliberately, repeatedly and maliciously, arguments unsupported and contradicted by facts and laws, thus perpetuating the fraud.  The fraudulent scheme was so elaborate and all-pervasive that the entire state civil action was irreparably tainted.  For Plaintiff's claims in the instant action pertaining to fraud, Plaintiff seeks relief from this Court in the form of award for costs, expenses and damages.  Plaintiff also seeks declaratory/injunctive relief by setting aside the judgment and cost orders of the state courts.

9.   Defendants' actions during the state civil action were in furtherance of the ongoing conspiracy to impede, hinder, defeat and/or obstruct justice in the state courts and to deny Plaintiff equal protection of the laws.

10.  Plaintiff's claims for the ongoing conspiracy to violate his constitutional rights and civil rights are against employees of federal agencies and their coconspirators (*Bivens*-type claims); state agencies, their employees and coconspirators (42 U.S.C. § 1983, § 1985, subsections (2)[2] and (3)[3], and §

---

[2] 5 U.S.C. § 1985 ("Conspiracy to interfere with civil rights"), subsection (2) ("Obstructing justice") supports a cause of action for the recovery of damages occasioned by a conspiracy by "two or more persons in any State or Territory[...] to influence the verdict[...] of any grand or petit juror in any such court[...]; or for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

[3] 5 U.S.C. § 1985, subsection (3) ("Depriving persons of rights or privileges") supports a cause of action for the recovery of damages occasioned by a conspiracy by "two or more persons in any State or Territory[...] for the purpose of depriving,

3

FAC                                                    Case No. 13-CV-2857-JLS-KSC

1986 claims); and private coconspirators (42 U.S.C. § 1985(2), (3), and § 1986 claims). Plaintiff seeks relief from this Court in the form of award for damages and appropriate declaratory/injunctive relief.

11. Plaintiff further alleges that federal agencies' unlawful actions during this ongoing conspiracy are due to their discriminatory practices; and deliberate ignoring of federal statutes, congressional acts and intent. The agencies also continue to be derelict in their duties under international treaties and United States statutes enacted to implement those treaties. These duties include, but are not limited to, truthful and complete reporting to the United States Congress of information pertaining to international child abduction cases and countries. Plaintiff seeks appropriate declaratory and injunctive relief against such agencies in the interest of justice in this case as well as in public interest. (28 U.S.C. § 2201(a).)[4]

12. Defendants have misused the fraudulently acquired state court orders for cost and expenses to put multiple liens on Plaintiff's primary home in San Diego County. Plaintiff prays relief from such improper clouding and slander of his title and interest in the property pursuant to California Code of Civil Procedure

---

either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws."

[4] "In a case of actual controversy within its jurisdiction, [...] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

4

FAC                                    Case No. 13-CV-2857-JLS-KSC

("CCP") § 760.020(a).[5]  Plaintiff claims costs, expenses and damages for defamation and unlawful clouding of title.

13. Plaintiff has been forced into under-employment and unemployment over the past three years as a direct result of Defendants' actions.  Plaintiff has been unable to pay his mortgage and his primary home is in foreclosure.  No award of damages will compensate Plaintiff for the loss of his primary residence.  Plaintiff seeks an injunction to delay the foreclosure process until after a just resolution of his claims against Defendants who have forced the foreclosure upon Plaintiff.

14. Defendants have engaged in defamation of Plaintiff (slander and libel) through unprivileged communication.  Plaintiff claims costs, expenses and damages for defamation pursuant to CCC §§ 45, 46 and 47.

15. Through his common law tort claims for the abduction and alienation of his only child, Plaintiff seeks award for damages.

16. Although this action has multiple Defendants and causes of action, not each cause is claimed against every Defendant.  Each cause of action in this FAC explicitly identifies Defendants against whom it is claimed.

## II.   THE COURT'S JURISDICTION

17. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 for Plaintiff's *Bivens*-type claims arising from violation of his constitutional rights by federal employees, their supervisors and private parties conspiring with those federal officials thereby acting under the color of federal law.  The rights violated here include Plaintiff's right to due process and equal protection of the laws guaranteed under the Fifth Amendment, and his parental rights guaranteed

---

[5] "An action may be brought under this chapter to establish title against adverse claims to real or personal property or any interest therein."  CCP § 760.020(a).

FAC                                          Case No. 13-CV-2857-JLS-KSC

under the First and the Ninth Amendments.[6]

18. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 for Plaintiff's claims under 42 U.S.C. § 1983 against individual state actors, private parties who conspired with such state actors thereby acting under the color of state law, and state agencies (*Monell*-type claims) to deny Plaintiff's constitutional rights to due process and equal protection of the laws, and his parental rights. (The First, Ninth, Fifth and Fourteenth Amendments.) Plaintiff's rights to due process and equal protection of the laws are also guaranteed in the equivalent sections of California Constitution (Article 1, §§ 1, 3(b)(4), 7(a) and 28.) His parental rights are protected by state statutes emanating from constitutionally protected rights (CCC § 49(a), CPC § 278) as well as by similar federal statutes (18 U.S.C. § 1204). The Court has jurisdiction for Plaintiff's § 1983 claims for violation of state laws. Plaintiff's *Monell*-type claims against supervisors in the state agencies are within the jurisdiction of this Court as § 1983 related claims.

19. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 as well as § 1343(a)(1), (2), (3) and (4) for Plaintiff's claims under 42 U.S.C. § 1985, subsections (2) and (3), and § 1986. These claims are for denial of equal protection to Plaintiff for his rights under the United States Constitution, *supra*, California Constitution[7], international treaties ratified by the United

---

[6] The First and the Ninth Amendments to the United States Constitution protect Plaintiff's parental rights to the custody of, and companionship and relationship with, his child from official encroachment. The Fifth Amendment protects Plaintiff's rights to due process and equal protection of the laws during exercise and assertion of his parental rights.

[7] Constitution of California, Article 1 ("Declaration of Rights"), § 28 identifies the rights of crime victims. It specifically identifies a victim's right to expect that "persons who commit felonious acts causing injury to innocent victims will be appropriately and thoroughly investigated," (Subsection (a)(4)); "to be treated with fairness [...], and to be free from intimidation, harassment, and abuse, throughout

6

States[8], United States statutes[9] [10], and California statutes[11].  These rights are protected from official as well as private encroachment.

---

the criminal or juvenile justice process," (Subsection (b)(1)); "to be reasonably protected from the defendant and persons acting on behalf of the defendant," (Subsection (b)(2)); "to be heard, upon request, at any proceeding [...], involving a post-arrest release decision, plea, sentencing, post-conviction release decision, or any proceeding in which a right of the victim is at issue," (Subsection (b)(8)).

[8] The Hague Convention on the Civil Aspects of International Child Abduction (1980) ("Hague Convention") is an international treaty ratified by the United States.  The Constitution guarantees Plaintiff's rights under this treaty, and requires the executive branch to protect those rights (Article II, § 3, "[the President] shall take care that the Laws be faithfully executed").  It also vests the authority and jurisdiction in a federal court to enforce and ensure those rights.  (Article III, §§ 1, 2.)  (See also Article VI; "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made [...] under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby...")

Article 3 of the Hague Convention states and guarantees parental rights as below.
"The removal or the retention of a child is to be considered wrongful where –
a) it is in breach of rights of custody attributed to a person, [...] either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."

[9] Provisions of the Hague Convention are consistent with the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") and its predecessor Uniform Child Custody Jurisdiction Act ("UCCJA") which provide that issues of child custody are to be adjudicated by a court within the jurisdiction that was the child's and the parents' home state or state of habitual residence.

[10] See 18 U.S.C. § 1204 (International Parental Kidnapping Crime Act, "IPKCA"). See *US v. Ventre*, 338 F. 3d 1047, 1053 (9th Cir. 2003).  ("The purpose of the IPKCA is to 'deter the removal of children from the United States to foreign countries in order *to obstruct parental rights*.'"  Citing H. Rep. No. 103-390, at 1; *italics* added.)

[11] See CCC § 49(a), *supra*.  See also CPC §§ 278, 278.5(a).

7

20. This Court has original jurisdiction in equity pursuant to 28 U.S.C. § 1331 for Plaintiff's fraud claims (fraud-on-the-court in state courts as well as extrinsic fraud on plaintiff in the same state action). Plaintiff's fraud claims are further supported by California Civil Code §§ 1427, 1428(2)[12], 1708[13], and 3294[14], and they can be alternatively joined under Fed. R. Civ. P. 20(a)(2). Plaintiff's defamation claims can be joined under Fed. R. Civ. P. 20(a)(2).

21. This Court has original and diversity jurisdiction (28 U.S.C. §§ 1331, 1332) for Plaintiff's claims arising from abduction and alienation of his only child. These claims are cognizable as common law torts for child abduction and subsequent damages.[15] Alternatively, these claims are supported by CCC § 49(a), and they can be joined under Fed. R. Civ. P. 20(a)(2). Plaintiff further submits that, from the date the abduction started through the present, the AP and her coconspirators have concealed the true identity of the coconspirators. Accordingly, any defendants to claims identified in this paragraph are estopped by their conduct in asserting the statutes of limitations.

22. Plaintiff's claims for unlawful and improper clouding of title to his primary

---

[12] "An obligation is a legal duty, by which a person is bound to do or not to do a certain thing." (CCC § 1427.) "An obligation arising from operation of law may be enforced in the manner provided by law, or by civil action or proceeding." (§ 1428(2).)

[13] "Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights." (CCC § 1708.)

[14] "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (CCC § 3294.)

[15] See RESTATEMENT (SECOND) OF TORTS, § 700 (1979) (unlawful taking of child). Plaintiff's abduction-related claims *do not* seek relief for the issues of divorce, child custody, alimony or child support, which are the province of state courts.

8

residence is pursuant to CCP § 760.020(a).  Jurisdiction for this state claim is normally in the Superior Court of San Diego pursuant to CCP § 760.040(a). The instant action however has many federal claims that are very closely related to Plaintiff's "clouding of title" claims.  Resolution of the former will facilitate a resolution of the latter.  Plaintiff submits that the latter claims have been properly joined under Fed. R. Civ. P. 20(a)(2).  This Court has supplemental jurisdiction for any claims viewed as pendent state claims, pursuant to 28 U.S.C. § 1367(a).

23. This FAC will detail facts that require further discovery of federal agency records.  The FAC will also establish that the agencies have refused to furnish the requested information to Plaintiff.  Only a federal district court has the jurisdiction and authority to compel such discovery, pursuant to Fed. R. Civ. P. 26 and/or 5 U.S.C. § 552a(b)(11) (disclosure of Government records "pursuant to the order of a court of competent jurisdiction").  State courts do not have jurisdiction or authority over federal agencies.  Jurisdiction of this Court is thus appropriate as well as necessary for not only Plaintiff's federal claims, but also those claims viewed as pendent state claims.

### III.   VENUE

24. Some of Plaintiff's claims are against a federal defendant (the USDOS).  Upon further discovery, Plaintiff will identify current or past federal employees as coconspirators who acted in their official capacity during the conspiracy. Plaintiff will name such individuals as Defendants in their individual capacity through a Second Amended Complaint ("SAC").  Such individuals remain unnamed ("DOES 1-20") in this FAC.  This FAC identifies *Bivens*-type claims against such unidentified Defendants.  Venue in this Court is proper (for both the FAC and the SAC) pursuant to 28 U.S.C. § 1391(e)(1)(C) as Plaintiff resides in San Diego County and the Complaint identifies a federal defendant.

25. Venue in this Court is also proper (for both the FAC and the SAC) pursuant to

9

28 U.S.C. § 1391(e)(1)(A) as Defendants Nicholas and Jones reside in San Diego County, and Defendant Nicholas & Butler, LLP has its primary business located in San Diego County.

26. Venue in this Court is also proper (for both the FAC and the SAC) pursuant to 28 U.S.C. § 1391(e)(1)(B) as Plaintiff's primary residence, a real property in dispute for Plaintiff's "clouding of title" claims, is in San Diego County. (Address:  826 Applewilde Drive, San Marcos, CA 92078.)

27. If this action did not have a federal defendant, the venue would still be proper pursuant to 28 U.S.C. § 1391(b)(1) or, in the alternative, 28 U.S.C. § 1391(b)(2) for reasons cited above.

## IV.   NAMED DEFENDANTS

28. This FAC identifies the following individuals, federal or state agencies, or corporations as Defendants.

1. MEERA UPASANI, an individual resident of California (hereinafter "Meera"[16])

2. MOHAN UPASANI, an individual resident of California (hereinafter "Mohan")

3. SUNILA KULKARNI, an individual resident of California (hereinafter "Sunila")[17]

4. MADHAVI NERURKAR, an individual resident of California (hereinafter "Madhavi")

5. CRAIG MCKENZIE NICHOLAS, a California attorney and resident of San Diego County (State Bar No. 178444) (hereinafter "Nicholas")

---

[16] Where multiple Defendants and/or key witnesses have the same last name, Plaintiff has taken the liberty to reference them by their first name.

[17] Although they share the same last name, Plaintiff and Defendant Sunila are not related.

10

6. TRACY JUNE JONES, a California attorney and resident of San Diego County (State Bar No. 263632) (hereinafter "Jones")

7. NICHOLAS & BUTLER, LLP, a San Diego law firm

8. LISA NICHOLAS NEAL, a California attorney (State Bar No. 205465) (hereinafter "Neal")

9. CHELSEA A. EPPS, a California attorney (State Bar No. 261026) (hereinafter "Epps")

10. RUTAN & TUCKER, LLP, a California law firm

11. NIRANJAN FRED THIAGARAJAH, a California attorney (State Bar No. 205772) (hereinafter "Thiagarajah")

12. KIRAN NAIR, a California attorney (State Bar No. 237090) (hereinafter "Nair")

13. LAW OFFICES OF FRED THIAGARAJAH, a California law firm

14. United States Department of State, a United States agency (hereinafter "USDOS")

15. Orange County Social Services Agency, a California state agency (hereinafter "OCSSA")

16. U.S. Bank National Association (hereinafter "U.S.Bank")[18]

17. WEST COAST CAPITAL GROUP, INC. (hereinafter "West Coast Capital")

18. United States Internal Revenue Service (hereinafter "IRS")[19]

---

[18] The first mortgage and the first lien on Plaintiff's primary residence are owned by U.S. Bank National Association, as Trustee for Terwin Mortgage Trust 2005-8HE, Asset-Backed Certificates, Series 2005-8HE, c/o Specialized Loan Servicing, LLC, 8742 Lucent Blvd., Suite 300, Highlands Ranch, CO 80129.

[19] Defendants U.S.Bank, West Coast Capital and IRS have been named pursuant to CCP § 762.060(b) *only* for the Sixteenth Cause of Action for improper clouding and slander of Plaintiff's title to his primary residence. Plaintiff admits, pursuant to

11

## V.   LEAVE TO NAME FICTITIOUSLY NAMED DEFENDANTS, PRESENT ADDITIONAL CLAIMS AND DAMAGES

29.  Plaintiff has attempted to establish the identities, roles and capacities of the coconspirators throughout the years, but has been unable to do so, in large part due to stonewalling by coconspirators and by state and federal agencies.

30.  Plaintiff submits that he requires to conduct discovery through provisions of Fed. R .Civ. P. as well as the Court's authority under 5 U.S.C. § 552a(b)(11) to ascertain the true identity of coconspirators.  This discovery will establish facts pertaining to the ongoing conspiracy as well as identities, roles and capacities of coconspirators (whether already named as Defendants or listed as DOES).  The discovery will be in support of Plaintiff's claims identified in this FAC and may result in identification of new claims.

31.  Plaintiff prays leave that at such time as the true names and capacities of such fictitiously named Defendants (DOES 1 through 20, inclusive), whether individual, corporate, associate, or otherwise,  and each of them as well as elements of the ongoing conspiracies have been ascertained through discovery, Plaintiff may be permitted to insert the same herein with appropriately amended allegations and/or claims (Second Amended Complaint, "SAC").  Plaintiff also prays leave that at such time as the true capacities of all Defendants have been ascertained, Plaintiff may be permitted to present the amount for damages claimed.

## VI.   STATEMENT OF FACTS AND GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

32.  Plaintiff lived at 21141 Canada Road #13D, El Toro, California 92630 in Orange County in 1990 with his then wife, NEELAM KULKARNI (a.k.a. NEELAM THAKUR) ("Neelam" or the AP).  Their son, SOUMITRA, was

---

CCP § 762.060(c), the validity of the claims of these three Defendants to the real property in dispute.  These three Defendants are not a party to any other claims.

FAC                                                          Case No. 13-CV-2857-JLS-KSC

born in March, 1990 in Mission Viejo, California, and resided with his parents (Plaintiff and Neelam) in El Toro, California.

33. Soon after the child's birth, Neelam and her coconspirators secretly plotted and made arrangements to abduct Soumitra and remove Plaintiff's infant son from the lawful custody of Plaintiff (herein referred to as "the abduction"), and have the child taken permanently to India with Neelam. They conspired to deny Plaintiff his constitutional rights and equal protection of the laws during determination and exercise of his parental and custodial rights to his child.

34. In furtherance of this conspiracy, the coconspirators applied for and acquired Soumitra's United States passport, unbeknownst to Plaintiff, with the intent to abduct, detain and conceal the child outside the United States, and to deny Plaintiff equal protection of the laws.[20] These coconspirators further facilitated the abduction by providing Neelam with money, transportation and assistance in fraudulently obtaining a duplicate birth certificate for the child, and arranging and paying for one-way airline tickets from United States to India for Neelam and Soumitra. The conspiracy started no later than June 19, 1990 while Neelam's parents were visiting the United States for the birth of Plaintiff's son. Neelam wrote a check to the county agency on that day to acquire a duplicate birth certificate for the child, unbeknownst to Plaintiff. (Exhibit 3.) Neelam has since admitted that she acquired and used the said birth certificate to acquire a United States passport for the child, also unbeknownst to Plaintiff, and that she used that passport to abduct the child.

35. In August and September of 1990, workers from the Child Protective Services of Orange County ("CPS") visited Plaintiff's residence on two occasions. Ms.

---

[20] Plaintiff learnt in 2011 (for the first time) that the infant's passport was mailed to a third-party coconspirator in 1990. Plaintiff learnt in 2013 (for the first time) from the USDOS that the 1990 passport application involved a passport applicant and an Identifying Witness. The passport acquisition was fraudulent and unlawful.

13

Cheryl Manatt and Ms. Katherene Dostal were the CPS case workers. On both occasions, they informed Plaintiff that the complaint was about the child crying. Plaintiff was not surprised as the child suffered from colic and had a history of crying due to the condition.[21] The CPS workers interviewed Plaintiff as well as Neelam. They also examined the child and the home environment. They concluded and informed Plaintiff that the complaints were without merit.

36. On October 15, 1990, Neelam abducted six-month old Soumitra, Plaintiff's only child, to India using the said passport, without Plaintiff's knowledge or consent. Plaintiff never saw his child again.

37. India does not recognize child abduction by a parent as a crime, and refuses to accede to the international law on child abduction, namely, the Hague Convention on the Civil Aspects of International Parental Abduction of 1980 ("Hague Convention"). Plaintiff's attempts, to have his child returned to the United States, or, in the alternative, to establish a relationship with and custodial/visitation rights to his son, failed as a result. His experience is typical for child abduction to India. The USDOS is statutorily designated as the Central Authority ("CA") for the United States for the Convention.[22] The Office of Children's Issues ("OCI") within the USDOS is required to annually report country-specific and case-specific information to the Congress. [23] Based on hundreds of abduction cases involving India, the OCI has posted the following observations on its web site. (Exhibit 4; *emphasis added*.)

---

[21] Plaintiff is in possession of the child's entire medical records while the child lived with him in 1990. They include records of phone calls by Neelam to the pediatrician's office reporting the child's crying, the child's visits to the doctor where Plaintiff took the child in, and subsequent treatment by the pediatrician. Plaintiff can file these records under seal under a protective order of the Court.

[22] 42 U.S.C. § 11606(a) and Ex. Ord. No. 12648, Aug. 11, 1988, 53 F.R. 30637.

[23] 42 U.S.C. §§ 11608a(a) and 11611.

14

"India is not a signatory of the Hague Convention on the Civil Aspects of International Parental Abduction; therefore, left-behind parents must rely on other avenues to recover their children from India. *Once a child has been abducted to India, remedies are very few.* India does not consider international parental child abduction a crime, and the Indian courts rarely recognize U.S. custody orders, preferring to exert their own jurisdiction in rulings that tend to favor the parent who wants to keep the child in India. For these reasons, *it is often very difficult for left-behind parents in the United States to obtain any access to a child who has been abducted to India.* In the rare scenario that a case is resolved, it is usually due to an agreement between the parents, rather than the result of court orders or arrest warrants. The State Department can help by attempting welfare and whereabouts visits; however, these visits may only be conducted with the consent of the child's physical guardian."

38. Upon reaching India, the AP made wild accusations of abuse against Plaintiff and his entire family (parents who lived in India, and sister and brother-in-law who lived in Salt Lake City, Utah). The AP made those accusations from the safe haven of India misusing the Indian Penal Code Section 498A (hereinafter "498A"). (See, for example, Exhibit 5, the AP's letter to the Immigration and Naturalization Service ("INS") in 1992.) 498A allows a woman to file complaints of abuse against her husband and his entire family without any evidence. Law enforcement agencies then arrest the accused without bail. All arrested persons, including any minor children, elderly grandparents and pregnant women, may spend months in jail that have deplorable conditions. The arrest is used for extortion of money as well as to meet other nefarious objectives such as alienation of children. In the corrupt Indian system, such laws foment a widespread racket of extortion with direct participation by attorneys, law enforcement officials and judicial officers of lower courts. The statute was enacted in 1983 specifically to stop the barbaric practice of dowry and dowry-related mistreatment of women. Plaintiff comes from an educated family which does not practice the custom of dowry. During Plaintiff's marriage to his former wife, not a red cent was expected, demanded or paid as dowry, and the statute was not even applicable. Plaintiff's mother, upon

FAC                                                    Case No. 13-CV-2857-JLS-KSC

getting her high school diploma in the 1950's, worked as an elementary school teacher to pay for her college education. This progressive, strong-willed and independent woman was explicitly accused of abusing the AP as well.

39. In the state civil action in 2009-13, Plaintiff presented an expert on international child abduction and 498A, Mr. Jeremy Morley ("Morley"), a New York attorney, who has consulted in hundreds of such cases and worked with the USDOS on many cases involving India. Mr. Morley presented case law from the Indian Supreme Court which called 498A "legal terrorism." He presented the following observations of the New Delhi High Court (which is the equivalent of the D.C. Circuit Court of Appeal and considered by many as the second-highest court in India) regarding misuse of 498A, based on that Court's review of thousands of cases.

> "There is a growing tendency amongst the women which is further perpetuated by their parents and relatives to rope in each and every relative- including minors and even school going kids nearer or distant relatives and in some cases against every person of the family of the husband whether living away or in other town or abroad and married, unmarried sisters, sister-in-laws, unmarried brothers, married uncles and in some cases grand-parents or as many as 10 to 15 or even more relatives of the husband. Once a complaint is lodged under Sections 498A/406 IPC whether there are vague, unspecific or exaggerated allegations or there is no evidence of any physical or mental harm or injury inflicted upon woman that is likely to cause grave injury or danger to life, limb or health, it comes as an easy tool in the hands of Police and agencies like Crime Against Women Cell to hound them with the threat of arrest making them run here and there and force them to hide at their friends or relatives houses till they get anticipatory bail as the offense has been made cognizable and non-bailable. Thousands of such complaints and cases are pending and are being lodged every day in and day out."

40. Morley cited another case from the New Delhi High Court where the Court observed that "the provisions of 498A are being used to convert failed

16

marriages into a crime and the people using this tool to extract as much monetary benefit as possible," and that in many cases a lump sum payment is received. Morley presented authoritative findings of senior police officers, social workers, judicial officers and attorneys from India that overwhelmingly support the same findings. Morley also presented findings of the USDOS and the United Nations that are consistent with the above statements. The World Health Organization has called treatment of elderly people in India through such criminal and civil statutes to be a leading cause of elderly abuse.

41. The USDOS understands and acknowledges the serious and widespread abuse of 498A. In its official Consular Information Sheet on India dated December 11, 2006 and issued by its Bureau of Consular Affairs on January 19, 2007, the USDOS issued the following warning to American men who marry a woman from India.

> "A number of U.S.-citizen men who have come to India to marry Indian nationals have been arrested and charged with crimes related to dowry extraction. [...] The courts sometimes order the U.S. citizen to pay large sums of money to his spouse in exchange for the dismissal of charges."

Mr. John Peters, the USDOS's Citizen Services Specialist for India based in Washington, D.C., remarked, in his official capacity, that "[t]he fact that we issued a warning should be an indication of how widespread the problem is."

42. Soon after abducting the child to India, the AP filed a police complaint against Plaintiff and his family under 498A. Plaintiff's elderly father was summoned to a police station in Mumbai from a different city where he lived. Plaintiff consulted multiple attorneys in India, and all of them advised him not to return to India under any circumstances. They also advised Plaintiff that, in addition to the persecuting criminal statutes in India, the family law was unfavorable to him as well. They advised Plaintiff that no family law court would grant him

17

*any* custody to his son unless the AP agreed to such an arrangement, which was consistent with the USDOS's findings, *supra*.

43. A few months after the abduction started, Plaintiff contacted the CPS and talked to one of the case workers, Ms. Dostal, who had come to his residence earlier. Plaintiff informed Ms. Dostal about the abduction and asked if the CPS complaints were filed by the AP or any person who might have aided and abetted the abduction. Plaintiff suspected such persons of foul play and filing malicious reports. Ms. Dostal did not reveal the identity of the person on confidentiality grounds. She however reiterated that the complaints were without merit and the case had been closed. She informed Plaintiff that since the complaints were about a crying child and since the AP was a stay-at-home mother, if anything, the AP would be the primary suspect in such complaints.

44. Plaintiff's application for permanent residence (or green card) of the United States was processed by the INS in 1991-92. The process involved vetting of Plaintiff for lawful behavior and good moral character. It involved a thorough background check about police complaints, charge-sheets, arrest records, etc. Plaintiff's interview with the INS was held on about March 10, 1992.

45. About a week before his interview with the INS, Plaintiff discussed the upcoming interview with an acquaintance in the East Indian community, Mr. Sunil Abhyankar. Sunil's wife, Ms. Sulabha Abhyankar, worked for the Orange County Social Services Agency ("OCSSA"), the parent organization of the CPS. The Abhyankars were friends of some of the Defendants.

46. During the INS interview, Plaintiff and his immigration attorney, Mr. Alan R. Klein, were present. The interviewing officer informed them that the INS had received a complaint about Plaintiff's character and alleged CPS reports from the OCSSA "within the last few days." The officer also informed Plaintiff that the agency would conduct further investigation before making a decision.

47. Plaintiff has recently acquired a copy of his immigration attorney's 1992 file.

18

1    Attached, as Exhibit 6, is Mr. Klein's hand-written note from 1992 made

2    immediately after the INS interview.  It confirms the account above.

3   48.  Plaintiff filed a Privacy Act request (5 U.S.C. § 552a) with the United States

4    Department of Homeland Security ("USDHS") in 2012 for disclosure of

5    pertinent records from his own Alien File (A-File).  (The INS has been

6    reorganized under the USDHS.)  Plaintiff specifically asked for all records

7    pertinent to the complaint filed by the OCSSA with the INS in 1992.  The

8    USDHS did not disclose any of those records.  The USDHS's partial

9    disclosure to Plaintiff does not have any reference to the OCSSA complaint,

10    subsequent withholding of Plaintiff's green card or any investigation

11    conducted.  The USDHS has thus withheld from Plaintiff his own records as

12    well as evidence of unlawful actions by OCSSA employees.

13   49.  Immediately after the 1992 INS interview, Plaintiff contacted Ms. Dostal of

14    the CPS.  She reiterated the CPS's findings once again and informed Plaintiff

15    that she would be very happy to discuss the matter with the INS officers.  She

16    asked Plaintiff to provide her direct contact information to such persons for

17    expedited processing of his green card.

18   50.  The INS conducted its own investigation and approved Plaintiff's application

19    for a U.S. permanent residence in about June 1992.

20   51.  Plaintiff has recently conducted discovery of the 1990 CPS records through

21    the Juvenile Court of Orange County.  *Infra*.  Based on the review of those

22    records, it is crystal clear that the CPS complaints were based on a child

23    allegedly crying.  There was no report of any domestic disturbance.  Based on

24    the unequivocal findings of the CPS workers and their glowing description of

25    a healthy and happy child, and of a loving and caring family, it is inexplicable

26    why the OCSSA filed a complaint against Plaintiff with the INS.  Plaintiff

27    alleges that the coconspirators and their friends within the OCSSA acted

28    maliciously and unlawfully to defame Plaintiff through insinuations and

19

misrepresentation. Had the INS denied Plaintiff's green card, Plaintiff faced a deportation to India. Not only did he then face a certain persecution under 498A, he would also have lost his parental rights and equal protection of the laws under United States and California Constitutions and statutes. Plaintiff went through a harrowing experience during those three months in 1992.

52. With full knowledge of the CPS reports, the United States Government approved Plaintiff's application for a U.S. citizenship in 2001-2, and more importantly, his application for a security clearance for employment in the defense/aerospace industry in 2003-4. Both processes, and particularly the latter one, require lawful behavior and a high moral character. Granting of a security clearance involves extensive vetting. The U.S. Government routinely renewed Plaintiff's clearance while he worked in that industry until 2011.

53. The AP filed for a divorce and child custody in the Family Court at Mumbai in 1993. She made accusations of abuse against Plaintiff and his entire family in her divorce petition. The AP also explicitly identified Meera as the conspirator who arranged for one-way airline tickets to India for the AP and the child for the purpose of abduction.

54. Upon reviewing the AP's divorce petition, Plaintiff called Meera and Mohan (the Upasanis) to ask about the AP's allegations. Both Upasanis denied any involvement in the abduction or witnessing any abuse or mistreatment. (They repeatedly stated the same during the state civil action in 2009-13.)

55. Plaintiff gave his father in India a power-of-attorney to represent Plaintiff's interests in the divorce matter and to hire an attorney to represent Plaintiff in the Indian court. Plaintiff also wrote a letter to the Indian court (that was filed through his attorney) respectfully informing the court that it had no jurisdiction, that the child was a U.S. citizen, and that the child had been abducted to India. (Exhibit 7.) Plaintiff also expressed his concerns about false criminal complaints against him under IPC 498A that would prohibit him

from going to India.  Plaintiff was aware of at least one such complaint that the AP had already filed.  Plaintiff was advised by his attorney of negative consequences of such a letter in the Indian culture and court traditions. Plaintiff however insisted on filing the document in the interest of justice and his due process rights.

56. Plaintiff's attorney made similar arguments in the Indian court.  That court ignored the argument and established its jurisdiction, consistent with hundreds of other cases of child abduction to India.  (See Exhibit 4, the USDOS's official findings about Indian courts forcing their jurisdiction in cases of child abduction.)  Regarding Plaintiff's concerns about malicious police complaints, the Indian court advised Plaintiff to seek anticipatory bail – for abuse that was alleged to have taken place in the United States!  Had Plaintiff returned to India on such anticipatory bail, the authorities would have confiscated his passport and forced him to stay in India until all criminal and civil proceedings against Plaintiff were resolved.  Such proceedings would have been resolved only after the AP and the corrupt Indian authorities had met their nefarious objectives.  Even after crossing all such hurdles, Plaintiff had no prospect of getting any custody of his child.

57. After allowing Plaintiff's representatives to present Plaintiff's defense and to make filings on his behalf for over a year, the Indian court ruled that Plaintiff's power-of-attorney to his father had inadequate court stamp and was thus invalid.  The court disqualified Plaintiff's attorney from the proceedings and disregarded all filings made by that attorney on Plaintiff's behalf.  The ruling was issued in a hurried manner while Plaintiff's attorney was not present in the court.  The court denied the attorney's subsequent attempts to present argument for reconsideration.  Plaintiff was subsequently advised by many legal experts in India that the power-of-attorney as well as the attorney's representation of Plaintiff were compliant with Indian laws, proper and

21

1   sufficient.  The court's ruling was unlawful even under Indian laws.  Further, if
2   there truly was a procedural issue with the attorney's representation of
3   Plaintiff, it should have come up when the papers were initially filed, and not
4   after one year.  Further, the court could and should have granted an
5   opportunity to rectify any technicalities.

6   58.  The AP and her parents, all coconspirators in this case of abduction, testified
7   in the Indian court with full knowledge and assurance that there would be no
8   cross-examination, adversarial witnesses, evidence or arguments.  They
9   presented no evidence other than their own testimony.  They did not present
10  Meera's testimony or affidavit, a witness and conspirator by their own account.

11  59.  The Indian court, which had no means or jurisdiction to investigate or
12  adjudicate any of the claims or issues, accepted the testimonies as
13  "unchallenged," and entered an *ex parte* judgment.  Plaintiff's representatives
14  (i.e. his father and attorney) witnessed the issuance of that ruling as muffled
15  members of the general public present in the open court, and not as Plaintiff's
16  representatives who could present a defense on his behalf.

17  60.  Plaintiff was denied his basic due process rights (both substantive and
18  procedural) in the Indian court.  Events in that court were consistent with the
19  findings of the USDOS, the United Nations and higher Indian courts regarding
20  rampant corruption and lack of due process in lower Indian courts.

21  61.  The Indian court granted the AP full custody of the child.  It did not grant
22  Plaintiff even a single visitation.  It also granted the AP a "permanent"
23  alimony, for a marriage that lasted twenty-one months and which the AP
24  ended by abducting the parties' only child.  The court did not inquire about or
25  factor in the AP's assets, live-in maid or chauffeur-driven car.

26  62.  Under Indian civil law, a father is not granted any custody unless the mother
27  stipulates.  Fathers are however granted about one supervised visitation a
28  month, a 30 minute or one hour visitation to be supervised by the mother or

22

her representative.  A father's (non-existent) rights under such laws are inconsistent with the American principles of justice.  Plaintiff was denied even those minimal rights.

63.  The AP and Defendants have routinely shed crocodile tears over how Plaintiff did not return to India to visit the child.  In addition to the insurmountable hurdles of the Indian 498A criminal statute, such a visit would not have resulted in *any* visitation for Plaintiff with his son.  Plaintiff would have to initiate a whole new legal proceeding for such a visitation.  It would have taken years to be processed through the system before getting rejected.  If the AP was truly acting in good faith as her coconspirators have claimed, she could have easily requested the Indian court to grant Plaintiff some visitation through the divorce decree.  That court would have signed on the dotted line.

64.  *All* Defendants and their state and federal coconspirators, at various times, have impermissibly and unlawfully relied on and advocated the illegitimate Indian court order.  They have espoused the Indian court's jurisdiction (which was in violation of U.S. and international laws), its "findings" (which were without any investigation, evidence or adversarial due process), and its *ex parte* order (which violated Plaintiff's constitutional rights).  Such advocacy has been in furtherance of the ongoing conspiracy to deny Plaintiff his constitutional rights as a parent, his due process rights and equal protection of the laws.

65.  The OCI managed this case as international child abduction starting in about 1996.  Per its statutory duties under the Hague Convention[24], it conducted welfare checks on Plaintiff's child in India on multiple occasions and provided reports to Plaintiff as the left-behind parent ("LBP").  The welfare visits were conducted by the USDOS's consular staff in Mumbai, India.  The first visit,

---

[24] 42 U.S.C. § 11608a(d)(1)

23

conducted in 1997, was made at the home of the child's maternal grandparents in Mumbai.  The child, the AP and the grandparents lived in that home.  The USDOS and its employees were thus clearly aware that the AP and her parents were detaining the abducted child at that address.  The AP has explicitly admitted her parents' participation in the abduction.

66.  In about 1998, the AP applied for and received a visitor visa to the United States at the U.S. Consulate in Mumbai, India.  Her coconspirators, including private parties and USDOS officials, knowingly and intentionally sponsored and/or facilitated this visit with full knowledge that the AP had abducted the child and was in violation of CPC § 278.5(a) and 18 U.S.C. § 1204, both *continuous* crimes.  (See Exhibit 2, CPC § 279.1.)  They were fully aware that the AP had fraudulently acquired the child's United States passport in 1990 without Plaintiff's knowledge and for the unlawful purpose of abducting the child.  They were also fully aware that the AP had acquired the Indian custody order fraudulently, from improper jurisdiction, and in violation of Plaintiff's parental rights as well as due process rights.  They were fully aware of the AP's and the coconspirators' legal duty to inform the OCDA's office about the child's whereabouts and reasons for the abduction, and to "commence a custody proceeding in a court of competent jurisdiction consistent with the federal Parental Kidnapping Prevention Act (Section 1738A, Title 28, United States Code) or the Uniform Child Custody Jurisdiction Act (Part 3 (commencing with Section 3400) of Division 8 of the Family Code)."  (CPC § 278.7(c).)  They were fully aware that the AP was in violation of multiple United States and California laws.  The coconspirators were thus in violation of federal visa statutes.[25]

67.  Federal statutes and USDOS regulations require the agency to restrict the use

---

[25] 8 U.S.C. §§ 1182(a)(3)(A)(ii); 1324(a)(1)(A)(iii) and (v); and 8 U.S.C. § 1327.

24

FAC                                                    Case No. 13-CV-2857-JLS-KSC

of an abducted child's passport to travel for reunification with the left-behind parent only.  The USDOS never put such restrictions in place.

68. Upon receiving the said visa in 1998, the AP secretly returned to Orange County later that year and brought then eight-year old Soumitra with her.  Plaintiff lived in Phoenix, Arizona at the time.  The AP called Plaintiff and informed him that she was in the U.S.  When Plaintiff specifically asked her about the child's whereabouts, the AP lied that the child was in India with his grandparents.  When Plaintiff asked the AP about her whereabouts, she declined to reveal that information.  She simply told Plaintiff that she was visiting some friends.  When Plaintiff asked for her contact phone number, the AP declined to give that information.  The Caller ID on Plaintiff's phone showed that the AP was calling from a private or "unknown" number.  When Plaintiff asked the AP how long she would be in the United States, she declined to give that information.

69. Plaintiff immediately contacted Ms. Ann Haralambie ("Haralambie"), a Tucson-based attorney well-known for her work in children's issues, child abduction and international custody disputes.  (Plaintiff had previously consulted Haralambie in 1995, soon after moving to Arizona.)  Plaintiff met with Haralambie in Tucson.  They placed a telephone call to another attorney in California.  After a lengthy discussion, both attorneys concluded and informed Plaintiff that any civil legal action would be feasible only if he knew the whereabouts of the mother and the child (if the child was with her), and the duration of their U.S. visit.

70. Over the next few weeks, Plaintiff feverishly contacted various state and federal authorities (the OCI within the USDOS, other USDOS officials, the FBI, the U.S. Attorney's office in Phoenix, the OCDA, California Attorney General's Office, etc.)  Plaintiff begged the law enforcement agencies to take some action or, at a minimum, arrange one visitation with the child if the child

25

was in the U.S. They all declined to act. When Plaintiff asked the OCI to provide information about the AP's whereabouts in the U.S. from her visa application, the OCI told Plaintiff that it did not have that information and further declined to acquire/provide that information.

71. The AP returned to India, unbeknownst to Plaintiff, after about two months and took Soumitra with her.

72. Each coconspirator in these 1998 events, both private individuals and federal employees, facilitated the AP's and the child's visit to the U.S., failed to inform the law enforcement agencies of the AP's and the child's whereabouts in the U.S., concealed those whereabouts from Plaintiff, and allowed the child to be re-abducted. Plaintiff alleges that each such participant acted in furtherance of the ongoing conspiracy to abduct and alienate Plaintiff's child, to violate Plaintiff's constitutional rights, and to deny Plaintiff equal protection of the laws. Plaintiff's parental rights are guaranteed by the First and the Ninth Amendments to the Constitution and protected from official encroachment. His due process and equal-protection-of-the-laws rights during determination of child custody, or prior to removal of the child from his custody or from the U.S. jurisdiction, are protected by the Fifth and the Fourteenth Amendments from official encroachment. Those rights are also protected from private encroachment by various state and federal statutes (civil as well as criminal) and international treaties cited herein. Plaintiff was the only lawful custodian of the child at the time, per United States laws. The same coconspirators also engaged in aiding and abetting the conspiracy. They had the knowledge that the above-mentioned wrongs had already been committed and were about to be repeated. They had the power to prevent and/or aid in preventing the commission of those wrongs, but refused so to do. Defendant Madhavi was one of the known conspirators who actively participated in the 1998 events. Plaintiff needs to conduct further discovery to establish all facts, and names,

26

roles and capacities of coconspirators.

73. Plaintiff has wondered how different his relationship with his son and his life would be if even one coconspirator in the 1998 events had obeyed the laws and respected Plaintiff's constitutional rights and right to equal protection under the laws.

74. The AP filed a lawsuit against Plaintiff in the Superior Court of Arizona in Phoenix in 2000 for execution of the Indian divorce decree. The AP, through her representatives in Orange County, California, retained an attorney in Phoenix. Plaintiff retained Haralambie, *supra*, as his attorney.

75. Plaintiff was paying the AP child support at the time. The AP wanted to collect a permanent alimony as well.

76. Although the AP had abducted the parties' child and was approaching the court with unclean hands, the Arizona Court granted her a sympathetic hearing. Parties filed various documents in support of their arguments, including affidavits and Indian case law. The AP made a variety of allegations of mistreatment against Plaintiff. Plaintiff filed documentary evidence including results of his polygraph test and transcripts of testimonies of the AP's parents in the Indian proceeding in 1995. Those testimonies contradicted the AP's latest assertions and allegations.

77. The AP stipulated to a dismissal with prejudice of her meritless and malicious Arizona action. The AP and her coconspirators have since claimed that the AP agreed to such a stipulation because she could not afford to travel to the United States for testimony. First, the Arizona Court never ruled on the issue of in-person testimony and the possibility of a telephonic testimony was discussed. Second, the AP has traveled to the U.S. on multiple occasions since abducting the child, including her visit in 1998. Her excuse is contradicted by facts. The AP once again shied away from an adversarial proceeding and cross-examination.

27

78. During the entire Arizona matter, the AP did not discuss or offer Plaintiff a single visitation to the child.

79. Plaintiff's subsequent attempts in 2001 to reach out to his son in India were unsuccessful (a recurring theme during this matter). Not knowing where the child lived or where to send child support checks, Plaintiff sent an e-mail to the AP. (Exhibit 8.) Plaintiff asked the AP for her address so that he could send a check. Plaintiff thus clearly reassured the AP as well as the child that he would take care of the child regardless of the mother's wrongdoing and continuing abuse of legal process. The AP responded with a poem purported to be by the child that disowned Plaintiff as his father. The AP did not provide her address or phone number. Plaintiff does not know if the child was aware of this communication. It however clearly demonstrates multiple well-established patterns of parental alienation discussed by various experts.[26] It also establishes that the AP did not need or care about the child support payments.

80. The AP again returned unlawfully to the United States in 2008 when she was eventually arrested. Various private parties and federal officials were once again in violation of statutes cited earlier. Plaintiff further believes and alleges that the AP's parents, who are known coconspirators and abductors, were unlawfully granted U.S. visas in about 1999 and visited the country.

81. In addition to the obvious perpetuation of abduction and denial of Plaintiff's constitutional and statutory rights, the psychological damage and alienation of

---

[26] See *Baker, Amy, J.L., Ph. D. "Parental Alienation Syndrome — The Parent/Child Disconnect,"* Social Work Today, Nov/ Dec 2008, Vol. 8 No. 6 P. 26. (Source: http://www.socialworktoday.com/archive/102708p26.shtml.) (Identifying behavioral patterns in cases of alienation. Recognizing the effects of the campaign of denigration against the targeted parent and how the child participates in such a campaign. Recognizing that the child identifies and sympathizes with persons who alienate and/or abduct.)

28

the child from Plaintiff as a direct result of the above-mentioned unlawful U.S. visits is immeasurable. Plaintiff has met his son only once – the day after the AP was arrested in 2008 when Soumitra sought a meeting with Plaintiff. During that meeting, Soumitra asked Plaintiff: "Why is this (the arrest) coming up so many years later?" It was so late only because law enforcement agencies (both state and federal) abdicated their responsibilities through the years, and USDOS officials violated the Constitution and various laws. During his most formative years, the child was told through the words and actions of various coconspirators, including federal officials, that he was not abducted at all.

82. Plaintiff believes and alleges that the process of approving and issuing a U.S. visa involves multiple individuals in the USDOS field office in a foreign country as well as other staff and supervisors in the United States. Plaintiff needs further discovery, including discovery of USDOS and other federal agency records, to establish all pertinent facts as well as identities, roles and capacities of various coconspirators, including federal officials. Establishing such facts is critical for Plaintiff to establish all aspects of the ongoing conspiracy, regardless of whether those federal employees are named as Defendants.

83. Plaintiff has requested various federal agencies (the FBI as well as the U.S. Attorney's office) to conduct an investigation of this abduction at various times over the years. His last attempt was in 2011-12 when he talked to FBI Special Agent Tony Alston, and Assistant United States Attorneys Robert Dugdale, Amanda Liskamm and Dorothy Kim. In Plaintiff's only meeting with the FBI, Special Agent Alston initially remarked that the state agencies should address the issue. Plaintiff pointed out the federal statute (18 U.S.C. § 1204) as well as lack of statutory limitations for prosecution (18 U.S.C. § 3283). The federal officials refused to conduct any investigation. Special

29

1    Agent Alston informed Plaintiff that the primary offender (i.e. the AP) had

2    been convicted and that the case was too old, and that the agencies would take

3    no action.

4    84.  Plaintiff alleges that the case has become "too old" as a direct result of various

5    state and federal agencies' refusal to address it over the years.  Further, the

6    United States Government acknowledges the long-term and multi-generational

7    nature of the victims' suffering.  Various federal statutes treat child abduction

8    as child abuse, and on par with capital offenses.  See the PROTECT Act of

9    2003.  (108th Congress P. L. 21.  Source: http://www.gpo.gov/fdsys/pkg/

10   PLAW-108publ21/html/PLAW-108publ21.htm.)  (Identifying the primary

11   purpose of the Act as "to prevent child abduction and the sexual exploitation

12   of children."  Making penalties against child kidnapping stronger, and in case

13   of non-family member abduction, 18 U.S.C. § 1201(g), making it a minimum

14   20-year sentence; *Id. Sec. 104*.  Modifying the statute on international parental

15   kidnapping, 18 U.S.C. § 1204, to be consistent with the Act; *Id. Sec. 107*.

16   Removing statutory limitations for prosecution of parental child abduction, 18

17   U.S.C. § 3283; *Id. Sec. 202*.)  The DOJ Fact Sheet for the Act acknowledges

18   these aspects of the Act.  (Source: http://www.justice.gov/opa/pr/2003/April/

19   03_ag_266.htm.)  It further states that "[t]he bill provides the judiciary with

20   less authority to give reduced prison sentences, by eliminating much-abused

21   grounds of departure such as 'diminished capacity,' aberrant behavior,' and

22   'family and community ties.'")  The executive branch clearly does not apply

23   the same standard to its own functions while dealing with child abduction, as

24   is evident here.  Federal agencies' position in this case of abduction is

25   contradicted by the Government's' official proclamations, and is in violation of

26   congressional acts and intent.  The position is however consistent with the

27   official position of multiple Attorneys General over the past twenty years

28   about *not prosecuting* the offenders under 18 U.S.C. § 1204.  Plaintiff alleges

30

FAC                                          Case No. 13-CV-2857-JLS-KSC

1    that the federal agencies' refusal even to conduct an investigation is consistent

2    with their prejudicial treatment of this case through the years.

3    85.  Plaintiff alleges that the continued malicious actions of various coconspirators

4    in this ongoing case of abduction continue to perpetuate the abduction and

5    alienation of Plaintiff's son.  Employees of state and federal agencies have

6    participated in those actions.  The agencies' argument regarding "primary

7    offender," *supra*, rings hollow in light of the facts over the past five years as

8    the "secondary offenders" continue to inflict damage.  Plaintiff believes and

9    alleges that the federal agencies' refusal to conduct any investigation, and to

10   disclose information pertinent to the unlawful 1990 passport issuance for

11   Plaintiff's infant son, *infra*, is intended to conceal the roles and identities of

12   various coconspirators, including past or present federal employees.

13   86.  Plaintiff believes and alleges that active participation and aiding and abetting

14   by federal employees in this abduction (unlawful issuance of the infant's 1990

15   passport, continued issuance of U.S. visas to the abductors, re-abduction of

16   Plaintiff's child from the United States in 1998, granting various conspirators

17   immigrant visas and citizenship of the United States in spite of their violation

18   of laws, etc.) is a direct result of a policy (official as well as quasi-official) and

19   custom of ignoring various criminal statutes pertaining to child abduction, and

20   unlawfully granting credit to foreign custody orders obtained from non-Hague

21   jurisdictions without due process to the left-behind parent.  Plaintiff further

22   alleges that these actions of federal employees and their supervisors are based

23   on Plaintiff's race, ethnicity, nationality and gender, and were in furtherance of

24   the conspiracy to deny Plaintiff equal protection of the laws.

25   87.  Plaintiff further believes and alleges that the USDOS deliberately continues to

26   be delinquent in its responsibility to report accurately, truthfully and

27   completely to the United States Congress and to the public the true nature of a

28   child abduction to India.  While the USDOS's country-specific information for

31

FAC                                                Case No. 13-CV-2857-JLS-KSC

India, *supra* (Exhibit 4), was truthful and helpful, it ignored the reality of
498A which has resulted in a gender-based bias in the Indian system. Further,
in cases of abduction by a father, Indian courts have routinely and rightfully
returned those children to the left-behind mothers in the United States. The
same courts however have consistently refused such justice to the left-behind
fathers. The USDOS has never made public such information. Further, even
that incomplete depiction of abduction to India is no longer reported by the
USDOS. Its current web site simply states that India does not comply with the
Hague Convention, and nothing more.

88. The OCDA filed criminal charges against the AP in 2008 – more than 17 years
after Plaintiff's child was abducted. The AP accompanied Plaintiff's now
grown to the U.S. later that year and was arrested at the Los Angeles Airport.

89. After the AP was arrested, Plaintiff once again urged the OCDA to establish
facts, a step he found necessary to overcome his son's brainwashing and
alienation, and also in the interest of justice. Plaintiff failed in his attempts.

90. Plaintiff further requested the OCDA to assist with joint counseling for his son
and him. The OCDA connected Plaintiff with the National Center for Missing
and Exploited Children ("NCMEC"). The NCMEC was helpless to intervene
without the son's cooperation as he was legally an adult now. (See Exhibit 9,
Plaintiff's e-mail communication with the OCDA's investigator, Mr. Paul
Litchenberg ("Litchenberg"), and the prosecuting attorney, Mr. James Bacin
("Bacin").)

91. Soon thereafter, Plaintiff asked the OCDA if it had a phone number for his
son. The OCDA forwarded Plaintiff's request to the AP's defense attorney – a
representative of the same offender who had victimized and brainwashed the
child since the tender age of six months. (Exhibit 10.)

92. Plaintiff received an e-mail from Thiagarajah, the AP's defense attorney.
(Exhibit 11.) Thiagarajah proposed a meeting "between [Plaintiff],

32

[Plaintiff's] attorney, [the AP] and [the AP's] attorney, to discuss the pending [criminal] case and the future of [Plaintiff's] relationship with [Plaintiff's] son." Thiagarajah falsely suggested that Plaintiff had asked for such a meeting. Plaintiff had indicated to his son that a face-to-face meeting between his mother (the AP) and Plaintiff might be useful as no such meeting had taken place in eighteen years. Plaintiff had no intention to discuss the criminal matter, and had no legal standing to discuss such a matter. Further, Thiagarajah's impermissible linking of the criminal matter with the future of Plaintiff's relationship with his son was a brazen attempt at blackmail and intimidation of a victim and a witness. The AP was being prosecuted for holding the father-son relationship hostage for over eighteen years, the very crime that Thiagarajah perpetuated through his e-mail.

93. Due to the unfortunate nature of a long-term child abduction and brainwashing of the child, Plaintiff had no choice but to pursue such a meeting. Plaintiff informed Bacin of Thiagarajah's proposal and asked if the OCDA would facilitate such a meeting. Bacin informed Plaintiff that the OCDA would not participate in such a meeting. He also advised Plaintiff that if Plaintiff was to pursue such a meeting on his own, Plaintiff should have his own attorney or at least a witness present. Plaintiff specifically told Bacin that Plaintiff considered Thiagarajah's e-mail as blackmail.

94. Plaintiff engaged a private attorney at his own expense to communicate with Thiagarajah. Thiagarajah changed his tactics, and did not want any attorney or witness present in the meeting. No meeting took place.

95. Soon thereafter, Plaintiff reached out to his son through e-mail on February 7, 2009. (Exhibit 12.) This communication was not related to the criminal proceeding. Plaintiff simply wanted to talk to his son. The son curtly responded: "Henceforth, please communicate through my mother's attorney."

96. Plaintiff believes and alleges that Thiagarajah attempted to silence Plaintiff

33

from giving a truthful and complete account of events in the criminal proceeding as a key witness, and from seeking a fair and just resolution as the crime victim. Thiagarajah's actions amount to obstruction of justice under CPC §§.136.1(a)(1), (2); (d).[27] The violation is even more serious as it was committed in furtherance of the continuing conspiracy to deny Plaintiff his due process and equal protection rights and to conceal identities and capacities of various conspirators in the abduction. (See CPC §.136.1(c)(2).) Plaintiff further believes and alleges that Thiagarajah's witness tampering amounts to an act of moral turpitude and attorney misconduct. See California Business and Professional Code ("BPC") §.6106.

97. Plaintiff further alleges that California public officials conspired with the AP, Thiagarajah and other coconspirators in the conspiracy to exclude Plaintiff from proper participation in that criminal proceeding as a witness and a victim. *Infra*. Thiagarajah's actions were thus under the color of state law, and in violation of Plaintiff's rights as a crime victim under California Constitution.[28] See also California Government Code ("CGC") Title 5 §

---

[27] CPC §.136.1(a), paragraphs (1) and (2) state as below.
"Except as provided in subdivision (c), any person who does any of the following is guilty of a public offense [...]:
(1) Knowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law.
(2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law."
CPC § 136.1(d). "Every person attempting the commission of any act described in subdivisions (a), (b), and (c) is guilty of the offense attempted without regard to success or failure of the attempt. The fact that no person was injured physically, or in fact intimidated, shall be no defense against any prosecution under this section."
[28] See Cal. Const. Article 1, §. 28(b)(1), (2) identifying specific rights of a victim.

34

FAC                                                Case No. 13-CV-2857-JLS-KSC

53243.4 (identifying abuse of office and crimes against public justice).

98. Plaintiff believes and alleges that Thiagarajah's actions were in furtherance of the ongoing conspiracy to violate Plaintiff's constitutional rights (California Constitution, Marsy's Law), parental rights (the First and the Ninth Amendments to the United States Constitution), and due process and equal protection rights (the Fourteenth Amendment); and to obstruct justice in a state court to deny Plaintiff equal protection of the laws based on his race, nationality, ethnicity and gender. Plaintiff believes and alleges that other Defendants knowingly, deliberately and maliciously participated in Thiagarajah's unlawful actions. Plaintiff needs to conduct further discovery to fully establish facts and involvement of other Defendants.

99. Plaintiff's son has not responded to any e-mails or phone messages from Plaintiff since that communication in February 2009.[29] Thiagarajah's witness tampering has resulted in further perpetuation of the alienation. In a long-term abduction, even when the child grows up, he is incapable of independent thoughts regarding his relationship with the left-behind parent, which allows the perpetrators to continue to manipulate the victims. The AP, her coconspirators and Thiagarajah inhumanely assaulted the most vulnerable spot.

100. During her criminal prosecution, the AP sought a pre-plea deal and the matter

---

"(1) [...] to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process.
(2) To be reasonably protected from the defendant and persons acting on behalf of the defendant."

[29] Although Plaintiff does not have a phone number for his son, Plaintiff found out in 2012, over the internet, that his son is a student at Boston College. Immediately after the Boston Marathon bombing, Plaintiff called the Mathematics Department at Boston College and asked for his son. He was transferred to a voice mailbox. Plaintiff left a message requesting his son to let Plaintiff know about his well-being. Plaintiff never heard from his son.

35

was referenced to the Orange County Probation Department ("OCP"). The prosecuting attorney informed Plaintiff that a probation officer would interview him. Plaintiff patiently waited to hear from the OCP. The probation officer assigned to the matter, Ms. Teri L. Lindsay ("Lindsay"), never contacted Plaintiff. Plaintiff contacted the OCP and asked for the name and contact information of the probation officer assigned to the case.

101. Plaintiff called Lindsay and left a voice message. Lindsay returned that call and Plaintiff talked to her briefly *once*. There is no reason to believe that Lindsay would have contacted Plaintiff or sought his statement if Plaintiff had not initiated the contact on his own.

102. During that phone conversation, Lindsay remarked that Plaintiff's son was not willing to give Plaintiff "a second chance." Plaintiff found that comment quite odd in light of the fact that the child was abducted at the age of six months and had never seen Plaintiff. The father and the son were never given the first chance. Plaintiff stated that he would like to start by providing a written statement and follow up with an interview. Lindsay informed Plaintiff that she would send him a letter outlining the nature of input sought. The OCDA's case file, which should have been forwarded to Lindsay, had Plaintiff's latest contact information. Lindsay did not send the promised letter to Plaintiff.

103. Plaintiff sent an e-mail to Lindsay on May 10, 2009 requesting a short extension and also reminding her of the letter she had promised. (Exhibit 13.) Lindsay mistook Plaintiff for the abducted child and responded.

104. Through her e-mail as well as a separate letter dated May 12, 2009, Lindsay asked Plaintiff (whom she mistook as the abducted child) to provide his input regarding his loss, any financial restitution and penalty sought. Lindsay never asked *Plaintiff, the left-behind parent*, for such information, and more importantly, for his account of events and causes of child abduction in 1990.

105. Lindsay asked the abducted child: "What you think should happen as a

36

FAC

Case No. 13-CV-2857-JLS-KSC

punitive consequence if the defendant (in this case your mother) is convicted, if anything." (Exhibit 13, *supra*.) It is well-established that an abducted child, particularly when the abduction starts at the age of six months, empathizes with and relates to his abductors, and rationalizes and defends their actions. The child also participates in a campaign of denigration against the left-behind parent. The tragedy is to be treated as child abuse.[30] Asking an abused, brainwashed child about the nature and extent of suffering is against every principle of the nature of child abduction.

106. Lindsay's use of the phrase "if anything" while discussing punitive consequence, and her subsequent recommendation that the AP should not serve any jail time, establish that she had already made up her mind about the case *prior to receiving or reviewing any input from either victim.*

107. Lindsay further asked the abducted child if Plaintiff knew the child's whereabouts over the years. First, Lindsay should have asked Plaintiff, the left-behind parent, that question as well. Second, as the USDOS has established, knowledge of an abducted child's whereabouts in India has no bearing on resolving the matter.

108. Plaintiff faithfully provided his written input to Lindsay, and addressed the psychological and emotional damage as well as efforts he had made to establish contact and custodial rights. Plaintiff suspected that the AP was making false and malicious accusations of abuse as she had always done, and addressed the issue briefly in his letter to Lindsay. Plaintiff however was in the dark about what accusations were being made and who was making them.

---

[30] Leading experts have recognized the life-long and multi-generational psychological and emotional damage caused by this crime. See *Faulkner, Nancy, Ph.D. "Parental Child Abduction is Child Abuse,"* presented to the United Nations Convention on Child Rights in Special Session, June 9, 1999. *Peer Reviewed at the U.N.* (Source: http://www.prevent-abuse-now.com/unreport.htm.) See also *Baker, Amy, J.L.*, *supra.* The USDOS has published similar findings.

FAC                                                    Case No. 13-CV-2857-JLS-KSC

He could not possibly address such accusations or motives of the accusers.

109. After providing his written input, Plaintiff attempted to contact Lindsay to follow up on his input and to schedule an interview. Lindsay did not return Plaintiff's call. She never saw or interviewed Plaintiff. Plaintiff had no choice but to write directly to the prosecuting attorney and the Superior Court. Lindsay violated Plaintiff's rights as a crime victim guaranteed under California Constitution.[31] Lindsay also participated in the conspiracy to keep Plaintiff, a victim and a witness, from fully participating in a criminal proceeding involving abduction of his child. Lindsay was supposed to abide by CPC § 278, a statute specifically enacted to protect parental rights. She excluded Plaintiff, a left-behind parent, from her "fact-finding."

110. During the pre-plea hearing in the Superior Court on June 12, 2009, Plaintiff was horrified to hear that Lindsay had concluded that the AP was abused and had recommended that the AP should not serve any jail or prison time. Lindsay violated and ignored every well-established guideline and statute regarding child abduction. See the PROTECT Act, *supra*. See also CPC § 278.6(a) (identifying the relevant factors and circumstances that are *required* to be factored in sentencing): paragraphs (4) (abduction outside the United States), (5) (the child never returned to the lawful custodian), (9) (duration of the abduction) and (10) (age of the child at the time abduction started).

111. Plaintiff stated to the Court that it would give him no pleasure if the AP was sentenced to five years, and no grief if she was allowed to walk. Plaintiff begged the Court to establish facts as that was the only means of overcoming his son's alienation. (Plaintiff's son was present in the Court, and so were

---

[31] See Cal. Const. Article I, § 28(b)(8) identifying specific rights of a victim. (8) To be heard, upon request, at any proceeding, including any delinquency proceeding, involving a post-arrest release decision, plea, sentencing, post-conviction release decision, or any proceeding in which a right of the victim is at issue.

38

some of the Defendants in the instant action.)  The Honorable Thomas M. Goethals of the Superior Court sympathized with Plaintiff's predicament, but remarked that it was the executive branch's job to conduct an investigation, and not of the court.  During the same hearing, Plaintiff urged the AP to take a polygraph test as he had done.  The AP simply smiled.

112. After reviewing the entire file, the AP's defense, and after listening to Soumitra and Plaintiff as the crime victims, the Honorable Judge set aside Lindsay's recommendation and offered the AP a jail term.  With full knowledge of the AP's accusations and the CPS report, Judge Goethals unequivocally stated that "the son would have been far better off with long-term legitimate unpolluted exposure to his father."  While commenting on Soumitra's alienation, Judge Goethals repeatedly remarked that "the well has been grossly poisoned."  He summed up Plaintiff's loss as below.

> "The victim [...] has been deprived of a gift as a parent; which I can say is probably the most precious gift that any parent has, which is time to raise and get to know his son.  And he's never going to get that back.  That's destroyed.  And that was destroyed by the Defendant's [the AP] conduct in this case."

113. Bacin (the prosecuting attorney) informed Plaintiff that Bacin had expressed his displeasure to both Lindsay and the judge regarding the pre-plea process, and that he told them that the victim (i.e. Plaintiff) was not heard during that process.  Bacin informed Plaintiff that Lindsay told Bacin that she had followed the OCP's process, and that Bacin told Lindsay that, if that was the case, the OCP's process was wrong.

114. Soon thereafter, Plaintiff called the OCP to find out the contact information for the agency's top official.  Plaintiff was informed that Mr. Chris Bieber was the "Director of the agency."  Plaintiff wrote directly to the Superior Court on July 21, 2009 about Lindsay's inappropriate actions and conclusions.  Plaintiff sent copies of his letter to the prosecuting attorney and Mr. Bieber.  The AP

FAC                                              Case No. 13-CV-2857-JLS-KSC

1    pleaded guilty on July 24, 2009.

2    115. On July 1, 2009, Plaintiff filed a written request with the OCP's Custodian of

3         Records for a copy of the pre-plea report. Plaintiff was initially told that the

4         report would have to be reviewed and redacted. Then he was told that his

5         request was being reviewed by an attorney for the OCP, and that he might not

6         be given a copy. The OCP denied Plaintiff's request citing California

7         Constitution, Marsy's Law Article 1, Section 28(b)(11). (Exhibit 14.) First,

8         that section does not prohibit disclosure of a pre-plea report. Further, the

9         intent of Marsy's Law was to ensure a victim's rights and to give him fair

10        visibility to criminal proceedings, among other rights. When a pre-plea report

11        is prepared, a plea offer is made to the defendant and accepted by her, there is

12        no separate pre-sentence report. In such a case, the pre-plea report replaces a

13        pre-sentence report. The OCP's distinction between the two defeats the

14        purpose of the constitutional amendment (Marsy's Law) made in 2008, and is

15        therefore unconstitutional. In any case, the OCP's refusal to disclose the

16        document, even a redacted one, was intended to conceal Lindsay's unlawful

17        and unconstitutional actions, and her malicious and baseless conclusions.

18        Such concealment was necessary to perpetuate the conspiracy to deny Plaintiff

19        equal protection of the laws.

20    116. Plaintiff petitioned the Superior Court as a pro se victim for release of the pre-

21         plea report. Thiagarajah vehemently opposed disclosure of any written

22         statements by the AP, her family and friends. Many of these individuals were

23         coconspirators in the abduction. Their communication with the OCP had very

24         low probative value of truthfulness. It was also in furtherance of the

25         conspiracy, and Plaintiff requires discovery of such communication to fully

26         establish facts as well as identities, roles and capacities of coconspirators.

27    117. The Superior Court issued an order for disclosure of a redacted pre-plea report

28         on July 6, 2010. The report was prepared and/or signed by Colleene Preciado,

                                          40

1    the Chief Probation Officer, and Lindsay.

2 118. Based on his review of the redacted pre-plea report and without any visibility

3    to its attachments, Plaintiff understands that dozens of individuals, primarily

4    from India, wrote to Lindsay on behalf of the AP, and that Lindsay had the

5    time and resources to review such irrelevant input and to include it in her

6    report. Lindsay however did not contact either Plaintiff or the USDOS or the

7    OCI while conducting her "pre-plea investigation." Not only is the OCI the

8    Central Authority for the Hague Convention, but it also had managed this

9    specific case of abduction for over a dozen years. The OCI would have

10    informed Lindsay that the AP had specifically asked the U.S. Consulate in

11    Mumbai *not to disclose* her and the child's whereabouts or contact information

12    to Plaintiff as well as the circumstances surrounding such concealment.

13 119. In his statement to the OCP, Thiagarajah made numerous factual assertions

14    that are contradicted by documentary evidence. Had Plaintiff been given an

15    opportunity to explain, such misrepresentations would have been readily

16    exposed. For example, Thiagarajah claimed as below.

17

18       "And Mr. Kulkarni has paid a mere pittance in child support. He has
19       refused to comply with the Indian court order for child support and
       even refused to pay when his own son directly asked him for money.
20       When Soumitra was older, he wrote a letter to his father asking him
21       for financially [sic] assistance. That plea fell on deaf ears."

22 First, Thiagarajah's depiction of Plaintiff's lack of desire to pay child support is

23 contradicted by the 2001 events and e-mail communication between Plaintiff

24 and the AP. *Supra*, Exhibit 8. Further, Plaintiff believes and alleges that

25 coconspirators manufactured "evidence" of communication from Soumitra to

26 Plaintiff for misuse in the criminal proceeding and later used it in the state

27 civil action as well. Plaintiff did not receive the letter from his son as

28 described by Thiagarajah. Plaintiff never received *any* letter from his son. It

FAC                                   Case No. 13-CV-2857-JLS-KSC

is easy to induce an abducted and brainwashed child to participate in such fraud. By making Thiagarajah the "gate" for any communication between Plaintiff and his son, and by excluding Plaintiff from the pre-plea process, conspirators ensured that their continuing unlawful and despicable acts would go undetected and unchallenged. These actions amounted to fraud on the court, and were in violation of California statutes for false evidence.

120. Thiagarajah's assertion below is in stark contrast with the events of 1998 when the AP brought the child to the U.S. and concealed him from Plaintiff.

> "The crime of child abduction targets parents who seek to conceal their child from the other parents, and parents who seek to avoid or disobey the courts in terms of custody or visitation. This is nothing like Neelam's case."

121. Thiagarajah further espoused the Indian court's "findings" of the AP's abuse.

> "The Indian Family court made other findings as well, including a finding of cruelty by Mr. Kulkarni against Neelam and that Mr. Kulkarni 'had created a situation which compelled the petitioner (Neelam) to leave the matrimonial home.' The court restated the testimony of witnesses that Mrs. Upasani came to Ms. Thakur's house when she was residing in CA and saw the marks from her beatings and remarked that 'her condition was such that it was dangerous to live with him (Avinash).'"

First, results of Plaintiff's polygraph test, *infra*, establish beyond any doubt that he never abused his wife. No conspirator has taken a polygraph. The AP specifically declined to take one. Second, the Indian court's findings were not based on Mrs. Upasani's (Defendant Meera) testimony, but on other conspirators' testimony about what Meera "witnessed." It was unreliable and inadmissible hearsay. Third, these assertions are directly contradicted by Meera's statements throughout the years, including during the state civil action

42

of 2009-13.  Meera has repeatedly stated under oath that she never came to Plaintiff's home, and never witnessed or suspected any abuse.  Fourth, such wild accusations were made, for the first time, from the safe haven of India, years after the abduction started and for the purpose of 498A complaints and divorce.

122. In spite of calling the AP a liar for falsely implicating her in the abduction, Meera posted $100,000 bail for the AP during the criminal proceeding. Plaintiff does not know if Meera provided a statement to the OCP, and if she did, whether her statements are consistent with her statements in other venues. Plaintiff needs to conduct discovery of the pre-plea report.  It directly pertains to Plaintiff's claims about fraud as well as denial of equal protection of the laws.  The OCP has zealously thwarted Plaintiff's efforts at discovery in order to conceal unlawful actions of many conspirators.

123. Thiagarajah further made the following assertions.

> "The DA indicates that no reports of domestic violence were reported before Neelam fled - that's not evidence that domestic violence didn't exist. Twenty years ago, domestic violence was not viewed as seriously by law enforcement and by society as it is today. And even today, there are many women who do not report domestic violence. Twenty years ago, there would have been a larger percentage of women who did not report domestic violence. This percentage would be even greater for immigrants, especially those, like Neelam, who come from cultures that don't acknowledge domestic violence and who are unfamiliar with the mechanisms of help in this country."

Thiagarajah's assertions are contradicted by the findings of the USDOS as well as by the findings of Indian courts regarding their own culture and 498A. Thiagarajah's depiction of a helpless woman trapped in a foreign land is contradicted by actions of various coconspirators including employees of the OCSSA who continued to persecute Plaintiff long after the AP was gone.

43

FAC                                          Case No. 13-CV-2857-JLS-KSC

124. Plaintiff's recent discovery of partial OCSSA records, *infra*, does not include any records of the OCSSA's malicious complaints to the INS against Plaintiff. While the OCSSA has disclosed such information to conspirators over the past three years, *infra*, it has concealed it from Plaintiff. Such concealment is in furtherance of the ongoing conspiracy and is necessary for its continuation.

125. Thiagarajah made numerous statements advocating judicial notice and legitimization of the Indian court order. ("No US court has nullified in [sic] the Indian family court's order of divorce, child custody and child support.") No U. S. court could lawfully uphold the Indian court order regarding child custody without violating Plaintiff's parental rights, due process and equal protection rights, and a multitude of state and federal statutes.

126. Without ever interviewing Plaintiff, and based entirely on coconspirators' statements, Lindsay made the following observations in her pre-plea report (which is not an exhaustive enumeration of all her findings):

> "The defendant was interviewed at the Probation Department." (Plaintiff however was not.)

> "The crime was committed because of unusual circumstances, such as continuous abuse."

> "She [the AP] then returned to her childhood home, the same home where she was raised and had met the victim, and the victim knew her exact whereabouts. She did not flee from country to country or exert effort to deprive the victim of information or contact with his son."

> "The defendant fled an abusive home situation with her infant son in 1990 and returned to her parents' home in India, the country of her origin."

> "[W]hen he [Plaintiff] failed to go to India to discuss the matter *in person*, or to reestablish a relationship with his son, she [the AP] eventually filed for divorce and was granted sole custody of their

FAC                                                  Case No. 13-CV-2857-JLS-KSC

son." (*Emphasis added.*)

"[I]n light of the defendant's victimization and the continued turmoil reportedly inflicted upon her by the victim, a compassionate disposition involving a lengthy number of community service hours or a substantial donation to a charitable organization in this county dedicated to assisting domestic violence victims, may also be viewed as suitable consequence..."

127. Lindsay's findings regarding this case directly contradict findings of Indian judicial authorities (including the Indian Supreme Court), other Indian experts (such as social workers, senior police officers and attorneys), and most importantly, the USDOS (which is the Central Authority for the Hague Convention). Her findings deliberately ignore the ground realities of an international child abduction and the widespread abuse of 498A in India.

128. The AP's, Thiagarajah's and Lindsay's repeated discussion of how Plaintiff did not return to India to discuss the matter *in person* is a clear admission of the AP's malicious intent to abuse 498A. If conducted in good faith, such a discussion could have taken place over the phone. Throughout the years, Plaintiff specifically asked the AP to withdraw her malicious accusations *in Indian courts* so that he could return to India. The AP and Defendants depict Plaintiff's reasonable expectation as bullying of a helpless Indian woman. (The AP and all Defendants have specifically and repeatedly played the "Indian woman/Indian man" card throughout the past 24 years, including the AP's criminal prosecution in 2008-9 and the 2009-13 state civil action.) Any accusations of abuse that allegedly occurred in the United States should have been addressed in the United States where authorities could conduct a fair investigation. Plaintiff's expectation was ethical, moral, lawful and fair. This is just one of numerous instances where coconspirators have turned their unlawful and malicious actions into a virtue, and denied Plaintiff due process

45

FAC                                         Case No. 13-CV-2857-JLS-KSC

1   and equal protection of the laws.

2   129. During the state civil action, Defendants presented an "expert" from India

3       whose only qualification was that he was an attorney from India.  His

4       "expertise" was in representing sex workers, and he had negligible or no

5       experience in family law, international child abduction or 498A.  The expert

6       went on to discredit, abuse, and disagree with rulings of the Indian Supreme

7       Court, United States statutes, international treaties, and findings of the

8       USDOS and the United Nations regarding India.  He had no authorities for

9       such bold statements other than his personal opinions.  He however

10      inadvertently presented a 2010 case law from the Indian Supreme Court where

11      the Court ruled that a woman may not file a 498A complaint after the divorce

12      is finalized.  During cross-examination, the expert effectively admitted that the

13      ruling meant that the AP could have continued to file any number of 498A

14      complaints against Plaintiff and his entire family all the way through 2010,

15      after the divorce was finalized in 1995, for alleged abuse that occurred in the

16      United States in 1990.  Without addressing this fundamental issue, Lindsay

17      and Preciado baselessly and maliciously concluded that "there is nothing to

18      suggest, other than the victim's denial, that the defendant is not telling the truth

19      in this matter."

20  130. Plaintiff will present further documentary evidence during this action that

21      discredits many of Lindsay's and Preciado's "findings."  Plaintiff believes and

22      alleges that the AP, her coconspirators, Thiagarajah, Lindsay and Preciado

23      conspired to deliberately exclude Plaintiff from any meaningful participation

24      in the pre-plea investigation as they were fully aware that their findings and

25      recommendations will be discredited.

26  131. Plaintiff alleges that Lindsay's and Preciado's actions in their official capacity

27      during the pre-plea process were in furtherance of the conspiracy to deny

28      Plaintiff equal protection of the laws and his constitutional rights.  Their

FAC                                    Case No. 13-CV-2857-JLS-KSC

actions resulted from prejudice against Plaintiff based on his race, ethnicity, nationality and gender. For example, if Plaintiff were a woman and a left-behind mother of an abducted child and if the abducting father made similar accusations of abuse, Lindsay's and Preciado's actions and conclusions would have been entirely different. In such a case, they would not have pursued the lynching of Plaintiff that they performed. If Plaintiff was a white man born and raised in the United States, Lindsay would not have made her outrageous findings without giving Plaintiff an opportunity to present his story.

132. Thiagarajah, Lindsay and Preciado repeatedly and extensively relied on "findings" of the Indian court during the divorce matter in 1993-95 and its order, including child custody. They brazenly exhorted the Superior Court to ignore Plaintiff's rights under the Hague Convention, the UCCJA/UCCJEA and various other state and federal statutes, which require that all such issues, and particularly that of child custody, should have been adjudicated in California. They deliberately ignored the requirements of CPC § 278.7(c)(2) which makes the Indian court order unlawful. They also exhorted the Superior Court to legitimize the lack of due process and equal protection of the laws inherent in the Indian court order. The Indian court's jurisdiction was limited to granting a divorce, and nothing more. Thiagarajah's advocacy and argument, as an attorney and an officer of the court, was unsupported and contradicted by law. He violated BPC § 6068, subd. (a) and (c).

133. While Thiagarajah, Lindsay and Preciado repeatedly discussed the plight of a poor helpless Indian woman who went without financial support from Plaintiff whose child she had abducted, Lindsay and Preciado outrageously suggested "a substantial donation to a charitable organization in this county dedicated to assisting domestic violence victims." First, there was no domestic violence. Further, they did not clarify if the poor AP was going to make such a donation on her own, or if other conspirators were going to contribute in exchange for

47

concealment of their identities and capacities during the abduction, similar to their posting of bail for the AP. The pre-plea report is silent on the names and roles of conspirators to the abduction. Although it cites extensively from the Indian court order, it curiously does not mention the Indian court's "finding" that Meera purchased one-way airline tickets for the abduction. That was the only admissible statement from the Indian court proceeding because it amounted to a statement against interest and statement about a conspirator by the AP and her parents. Thiagarajah, Lindsay and Preciado deliberately concealed identities of such conspirators. Continuing concealment of facts has been necessary to continue the conspiracy to deny plaintiff due process and equal protection rights.

134. The OCP's pre-plea process has effectively legitimized an unfettered pathway to child abduction where coconspirators can continue their mudslinging with impunity, the left-behind parent (a colored man of East Indian origin) is excluded from any investigation, the abductors' falsehoods are accepted without adversarial due process, laws are ignored, and the abduction is legitimized. This process allows the abductors and the OCP to effectively declare, twenty years after the abduction, that the LBP had forfeited his right to child custody prior to the commencement of the abduction. The OCP's standard for due process rights and equal protection of the laws to a left-behind father of East Indian origin is identical to Indian standards. It is unimaginable under the American principles of justice. Plaintiff alleges that OCP employees and their supervisors were enabled in their violation of Plaintiff's rights by the discriminatory policies, practices and customs of the OCP. All private parties, who conspired with the OCP officials, were acting under the color of state law.

135. After the AP pleaded guilty to the felony crime of child abduction, Plaintiff filed the state civil action to seek relief for the abduction of his only child.

48

136. While the AP was serving her sentence in the custody of the Orange County Sheriff, her deposition was taken on behalf of Plaintiff on December 29, 2009. (Excerpts attached as Exhibit 15.) As the AP had lived in India between 1990 and 2008, this was Plaintiff's first opportunity to depose her. The AP admitted that she acquired the infant's passport in 1990 for the purpose of abduction and that she kept Plaintiff in the dark. (Exhibit 15, 103:12-17; 104:23 - 105:1.) When asked about assistance by other individuals in the abduction, the AP initially "refused to tell," and then claimed that she did not remember. Her attorney, Ms. Kiran Nair (who worked for Thiagarajah's law firm), acknowledged that the AP would not cooperate in the court-ordered deposition for the fear of criminal prosecution of her coconspirators. (Exhibit 15; 53:13 - 55:25.) Plaintiff's efforts to establish the identity of the coconspirators failed due to the AP's non-cooperation.

137. Thiagarajah and/or Nair violated Rule 5-220 of California Rules of Professional Conduct[32] and BPC § 6077[33].

138. The AP was serving her felony sentence at the time of her deposition perjury. The terms of her probation specifically required her to obey the laws and court orders. The deposition was taken pursuant to an explicit order of the Superior Court to conduct such a deposition at the jailhouse. The AP was thus in violation of various laws and terms of her probation. By allowing their client to testify falsely, Thiagarajah and Nair violated BPC § 6068(d) which amounts to fraud on the court and Plaintiff. Plaintiff further alleges that various conspirators suborned the AP's perjury in furtherance of the ongoing

---

[32] "Rule 5-220 (Suppression of Evidence): A member shall not suppress any evidence that the member or the member's client has a legal obligation to reveal or to produce."

[33] BPC § 6077. "The rules of professional conduct adopted by the board, when approved by the Supreme Court, are binding upon all members of the State Bar."

FAC                                          Case No. 13-CV-2857-JLS-KSC

conspiracy and to obstruct justice.

139. The AP was deported to India soon after that deposition, and has been unavailable to Plaintiff for further testimony ever since. Plaintiff believes and alleges that actions of the AP, Thiagarajah, Nair and other conspirators were part of the elaborate scheme to commit fraud on Plaintiff and the Superior Court during various state actions (criminal and civil) arising out of the abduction of Plaintiff's child. The concealment also was in furtherance of the conspiracy to deny Plaintiff his due process and equal protection rights.

140. During her deposition, the AP effectively admitted committing multiple crimes, including fraudulent passport acquisition for the child in 1990 for an unlawful activity[34], child abduction[35], a conspiracy with other individuals to commit those crimes and a continuing conspiracy to conceal their identity[36]. Coconspirators in the continuous crime of child abduction can be prosecuted under 18 U.S.C. §§ 1201(g), 1204. Statutory limits for prosecution never expire. (18 U.S.C. §§ 3283, 3299.)

141. In spite of the AP's non-cooperation during her deposition, Plaintiff joined Meera, her husband Mohan, Madhavi (the AP's sister) and Rajesh Nerurkar ("Rajesh," Madhavi's former husband) as defendants in the state civil action. This amendment was based on the AP's past statements, Meera's posting of $100,000 bail for the AP in spite of the AP implicating Meera in the abduction, and other facts known to Plaintiff at the time.

142. Rajesh was no longer married to Madhavi at the time and wanted to renounce his role in the conspiracy. Plaintiff and Rajesh reached an out of court settlement. Rajesh provided an affidavit which detailed many facts of the ongoing abduction. (Exhibit 16.) Rajesh provided specifics of involvement of

---

[34] 18 U.S.C. §§ 1542, 1544, 1546
[35] 18 USC § 1204; CPC § 278
[36] 18 USC § 373

50

coconspirators Meera, Mohan and Sunila (such as unlawful passport acquisition, providing the AP with money, airline tickets and transportation, etc.) (Exhibit 16, ¶¶ 3, 8.) This was the first time Plaintiff came to know about and/or got confirmation for many details of the abduction and actions of specific individuals, including unlawful assistance in passport acquisition for the infant. Meera, Mohan and Sunila have explicitly denied any knowledge of or participation in any of the acts alleged by Rajesh. Rajesh's statements are against interest. Although he did not know the principals in 1990, Rajesh came to know Madhavi and the AP in 1996. He has admitted to concealing the child in his home in 1998 with full knowledge that the child had been abducted. Rajesh has exposed himself to criminal prosecution for which the statutory limit never expires. Rajesh testified to these statements in the state civil action. His affidavit and testimony are the most trustworthy of any coconspirator's statements made at any time over the past twenty-four years.

143. Based on Rajesh's affidavit, Plaintiff joined Sunila as a defendant in the state civil action.

144. Soon after learning from Rajesh that the child's 1990 passport was acquired fraudulently and mailed to Meera's home, Plaintiff contacted the Passport Office within the USDOS in about April 2011 to request passport records from 1990 to establish the veracity of Rajesh's account. Plaintiff was told that he would need an order for disclosure from a federal court. Plaintiff had no pending federal action or cause to seek such an order. The state civil trial started soon thereafter and Plaintiff could not conduct such discovery through the state court which did not have the authority or jurisdiction to order a federal agency to disclose records.

145. Soon after the state trial was complete, Plaintiff filed a federal action in the Central District of California on September 12, 2011 for disclosure of USDOS records. The federal defendant argued, and the Court agreed that Plaintiff had

51

not exhausted his remedies through the administrative process of filing a Freedom of Information Act (FOIA) / Privacy Act (PA) request. Plaintiff's pro se action was dismissed without prejudice.

146. Plaintiff filed a FOIA request with the USDOS on October 8, 2011 for disclosure of how his son's 1990 passport was issued. The request carefully excluded any information that might be construed as the son's privacy-protected information. The USDOS initially informed Plaintiff on November 14, 2011 that it would disclose records after redacting any personally identifiable information (PII) (Exhibit 17). The agency then denied the entire request on December 19, 2011 citing its regulation 22 C.F.R. § 172.12(a) (requiring authorization of the subject of records) and FOIA Exemption 6 (invasion of privacy of the subject). (Exhibit 18.) FOIA controlling law requires the agency to provide a case-specific rationale for Exemption 6 withholding. Mere recitation of statutory language is not sufficient. The agency did not provide such analysis and violated the law.

147. After researching FOIA and PA legal framework, Plaintiff filed an administrative appeal on January 2, 2012. The USDOS denied the appeal on May 2, 2012 citing the same reasons. It also facetiously asked Plaintiff to work with law enforcement agencies with full knowledge that those agencies had deliberately declined to conduct any investigation throughout the years.

148. Having exhausted his administrative remedies, Plaintiff filed another FOIA/PA federal action in the Central District on June 18, 2012.

149. The USDOS sought and received a dismissal with prejudice for failure to abide by the requirement of 22 C.F.R. § 172.12(a) for third-party authorization. Plaintiff believes and alleges that various coconspirators' actions to induce Plaintiff's son to cut off any contact with Plaintiff was also intended to deny Plaintiff authorization by his son.

150. Plaintiff spent months conducting exhaustive research of FOIA legal

FAC                                                    Case No. 13-CV-2857-JLS-KSC

framework, congressional reports, controlling law as well as Government rule-making authority. He filed a motion to reconsider and to review the legality of the agency regulation on January 15, 2013. Plaintiff irrefutably established that the requirement for third-party authorization was unlawful under FOIA.

151. The USDOS did not argue against Plaintiff's motion and agreed to rescind its unlawful regulation. The case was reinstated on March 15, 2013.

152. After being served with a motion for sanctions under Fed. R. Civ. P. 11, defendant USDOS renounced its citation of and reliance on the unlawful regulation.

153. The USDOS then turned its attention to justify withholding of information under FOIA Exemption 6. It filed a motion for summary judgment on June 28, 2013 claiming, among other things, the invasion of privacy of individuals who may have assisted in the 1990 passport acquisition for Plaintiff's infant son. This was the first time the agency provided a "privacy analysis." FOIA specifically requires a detailed rationale for Exemption 6 withholding at the time of withholding. The USDOS spent the entire time between October 2011 and June 2013 withholding information pursuant to an unlawful regulation and without meeting its obligation to provide privacy analysis.

154. Plaintiff argued that information about an address where the passport was mailed in 1990 could not possibly be his son's privacy-protected information if the son never lived there. Plaintiff also argued that the FOIA action was not only to identify the private parties involved in the abduction, but also to expose a Government agency's unlawful actions in passport issuance, which is the primary purpose of FOIA. The USDOS' motion was granted and Plaintiff's FOIA action was terminated. The judge deferred to the agency's privacy analysis.

155. The instant action is not intended to relitigate the FOIA action which is presently on appeal. The two actions have entirely different claims, legal

53

1    bases and issues.

2   156. During the course of the FOIA action, the USDOS disclosed, for the first time,

3        on August 29, 2013 that the 1990 passport application included an Affidavit of

4        an Identifying Witness, implying that verification of information such as the

5        child's address was not based on documentary evidence such as utility bills,

6        but on statement of a third party. During the course of that litigation, the

7        Government attorney, Mr. David Pinchas ("Pinchas"), also informed Plaintiff

8        that "the passport may have been mailed to a different address."

9   157. Pinchas also admitted that he contacted and discussed the FOIA action with

10        Mr. James Abelin, an attorney representing Defendant Sunila. Such contact

11        was inexplicable for a FOIA action which entails discovery of Government

12        wrong-doing by any member of the public.

13  158. Plaintiff believes and alleges that the USDOS has deliberately, maliciously

14        and unlawfully stonewalled Plaintiff's discovery in order to conceal the

15        identity of coconspirators, including federal officials who issued the 1990

16        passport. Such concealment is not only for the purpose of avoiding criminal

17        or civil liability of those individuals, but also in furtherance of the continued

18        conspiracy to deny Plaintiff his due process and equal protection rights and to

19        obstruct justice in various judicial proceedings. Plaintiff submits that he needs

20        to conduct discovery of USDOS records to establish fraud in the state civil

21        action as well as to establish identity of unnamed federal Defendants.

22        Standard for such discovery in the instant action is pursuant to Fed. R. Civ. P.

23        26. It is quite different than the FOIA standard for disclosure.

24  159. In the state civil action, Defendants Meera, Mohan and Madhavi were

25        represented by Defendants Neal and Epps. Neal and Epps are employees of

26        Rutan & Tucker, LLP. After Plaintiff joined Defendant Sunila, she was

27        represented by Defendant Nicholas who also is Neal's brother. Nicholas is a

28        partner in Nicholas & Butler, LLP.

160. During the discovery phase of the state civil action, Nicholas noticed a video telephonic deposition of the AP who was in India. Nicholas canceled the deposition at the last minute and never rescheduled it, thus making the AP unavailable. Plaintiff believes and alleges that the deposition was canceled to avoid the AP's validation of many of her past statements that were inconvenient to Defendants. Had the AP validated such statements, they would have become admissible evidence. The statements included the AP's explicit prior statements under oath about assistance of various coconspirators as well as her explicit statements that the child was never abused. Admission of the latter statement would have precluded Defendants' defense that the child was abused. Such a deposition would also have exposed many inconsistencies in the AP's prior statements, and would have established her as a lying, spiteful child abductor. The AP has made, over the years, many inconsistent statements about who was abused, by whom, the nature of abuse and when the alleged abuse started. By not holding the deposition, Defendants once again shielded the AP from an adversarial proceeding.

161. The state civil trial commenced on June 22, 2011. Parties filed various motions in limine about a week before.

162. In their motion brief filed on behalf of Meera, Mohan and Madhavi on June 17, 2011, opposing Plaintiff's *motion in limine* to exclude alleged abuse, Neal and Epps made the following arguments and statements of alleged facts (Exhibit 19):

> "... the fact that Plaintiff's abuse of Neelam was the catalyst that forced her to escape to India with their son Soumitra in the first place." *p. 1.*

> Arguing against "depriv[ing] Defendants of the tools necessary to probe, test, and discredit Plaintiffs theory of the case," and "further prevent[ing] the jury from hearing and weighing evidence that is material to the context and just determination of this dispute." *p. 2.*

55

FAC                                              Case No. 13-CV-2857-JLS-KSC

"While it comes as no surprise that Plaintiff is desperate to shield the jury from evidence that he abused his wife which may be embarrassing, uncomfortable and damaging to his case, unfortunately for Plaintiff, this is not the standard for excluding evidence at trial. Evidence is not unduly prejudicial merely because it casts a party in a bad light, or because the party contests the evidence. [Citation] Rather, exclusion of evidence under section 352 is reserved for those cases where the proffered evidence has little evidentiary value and creates an emotional bias against the defendant. [Citation]" *p. 2.*

"... evidence of the abuse is extremely relevant and probative to, among other things, determination of Plaintiff's credibility and his motives for bringing suit, Defendants' defenses, and Plaintiff's punitive damages claims. Given the overwhelming probative value of the evidence..." p. 2.

"Defendants intend to present testimony and evidence at trial to expose the falsity of Plaintiff's claims that he never abused Neelam and to demonstrate that Plaintiff is responsible for causing Neelam and Soumitra to leave for India in the first place." p. 5.

"It is Defendants' position that Plaintiff commenced this action not because he experienced any compensable emotional distress due to being separated from his son, but rather because he desired to seek revenge against his ex-wife Neelam, and anyone who was acquainted with Neelam, in order to punish Neelam for accusing Plaintiff of abuse and escaping from his control." p. 5.

"[Defendants assert] the defense that Plaintiff is Responsible for Alleged Damages and that any damages sought by Plaintiff are due in whole or in part to Plaintiffs own negligent, deliberate, intentional, reckless, or unlawful acts or omissions. [Citation] Defendants also assert the defense of Comparative Fault and state that in the event they are found liable for any tortuous conduct, including negligence, which liability is denied, Plaintiff's recovery, if any, must be reduced in proportion to Plaintiff's comparative fault. [Citation] Accordingly, evidence that Plaintiff abused his wife is directly relevant to both of these defenses." *p. 6,* internal quotations omitted.

"[T]he evidence will show that Plaintiff's abuse of Neelam directly contributed to and/or was the sole cause of Plaintiff's injuries because Plaintiff's mistreatment of Neelam is what drove her to leave Plaintiff and take Soumitra to India in the first place... [E]vidence of the abuse is undeniably relevant and important to Defendants' affirmative defenses that Plaintiff caused and/or is at fault for any purported injuries he claims to have suffered for Neelam taking Soumitra to India, and that Plaintiff's recovery, if any, should therefore be barred." p. 6.

"Neelam was granted sole custody of Soumitra by the court in India based on her statements that Plaintiff had abused her during their marriage. When Neelam and Soumitra visited the United States in 1998 and stayed with Neelam's sister Madhavi, they were in the United States on valid Visas and Neelam had full custody of Soumitra as provided for in Neelam's divorce decree. Madhavi testified during her deposition that she was specifically aware of Neelam's claims that Plaintiff had abused her and that she was fearful for Soumitra's safety. Madhavi understood the abuse to be the reason why Neelam left for India with Soumitra, and why Neelam was eventually granted sole custody of Soumitra." *p. 7.*

"Defendants were informed and believed that Neelam had been granted full custody of Soumitra due in part to Plaintiffs abuse and that Plaintiff had no parental rights after April 1995." p. 7.

"In order to rebut Plaintiff's contention that Defendants acted maliciously, Defendants are well within their rights to introduce evidence of Plaintiff's abuse of Neelam to show that any purported assistance given by any of the Defendants to Neelam under the circumstances of her departure was not malicious, and was justifiable." *p. 7.*

"[I]t is understandable that Plaintiff may want to exclude evidence that is embarrassing or uncomfortable, and damaging to his case. Unfortunately for Plaintiff, that is not the legal standard to be applied. [...] Even if evidence concerning the abuse was unduly prejudicial within the meaning of the Code, which it is not, it is sufficiently

probative to outweigh any prejudice that might occur. To exclude relevant evidence under Evidence Code section 352, its probative value must be substantially outweighed by risk of undue consumption of time, undue prejudice, confusing the issues, or misleading the jury." *p. 8*, internal quotations and citations omitted.

"[E]vidence relating to the abuse is extremely probative. The abuse of Neelam by Plaintiff and Neelam's subsequent departure to India with Soumitra cannot be neatly and surgically separated from one another. They are inextricably intertwined. The abuse will put Neelam' s decision to take her son to India in context as an understandable act of a vulnerable and desperate mother looking out for the best interest of her child. It also explains why Neelam was awarded sole custody of Soumitra, and why no acts of Defendants can possibly be characterized as helping to 'conceal' Soumitra from Plaintiff, much less be motivated by malice so as to support Plaintiff's punitive damages claims. Additionally, the abuse is directly relevant to multiple affirmative defenses asserted by Defendants." *p. 9*.

"It is essential that the jury be informed of the factual background which triggered Plaintiffs separation from his son and this dispute in the first place, not merely Plaintiff's selective and inaccurate version of events." *pp. 9-10*.

163. In his concurrent motion brief filed on June 17, 2011 on behalf of Sunila, opposing Plaintiff's *motion in limine* to exclude alleged abuse, Nicholas made the following statements. (Exhibit 20; *emphasis* added.)

"[E]vidence of this abuse is highly relevant not only to Plaintiff's *claims for emotional distress*, but also to his *claims that Neelam kept Soumitra from Plaintiff during the entire time Soumitra lived in India*. Evidence of the alleged abuse will tend to show evidence of Plaintiff's demeanor and state of mind *during the time just prior to* and when Neelam was in India with Soumitra." (*Id. p. 2*.)

"Sunila intends to offer evidence of *Plaintiff's conduct at that time* as it relates to the abduction of Soumitra." (*Id. p. 3*.)

Nicholas then argued about the "probative value" of the evidence of alleged

FAC                                         Case No. 13-CV-2857-JLS-KSC

abuse and why it should be allowed.  (*Id. p. 3*, Sec. B.)  Nicholas argued on behalf of all defendants that "any order precluding the admission of such testimony and evidence at trial simply deprives Defendants of the tools necessary to probe, test and discredit the testimony of Plaintiff and any adverse witnesses, and further deprives the jury of hearing and weighing evidence that is material to the resolution of this case." (*Id. p. 4*.)  Finally, by stating that "Sunila does not intend to belabor the facts surrounding the alleged abuse by Neelam by Plaintiff," (*Id. p. 2*), Nicholas incorporated all arguments presented by Neal and Epps in their concurrent motion brief, *supra*.

164. By their own admissions, Defendants Neal, Epps, Nicholas, Meera, Mohan, Madhavi and Sunila introduced allegations of abuse as defense against damages as well as to re-litigate if Plaintiff's child was abducted at all (i.e. issue of liability).  Their pre-trial briefs, in-trial testimonies and cross-examinations in the presence of the jury, in-trial arguments outside the presence of the jury, opening and closing statements in the presence of the jury, arguments during post-trial motions, and arguments during the appeal "inextricably intertwined" discussion of abuse as it pertained to liability as well as damages.

165. Defendants' re-litigation of whether Plaintiff's child was abducted and whether the child or the AP was abused clearly contradicted the AP's guilty plea of malicious, unlawful and continuous abduction and her subsequent felony conviction..[37] [38] [39] [40]  It also violated the doctrines of *res judicata* and

---

[37] The AP entered her guilty plea stating that "on and between October 15, 1990 & March 25, 2008, [she] unlawfully took, kept, withheld Soumitra K., a child, maliciously & unlawfully depriving Avinash Kulkarni, a lawful custodian, of his right to custody."  Exhibit 1.

[38] "*malicious*:  1. Substantially certain to cause injury.  2. Without just cause or excuse."  *Black's Law Dictionary*, Ninth Ed. (2009), p. 1043.

59

*collateral estoppel.* Such re-litigation was impermissible and malicious. The AP was granted full due process rights during her criminal prosecution. She was represented and advised by a competent attorney. She entered her guilty plea under oath of her own free will. The judge in that proceeding accepted the plea and convicted her of a felony crime. Re-litigation of the issues of abduction and abuse during the civil action was impermissible. It was egregious in light of the fact that the AP did not testify in the civil action and was made unavailable by Defendants. Defendants improperly exploited Plaintiff's race, ethnicity, nationality and gender to introduce such re-litigation and to deprive him of equal protection of the laws.

166. Plaintiff further alleges that Defendants' repeated arguments, that the AP "went home" in 1990, that an Indian court granted her child custody based on allegations of abuse, that Plaintiff had no parental rights after April 1995 when the Indian judgment was entered, were unlawful. Per various federal and state statutes, international treaties as well as constitutional provisions cited earlier, all such arguments were unsupported and contradicted by the laws. They were made to brazenly exhort the court and the jury to deny Plaintiff his due process and equal protection rights because he was "different", a colored man of East Indian origin who should not be granted such rights in the United States. Defendants Neal, Epps and Nicholas were in violation of BPC § 6068, subd. (a) and (d), which amounted to fraud on the court and Plaintiff.

---

"*malice*: 1. The intent, without justification or excuse, to commit a wrongful act. 2. Reckless disregard of the law or of a person's legal rights." *Id.*, p. 1042.

[39] See Cal. Pen. Code §§ 278.5, 278.7. § 278.5 does not apply in case of abuse of the child or the abducting parent. A guilty plea pursuant to § 278.5(a) implicitly admits to absence of abuse. It explicitly admits to lack of just or lawful cause, and malice.

[40] Crime of child abduction is continuous as long as concealment, withholding or detainment of the child continues. See CPC § 279.1. See also 18 USC § 1204(a).

60

167. The AP, a coconspirator in this case of abduction, acquired the Indian custody order through fraud and brazen violation of Plaintiff's due process rights even under Indian laws, and most certainly under the American principles of due process. *Supra.* By basing their defenses and arguments in the Superior Court, and subsequently in the California Court of Appeal, on the Indian court order, Defendants exhorted those courts to legitimize the violation of Plaintiff's due process rights during Indian court proceedings. Plaintiff alleges that, through their repeated advocacy of the Indian court order, Defendants have taken ownership of the prejudice, lack of equal protection of the laws and lack of due process inherent in the Indian laws and judicial system in general, and in that Indian court proceeding in particular.[41]  Plaintiff alleges that these Defendants are liable for all damages arising out of the unlawful issuance of the Indian order as viewed under the American principles of justice.

168. Allegations of abuse is not a defense against the tort of child abduction under California law. Further, each defendant in the state civil action (namely, Meera, Mohan, Sunila and Madhavi) repeatedly stated that s/he had not heard of or suspected any abuse in 1990. Each of them stated that s/he considered Plaintiff to be a person of high moral character, and a loving and caring husband and father. Each of them stated that s/he was not aware of the AP's plan to abduct in 1990, and did not aid or abet in any manner. The same defendants and their attorneys then argued that "Defendants are well within their rights to introduce evidence of Plaintiff's abuse of Neelam to show that any purported assistance given by any of the Defendants to Neelam under the

---

[41] The AP brought the fraudulent Indian court order for execution in the Superior Court of Arizona in Phoenix in 2000. *Supra.* The Arizona Court dismissed the AP's petition with prejudice. Under the doctrine of *res judicata*, the issue of the Indian court order should not be and should not have been re-litigated in any California forum.

FAC                                         Case No. 13-CV-2857-JLS-KSC

circumstances of her departure was not malicious, and was justifiable." Defendants violated the law as well as the doctrine of *judicial estoppel*[42] in such a brazen manner due only to Plaintiff's race, nationality, ethnicity and gender.  Through such duplicity and unlawful arguments, they openly exhorted the trial judge and the jury to follow an unspoken, unofficial and extra-legal system of justice based on code words like "abuse."  Under such a system, abduction is not really an abduction, innuendo becomes facts even when perjury is established, and law is to be set aside based on the victim's demographic.  Plaintiff alleges that the conspiracy to deny him equal protection of the laws is even more reprehensible because it was based on misrepresentations, concealment and fraud.  *Infra.*  Defendants engaged in mud-slinging by accusing Plaintiff, without any evidence, of presenting "selective and inaccurate version of events," while engaging in presenting selective, inaccurate and fraudulent version of evidence that was contrary to their defense of abuse.  They eloquently argued that "probative value must be substantially outweighed by risk of undue consumption of time, undue prejudice, confusing the issues, or misleading the jury," while impermissibly reopening previously adjudicated issues of abduction and abuse for re-litigation.  They did so with full knowledge of evidence to the contrary that made any hearsay evidence of abuse non-probative.  *Infra.*  They did so precisely to consume inordinate amount of time to discuss abuse through hit-and-run tactics, to cause undue prejudice against Plaintiff, to confuse the issues of abduction and abuse,  to confuse the issues of liability and damages, and to mislead the trial judge, the jury and the Court of Appeal.

169. Further, Defendants' argument that the AP visited the United States and

---

[42] "*judicial estoppel*:  Estoppel that prevents a party from contradicting previous declarations made during the same or an earlier proceeding if the change in position would adversely affect the proceeding or constitute a fraud on the court." *Black's Law Dictionary*, Ninth Ed. (2009), p. 631.

FAC                                              Case No. 13-CV-2857-JLS-KSC

Madhavi in 1998 on a "valid Visa" contradicts the law. As discussed elsewhere in this FAC, the *acquisition as well as issuance* of that visa were in violation of various federal statutes. The USDOS's subsequent refusal to divulge the child's whereabouts in the United States was in furtherance of the conspiracy to abduct and conceal the child. Madhavi's failure to inform the authorities and Plaintiff about the child's and the AP's presence in her home was in violation of the law. The child's subsequent removal to India amounted to re-abduction (although the original abduction had never ended under the doctrine of a *continuous* crime, see CPC § 279.1). These actions were in violation of Plaintiff's parental rights and his right to equal protection of the laws. Defendants' continued advocacy and reliance on their past unlawful conduct is in furtherance of their prejudicial advocacy to deny Plaintiff equal protection of the laws. Arguments presented by Neal, Epps and Nicholas in the state courts advocated and defended unlawful actions. Those attorneys violated various sections of the BPC cited earlier as well as rules of attorney conduct, and committed fraud on the court and Plaintiff.

170. During the hearing on various *motions in limine* on June 20, 2011 (two days before the state civil trial started) Defendants argued that Plaintiff's former brother-in-law Mr. Santosh Limaye (hereinafter "Santosh") witnessed abuse of Plaintiff's former wife in 1990, that "two social services calls were made to the plaintiff's residence back in 1990 because there were complaints of abuse," and that "plaintiff's green card was held up because there were allegations of abuse against him." (Exhibit 21, Neal argument, SRT 30:20 - 31:15.[43]) Then Neal dramatically declared that "there's abuse all over this case." (*Id.*, SRT 31:15-16.) Nicholas further argued that discussion of abuse, as explained by his sister Neal above, was proper to "impeach plaintiff's deposition testimony

---

[43] Reporter's Transcript from the state civil trial is referenced herein as "SRT."

FAC                                          Case No. 13-CV-2857-JLS-KSC

where he said he had this good marriage, this strong marriage to Neelam before she left and this came out of the blue for him." (*Id.*, Nicholas argument, SRT 32:4-7.  See also SRT 34:9-15.)  See also Neal argument, SRT 26:25 - 27:11.  ("We're going to bring in a lot of evidence, Your Honor, that Neelam was abused by the Plaintiff, that she was abused, the child was abused, that she was escaping back to India to get away from that abuse.  India is their homeland.  It's where the Plaintiff is from; it's where Neelam is from.  [...] And the evidence simply is that she was just going back home.  She was just going back home because she was suffering severe abuse here.")

171. Defendants' "abuse" argument above was contradicted by the only admissible statement of the AP, her guilty plea, in which she clearly admitted to a malicious and unlawful abduction without a just cause.  The plea implicitly admits to lack of any abuse.  (CPC § 278(5), (7).)  During the hearing on June 20, 2011, the civil trial judge repeatedly ruled that both the plea and the conviction were *res judicata*.  (Exhibit 21, SRT 23:10-16, 23:22-24, 24:16-19, 25:5-6, 25:15-25, 27:18, 36:16-18.).  Defendants Neal and Nicholas continued to present unlawful arguments about abduction and abuse, ignoring the meaning of CPC § 278(5) and (7).  The judge continued to preclude many defenses such as that the AP pleaded guilty under duress (SRT 25:18-21).  Defendants kept pushing and bullying the judge by presenting arguments that they knew or should have known were unsupported and contradicted by the law.  Once the judge issued his final ruling on *res judicata*, any continued defense of abuse, whether to argue that there was no abduction, or that Plaintiff did not have a happy marriage, or that Plaintiff did not suffer as a result of abduction, was impermissible and unlawful.  Worse yet, they continued to present arguments and witnesses (including an expert witness) throughout the trial and appeal to claim that the child was not abducted at all, and that the AP's guilty plea was under duress.  Defendants violated the court's

64

rulings and the *law of case* doctrine repeatedly, deliberately and maliciously. Defendant attorneys deliberately ignored the meaning and intent of CPC § 278. They violated BPC §§ 6068(d), 6103 by presenting arguments unsupported and contradicted by facts as well as law, and also directly violating the court's rulings. That amounts to fraud on the court. They repeated this unlawful defense throughout the trial, during post-trial motions as well as during appeal. Such brazen and reckless misconduct was elaborately planned and executed only due to Plaintiff's race, nationality, ethnicity and gender, thus depriving Plaintiff of equal protection of the laws. They could do so only because Plaintiff is a colored man of East Indian origin.

172. Santosh (Plaintiff's former brother-in-law) committed perjury during his testimony in spite of hours of coaching by Defendants, thus discrediting his entire testimony. *Infra.* Santosh further admitted that he never witnessed or suspected any abuse that would remotely raise concerns for the child's or the mother's safety or well-being. *Infra.* Through his recent discovery of the CPS records, *infra*, Plaintiff will establish that Defendants engaged in deliberate and repeated fraud of deceit, factual misrepresentation, concealment and nondisclosure of those records. Contents of those records clearly establish that there was no abuse of either the child or the mother, and that Plaintiff indeed had a happy marriage. Defendants further perpetuated this fraud by violating an explicit order by the trial judge to disclose the social services records to Plaintiff. Finally, Plaintiff's green card was held up by the INS in 1990 entirely due to malicious actions of Defendants and the OCSSA. Defendants repeatedly engaged in the fraud of factual misrepresentation, concealment, nondisclosure and deceit for issues of abuse and abduction which *they chose to raise and re-litigate*. This was fraud on the court and Plaintiff.

173. Plaintiff alleges that Defendants' argument that "there's abuse all over this case," and their listing of various pieces of "evidence" that would establish

FAC                                    Case No. 13-CV-2857-JLS-KSC

abuse, were deliberate, malicious and deceitful misrepresentations made specifically to induce the trial judge to reopen litigation of abuse and abduction even when the AP was not available for testimony.

174. The AP had presented all of the above-mentioned "evidence" of abuse during her criminal prosecution in the same Superior Court in 2009. Plaintiff had been unlawfully excluded from a fair participation in that proceeding. Santosh had given a written statement to the probation officer, unbeknownst to Plaintiff. Plaintiff came to know of that communication during the state civil action in 2011.[44] The AP had also discussed the CPS records, unbeknownst to Plaintiff. The prosecuting attorney and the Honorable Thomas M. Goethals of the Superior Court had full visibility to the CPS records (unlike the triers of facts in the civil action). The prosecuting attorney and the judge found no need to seek Plaintiff's input regarding the CPS matter as the evidence unequivocally establishes lack of any abuse.

175. Plaintiff believes and alleges that the stark difference in the outcome of the two proceedings in the same Superior Court was a direct result of the concealment of the CPS records in the civil proceeding. While the prosecuting attorney in the criminal proceeding was able to meet his higher standard of establishing the AP's guilt sufficient for a felony conviction even when Plaintiff did not provide any meaningful input on the abuse issue, Defendants in the civil action irreparably prejudiced the trier (the judge as well as the jury) through concealment and misrepresentation of critical evidence, and by making the AP unavailable.

176. Santosh was married to Plaintiff's sister between about 1984 and 2001. They lived in Salt Lake City, Utah in 1990.

177. After abducting the child to India in 1990, the AP made explicit accusations of

---

[44] Plaintiff is unaware of the exact contents of Santosh's statements to the probation officer. Plaintiff's pending discovery includes those statements.

66

physical and emotional abuse of the child as well as her against Plaintiff and his entire family *including Santosh.* (See Exhibit 5, the AP's letter to the INS.) She made similar accusations in the Indian divorce proceedings, entirely consistent with the "498A justice" of India. Through the years, Santosh has denied accusations against him, has laughed at them and has called the AP a liar.

178. While Plaintiff was visiting his sister and her family for the Christmas holiday in 1997, he visited a family friend in Salt Lake City. The friend informed Plaintiff that she had heard of physical abuse of Plaintiff's sister by Santosh. Plaintiff questioned Santosh about such allegations. Santosh got upset and slammed Plaintiff's sister against a door that resulted in her having a split lip. When Plaintiff tried to intervene, Santosh assaulted Plaintiff. Santosh smashed Plaintiff's skull and broke Plaintiff's finger. Plaintiff needed two surgeries on his head to reconstruct his broken skull. Throughout this incident, Plaintiff did not hit or assault Santosh even once. Santosh did not have a single scratch on his body after this incident. Santosh was prosecuted by the Salt Lake County District Attorney for these assaults. During the state civil action in 2011, Santosh validated this account of events. Attached, as Exhibit 22, are excerpts of Santosh's testimony. (See Exhibit 22, SRT 1521:13 - 1526:25.) Plaintiff's account is also validated by his own polygraph test. (Exhibit 23.) While a score of "+6" is sufficient to establish truthfulness, Plaintiff had a score of "+21" regarding lack of any assault by Plaintiff on Santosh, the AP or Plaintiff's child.

179. A few months after his December 1997 assault on Plaintiff and Plaintiff's sister, Santosh walked out on his family, presumably to manufacture facts about a spiteful wife who was going to testify against Santosh during his criminal prosecution. Between 1998 and 2000, Plaintiff spent tens of thousands of dollars to pay for basic necessities of his sister and two nephews

67

(food, housing, utilities, medical bills, etc.)  Plaintiff also spent $16,000 to put his sister through a full-time professional training course so that she could stand on her own feet.  Plaintiff had to refinance his primary residence in Phoenix for this purpose.

180. After his sister completed her professional training and found a job, Plaintiff sold his house in Phoenix and used the funds to purchase a house in Salt Lake City for his sister and nephews to live in.  This property was purchased in December 2000 and Plaintiff was the only borrower for the loan.  Plaintiff made the mortgage payments on this property every month until 2010.  When his nephews grew up and moved out, Plaintiff sold the property in October 2010.  He gave all funds from the appreciation of property value to his sister towards her purchase of a townhome.  Plaintiff's account of his long-term financial support to his sister and nephews was validated in the state civil trial through documentary evidence as well as testimonies of Plaintiff, Santosh, Plaintiff's sister and younger nephew, Nikhil.  (See Exhibit 24, Excerpts of Nikhil Limaye Testimony, SRT 1754 - 1758.)  Nikhil started medical school at the University of Utah in 2013.  Plaintiff is proud of his sister and nephew for their achievements, and is happy to have been a part of their success story.  Notwithstanding Defendants' unscrupulous and malicious litigation tactics and continued character assassination of Plaintiff, it is undisputed that Plaintiff's sister has not been assaulted again by her former husband since Plaintiff's intervention in 1997.  Plaintiff is proud of his achievement.

181. After his 1997 assault on Plaintiff and Plaintiff's sister, Santosh contacted Plaintiff's former wife in India and developed a social relationship.  The AP gave Santosh full access to the abducted child, while Plaintiff's parents, who lived in India, were not allowed a single visitation.  While Plaintiff was busy supporting his son, aging parents, sister and nephews financially, and while Plaintiff himself was denied access to his son and even the knowledge of his

68

son's whereabouts, Santosh and the AP were busy with their indecent liaison and with perpetuation of the abduction and alienation of Plaintiff's child.

182. One of the critical aspects of Defendants' defense in the state civil action was to argue that Plaintiff and his family had free access to the abducted child in India throughout the years. First, such argument is irrelevant to Plaintiff's custodial rights under various state and federal statutes, and the international treaty discussed in this FAC. Further, the argument is contradicted by the fact that neither Plaintiff nor his parents (i.e. the child's grandparents) saw the child even once. Further, the AP's guilty plea explicitly admits to *keeping* and *withholding* the child *continuously*. The trial judge had admitted the guilty plea under the doctrine of *res judicata*, and under the law of that case, further litigation of whether it was an abduction was impermissible. In support of Defendants' irrelevant and impermissible argument, Santosh testified, under direct examination, about his visit to India in 1992 in which he could not see the AP but was allowed a visit with the child. (Exhibit 22, SRT 1491 - 1493. See 1493:8-9.) Under the same direct examination a few minutes later, Santosh contradicted himself by claiming that he met the AP during that visit. (SRT 1513:20-21.) He thus committed perjury and invalidated his entire testimony. Under cross-examination, Santosh admitted that Defendants spent hours preparing him for his testimony. (SRT 1520:5 - 1521:12.) It is evident that Santosh could not spin a consistent yarn even after hours of coaching by Defendants. Santosh had specifically told Plaintiff after that 1992 visit to India that he did not see either the AP or the child. By allowing Santosh, their star witness, to testify falsely, Defendant attorneys from the state civil action violated BPC § 6068(d) which amounts to fraud on the court and Plaintiff. Plaintiff further alleges that conspirators suborned Santosh's perjury in

FAC                                             Case No. 13-CV-2857-JLS-KSC

1   furtherance of the ongoing conspiracy and to obstruct justice.[45]

2   183. Santosh then proceeded with his testimony to manufacture events of emotional

3   abuse of the AP. He testified that, during his short visit to Plaintiff in 1990

4   prior to the abduction, he did not see any affection by Plaintiff towards the

5   child – this testimony coming from a man whose children were picked up,

6   both literally and figuratively, by Plaintiff for over ten years! (See Exhibit 24,

---

[45] During the first few years after the abduction started in 1990, Plaintiff and his family in India attempted to arrange a visitation for Plaintiff's parents with the child, both as Plaintiff's representatives as well as the child's grandparents. They offered to meet the child at any place of the AP's preference. Plaintiff's parents and two aunts visited the AP's residence in January 1991, about three months after the abduction. The visit was pre-arranged with the AP. The AP drove them away without showing them the child. During the Indian divorce matter in 1993-95, Plaintiff filed multiple requests with the court to allow such a visitation. Attached, as Exhibit 40, is the AP's objection to one of Plaintiff's applications. This objection was filed on October 12, 1993 in response to Plaintiff's request filed on September 14, 1993. The court did not grant a single visitation.

Plaintiff's son was told, from the tender age of six months, that his maternal grandfather was his father, a fact confirmed by the former conspirator Rajesh. (Exhibit 16, ¶ 15.) The abductors stole the child's identity. It was years before the child found out, from his interaction with the outside world, that the man was not his father. It was essential for the abductors to conceal the child from any person related to or associated with Plaintiff. Upon this shocking discovery at the age of about seven years, Soumitra would cry and ask to see his real father. That was the first time the AP allowed very sporadic, controlled and manipulated phone contact between Plaintiff and his child. The AP would always be present in every phone call. During one of those calls, Plaintiff offered to bring Soumitra to the United States for a visit for however long Soumitra wanted to visit. Soumitra dreamily asked his mother if he could go. She coldly refused. Soumitra did not say a word for the rest of that phone call. He gradually lost interest in those phone calls. The AP brought the child to the U.S. the following year in 1998 and re-abducted him with aiding and abetting from federal officials. Plaintiff has stayed awake at countless nights remembering his son's dreamy voice. Soumitra changed his legal name from "Soumitra Avinash Kulkarni" to "Steve Soumitra Thakur" in a Massachusetts court in 2012. He has officially changed his identity, taking the name of the family that abducted him.

FAC                                           Case No. 13-CV-2857-JLS-KSC

Testimony of Santosh's son.)  Defendants then introduced the AP's 498A accusations of abuse through Santosh's testimony.  Santosh "corroborated" accusations of emotional abuse, except those made against him which he denied.  Santosh admitted, under cross-examination, he never witnessed or suspected any physical abuse.  (Exhibit 22, SRT 1571-72.)

184. During the pre-trial hearing on Plaintiff's motion to exclude the abuse defense, Defendants depicted Santosh as their only and star witness to abuse, fully aware of the fact that he had not witnessed any abuse, that he himself had been accused of abuse by the AP, that he had been prosecuted for domestic violence against Plaintiff's sister and Plaintiff, and that Santosh would testify to whatever they would coach him to say.  Their argument however allowed them to impermissibly re-litigate the issue of abuse.  (See the trial judge's initial ruling on allowing only an eye witness.  Exhibit 21, SRT 36:18-9.)  Once they had their foot in the door, they repeatedly and improperly induced the judge to allow impermissible introduction of hearsay of abuse based entirely on the AP's 498A accusations made from the safe haven of India.  In the elaborate fraudulent scheme of the "abuse" defense, Defendants did not care if Santosh was established to be a liar out for revenge.  Their cynical "abuse" defense had already succeeded by the time Santosh testified on the penultimate day of the three-week long trial.  See Exhibit 25, Affidavit of the Alternate Juror, Ms. Rebecca Murphy.  Many jurors had made up their mind against Plaintiff only a few days into the trial.

185. Plaintiff further alleges that Defendants' cynical defense was based entirely on bias towards Plaintiff based on his race, nationality, ethnicity and gender.  For example, if Plaintiff were a woman who was brutally assaulted by her brother-in-law while attempting to protect her sister, and if the same woman had spent the next 12 years of her life providing for that sister and nephews, Defendants would not have engaged in such defenses or brought Santosh in for a perjured

71

1    testimony.

186. In the state civil action, Epps, acting as Madhavi's attorney, filed a petition
     with the Juvenile Court of Orange County for disclosure of CPS records,
     pursuant to California Welfare and Institutions Code ("WIC") § 827, on June
     1, 2011 i.e. only three weeks prior to the start of the trial. Epps requested
     "[a]ny and all records of any complaint lodged with Social Services Agency,
     visits by social service agents, or investigations concerning, relating to or
     referring to Avinash Kulkarni, Neelam Kularni [sic] aka Neelam Thakur,
     Soumitra Kulkarni..." She stated, under penalty of perjury, that "[a]ccording
     to Neelam, she was forced to return to India due to Plaintiffs physical and
     emotional abuse," and that "[a]ccordingly, we are seeking any and all records
     that may evidence or relate to the incidents referrenced [sic] above as they are
     relevant to the claims that Plaintiff is making in this action." Exhibit 26.

187. Plaintiff alleges that Defendants have been aware of the exact contents of the
     CPS records for the past twenty-four years. They have been aware that those
     records unequivocally establish lack of any child or spousal abuse. They were
     aware of these facts even prior to October 15, 1990 when the abduction
     started. They aided and abetted the abduction in spite of this knowledge.
     Further, they have misused their knowledge of the CPS records to unlawfully
     harass Plaintiff throughout the past twenty-four years through innuendo and
     based on prejudice against Plaintiff's race, nationality, ethnicity and gender.
     Further, the AP stayed with Madhavi, her sister, for over a year during the
     AP's criminal prosecution in 2008-10. The AP attempted to use the CPS
     records for her defense. Madhavi and other Defendants, who paid for the AP's
     bail and potentially criminal defense, had access to the CPS records
     throughout this period.

188. Defendants' timing for the request for the CPS records on the eve of the civil
     trial was malicious as it was intended to deny Plaintiff a fair opportunity to

access and investigate those records. Further, the explicit language in Epps' 827 petition misled the Juvenile Court to believe that the requester would properly and honestly use the entire CPS records including investigative records and the agency's findings. Defendants had no such plan as they all along intended to misuse selective and misleading portions to defame Plaintiff, and to prejudice and mislead the court and the trier. *Infra*. Defendants committed fraud on the Juvenile Court and on Plaintiff.

189. WIC § 827 is quite explicit and restrictive in granting disclosure. (See subsection (a)(1).) It restricts access to public officials only for the purposes explicitly identified within the statute, and to the child and her parents. Any other person must get a specific court order pursuant to paragraph (a)(1)(P) ("Any other person who may be designated by court order of the judge of the juvenile court upon filing a petition.") Per Epps' 827 petition, disclosure was requested only for Epps and Madhavi. Access to the CPS records by any other person, including Neal, was unauthorized and unlawful. Neal's and Epps' presentation and dissemination of CPS records during the trial for any purported purpose (such as establishing abuse, impeaching Plaintiff's testimony, etc.) was unlawful. It is even more reprehensible that Defendants misrepresented facts from the CPS records to paint a picture clearly contradicted by those records, and when explicitly ordered by the Superior Court to disclose those records to Plaintiff, they selectively disclosed only four pages out of the 36 pages they received. *Infra*.

190. Defendants violated WIC § 827 for the purpose of defaming Plaintiff, prejudicing the court and the jury, and to obstruct justice.

191. Defendants made extensive references to the 1990 CPS visits to Plaintiff's home and CPS reports throughout the state civil trial and appeal. They solicited hearsay testimonies of witnesses (most of them coconspirators) about those events; read from the CPS reports during trial and repeatedly

73

misrepresented the content of those reports during testimonies as well as arguments.

192. Rajesh (the AP's former brother-in-law) did not know any individuals in this case of abduction in 1990. He was not married to or had met Madhavi at the time. Rajesh had no personal knowledge of any events from 1990, including the CPS visits. Rajesh met and married Madhavi in 1996-7. They moved to Orange County that year. Rajesh and Madhavi assisted the AP in 2000-1 when the AP attempted to execute the fraudulent Indian divorce decree in Arizona. Rajesh acted as the AP's power-of-attorney, hired an attorney in Arizona, and facilitated communication between the attorney and the AP. Rajesh never met Plaintiff at any time prior to Rajesh's deposition and testimony in the state civil action in June 2011.

193. During the Arizona action, a statement by Rajesh was filed in the court on behalf of the AP. Rajesh's assertions of facts from 1990 were entirely hearsay of what he had heard from the AP and other coconspirators who participated in the abduction in 1990. No party or attorney in the Arizona action claimed or assumed otherwise. Filing of such an affidavit was impermissible.

194. During the state civil action, Nicholas repeatedly questioned Rajesh about the veracity of Rajesh's 2000 statements in the Arizona court about the 1990 CPS events. (Exhibit 27, SRT 628:1 - 630:11.) Nicholas repeated conveyed to the court and the jury the following insinuations and hearsay.

> "UNFORTUNATELY, THE HUSBAND WAS EMOTIONALLY AND PHYSICALLY ABUSIVE TO THE WIFE DURING THE MARRIAGE. ON AT LEAST TWO OCCASIONS AFTER NOTIFICATION OF THE ABUSIVE BEHAVIOR TO THE POLICE BY NEIGHBORS, NEIGHBORS CALLED THE POLICE AND A SOCIAL SERVICE AGENCY WAS CALLED UPON TO INQUIRE INTO THE ALLEGATIONS." (SRT 629:20-25.)

FAC                                                Case No. 13-CV-2857-JLS-KSC

"CHARGES OF CHILD AND SPOUSAL ABUSE WERE FILED AGAINST HUSBAND IN ORANGE COUNTY; HOWEVER, WIFE NOW ACKNOWLEDGES THAT WHEN ASKED BY THE AUTHORITIES AT THE TIME WHETHER SUCH CHILD AND SPOUSAL ABUSE HAD ACTUALLY OCCURRED, SHE DENIED THE CHARGES AND DECLINED TO TELL THE TRUTH ABOUT HUSBAND'S MENTAL TORTURE AND VIOLENT ACTS SIMPLY IN ORDER TO SPARE HER HUSBAND." (SRT 630:3-10.)

195. Rajesh repeatedly stated that he had no personal knowledge of the 1990 events and Nicholas's cross-examination of Rajesh had no purpose other than presenting the AP's hearsay 498A accusations and spreading the innuendo. At the time of this testimony, Defendants were in possession of the CPS records, while Plaintiff, the trial judge and the jury had not seen them. Defendants were fully aware that the insinuations were contradicted by the contents of those records, that the CPS visits were based only on alleged crying of the child and not on any abusive behavior by Plaintiff, that no charges were filed against Plaintiff, that the CPS workers specifically recommended that no further complaints against the family should be entertained as the complaints seemed to be motivated by racial prejudice, and that the CPS had closed the case as totally unsubstantiated. *Infra.*

196. Further, the AP's numerous communications with the INS, the U.S. Consulate in Mumbai and other Government agencies after the abduction clearly contradict Defendants' repeated assertions throughout the state civil action that the AP "spared her husband." At the time of the CPS events, the AP was already in the middle of the conspiracy to abduct the child, and was afraid that she might be exposed if the CPS or any law enforcement agency were to conduct further investigation.

197. Nicholas and other Defendants concealed facts (i.e. contents of the CPS records) that were adverse to their defense. Nicholas had specifically noticed

75

the AP's deposition prior to the trial, but canceled it thus making the AP unavailable. Nicholas could have easily verified facts about the CPS events during such deposition. Nicholas committed acts of moral turpitude and dishonesty; advanced untrue facts prejudicial to Plaintiff; concealed facts adverse to his argument; misled and deceived the court and the jury; and defamed Plaintiff to the court and the jury. Nicholas violated BPC §§ 6068(d), 6106 and 6128(a), and committed fraud on the court, the jury and Plaintiff.

198. Neal then continued to question Rajesh about the 1990 CPS events. (Exhibit 27, SRT 650:9 - 651:20.) She perpetuated the same insinuations that Nicholas spread earlier. She then asked Rajesh if "someone from the apartment complex [...] heard someone say, 'Don't hit my baby." This amounted to quadruple hearsay presented through Rajesh, a former conspirator. Neal was in possession of the CPS records at the time. She had not presented or authenticated them, and had no intention to do so. *Infra*. Neal committed dishonest, deceitful and malicious acts of moral turpitude and fraud, and violated various sections of the BPC cited earlier.

199. During Plaintiff's testimony on June 30, 2011, Neal showed him four pages of the CPS records out of the 36 pages Defendants received from the OCSSA. (Exhibit 28, SRT 1029:17 - 1036:4.) Those pages were limited to the preliminary complaints the CPS had received, and did not include records of CPS visits to the household, their interviews with Plaintiff or the AP, their examination of the child and other findings, or the CPS's conclusions and recommendation. This was the first time Plaintiff had seen any CPS records. Defendants were aware of that fact. Neal continued to cite from the incomplete and altered document, "to refresh Plaintiff's recollection." (SRT 1029:17-22, 1030:5-7, 1031:4-6.) If Plaintiff had never seen the document, it couldn't possibly refresh his memory.

76

200. Plaintiff's attorney repeatedly objected that he had never seen the document and that it was not properly admitted or authenticated, and was extremely prejudicial hearsay. Plaintiff's attorney also objected to the relevance of such a document for issues resolved *res judicata*. (SRT 1032:11 - 1033:18.)

201. Plaintiff and his attorney had informed Defendants and the judge that, to the extent the CPS records were relevant during the trial, they did not object to Defendants' acquisition of those records through an 827 petition. Plaintiff and his attorney looked forward to a full discussion of those records provided the records were fully presented, authenticated and made available to Plaintiff prior to the trial. Neal herself admitted as such. (SRT 1033:19- 1034:2.)

202. When the judge specifically asked Neal about the person filing the CPS complaints, Neal clearly indicated that she knew who the person was and could bring in that person. She also had no intention of doing so, of authenticating the document, or making it admissible. (SRT 1034:13-17.) Neal was interested only in factual misrepresentation, deceit, concealment and nondisclosure, for the purpose of deliberate obstruction of justice and fraud. Neal was interested only in misusing and advocating extreme prejudice against an East Indian man.

203. Neal presented the same four pages for the trial judge's review to decide if the line of questioning could continue. Although the judge precluded the questioning, Neal had already read from the CPS records, spread the insinuations to the jury, and biased the judge. She also misled the judge by showing him only four pages.

204. There was further discussion of the CPS report in the state court the following day (July 1, 2011.) (Exhibit 29, SRT 1040:18 - 1043:13.) Neal repeatedly and maliciously asked the judge if she could examine witnesses, based entirely on quadruple hearsay, if the CPS visits were a result of someone imagining that s/he heard the AP saying "Don't hit my baby." (SRT 1041:12-20, 1042:20-

77

23.)  Neal stated that "those reports suggest there was fighting," (SRT 1041:23-25), an assertion contradicted by the contents of those reports, *infra*. Through this discussion, Neal misled and prejudiced the judge.

205. Neal then innocently asserted that "[she didn't] have to even talk about the report or show [Plaintiff] the report..." (SRT 1041:25 - 1042:6.)  Once Defendants *chose to discuss* the issues of the CPS report in particular and abuse in general (in violation of the *res judicata* ruling and laws), it was their duty to fully disclose those reports to Plaintiff, the judge and the jury, including portions unfavorable to Defendants' abuse defense.

206. The judge acknowledged that the CPS report was "dynamite." (SRT 1040:22-23).  Its prejudicial effect on the judge and the jury throughout the trial, and on Court of Appeal, has been extreme.

207. Neal then played the frustrated victim whose hands were tied from presenting evidence. (SRT 1041:17-20.)  She tied her own hands by not presenting the report to Plaintiff and the court, while deliberately, maliciously and repeatedly misrepresenting it.  That was her intent all along.  The trial judge's comment at the end of this conversation to Neal ("You may be frustrated," SRT 1043:12) says it all.  The trial judge was led to believe that Defendants were being denied presentation of authentic evidence of abuse only due to legal technicalities.  Neal and other Defendants were, in reality, concealing the most damning evidence against their abuse defense.  *Infra.*  In stark contrast to these events, the AP had been convicted for the felony crime of child abduction in a criminal proceeding where the prosecuting attorney and the judge had full visibility to the CPS report.

208. On the same day of trial (July 1, 2011), Plaintiff's attorney informed the court that Defendants had promised to give him a copy of the CPS report, but had not done so. *The court specifically ordered Defendants to disclose the CPS records to Plaintiff.* (Exhibit 29, SRT 1135:25 - 1136:5.)  In response to the

78

explicit court order, Neal e-mailed to Plaintiff's attorney only those four pages of the CPS document that she had shown Plaintiff and the judge.  Neal deliberately and maliciously violated a court order in furtherance of the conspiracy to commit fraud through factual misrepresentation, concealment, nondisclosure and deceit, and to deny Plaintiff equal protection of the laws.  Neal had facetiously stated earlier that "[she didn't] want to run afoul of any of the court's rulings," (Exhibit 29, SRT 1040:20-21).  She did exactly that.

209. Defendants continued to rely on, cite from and misrepresent the CPS document throughout the trial and appeal.  Epps tried to elicit hearsay testimony of the CPS visits from Plaintiff's former brother-in-law, Santosh.

210. During her closing argument, Neal referenced the social services visits *four times*.  Neal once again argued that the visits were a result of domestic abuse, and that charges were filed against Plaintiff.

211. During discovery in the instant action, Plaintiff petitioned the Juvenile Court of Orange County on January 6, 2014 for disclosure of the 1990 CPS records pursuant to WIC § 827.  That court granted disclosure through an order dated January 28, 2014.  (Exhibit 30.)  The OCSSA disclosed 32 pages, some of them redacted, to Plaintiff on February 3, 2014.

212. Plaintiff's 827 request was made specifically for the instant action.  Information requested was very similar to Epps' 827 petition in 2011.  *Supra.*  In his 827 petition, Plaintiff specifically mentioned potentially malicious actions of OCSSA employees as below.

> "The Immigration and Naturalization Service ("INS") of the U. S. Justice Department processed my application for Green Card in 1991-2.  My interview with the INS was scheduled for March 1992.  I discussed the upcoming interview with an acquaintance in the East Indian community, Mr. Sunil Abhyankar, about one week prior to the interview.  During the interview, I was informed by the INS officer that the agency had received, *within the prior few days*, a complaint

79

about my character regarding the CPS report. Mr. Abhyankar's wife, Ms. Sulabha Abhyankar, worked for the OCSSA at the time, and was a good friend of individuals who allegedly aided and abetted the abduction. I reasonably suspect that the coconspirators filed the complaint with the INS maliciously and possibly by misusing their personal contacts within the OCSSA, to deny me a permanent residence and protection under U.S. laws regarding child abduction and custody. Their actions were also in furtherance of the campaign of denigration and perpetuation of the child's alienation from me."

213. The OCSSA's disclosure to Plaintiff clearly indicates that the agency's search for records, based on Plaintiff's 827 request, had come up with 36 pages. The agency however disclosed only 32 pages. While handing the package to Plaintiff on February 3, 2014, Ms. Erika Padilla ("Padilla") of the OCSSA informed Plaintiff that the other four pages had been deleted. When Plaintiff asked what the deleted pages were about, Padilla was evasive and mentioned that they were "police records." Padilla did not answer Plaintiff's questions about reasons or statutory basis for such deletion, or when the records were deleted. They clearly were not deleted prior to Plaintiff's 827 request.

214. Based on the contents of the 32 pages disclosed to Plaintiff and the unequivocal findings of the CPS workers, it is inexplicable why there would be any other "police records" unless they were created improperly or maliciously. *Infra.* Further, the OCSSA disclosed more pages to the abductors of Plaintiff's child, but not to Plaintiff himself who has more access rights under § 827 as the father. While Defendants misused the disclosure unlawfully during the state civil action, Plaintiff has been denied the documents in the instant action for proper and lawful use, resulting in obstruction of justice.

215. Plaintiff had no visibility to the internal processing and decision-making of his 827 request. Plaintiff believes and alleges that the withholding by the OCSSA, whether resulting from spoliation or concealment, is malicious and

80

unlawful.  It is intended not only to conceal past unlawful activities of OCSSA employees and their participation in the ongoing conspiracy, but also to deny Plaintiff due process and equal protection of the laws in the instant action, thus continuing the conspiracy.  Through its improper withholding, the OCSSA has committed fraud.  Such withholding will allow coconspirators to continue to misuse Plaintiff's race, nationality, ethnicity and gender to further perpetuate innuendo and falsehoods in the instant action.

216. Plaintiff requires further discovery of not only the withheld records, but also of how Plaintiff's 827 request was processed, before he can fully state facts and claims.  Such discovery is also necessary to identify roles and capabilities of state officials so that Plaintiff can join additional Defendants.

217. Based on his review of the partial CPS records disclosed to him, Plaintiff understands that the CPS received two separate complaints in 1990.

218. The first complaint was reported on August 21, 1990.  It stated as below.

> "[Redaction] concerned for baby.  It cries a lot-blood curdling screams, mo[ther] could be heard saying 'Don't hit my baby.' [Redaction] husband woke up last night by bay's crying and it sounded like it was being shaken.  The voice trembled."

219. Plaintiff and his wife spoke Marathi, one of 20-odd Indian languages, at home exclusively.  Plaintiff did not have any Marathi-speaking neighbors in 1990 and it is improbable that any neighbor understood a single word spoken in the household.  Further, neither the AP nor any Defendant has ever claimed that the AP actually said anything remotely close to "Don't hit my baby" – in English, Marathi or any other language.  Further, the child was colicky and used to cry frequently and loudly.  *Supra.*

220. CPS case worker Ms. Cheryl Manatt ("Manatt") and OC Sheriff's deputy W. Hunt visited Plaintiff's residence on the same day.

221. Manatt "observe[d] baby Soumitra who appeared healthy and happy."  Manatt

81

interviewed Plaintiff's wife in private in the presence of the Sheriff's deputy, and the wife "denied being abused by husband or that he was abusive to their child." Manatt noted that "[b]oth parents were very cooperative even though it appeared that the allegations were ***totally unsubstantiated***." (***Emphasis added***.)  She closed the case.  Sheriff's deputy agreed with her assessment and disposition.

222. The second complaint, filed on September 3, 1990, stated that "5 mo[nth] old regularly screaming, sounded like mi[nor] is being tortured, there are 6 adults living in residence. [Redaction] concerned for welfare of minor."

223. At the time of the child's birth, family members visited Plaintiff and his wife for extended periods – a widely and commonly practiced custom in the East Indian community in the United States.  The child's maternal grandmother visited between March 20, 1990 (about a week before the child's birth) and July 15, 1990 for about four months.  She was joined by her husband, the child's maternal grandfather, between May 10, 1990 and July 15, 1990, at which time both grandparents returned to India.  Plaintiff's mother visited between August 10, 1990 and October 10, 1990, and was joined by Plaintiff's father for portions of that visit.  Plaintiff's sister, who lived in Salt Lake City, Utah, came with her family (husband and two children) for a short visit.

224. In response to the second complaint, Ms. Katherene Dostal ("Dostal") of the CPS visited the family on September 11th.  Dostal personally observed that "mi[nor] Soumidra [sic] age 6 months does have a loud scream but this is activated when lying on blanket and is playful, and also when others are speaking (for attention)."  Dostal further personally observed that the "mi[nor] was changed & no marks or bruises were evident."  Dostal further noted that the "mi[nor] appears very healthy, well developed, cheerful, well adjusted, happy and healthy."  She further noted that the "***mo[ther]*** and fa[ther] believe someone does not approve of them & is making reports," and that "fa[ther] &

82

mo[ther] seem intelligent, educated[,] cooperative and caring." (***Emphasis added***.)  Dostal further noted that "[the grandmother i.e. Plaintiff's mother] was baking pastry & cooling the meal," and that "[the] house was clean, orderly & well stocked [with] food."  Dostal concluded that she could "find no problem except possible prejudice in neighborhood vs. this family."  Ms Dostal specifically "request[ed] this family be flagged & ***no further cases be allowed to [be] filed against them***."  (***Emphasis added***.)  She noted that "this is also the opinion of SSW Cheryl Manatt who investigated Incident #1."

225. Upon thorough investigation, Dostal concluded thusly: "It seems as if there are false reports vs. this family and it could possibly be prejudice in the neighborhood vs. their Indian nationality.  [A]lso, this family has relatives who come & go so at times there are added extended family members in the home which is increasingly rare in our american society."  Dostal also noted that the "above info [was] provided in consultation [with] Cheryl Manatt."

226. The person(s) filing the complaints with the CPS did not mention *any domestic disturbance* such as altercation, fighting or arguing.  S/he did not attribute a single word or action to Plaintiff.  The reporting person's speculation regarding abuse or torture of the baby was based entirely on the loud sound of the child's crying.  The reporting person did not express any possibility of or concern about abuse of Plaintiff's wife.  It is clear from the evidence of the CPS records that, while the first complaint was based on the child's alleged crying, the second one was based on such crying and presence of extended family members in Plaintiff's home.

227. Plaintiff alleges that his recent discovery of the CPS records makes Defendants' transgressions during the state civil action even more despicable.  While wagging a finger in Plaintiff's face and screaming "abuse" throughout the state civil trial, they were concealing, behind their backs with their other hand, authoritative evidence to the contrary.  Their shrill language and

83

righteous outrage about abuse was not sincere or religious, but was feigned and sacrilegious towards the trial judge, the jury, the Court of Appeal and Plaintiff. Their concealment and misrepresentation of the CPS records amounted to fraud on the court and Plaintiff.[46] It was also in furtherance of the ongoing conspiracy to deny Plaintiff his due process rights and equal protections under the laws. Neal, Epps, Nicholas and Jones are in violation of multiple sections of BPC cited earlier.

228. Two experienced and professional CPS workers specifically identified prejudice towards East Indians as the cause of those CPS complaints. Implicit in that conclusion is the prejudice against and stereotyping of Indian men as abusive husbands and/or fathers. Defendants despicably picked up on such stereotyping and turned the state proceedings into Plaintiff's lynching. Neal's and Epps' specific citation of "Don't hurt my baby" in their appeal brief, and the Court of Appeal's unfortunate reliance on that brief and citation of the same phrase in its Opinion, are the strongest evidence of the prejudicial effect and destructive power of such stereotyping. Judge Goethals of the criminal proceeding, with full knowledge of the contents of the CPS report, had unequivocally observed that "the son would have been far better off with long-term legitimate unpolluted exposure to his father." The Court of Appeal and the civil trial judge were not shown those CPS records. Neither were the jury or Plaintiff. Court of Appeal's Opinion is on the internet and will live there forever. A simple Google search for Plaintiff's name leads one to that document. Plaintiff wakes up in the middle of the night, his heart racing with anxiety and horror, just wondering about the unbearable defamation as well as its devastating effect on any potential relationship between Plaintiff and his son.

---

[46] California law treats factual misrepresentation, deceit, concealment and nondisclosure as fraud.

FAC                                    Case No. 13-CV-2857-JLS-KSC

229. Contents of those CPS records, generated *during the time just prior to* the onset of the child's abduction, eliminate *any probative value* of abuse. Those records portray, based on thorough and independent investigation by multiple experienced and unbiased CPS professionals, a clear picture of a happy family (Plaintiff, his former wife and the child), and directly refute Defendants' portrayal of Plaintiff as a disturbed, stressed, abusive and unhappy man who forced his wife to flee. Those records unequivocally portray Plaintiff as a loving and caring father and husband who provided for his family and took care of his duties as a responsible family man. The AP's guilty plea is consistent with the findings of the CPS workers regarding abuse.

230. Plaintiff alleges that Defendants violated every tenet of American justice that they so eloquently espoused in their pre-trial pleadings, during trial as well as post-trial. While facetiously arguing for a defendant's right to "the tools necessary to probe, test and discredit the testimony of Plaintiff and any adverse witnesses," they denied Plaintiff such tools and his due process rights through concealment and factual misrepresentation of highly pertinent evidence, and through deceit. While pleading for the need for the jury to hear and weigh "evidence that is material to the resolution of this case," Defendants were depriving the trial judge and the jury of exactly such evidence. While maliciously arguing for "the overwhelming probative value" of the evidence of abuse that was nothing but falsehoods and innuendos presented through inadmissible hearsay, they concealed substantive evidence to the contrary, in direct violation of an explicit court order directing them to disclose it.

231. Plaintiff believes and alleges that, had Defendants presented the CPS records for the trial judge's review prior to rulings on various *motions in limine* on the eve of the trial, as was their duty to do, it is highly likely that the judge would have disallowed the whole abuse defense and the ensuing three-week-long lynching of Plaintiff. It is also highly likely that the trial judge would have

85

disallowed the testimony of Defendants' "expert" psychiatrist that was based primarily on allegations of abuse. *Infra*. Plaintiff believes and alleges that such disclosure would have altered many rulings of the trial judge who initially accepted the doctrine of *res judicata*, and then incrementally diluted and nullified that original ruling throughout the course of the trial. Plaintiff believes and alleges that such disclosure would also have altered the trial judge's rulings on various post-trial motions including Plaintiff's motions for a new trial and for taxing of costs. It would also have altered the Opinion of the Court of Appeal which found allegations of abuse highly probative, based entirely on innuendo and resulting from Defendants' deceit, misrepresentation and concealment.

232. The state trial transcripts are approximately 2,000 pages long. About two third of testimonies and arguments consist of re-litigation of abuse and abduction. Plaintiff alleges that Defendants committed fraud on the court and on Plaintiff in every instance of such re-litigation. Plaintiff further alleges that Defendants deliberately and maliciously violated Plaintiff's due process and equal protection rights based on and by advocating discrimination against Plaintiff's race, ethnicity, nationality and gender.

233. Defendants in the state civil action and their attorneys (all Defendants here) presented "expert" testimony of Dr. Mark Lipian ("Lipian"), a forensic psychiatrist and psychologist, to present forensic evaluation of Plaintiff. During the state court hearing on *motions in limine* on June 20, 2011, Neal stated that Lipian would testify that Plaintiff has "antisocial personality disorder," "narcissistic personality disorder," and that Plaintiff "may either be bipolar or have a drug problem." (Exhibit 21, SRT 33:16-20.)

234. Lipian did not have any experience in treating or evaluating a single case of child abduction or parental alienation, which are specialized areas of forensic psychology. Lipian's primary area of forensic work was for corporate clients

86

evaluating their employees in employment related litigation.  In his testimony, Lipian never referenced any established work in those specialized branches of psychology.

235. Lipian never contacted Plaintiff or Plaintiff's attorney, never attempted to interview or interviewed Plaintiff.  Lipian never reviewed any relevant medical records of Plaintiff.[47]

236. American Academy of Psychiatry and the Law ("AAPL") is an authoritative organization in the field of forensic psychiatry.  Its Ethics Guidelines for the Practice of Forensic Psychiatry, adopted in May 2005 are attached as Exhibit 31 ("AAPL Guidelines").  AAPL Guideline for Consent states that "[t]he informed consent of the person undergoing the forensic evaluation should be obtained when necessary and feasible."  This Guideline is consistent with the American Psychological Association's ("APA") Ethical Principles of Psychologists and Code of Conduct adopted on August 21, 2012.  APA's Standards 3.10(a) requires an informed consent, and Standard 9.01(b) ("Bases for Assessments") requires that "psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When, despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made ..."

237. Lipian based his evaluation on "records review" and on his interviews with the AP, the abducted child, Santosh (Plaintiff's former brother-in-law) and various Defendants.  To the extent Lipian's evaluation was based on Plaintiff's past communication with others, it had no basis in psychiatry and amounted to

---

[47] Lipian reviewed a one-page medical record where Plaintiff's primary care physician, in response to Plaintiff's general statements about various stressful events in his life, had made a general statement that Plaintiff should seek counseling.  The physician was not qualified to nor did he perform any psychiatric evaluation or treatment.

FAC                                      Case No. 13-CV-2857-JLS-KSC

fraud, *infra*. Lipian's other sources were handpicked to conduct a character assassination of Plaintiff under the guise of forensic evaluation. The AP had pleaded guilty to abduction, admitting that she was never abused. She had made too many inconsistent statements over the years, all of which were available to Lipian for his evaluation. Plaintiff's son, abducted at the age of six months, must be considered a brainwashed child who had never seen his father. Santosh was prosecuted for domestic violence and committed perjury during his testimony. These sources had no probative value of providing reliable information about Plaintiff.

238. Lipian interviewed the AP and Plaintiff's son *together* in a 1.5 hour international phone call arranged by Defendants. The abducted child was interviewed for about 30 minutes *in the presence of the abductor*, which is impermissible in an abduction case. Lipian did not factor in the psychological damage to the abducted child which is well-established through authoritative and peer-reviewed research. See *Faulkner*, *supra*.

239. Lipian testified that Plaintiff was sociopathic, psychopathic, was lying about his entire case, had never suffered emotional distress, and that Lipian did not believe the defendants had assisted the AP in the child abduction. Lipian further testified that Plaintiff had a narcissistic personality disorder and antisocial personality disorder. Lipian testified that Plaintiff's entire case was a farce.

240. Lipian declared himself an expert on "malingering." While he declared Plaintiff, the only person to have taken a polygraph, to be a liar, Lipian did not address the inconsistencies in the AP's and Santosh's statements.

241. After eight years of not seeing his child and dealing with the corrupt Indian system, Plaintiff wrote a letter to the Indian Prime Minister begging for justice and human rights. Plaintiff stated that the emotional needs of his eight-year old child were paramount. Plaintiff received a kind response from Sen. John

88

McCain who received a copy of Plaintiff's letter. (Exhibit 32.)  Based on this letter, Lipian concluded that Plaintiff seeks special treatment, is full of self-importance and thus narcissistic.

242. When Plaintiff's son wanted to apply to U.S. colleges in 2007, he contacted Plaintiff for assistance.  The AP allowed this contact on the condition that the son would not reveal his phone number or address to the father.  Soumitra and Plaintiff communicated over the internet, first through internet telephony (computer-to-computer phone calls), and then through e-mails and internet chats.

243. Plaintiff acquired certified copies of Soumitra's birth certificate and also assisted with acquiring a U.S. social security number for Soumitra.  Plaintiff worked incessantly with the OCI and USDOS, the U.S. Consulate in Mumbai as well as the SSA offices in Baltimore and Manila, Philippines, to get the SSN issued in a timely manner.  Plaintiff also reviewed Soumitra's college application essays and provided feedback.

244. Soumitra was not doing well in high school, but wanted to apply to top colleges such as Stanford.  When he informed Plaintiff of certain unethical steps in his college application, Plaintiff advised Soumitra that such measures would be wrong.  Plaintiff instead suggested that Soumitra should apply to lesser colleges, improve his grades and then go to a top college for graduate studies.  Plaintiff repeatedly assured Soumitra that he would financially support Soumitra's college education.

245. Soumitra ignored Plaintiff's advice.  The fact that the AP encouraged and induced such behavior, and signed off on that college application establishes the AP's lack of moral behavior and the extent of parental alienation in this case.

246. Based on these set of events and related documentary evidence (e-mails and transcripts of internet chats between Soumitra and Plaintiff), Lipian testified

89

that Plaintiff only wanted his son to go to UCSD rather than Stanford because it would better fit Plaintiff's needs, and that Plaintiff did not care about his son's desires. This was Lipian's "evidence" of Plaintiff's narcissism.

247. Lipian extensively conveyed to the court and the jury the AP's hearsay about abuse which was inconsistent with her statements to the CPS as well as her guilty plea. Lipian declared that the AP was abused and that she did not abduct the child. Such testimony was impermissible in light of the trial judge's *res judicata* acceptance of the issues.

248. Lipian testified that Defendants did not provide him a copy of the CPS report, a highly relevant document by unbiased authorities.

249. While the AP and the abducted child were made available to Lipian for his evaluation of Plaintiff, and while they were also listed on Defendants' Witness List, they were made unavailable for trial testimony by Defendants.

250. Most of the personality disorders attributed to Plaintiff, a left-behind parent, by Lipian are established to be personality profiles of the abducting parent. See *Faulkner*, *supra*, (identifying paranoid-delusional and sociopathic as two personality profiles of the AP), See *Baker*, *supra*, (identifying narcissistic, borderline and antisocial personality disorders as profiles of alienating parents and also identifying the likelihood of many of them being active alcoholics). An AP may have *one or more* of these disorders. It is then a mathematical impossibility that an LBP has *all* of those disorders.

251. Lipian's testimony had no basis in established principles and techniques of forensic psychiatry or psychology; his sources had no probative value of speaking the truth; his findings were unsupported by facts and law, and were against well-established findings for child abduction and parental alienation.

252. Plaintiff alleges that Defendants and Lipian conspired to manufacture false forensic evidence and evaluation. Plaintiff was denied the opportunity to cross-examine Lipian's sources (the AP and Plaintiff's son). Defendants

90

1   committed fraud on the court and Plaintiff.  Attorney Defendants violated

2   various section of the BPC and Rules of Ethical Conduct cited herein.

3   253. Plaintiff alleges that Defendants' solicitation and presentation of Lipian's

4   testimony was in furtherance of the ongoing conspiracy to deny Plaintiff his

5   due process rights and equal protection of laws during determination of his

6   parental rights.  Their litigation tactics were similar to the practices of the

7   probation officer i.e. to declare, without a fair adversarial hearing, that

8   Plaintiff never had parental rights, and to do so by ignoring a multitude of

9   laws and constitutional provisions.

10  254. The trial judge in the state civil action granted non-suit motions by Sunila and

11  Madhavi.  There was significant evidence against both defendants that was

12  required to be considered as favorable to Plaintiff for the purpose of non-suit.

13  The AP had admitted to a *continuous*, malicious and unlawful abduction.

14  Madhavi had admitted that she actively brought the AP and the child to the

15  U.S. in 1998, never informed the authorities, and the child was re-abducted to

16  India.  Rajesh, a former conspirator, testified against interest to Sunila's

17  explicit participation in the abduction.  By doing so, Rajesh admitted to

18  knowledge of the conspiracy to abduct and his active participation in the

19  conspiracy in 1998 with that knowledge.  Rajesh has exposed himself to

20  criminal prosecution for child abduction at any time in his lifetime.  Madhavi,

21  a coconspirator and co-defendant, had inadvertently admitted to Sunila's

22  participation in the abduction.

23  255. Plaintiff believes and alleges that, after weeks of abuse cacophony, Defendants

24  improperly induced the trial judge to ignore facts and law, including his own

25  *res judicata* admission of the AP's guilty plea and felony conviction.

26  256. After three weeks of trial dominated by discussion of abuse, the trial judge

27  sent the issues of liability of Meera and Mohan, and resulting damages, to the

28  jury.  The trial consisted of three weeks of testimony worth approximately

91

2,000 pages and well over 100 exhibits.  The jury did not deliberate, did not review any trial transcripts or a single exhibit.  Majority of the jurors had made up their minds based on trial testimony and arguments.  Some of the jurors had made up their minds after only a few days of trial.  (See Exhibit 25, Declaration of Alternate Juror, Ms. Rebecca Murphy.)  The jury answered only one question of the Jury Form:  Were Meera and Mohan "aware that Neelam Kulkarni planned to abduct Soumitra?"  The majority answered in the negative.  (See Exhibit 33, State Trial Judgment on Jury Verdict.)

257. Plaintiff believes and alleges that Defendants' impermissible and prejudicial re-litigation of abuse and exploitation of prejudice against Plaintiff's race, ethnicity, nationality and gender, irreparably poisoned the jury.  Plaintiff believes and alleges that the jury essentially answered the question *whether the AP planned to abduct the child*.  Plaintiff believes and alleges that, had all testimonies and arguments of abuse been precluded (as they should have been under the doctrine of *res judicata*), or in the alternative, had all the CPS records been made available to the court and Plaintiff, and been properly authenticated and presented to the jury, the outcome of the jury verdict would have been different.  The instant action is not intended to review the jury verdict, the trial judge's rulings or orders, or Court of Appeal's Opinion.  It is intended to address Plaintiff's grievance against Defendants for their fraudulent and prejudicial actions during the state civil action.

258. In their Opposition Brief filed in the Court of Appeal on September 14, 2012 on behalf of Meera, Mohan and Madhavi, Neal and Epps made the following statements of "facts," and explicitly stated as fact that Plaintiff abused his former wife. (Exhibit 34, Section III – "Statement of Facts," Subsection D – "Appellant and Neelam Were Having Marital Problems.")

FAC                                                    Case No. 13-CV-2857-JLS-KSC

"According to Neelam and others, the relationship was emotionally and physically abusive. *(See, e.g.,* 4 RA 001053-RA 001056; 4&5 RA 001059-RA 001150; 5 RA 001160-RA 001181; 3RT 442:19-444:3; 8 RT 1469:2-1471:12; 1511:4-1512:10; 1563:19-1566:23.) Appellant had a bad temper, frequent mood swings and would yell at Neelam for no reason. (3RT 388:24-389:8; 442:19-444:3.) Appellant argued with Neelam about her behavior when Appellant's parents were visiting. (8 RT 1466:7-24.)  Appellant's former brother-in-law, Santosh Limaye ("Santosh"), witnessed some of the arguments firsthand and observed Appellant threaten to send Neelam to India without their baby Soumitra, and to send Soumitra to live with Appellant's sister Shalaka Limaye ("Shalaka") and Santosh. (8 RT 1469:2-25; 1470:7-1471:12.)

"At some point, the arguments got physical and Appellant tried to choke Neelam and locked her outside of the house. (3RT 442:19-444:3; 4 RA 001087.) Neelam was scared for her and Soumitra's safety. (Jd.) Child Protective Services (CPS) came to the home twice. (5 RT 829:1- 831:13.) The CPS visits resulted in an investigation when Appellant applied for his green card two years later.[4] *(Id.;* 2 RT 287:19-288:13; 309:15-25.) According to Neelam, CPS responded to complaints from neighbors about fighting, but Neelam denied suffering any abuse when CPS came to investigate because she did not want Appellant to get deported. (4 RT 630:3-15; 650:9-651 :20; 5 RA 001175-RA 001176.)"

Fn. 4 referenced in the above statements stated:  "Pursuant to Evidence Code section 352, the trial court precluded defense counsel from using a report obtained from CPS, containing the statement "don't hurt my baby" to refresh Appellant's recollection/impeach Appellant's testimony that the CPS visits had nothing to do with spousal or child abuse."

259. In their Opposition Brief filed in the Court of Appeal on September 12, 2012 on behalf of Sunila, Nicholas and Jones repeated the above statements of "facts," and explicitly stated as fact that Plaintiff abused his former wife. (Exhibit 35, Section II – "Statement of Facts," Subsection C – "Appellant Abused Neelam Causing Her to Escape With Soumitra to India on October 15, 1990.")

93

FAC                                Case No. 13-CV-2857-JLS-KSC

260. Defendants' statement of "facts" above, and the argument that followed (the Brief is 115 pages long), was based entirely on the AP's wild accusations made from the safe haven of India under the aegis of Indian Penal Code Section 498A, years after the abduction had started. The AP was made unavailable for deposition and trial testimony. Her statements were impermissibly introduced as "facts" through hearsay testimony of other witnesses all of whom had engaged in aiding and abetting the conspiracy to abduct and alienate Plaintiff's son. Defendants' extensive list of references to the Reporter's Transcript in their appeal briefs, cited only as examples and by no means an exhaustive list, shows the extent of the abuse litigation.

261. Defendants' graphic description of "abuse" in their Appeal briefs was contradicted by the AP's statements to the CPS workers as well as independent findings of those workers. Defendants continued to conceal and misrepresent CPS records during the appeal. They did not inform the Court of Appeal that they had concealed records in spite of the trial judge's explicit order to disclose them. While introducing the AP's false and malicious account of why the CPS visited the household, which amounted to quadruple hearsay by coconspirators who had a vested interest in distorting facts, Defendants concealed the actual CPS records which clearly establish absence of any domestic disturbance, fighting or abuse.

262. While facetiously arguing for impeachment of Plaintiff's testimony regarding the CPS visits, Defendants again played the victim in their Appeal brief. They once again presented selective and misleading portions of the unauthorized CPS records ("don't hurt my baby"). They concealed the CPS workers' findings that the complaints arose out of prejudice against Plaintiff's East Indian origin. Defendants once again achieved the prejudicial effect of selective presentation of the CPS records.

263. Defendants Meera, Mohan, Madhavi, Neal, Epps and Rutan & Tucker, LLP

94

1   filed their Reply Brief during the appeal on February 22, 2013.  The appeal

2   was argued by Plaintiff's appeal attorney Kevin Rhine, Epps and Jones on June

3   20, 2013.  The Court of Appeal filed its Opinion on July 19, 2013.

264. Plaintiff alleges that the Court of Appeal's re-litigation of the abuse issue and

its acceptance of quadruple hearsay from a coconspirator (Rajesh) regarding

the CPS reports was the unfortunate and inevitable consequence of

Defendants' unlawful and malicious litigation.  Defendants continued to

engage in fraud on the Court of Appeal.  They continued to improperly exploit

prejudice based on Plaintiff's race, ethnicity, nationality and gender.  The

instant action is not intended to review the Court of Appeal's Opinion.  It is

intended to address Plaintiff's grievance against Defendants for their

fraudulent and prejudicial actions during the appeal process of the state civil

action.  Defendants did not get either the Superior Court or the Court of

Appeal to overturn the trial judge's *res judicata* admission of the AP's guilty

plea and felony conviction.  Their re-litigation of that plea and conviction as

well as re-litigation of the abuse issue was impermissible, unlawful and

malicious.

265. Plaintiff filed a petition for review with the California Supreme Court, as a pro

se litigant, on August 30, 2013.  The Supreme Court denied review, without

any explanation, on October 2, 2013.  The review was neither briefed, argued

nor ruled upon merit.

266. In Plaintiff's FOIA action against the USDOS, *supra*, the federal court in the

Central District issued an order granting the federal defendant's motion for

summary judgment on November 20, 2013.  That court issued the final

judgment on December 2, 2013.

267. Plaintiff filed the instant action on November 29, 2013.  Plaintiff filed various

discovery applications over the next two months.  The applications are still

pending.

FAC                                    Case No. 13-CV-2857-JLS-KSC

268. Defendants Meera, Mohan, Madhavi, Sunila, Neal, Epps, Rutan & Tucker, LLP, Nicholas, Jones and Nicholas & Butler, LLP have registered multiple liens on Plaintiff's primary residence in San Marcos to collect their costs, expenses and expert fees in the state civil action. (Exhibits 36, 37, 38, 39.) The liens total $73,995.78. Majority of this amount is for the fraudulent "expert" testimony of Lipian. Another significant portion is for the "expert" Indian attorney who disagreed with Indian Supreme Court, international treaties, and findings of the USDOS and the United Nations. These Defendants have or should have known that they acquired the state court orders through fraud. They have defamed Plaintiff, and have improperly clouded his title.

269. As a direct result of coconspirators' fraudulent actions over the past five years, Plaintiff has spent an enormous amount of time on discovery in various state and federal courts as a pro se litigant. Plaintiff has been stonewalled by various conspirators as well as state and federal agencies whose employees have been conspirators at various times. Plaintiff has been forced into underemployment and unemployment as a direct result of these events.

270. The unbearable loss of reputation as a direct result of Defendants' unlawful and malicious "abuse" defense has further perpetuated Plaintiff's unemployment. A simple search for Plaintiff's name leads one to the Opinion of California Court of Appeal which unmistakably suggests a high probability of child and spousal abuse by Plaintiff. That unfortunate opinion was acquired by Defendants through fraud.

271. Plaintiff has been unable to pay his mortgage and meet many other financial obligations such as paying his credit card bills. After the conclusion of the state civil action, Plaintiff had to withdraw funds from his 401K retirement account to pay his attorney. Without any prior experience of such a withdrawal, Plaintiff unintentionally withheld less taxes than needed. Plaintiff

96

thus owes the IRS past taxes which he has been unable to pay due to forced underemployment and unemployment of the past few years. The IRS has registered a lien against Plaintiff's primary residence as well.

272. Plaintiff has had a long history of being financially responsible. He did not accrue credit card debt and paid his taxes on time. He also has been willing and able to take on financial responsibility for his sister and nephews for years. Events of the past few years however have destroyed the good credit history and reputation Plaintiff had built and maintained for decades. This loss of good standing has perpetuated Plaintiff's unemployment. It also has disqualified him from acquiring a security clearance to work in the defense/aerospace industry where he worked between 2003 and 2011. Changing career path and industries is a very difficult task, especially at Plaintiff's age. Longer Plaintiff has remained unemployed, his chances of a financial recovery have become more remote.

273. Plaintiff's house is presently in foreclosure. Unless that process is temporarily halted through a fair and just intervention of this Court, Plaintiff will be homeless in a few weeks. The Notice of Foreclosure was filed by West Coast Capital on March 19, 2014. Statute allows commencement of foreclosure in 90 days from such filing, or on June 16, 2014.

274. Defendants' improper clouding of Plaintiff's title has diminished the value of his primary residence as well as made less damaging options such as a short sale impossible, thus perpetuating Plaintiff's foreclosure problems.

## VII.   CAUSES OF ACTION FOR FRAUD ON THE COURT IN THE STATE CIVIL ACTION

### *FIRST CAUSE OF ACTION*

**(Fraud on the Court and Conspiracy to Commit Fraud on the Court in the State Civil Action)**

275. Plaintiff hereby incorporates by reference paragraphs 32 through 274,

FAC                                    Case No. 13-CV-2857-JLS-KSC

1  inclusive, of this FAC as if fully set forth herein.

2  276. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila,

3  Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law

4  firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of

5  Fred Thiagarajah for their actions in the state civil action.  (Case No. 30-2009-

6  00322804 from the Superior Court of the State of California, County of

7  Orange; and the subsequent appeal Case No. G045914 in the Court of Appeal

8  of the State of California, Fourth Appellate District, Division Three.)  Plaintiff

9  claims the Court's jurisdiction in equity.  Plaintiff joins each of the three law

10  firms under the *respondeat superior* doctrine.  All Defendants are jointly and

11  severally liable for damages sought.

12  277. Plaintiff alleges that each Defendant committed and/or conspired to commit

13  fraud of deceit, factual misrepresentation, concealment and/or nondisclosure

14  on the courts in the state civil action.  Plaintiff further alleges that each

15  Defendant violated and/or conspired to violate court orders.  Plaintiff further

16  alleges that each Defendant gave, suborned or allowed perjured or

17  manufactured testimonies; and/or conspired to give, suborn or allow perjured

18  or manufactured testimonies.  Plaintiff alleges that Defendants conspired to

19  present manufactured forensic evidence that contradicted facts, laws and

20  established principles of forensic psychiatry.

21  278. Plaintiff alleges that each Defendant committed and/or conspired to commit

22  fraud of deceit, factual misrepresentation, concealment and/or nondisclosure

23  on the courts pertaining to issues that were not before the court and/or issues

24  that were improperly and unlawfully litigated by Defendants, depriving

25  Plaintiff a fair opportunity to present and litigate his claims.  Plaintiff further

26  alleges that Defendants committed and/or conspired to commit fraud of deceit,

27  factual misrepresentation, concealment and/or nondisclosure on the courts

28  with full knowledge of the jurisdictional limitations of that forum which

98

FAC                                    Case No. 13-CV-2857-JLS-KSC

deprived Plaintiff a fair opportunity to prove Defendants' fraud.

279. Plaintiff alleges that Defendants conspired to misuse two biased witnesses (the AP and Plaintiff's abducted son), that the two witnesses were available to Defendants throughout the civil litigation for the improper purpose of manufacturing evidence, that Defendants listed the two witnesses on Defendants' list of trial witnesses but made them unavailable for pre-trial deposition and trial testimony.  Plaintiff alleges that Defendants' actions deprived Plaintiff a fair opportunity to present and litigate his claims, and to cross--examine adversarial witnesses, thus resulting in fraud on the courts.

280. Plaintiff further alleges that each attorney Defendant and law firm Defendant committed and/or conspired to commit acts of moral turpitude and dishonesty, and fraud on the court, by advancing untrue facts prejudicial to Plaintiff; by misrepresenting and concealing material information and facts adverse to their defense; by violating their duty not to mislead the court and the jury; by deceiving the court and the jury; by defaming Plaintiff to the court and the jury; by omitting material facts favorable to Plaintiff; by making false statements in written briefs, during oral arguments and during trial testimony; by violating court orders for disclosure of evidence and depositions of witnesses; and/or by presenting arguments unsupported and contradicted by law.  Plaintiff alleges that each of them obstructed or conspired to obstruct justice..

281. Plaintiff alleges that each attorney Defendant violated one or more statutes, including but not limited to, BPC §§ 6068, 6103, 6106, 6128.  Plaintiff further alleges that each attorney Defendant violated one or more Rules described in California State Bar's Rules of Professional Conduct, including but not limited to: 1-120, 3-200(A), (B); 5-200(A), 5-200(B), and/or 5-220.  Plaintiff further alleges that each attorney Defendant violated one or more Rules described in the American Bar Association's Model Rules of Professional Conduct,

99

including but not limited to: 1.2(d), 3.3(a)(1), 3.3(a)(3), 3.3(b), 3.3(c), 3.4(b), 3.4(c), 3.4(e), 3.5(a), 4.1(a), 4.1(b), 4.4(a), 8.4(a), 8.4(b), 8.4(c), 8.4(d), and/or 8.4(e).

282. Plaintiff further alleges that the law firms of Rutan & Tucker, LLP; Nicholas & Butler, LLP; and/or Law Offices of Fred Thiagarajah; and/or their employees have violated multiple Rules described in the American Bar Association's Model Rules of Professional Conduct, including but not limited to: 5.1(a), 5.1(b), and/or 5.1(c)(2).

283. Plaintiff alleges that Defendants' elaborate scheme to commit fraud on the court was so broad and all- pervasive that it tainted the entire state civil action, resulting in great injustice to Plaintiff.

284. Defendants knowingly, willfully and maliciously conspired and agreed with the other Defendants, and each of them, to commit fraud on the courts in the state civil action.

285. Pursuant to their conspiracy and agreement, and in furtherance thereof, Defendants  performed unlawful acts to the detriment of Plaintiff.  In this regard, Defendants knew that their actions would deprive Plaintiff of justice, due process and equal protection of the laws.  In spite of this knowledge, Defendants continued to actively participate in their unlawful acts and scheme to commit fraud; and gave the other Defendants, and each of them, substantial assistance and encouragement to so act.

286. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered grave injustice in the state civil action, humiliation, embarrassment, unbearable defamation, further estrangement from his abducted son, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

287. Defendants' conduct as alleged herein and/or to be established through

FAC                                    Case No. 13-CV-2857-JLS-KSC

discovery, and upon which this Cause of Action is based, constitutes the commission of multiple criminal offenses.

288. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur the additional expenses and litigation costs, the precise amount of which will be proven at trial.

289. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's rights as well as Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

290. Plaintiff prays the Court to grant relief for this Cause of Action by

    a.   setting aside all judgments and orders of the Superior Court and California Court of Appeal in the state civil action that resulted from Defendants' fraud on those courts;

    b.   granting Plaintiff actual damages for all litigation costs and expenses in the state civil action (including costs, court fees, expenses, attorney fees, expert witness fees, etc.) as well as for all litigation costs and expenses incurred in subsequent state and federal actions pursued by Plaintiff in order to conduct discovery and establish fraud by defendants (including costs, court fees, expenses, etc.);

    c.   granting Plaintiff actual damages and opportunity costs arising out of his forced underemployment or unemployment, caused by Defendants' fraudulent actions, and resulting in Plaintiff's actual loss of earnings, his inability to pay mortgage, loss of credit, potential foreclosure of his home and potential bankruptcy; and for loss of earnings Plaintiff will incur in

101

1   future (opportunity costs);

2   d.   granting Plaintiff damages sought in the state civil action as a loss

3   resulting from intended and foreseeable consequence of Defendants'

4   deceit, fraud, malice and oppression;

5   e.   granting Plaintiff exemplary, punitive and special damages for

6   Defendants' intentional and reckless misconduct (Cal. Civ. Code § 3294)

7   with special consideration for the perpetuation of alienation of Plaintiff's

8   abducted son due to Defendants' malicious actions as well as for

9   defamation and loss of reputation caused by those actions;

10  f.   granting Plaintiff any other compensatory and non-compensatory

11  damages as appropriate;

12  g.   recommending appropriate disciplinary actions against Neal, Epps,

13  Nicholas, Jones, Thiagarajah and Nair as well as against the law firms of

14  Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred

15  Thiagarajah, pursuant to the statutes and rules cited herein as well as any

16  other applicable statutes, regulations or rules; and

17  h.   granting any other injunctive and declaratory relief as appropriate.

18  ### ***SECOND CAUSE OF ACTION***

19  **(Aiding and Abetting the Conspiracy to Commit Fraud on the Court in the**

20  **State Civil Action)**

21  291. Plaintiff hereby incorporates by reference paragraphs 32 through 274,

22  inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates

23  by reference all allegations made in the First Cause of Action as if fully set

24  forth herein.

25  292. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila,

26  Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law

27  firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of

28  Fred Thiagarajah for their actions in the state civil action.  Plaintiff claims the

102

Court's jurisdiction in equity. Plaintiff joins each of the three law firms under the *respondeat superior* doctrine. All Defendants are jointly and severally liable for damages sought.

293. Plaintiff alleges that each Defendant knowingly aided and abetted the commission of fraud on the state courts and the conspiracy to commit fraud on the state courts. Each Defendant had a duty and was in a position to prevent such fraud.

294. Plaintiff prays the Court to grant relief for this Cause of Action by

   a. setting aside all judgments and orders of the Superior Court and California Court of Appeal in the state civil action that resulted from Defendants' fraud on those courts;

   b. granting Plaintiff actual damages for all litigation costs and expenses in the state civil action (including costs, court fees, expenses, attorney fees, expert witness fees, etc.) as well as for all litigation costs and expenses incurred in subsequent state and federal actions pursued by Plaintiff in order to conduct discovery and establish fraud by defendants (including costs, court fees, expenses, etc.);

   c. granting Plaintiff actual damages and opportunity costs arising out of his forced underemployment or unemployment, caused by Defendants' fraudulent actions, and resulting in Plaintiff's actual loss of earnings, his inability to pay mortgage, loss of credit, potential foreclosure of his home and potential bankruptcy; and for loss of earnings Plaintiff will incur in future (opportunity costs);

   d. granting Plaintiff damages sought in the state civil action as a loss resulting from intended and foreseeable consequence of Defendants' deceit, fraud, malice and oppression;

   e. granting Plaintiff exemplary, punitive and special damages for Defendants' intentional and reckless misconduct (Cal. Civ. Code § 3294)

103

with special consideration for the perpetuation of alienation of Plaintiff's abducted son due to Defendants' malicious actions as well as for defamation and loss of reputation caused by those actions;

f.   granting Plaintiff any other compensatory and non-compensatory damages as appropriate;

g.   recommending appropriate disciplinary actions against Neal, Epps, Nicholas, Jones, Thiagarajah and Nair as well as against the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah, pursuant to the statutes and rules cited herein as well as any other applicable statutes, regulations or rules; and

h.   granting any other injunctive and declaratory relief as appropriate.

### ***THIRD CAUSE OF ACTION***

### **(Negligence Per Se For Violations of Law)**

295. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates by reference all allegations made in the First and Second Causes of Action as if fully set forth herein.

296. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah for their actions in the state civil action.  Plaintiff claims the Court's jurisdiction in equity.  Plaintiff joins each of the three law firms under the *respondeat superior* doctrine.  All Defendants are jointly and severally liable for damages sought.

297. Defendants, and each of them, had a duty to not commit or facilitate the commission of fraud on the courts in the state civil action.  Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes the commission of multiple

104

criminal offenses and violation of Plaintiff's rights, causing economic, compensatory, and special damages as alleged herein and in an amount to be established at trial.[48]

298. At all times mentioned herein, Plaintiff  was amongst the class of persons sought to be protected from Defendants' transgressions and violation of statutes.  The harm suffered by Plaintiff, as alleged herein, as a direct and proximate result of the acts of Defendants, as alleged herein, was the type of harm Defendants had an obligation and duty not to inflict.

299. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered grave injustice in the state civil action, humiliation, embarrassment, unbearable defamation, further estrangement from his abducted son, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

300. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs, the precise amount of which will be proven at trial.

301. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship.  Defendants, and each of them,  further acted with willful and conscious disregard for Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

---

[48] Plaintiff prays leave that at such time as any further violations of statutes by Defendants are identified through discovery, Plaintiff may be permitted to amend the FAC with appropriate allegations.

FAC                                        Case No. 13-CV-2857-JLS-KSC

### *FOURTH CAUSE OF ACTION*

### (Intentional Infliction of Emotional Distress)

302. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the First and Second Causes of Action as if fully set forth herein.

303. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah for their actions in the state civil action. Plaintiff claims the Court's jurisdiction in equity. Plaintiff joins each of the three law firms under the *respondeat superior* doctrine. All Defendants are jointly and severally liable for damages sought.

304. The actions of Defendants, and each of them, as alleged herein, constitute outrageous conduct which is so beyond the bounds of human decency that no reasonable person in the place of Plaintiff could reasonably be expected to bear it.

305. In doing the acts alleged herein, Defendants, and each of them, acted with the intent to cause Plaintiff severe emotional distress, or acted with reckless disregard as to the probability of causing severe emotional distress to Plaintiff.

306. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

307. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages,

106

opportunity costs, additional expenses  and litigation costs, the precise amount of which will be proven at trial.

308. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship.  Defendants, and each of them,  further acted with willful and conscious disregard of Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### *FIFTH CAUSE OF ACTION*
### (Negligent Infliction of Emotional Distress)

309. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates by reference all allegations made in the First and Second Causes of Action as if fully set forth herein.

310. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah for their actions in the state civil action.  Plaintiff claims the Court's jurisdiction in equity.  Plaintiff joins each of the three law firms under the *respondeat superior* doctrine.  All Defendants are jointly and severally liable for damages sought.

311. Defendants, and each of them, had a duty to not cause, aid, abet, conspire in or facilitate the fraud on the courts during the state civil action.

312. Plaintiff believes and thereupon alleges that Defendants, and each of them, knew or should have known that their failure to perform their obligations, as set forth herein, would cause Plaintiff severe emotional distress, and with that

FAC                                        Case No. 13-CV-2857-JLS-KSC

knowledge Defendants, and each of them, negligently performed their duties and obligations owed to the state courts and Plaintiff, thus directly and proximately resulting in severe emotional distress to Plaintiff.

313. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be determined according to proof at the time of trial.

314. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses  and litigation costs, the precise amount of which will be proven at trial.

## VIII.   CAUSES OF ACTION FOR EXTRINSIC FRAUD ON PLAINTIFF IN THE STATE CIVIL ACTION

### *SIXTH CAUSE OF ACTION*

**(Extrinsic Fraud and Conspiracy to Commit Extrinsic Fraud on Plaintiff in the State Civil Action)**

315. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.

316. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah for their actions in the state civil action.  (Case No. 30-2009-00322804 from the Superior Court of the State of California, County of Orange; and the subsequent appeal Case No. G045914 in the Court of Appeal of the State of California, Fourth Appellate District, Division Three.)  Plaintiff claims the Court's jurisdiction in equity.  Plaintiff joins each of the three law

FAC                                          Case No. 13-CV-2857-JLS-KSC

firms under the *respondeat superior* doctrine.  All Defendants are jointly and severally liable for damages sought.

317. Plaintiff alleges that each Defendant committed and/or conspired to commit extrinsic fraud on Plaintiff in the state civil action depriving him a fair opportunity to present and litigate his claims, due process and equal protection of the laws.  Plaintiff alleges that each Defendant committed and/or conspired to commit fraud of deceit, factual misrepresentation, concealment and/or nondisclosure on Plaintiff pertaining to issues that were not before the court and/or issues that were improperly and unlawfully litigated by Defendants, depriving Plaintiff a fair opportunity to present and litigate his claims. Plaintiff further alleges that Defendants committed and/or conspired to commit fraud of deceit, factual misrepresentation, concealment and/or nondisclosure on Plaintiff with full knowledge of the jurisdictional limitations of that forum which deprived Plaintiff a fair opportunity to prove Defendants' fraud.  Plaintiff further alleges that each Defendant violated and/or conspired to violate court orders.  Plaintiff further alleges that each Defendant gave, suborned or allowed perjured or manufactured testimonies; and/or conspired to give, suborn or allow perjured or manufactured testimonies.  Plaintiff alleges that Defendants conspired to present manufactured forensic evidence that contradicted facts, laws and established principles of forensic psychiatry.

318. Plaintiff alleges that Defendants conspired to misuse two biased witnesses (the AP and Plaintiff's abducted son), that the two witnesses were available to Defendants throughout the civil litigation for the improper purpose of manufacturing evidence, that Defendants listed the two witnesses on Defendants' list of trial witnesses but made them unavailable for pre-trial deposition and trial testimony.  Plaintiff alleges that Defendants' actions deprived Plaintiff a fair opportunity to present and litigate his claims, and to cross--examine adversarial witnesses.

319. Plaintiff further alleges that each attorney Defendant and law firm Defendant committed and/or conspired to commit acts of moral turpitude and dishonesty, and fraud on the court and Plaintiff, by advancing untrue facts prejudicial to Plaintiff; by misrepresenting and concealing material information and facts adverse to their defense; by violating their duty not to mislead the court and the jury; by deceiving the court and the jury; by defaming Plaintiff to the court and the jury; by omitting material facts favorable to Plaintiff; by making false statements in written briefs, during oral arguments and during trial testimony; by violating court orders for disclosure of evidence and depositions of witnesses; and/or by presenting arguments unsupported and contradicted by law. Plaintiff alleges that each of them obstructed or conspired to obstruct justice.

320. Plaintiff alleges that each attorney Defendant violated one or more statutes, including but not limited to, various sections of the BPC cited herein. Plaintiff further alleges that each attorney Defendant violated one or more Rules described in California State Bar's Rules of Professional Conduct and in the American Bar Association's Model Rules of Professional Conduct.

321. Plaintiff further alleges that the law firms of Rutan & Tucker, LLP; Nicholas & Butler, LLP; and/or Law Offices of Fred Thiagarajah; and/or their employees have violated multiple Rules described in the American Bar Association's Model Rules of Professional Conduct.

322. Plaintiff alleges that Defendants' elaborate scheme to commit fraud on Plaintiff was so broad and all- pervasive that it tainted the entire state civil action, resulting in great injustice to Plaintiff.

323. Defendants knowingly, willfully and maliciously conspired and agreed with the other Defendants, and each of them, to commit fraud on Plaintiff in the state civil action.

324. Pursuant to their conspiracy and agreement, and in furtherance thereof,

110

FAC

Case No. 13-CV-2857-JLS-KSC

Defendants performed unlawful acts to the detriment of Plaintiff. In this regard, Defendants knew that their actions would deprive Plaintiff of justice, due process and equal protection of the laws. In spite of this knowledge, Defendants continued to actively participate in their unlawful acts and scheme to commit fraud; and gave the other Defendants, and each of them, substantial assistance and encouragement to so act.

325. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered grave injustice in the state civil action, humiliation, embarrassment, unbearable defamation, further estrangement from his abducted son, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

326. Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes the commission of multiple criminal offenses.

327. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur the additional expenses and litigation costs, the precise amount of which will be proven at trial.

328. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's rights as well as Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

329. Plaintiff prays the Court to grant relief for this Cause of Action by

    a.   setting aside all judgments and orders of the Superior Court and

111

California Court of Appeal in the state civil action that resulted from Defendants' fraud on Plaintiff;

b. granting Plaintiff actual damages for all litigation costs and expenses in the state civil action (including costs, court fees, expenses, attorney fees, expert witness fees, etc.) as well as for all litigation costs and expenses incurred in subsequent state and federal actions pursued by Plaintiff in order to conduct discovery and establish fraud by defendants (including costs, court fees, expenses, etc.);

c. granting Plaintiff actual damages and opportunity costs arising out of his forced underemployment or unemployment, caused by Defendants' fraudulent actions, and resulting in Plaintiff's actual loss of earnings, his inability to pay mortgage, loss of credit, potential foreclosure of his home and potential bankruptcy; and for loss of earnings Plaintiff will incur in future (opportunity costs);

d. granting Plaintiff damages sought in the state civil action as a loss resulting from intended and foreseeable consequence of Defendants' deceit, fraud, malice and oppression;

e. granting Plaintiff exemplary, punitive and special damages for Defendants' intentional and reckless misconduct (Cal. Civ. Code § 3294) with special consideration for the perpetuation of alienation of Plaintiff's abducted son due to Defendants' malicious actions as well as for defamation and loss of reputation caused by those actions;

f. granting Plaintiff any other compensatory and non-compensatory damages as appropriate;

g. recommending appropriate disciplinary actions against Neal, Epps, Nicholas, Jones, Thiagarajah and Nair as well as against the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah, pursuant to the statutes and rules cited herein as well as any

112

other applicable statutes, regulations or rules; and

h.   granting any other injunctive and declaratory relief as appropriate.

### *SEVENTH CAUSE OF ACTION*

**(Aiding and Abetting the Conspiracy to Commit Extrinsic Fraud on Plaintiff in the State Civil Action)**

330. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates by reference all allegations made in the Sixth Cause of Action as if fully set forth herein.

331. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah for their actions in the state civil action.  Plaintiff claims the Court's jurisdiction in equity.  Plaintiff joins each of the three law firms under the *respondeat superior* doctrine.  All Defendants are jointly and severally liable for damages sought.

332. Plaintiff alleges that each Defendant knowingly aided and abetted the commission of fraud on Plaintiff during the state civil action and the conspiracy to commit fraud on Plaintiff.  Each Defendant had a duty and was in a position to prevent such fraud.

333. Plaintiff prays the Court to grant relief for this Cause of Action by

a.   setting aside all judgments and orders of the Superior Court and California Court of Appeal in the state civil action that resulted from Defendants' fraud on Plaintiff;

b.   granting Plaintiff actual damages for all litigation costs and expenses in the state civil action (including costs, court fees, expenses, attorney fees, expert witness fees, etc.) as well as for all litigation costs and expenses incurred in subsequent state and federal actions pursued by Plaintiff in

113

order to conduct discovery and establish fraud by defendants (including costs, court fees, expenses, etc.);

c. granting Plaintiff actual damages and opportunity costs arising out of his forced underemployment or unemployment, caused by Defendants' fraudulent actions, and resulting in Plaintiff's actual loss of earnings, his inability to pay mortgage, loss of credit, potential foreclosure of his home and potential bankruptcy; and for loss of earnings Plaintiff will incur in future (opportunity costs);

d. granting Plaintiff damages sought in the state civil action as a loss resulting from intended and foreseeable consequence of Defendants' deceit, fraud, malice and oppression;

e. granting Plaintiff exemplary, punitive and special damages for Defendants' intentional and reckless misconduct (Cal. Civ. Code § 3294) with special consideration for the perpetuation of alienation of Plaintiff's abducted son due to Defendants' malicious actions as well as for defamation and loss of reputation caused by those actions;

f. granting Plaintiff any other compensatory and non-compensatory damages as appropriate;

g. recommending appropriate disciplinary actions against Neal, Epps, Nicholas, Jones, Thiagarajah and Nair as well as against the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah, pursuant to the statutes and rules cited herein as well as any other applicable statutes, regulations or rules; and

h. granting any other injunctive and declaratory relief as appropriate.

## ***EIGHTH CAUSE OF ACTION***

### (Negligence Per Se For Violations of Law)

334. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates

114

FAC                                          Case No. 13-CV-2857-JLS-KSC

by reference all allegations made in the Sixth and Seventh Causes of Action as if fully set forth herein.

335. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah for their actions in the state civil action. Plaintiff claims the Court's jurisdiction in equity. Plaintiff joins each of the three law firms under the *respondeat superior* doctrine. All Defendants are jointly and severally liable for damages sought.

336. Defendants, and each of them, had a duty to not commit or facilitate the commission of fraud on Plaintiff in the state civil action. Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes the commission of multiple criminal offenses and violation of Plaintiff's rights, causing economic, compensatory, and special damages as alleged herein and in an amount to be established at trial.[49]

337. At all times mentioned herein, Plaintiff was amongst the class of persons sought to be protected from Defendants' transgressions and violation of statutes. The harm suffered by Plaintiff, as alleged herein, as a direct and proximate result of the acts of Defendants, as alleged herein, was the type of harm Defendants had an obligation and duty not to inflict.

338. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered grave injustice in the state civil action, humiliation, embarrassment, unbearable defamation, further estrangement from his abducted son, financial hardship, and great mental and emotional distress, all

---

[49] Plaintiff prays leave that at such time as any further violations of statutes by Defendants are identified through discovery, Plaintiff may be permitted to amend the FAC with appropriate allegations.

115

to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

339. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs, the precise amount of which will be proven at trial.

340. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard for Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### ***NINTH CAUSE OF ACTION***

### **(Intentional Infliction of Emotional Distress)**

341. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Sixth and Seventh Causes of Action as if fully set forth herein.

342. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of Fred Thiagarajah for their actions in the state civil action. Plaintiff claims the Court's jurisdiction in equity. Plaintiff joins each of the three law firms under the *respondeat superior* doctrine. All Defendants are jointly and severally liable for damages sought.

343. The actions of Defendants, and each of them, as alleged herein, constitute outrageous conduct which is so beyond the bounds of human decency that no

FAC                                                    Case No. 13-CV-2857-JLS-KSC

reasonable person in the place of Plaintiff could reasonably be expected to bear it.

344. In doing the acts alleged herein, Defendants, and each of them, acted with the intent to cause Plaintiff severe emotional distress, or acted with reckless disregard as to the probability of causing severe emotional distress to Plaintiff.

345. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

346. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses and litigation costs, the precise amount of which will be proven at trial.

347. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### *TENTH CAUSE OF ACTION*
### **(Negligent Infliction of Emotional Distress)**

348. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Sixth and Seventh Causes of Action as

117

FAC                                     Case No. 13-CV-2857-JLS-KSC

1  if fully set forth herein.

2  349. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila,

3  Madhavi, Neal, Epps, Nicholas, Jones, Thiagarajah, Nair as well as the law

4  firms of Rutan & Tucker, LLP, Nicholas & Butler, LLP, and Law Offices of

5  Fred Thiagarajah for their actions in the state civil action.  Plaintiff claims the

6  Court's jurisdiction in equity.  Plaintiff joins each of the three law firms under

7  the *respondeat superior* doctrine.  All Defendants are jointly and severally

8  liable for damages sought.

9  350. Defendants, and each of them, had a duty to not cause, aid, abet, conspire in or

10  facilitate the fraud on Plaintiff during the state civil action.

11  351. Plaintiff believes and thereupon alleges that Defendants, and each of them,

12  knew or should have known that their failure to perform their obligations, as

13  set forth herein, would cause Plaintiff severe emotional distress, and with that

14  knowledge Defendants, and each of them, negligently performed their duties

15  and obligations owed to the state courts and Plaintiff, thus directly and

16  proximately resulting in severe emotional distress to Plaintiff.

17  352. As a direct and proximate result of the actions of Defendants, and each of

18  them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety,

19  grief, and mental anguish, and has further suffered great psychological and

20  emotional pain, all to Plaintiff's general damage in an amount in excess of the

21  minimum jurisdiction of this court, the precise amount of which will be

22  determined according to proof at the time of trial.

23  353. As a further direct, foreseeable, and proximate result of Defendants' conduct,

24  and each of them, Plaintiff has been forced to incur actual damages,

25  opportunity costs, additional expenses  and litigation costs, the precise amount

26  of which will be proven at trial.

27

28

FAC                                                    Case No. 13-CV-2857-JLS-KSC

# IX.   CAUSES OF ACTION FOR DEFAMATION
## *ELEVENTH CAUSE OF ACTION*
### (Defamation and Conspiracy to Defame)

354. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.

355. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP, for their actions in the state civil action. (Case No. 30-2009-00322804 from the Superior Court of the State of California, County of Orange; and the subsequent appeal Case No. G045914 in the Court of Appeal of the State of California, Fourth Appellate District, Division Three.) Plaintiff claims the Court's jurisdiction pursuant to 28 U.S.C. § 1367(a) for this pendent state claim under CCC §§ 44, 45, 46 and 48a. Plaintiff joins each of the three law firms under the *respondeat superior* doctrine. All Defendants are jointly and severally liable for damages sought.

356. Plaintiff alleges that each Defendant defamed and/or conspired to defame Plaintiff through slander and libel through unprivileged communication in the state civil action. Defendants deliberately, repeatedly and maliciously claimed that Plaintiff abused his wife and child, that the CPS visited Plaintiff's residence in response to reports of domestic disturbance and/or abuse, that charges were filed against Plaintiff. Defendants gave, suborned or allowed perjured or manufactured testimonies; and/or conspired to give, suborn or allow perjured or manufactured testimonies to convey such allegations to the courts and the jury. Defendants deliberately and maliciously committed and/or conspired to commit fraud of deceit, factual misrepresentation, concealment and/or nondisclosure on Plaintiff and the courts in furtherance of defamation and conspiracy to defame. Defendants deliberately and maliciously violated a court order to disclose to Plaintiff the CPS records. Full

FAC                                                            Case No. 13-CV-2857-JLS-KSC

disclosure of those records would have established lack of any abuse as well as falsehood of Defendants' other allegations. Defendants' concealment and nondisclosure of such evidence, in violation of the court order, and their partial and misleading disclosure amounted to destruction and alteration of evidence in their possession, thereby depriving Plaintiff the use of that evidence.

357. Plaintiff alleges that the conspiracy to defame Plaintiff was broad and all-pervasive throughout the state civil action. A significant majority of Defendants' testimonies, cross-examination of other witnesses, arguments during pre-trial motions, arguments during trial in the presence of the jury as well as outside the jury's presence, arguments during post-trial motions as well as arguments during the appeal process were dominated by the "abuse" defense. This tainted the entire state civil action and amounted to obstruction of justice.

358. Plaintiff alleges that each attorney Defendant violated one or more statutes, including but not limited to, various sections of the BPC cited herein. Plaintiff further alleges that each attorney Defendant violated one or more Rules described in California State Bar's Rules of Professional Conduct and in the American Bar Association's Model Rules of Professional Conduct.

359. Defendants knowingly, willfully and maliciously conspired and agreed with the other Defendants, and each of them, to defame Plaintiff in the state civil action.

360. Pursuant to their conspiracy and agreement, and in furtherance thereof, Defendants performed unlawful acts to the detriment of Plaintiff. In this regard, Defendants knew that their actions would deprive Plaintiff of justice, due process and equal protection of the laws, and would also result in unbearable defamation. In spite of this knowledge, Defendants continued to actively participate in their unlawful acts and scheme to defame; and gave the

other Defendants, and each of them, substantial assistance and encouragement to so act.

361. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered grave injustice in the state civil action, humiliation, embarrassment, unbearable defamation, further estrangement from his abducted son, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

362. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur the additional expenses and litigation costs, the precise amount of which will be proven at trial.

363. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which continues to subject Plaintiff to cruel and unjust hardship.  Defendants, and each of them,  further acted with willful and conscious disregard of Plaintiff's rights as well as Defendants' duties and obligations under various statutes cited herein.  Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

364. Plaintiff prays the Court to grant relief for this Cause of Action by

    a.   granting Plaintiff actual damages for all litigation costs and expenses in the state civil action (including costs, court fees, expenses, attorney fees, expert witness fees, etc.) as well as for all litigation costs and expenses incurred in subsequent state and federal actions pursued by Plaintiff in order to conduct discovery and establish Defendants' malicious, slanderous and libelous statements;

    b.   granting Plaintiff actual damages and opportunity costs arising out of his forced underemployment or unemployment, caused by Defendants'

121

defamation of Plaintiff, and resulting in Plaintiff's actual loss of earnings, his inability to pay mortgage, loss of credit, potential foreclosure of his home and potential bankruptcy; and for loss of earnings Plaintiff will incur in future (opportunity costs);

c.   granting Plaintiff damages sought in the state civil action as a loss resulting from intended and foreseeable consequence of Defendants' defamation of Plaintiff;

d.   granting Plaintiff general, exemplary and special damages for Defendants' intentional and reckless misconduct (Cal. Civ. Code §§ 3294, 48a) with special consideration for the perpetuation of alienation of Plaintiff's abducted son due to the defamation as well as for the loss of reputation, shame, mortification and hurt feelings caused by those actions;

e.   granting Plaintiff any other compensatory and non-compensatory damages as appropriate;

f.   recommending appropriate disciplinary actions against Neal, Epps, Nicholas and Jones as well as against the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP, pursuant to the statutes and rules cited herein as well as any other applicable statutes, regulations or rules; and

g.   granting any other injunctive and declaratory relief as appropriate.

## *TWELFTH CAUSE OF ACTION*

### **(Aiding and Abetting the Conspiracy to Defame)**

365. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates by reference all allegations made in the Eleventh Cause of Action as if fully set forth herein.

366. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP, for their actions in the state civil

122

FAC                                                    Case No. 13-CV-2857-JLS-KSC

action.  Plaintiff claims the Court's jurisdiction pursuant to 28 U.S.C. § 1367(a) for this pendent state claim under CCC §§ 44, 45, 46 and 48a. Plaintiff joins each of the three law firms under the *respondeat superior* doctrine.  All Defendants are jointly and severally liable for damages sought.

367. Plaintiff alleges that each Defendant knowingly aided and abetted the defamation of Plaintiff during the state civil action and the conspiracy to defame Plaintiff.  Each Defendant had a duty and was in a position to prevent such defamation.

368. Plaintiff prays the Court to grant relief for this Cause of Action by

    a.    granting Plaintiff actual damages for all litigation costs and expenses in the state civil action (including costs, court fees, expenses, attorney fees, expert witness fees, etc.) as well as for all litigation costs and expenses incurred in subsequent state and federal actions pursued by Plaintiff in order to conduct discovery and establish Defendants' malicious, slanderous and libelous statements;

    b.    granting Plaintiff actual damages and opportunity costs arising out of his forced underemployment or unemployment, caused by Defendants' defamation of Plaintiff, and resulting in Plaintiff's actual loss of earnings, his inability to pay mortgage, loss of credit, potential foreclosure of his home and potential bankruptcy; and for loss of earnings Plaintiff will incur in future (opportunity costs);

    c.    granting Plaintiff damages sought in the state civil action as a loss resulting from intended and foreseeable consequence of Defendants' defamation of Plaintiff;

    d.    granting Plaintiff general, exemplary and special damages for Defendants' intentional and reckless misconduct (Cal. Civ. Code §§ 3294, 48a) with special consideration for the perpetuation of alienation of Plaintiff's abducted son due to the defamation as well as for the loss of reputation,

123

shame, mortification and hurt feelings caused by those actions;

e.  granting Plaintiff any other compensatory and non-compensatory damages as appropriate;

f.  recommending appropriate disciplinary actions against Neal, Epps, Nicholas and Jones as well as against the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP, pursuant to the statutes and rules cited herein as well as any other applicable statutes, regulations or rules; and

g.  granting any other injunctive and declaratory relief as appropriate.

### ***THIRTEENTH CAUSE OF ACTION***

### **(Negligence Per Se For Violations of Law)**

369. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates by reference all allegations made in the Eleventh and Twelfth Causes of Action as if fully set forth herein.

370. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP, for their actions in the state civil action.  Plaintiff claims the Court's jurisdiction pursuant to 28 U.S.C. § 1367(a) for this pendent state claim under CCC §§ 44, 45, 46 and 48a. Plaintiff joins each of the three law firms under the *respondeat superior* doctrine.  All Defendants are jointly and severally liable for damages sought.

371. Defendants, and each of them, had a duty to not defame or facilitate the defamation of Plaintiff in the state civil action.  Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes violation of multiple statutes and Plaintiff's rights, causing economic, compensatory, and special damages as alleged herein and in an amount to be established at trial.

372. At all times mentioned herein, Plaintiff  was amongst the class of persons

FAC                                                           Case No. 13-CV-2857-JLS-KSC

sought to be protected from Defendants' transgressions and violation of statutes. The harm suffered by Plaintiff, as alleged herein, as a direct and proximate result of the acts of Defendants, as alleged herein, was the type of harm Defendants had an obligation and duty not to inflict.

373. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered grave injustice in the state civil action, humiliation, embarrassment, unbearable defamation, further estrangement from his abducted son, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

374. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs, the precise amount of which will be proven at trial.

375. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard for Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

## *FOURTEENTH CAUSE OF ACTION*

### (Intentional Infliction of Emotional Distress)

376. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Eleventh and Twelfth Causes of Action as if fully set forth herein.

377. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila,

125

Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP, for their actions in the state civil action.  Plaintiff claims the Court's jurisdiction pursuant to 28 U.S.C. § 1367(a) for this pendent state claim under CCC §§ 44, 45, 46 and 48a. Plaintiff joins each of the three law firms under the *respondeat superior* doctrine.  All Defendants are jointly and severally liable for damages sought.

378. The actions of Defendants, and each of them, as alleged herein, constitute outrageous conduct which is so beyond the bounds of human decency that no reasonable person in the place of Plaintiff could reasonably be expected to bear it.

379. In doing the acts alleged herein, Defendants, and each of them, acted with the intent to cause Plaintiff severe emotional distress, or acted with reckless disregard as to the probability of causing severe emotional distress to Plaintiff.

380. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

381. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses  and litigation costs, the precise amount of which will be proven at trial.

382. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship.  Defendants, and each of them,  further acted with willful and conscious disregard of Plaintiff's rights, and

126

Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### *FIFTEENTH CAUSE OF ACTION*

#### (Negligent Infliction of Emotional Distress)

383. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Eleventh and Twelfth Causes of Action as if fully set forth herein.

384. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP, for their actions in the state civil action. Plaintiff claims the Court's jurisdiction pursuant to 28 U.S.C. § 1367(a) for this pendent state claim under CCC §§ 44, 45, 46 and 48a. Plaintiff joins each of the three law firms under the *respondeat superior* doctrine. All Defendants are jointly and severally liable for damages sought.

385. Defendants, and each of them, had a duty to not cause, aid, abet, conspire in or facilitate defamation of Plaintiff during the state civil action.

386. Plaintiff believes and thereupon alleges that Defendants, and each of them, knew or should have known that their failure to perform their obligations, as set forth herein, would cause Plaintiff severe emotional distress, and with that knowledge Defendants, and each of them, negligently performed their duties and obligations owed to the state courts and Plaintiff, thus directly and proximately resulting in severe emotional distress to Plaintiff.

387. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the

127

1    minimum jurisdiction of this court, the precise amount of which will be

2    determined according to proof at the time of trial.

3    388. As a further direct, foreseeable, and proximate result of Defendants' conduct,

4    and each of them, Plaintiff has been forced to incur actual damages,

5    opportunity costs, additional expenses  and litigation costs, the precise amount

6    of which will be proven at trial.

7    **X.    CAUSES OF ACTION FOR IMPROPER CLOUDING AND**

8    **SLANDER OF TITLE**

9    ***SIXTEENTH CAUSE OF ACTION***

10    **(Improper Clouding and Slander of Plaintiff's Title to his Primary Residence**

11    **and Conspiracy to commit these acts)**

12    389. Plaintiff hereby incorporates by reference paragraphs 32 through 274,

13    inclusive, of this FAC as if fully set forth herein.

14    390. Plaintiff alleges this cause of action against Defendants Meera, Mohan,

15    Madhavi, Sunila, Neal, Epps, Rutan & Tucker, LLP, Nicholas, Jones, Nicholas

16    & Butler, LLP, U.S. Bank,  West Coast Capital, IRS, and "all persons

17    unknown, claiming any legal or equitable right, title, estate, lien, or interest in

18    the property described in the complaint adverse to plaintiff's title, or any cloud

19    upon plaintiff's title thereto."[50]  Plaintiff admits the validity of claims of

20    Defendants U.S. Bank, West Coast Capital and IRS to the real property in

21    dispute here.[51]  Plaintiff claims the Court's jurisdiction pursuant to 28 U.S.C. §

22    1367(a) for this pendent state claim under CCP § 760.020(a).

23    391. Plaintiff alleges that Defendants Meera, Mohan, Madhavi, Sunila, Neal, Epps,

24    Rutan & Tucker, LLP, Nicholas, Jones, Nicholas & Butler, LLP, were or

25    should have been aware that they obtained the state court orders in the state

26    _____

27    [50] See CCP § 762.060(a) and (b).

28    [51] See CCP § 762.060(c).

128

FAC                                    Case No. 13-CV-2857-JLS-KSC

civil action through fraud, and that using those orders to cloud and slander Plaintiff's title to his primary residence was malicious, improper, unlawful and fraudulent.

392. Plaintiff alleges that Neal, Epps, Nicholas and Jones violated one or more statutes, including but not limited to, various sections of the BPC cited herein. Plaintiff further alleges that each attorney Defendant violated one or more Rules described in California State Bar's Rules of Professional Conduct and in the American Bar Association's Model Rules of Professional Conduct.

393. Plaintiff alleges that Defendants Meera, Mohan, Madhavi, Sunila, Neal, Epps, Rutan & Tucker, LLP, Nicholas, Jones, Nicholas & Butler, LLP, knowingly, willfully and maliciously conspired and agreed with each other, to improperly cloud and slander Plaintiff's title to his primary residence.

394. Pursuant to their conspiracy and agreement, and in furtherance thereof, Defendants performed unlawful acts to the detriment of Plaintiff. In this regard, Defendants knew that their actions would result in defamation of Plaintiff and further cause him unbearable financial hardship and loss of his primary residence. In spite of this knowledge, Defendants continued to actively participate in their unlawful acts and scheme to improperly cloud Plaintiff's title; and gave the other Defendants, and each of them, substantial assistance and encouragement to so act.

395. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered humiliation, embarrassment, unbearable defamation, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

396. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur the additional expenses and litigation costs, the precise amount of which will be proven at trial.

397. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's rights as well as Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

398. Plaintiff prays the Court to issue an injunctive order to halt the foreclosure process of Plaintiff's primary residence by any Defendant until this cause of action and related causes of action for fraud are adjudicated. Plaintiff submits that no amount of damages will compensate the severe hardship that will be inflicted on Plaintiff if he becomes homeless.

399. Plaintiff further prays the Court to grant injunctive relief by ordering removal of liens on Plaintiff's primary residence at 826 Applewilde Drive, San Marcos, CA 92078 in the name of Defendants Meera, Mohan, Madhavi and Sunila that are based on orders from the state courts in the state civil action.

400. Plaintiff further prays the Court to enjoin Defendants Meera, Mohan, Madhavi, Sunila, Neal, Epps, Rutan & Tucker, LLP, Nicholas, Jones, Nicholas & Butler, LLP, or any of their past, current or future representatives from using those state court orders to cloud the tile to Plaintiff's current primary residence or any other real property Plaintiff may own in future.

401. Plaintiff prays the Court to grant further relief for this Cause of Action by

    a.   granting Plaintiff actual damages for all litigation costs and expenses incurred for this Cause of Action (including costs, court fees, expenses, etc.);

    b.   granting Plaintiff actual damages arising out of his the improper clouding of title

FAC                                              Case No. 13-CV-2857-JLS-KSC

c. granting Plaintiff general, exemplary, punitive and special damages for Defendants' intentional and reckless misconduct (Cal. Civ. Code § 3294);

d. granting Plaintiff any other compensatory and non-compensatory damages as appropriate;

e. recommending appropriate disciplinary actions against Neal, Epps, Nicholas and Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP pursuant to the statutes and rules cited herein as well as any other applicable statutes, regulations or rules; and

f. granting any other injunctive and declaratory relief as appropriate.

## *SEVENTEETH CAUSE OF ACTION*

### (Aiding and Abetting the Conspiracy to Improperly Cloud and Slander Plaintiff's Title to his Primary Residence)

402. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Sixteenth Cause of Action as if fully set forth herein.

403. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's jurisdiction pursuant to 28 U.S.C. § 1367(a) for this pendent state claim under CCP § 760.020(a). Plaintiff joins each of the three law firms under the *respondeat superior* doctrine. All Defendants are jointly and severally liable for damages sought.

404. Plaintiff alleges that each Defendant knowingly aided and abetted the improper clouding and slander of Plaintiff's title to his primary residence as well as the conspiracy to do so. Each Defendant had a duty and was in a position to prevent such improper clouding and slander.

405. Plaintiff further prays the Court to enjoin Defendants Meera, Mohan,

131

FAC

Case No. 13-CV-2857-JLS-KSC

Madhavi, Sunila, Neal, Epps, Rutan & Tucker, LLP, Nicholas, Jones, Nicholas & Butler, LLP, or any of their past, current or future representatives from using those state court orders to cloud the tile to Plaintiff's current primary residence or any other real property Plaintiff may own in future.

406. Plaintiff prays the Court to grant further relief for this Cause of Action by

    a.   granting Plaintiff actual damages for all litigation costs and expenses incurred for this Cause of Action (including costs, court fees, expenses, etc.);

    b.   granting Plaintiff actual damages arising out of his the improper clouding of title

    c.   granting Plaintiff general, exemplary, punitive and special damages for Defendants' intentional and reckless misconduct (Cal. Civ. Code § 3294);

    d.   granting Plaintiff any other compensatory and non-compensatory damages as appropriate;

    e.   recommending appropriate disciplinary actions against Neal, Epps, Nicholas and Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP pursuant to the statutes and rules cited herein as well as any other applicable statutes, regulations or rules; and

    f.   granting any other injunctive and declaratory relief as appropriate.

## ***EIGHTEENTH CAUSE OF ACTION***
### **(Negligence Per Se For Violations of Law)**

407. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Sixteenth and Seventeenth Causes of Action as if fully set forth herein.

408. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's

FAC                                            Case No. 13-CV-2857-JLS-KSC

jurisdiction pursuant to 28 U.S.C. § 1367(a) for this pendent state claim under CCP § 760.020(a).  Plaintiff joins each of the three law firms under the *respondeat superior* doctrine.  All Defendants are jointly and severally liable for damages sought.

409. Defendants, and each of them, had a duty to not commit or facilitate the commission of improper clouding and slander of Plaintiff's title to his primary residence.  Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes violation of statutes and Plaintiff's rights, causing general, economic, compensatory, and special damages as alleged herein and in an amount to be established at trial.

410. At all times mentioned herein, Plaintiff  was amongst the class of persons sought to be protected from Defendants' transgressions and violation of statutes.  The harm suffered by Plaintiff, as alleged herein, as a direct and proximate result of the acts of Defendants, as alleged herein, was the type of harm Defendants had an obligation and duty not to inflict.

411. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered humiliation, embarrassment, unbearable defamation, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

412. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs, the precise amount of which will be proven at trial.

413. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship.  Defendants, and each of them,  further

acted with willful and conscious disregard for Plaintiff's rights, and
Defendants' duties and obligations under various statutes cited herein.
Defendants' conduct warrants the assessment of punitive damages from
Defendants in an amount according to proof.

### *NINETEENTH CAUSE OF ACTION*

### **(Intentional Infliction of Emotional Distress)**

414. Plaintiff hereby incorporates by reference paragraphs 32 through 274,
inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates
by reference all allegations made in the Sixteenth and Seventeenth Causes of
Action as if fully set forth herein.

415. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila,
Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan &
Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's
jurisdiction pursuant to 28 U.S.C. § 1367(a) for this pendent state claim under
CCP § 760.020(a). Plaintiff joins each of the three law firms under the
*respondeat superior* doctrine. All Defendants are jointly and severally liable
for damages sought.

416. The actions of Defendants, and each of them, as alleged herein, constitute
outrageous conduct which is so beyond the bounds of human decency that no
reasonable person in the place of Plaintiff could reasonably be expected to
bear it.

417. In doing the acts alleged herein, Defendants, and each of them, acted with the
intent to cause Plaintiff severe emotional distress, or acted with reckless
disregard as to the probability of causing severe emotional distress to Plaintiff.

418. As a direct and proximate result of the actions of Defendants, and each of
them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety,
grief, and mental anguish, and has further suffered great psychological and
emotional pain, all to Plaintiff's general damage in an amount in excess of the

134

FAC                                    Case No. 13-CV-2857-JLS-KSC

minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

419. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses and litigation costs, the precise amount of which will be proven at trial.

420. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### *TWENTIETH CAUSE OF ACTION*

#### (Negligent Infliction of Emotional Distress)

421. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Sixteenth and Seventeenth Causes of Action as if fully set forth herein.

422. Plaintiff alleges this cause of action against defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's jurisdiction pursuant to 28 U.S.C. § 1367(a) for this pendent state claim under CCP § 760.020(a). Plaintiff joins each of the three law firms under the *respondeat superior* doctrine. All Defendants are jointly and severally liable for damages sought.

423. Defendants, and each of them, had a duty to not cause, aid, abet, conspire in or facilitate improper clouding and slander of Plaintiff's title to his primary residence.

424. Plaintiff believes and thereupon alleges that Defendants, and each of them, knew or should have known that their failure to perform their obligations, as set forth herein, would cause Plaintiff severe emotional distress, and with that knowledge Defendants, and each of them, negligently performed their duties and obligations owed to Plaintiff, thus directly and proximately resulting in severe emotional distress to Plaintiff.

425. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

426. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses and litigation costs, the precise amount of which will be proven at trial.

## XI. *BIVENS*-TYPE CAUSES OF ACTION FOR VIOLATION OF PLAINTIFF'S CIVIL RIGHTS

### *TWENTY-FIRST CAUSE OF ACTION*

### (Deprivation of and Conspiracy to Deprive Federal Constitutional and Statutory Rights by Federal Officials and Agencies)

427. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.

428. Plaintiff alleges this cause of action against unnamed federal Defendants in their individual capacity, Meera, Mohan, Sunila, Madhavi, other unnamed

136

1    private parties, and USDOS.

2    429. Plaintiff alleges violation of his constitutionally-guaranteed parental rights as

3        well as due process and equal protection rights by federal employees, their

4        supervisors and private parties conspiring with those federal officials thereby

5        acting under the color of federal law, during issuance of the U.S. passport for

6        Plaintiff's then-infant child for the purpose of the child's abduction as well as

7        during the 1998 events of the child's re-abduction.  Plaintiff alleges that the

8        abduction was part of the broader conspiracy to deny Plaintiff his due process

9        and equal protection rights during exercise and assertion of his parental rights,

10       and during any judicial proceeding arising out of that abduction.  Plaintiff

11       asserts this Cause of Action against all such coconspirators.  All individual

12       Defendants (federal employees or private parties) are jointly and severally

13       liable for damages sought.

14   430. Plaintiff further alleges that all such individuals, whether federal employees or

15       their private coconspirators, have conspired throughout the past 24 years to

16       conceal the true nature of those 1990 and 1998 events, and identities, roles and

17       capacities of various offenders.  Plaintiff's failure over the past three years to

18       conduct discovery of federal records was a direct result of the ongoing and

19       improper concealment.  The concealment is also part of and an essential

20       element of the conspiracy to deny Plaintiff his due process and equal

21       protection rights.  Plaintiff therefore submits that all such Defendants and their

22       coconspirators are estopped by their conduct in asserting the statutes of

23       limitations.

24   431. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 for Plaintiff's

25       *Bivens*-type claims against federal employees, their supervisors and private

26       parties conspiring with those federal officials thereby acting under the color of

27       federal law.

28   432. Plaintiff submits that further discovery, including discovery of federal

137

FAC                                      Case No. 13-CV-2857-JLS-KSC

agencies' records, is necessary for him to identify all facts, to fully state his claims and to name all Defendants.

433. Plaintiff alleges that Defendants (named and unnamed), knowingly, willfully and maliciously conspired and agreed with the other Defendants, and each of them, to deny Plaintiff his federal rights.

434. Pursuant to their conspiracy and agreement, and in furtherance thereof, Defendants performed unlawful acts to the detriment of Plaintiff. In this regard, Defendants knew that their actions would deprive Plaintiff of his federal rights. In spite of this knowledge, Defendants continued to actively participate in their unlawful acts and scheme to deny Plaintiff his federal rights; and gave the other Defendants, and each of them, substantial assistance and encouragement to so act.

435. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered abduction of his only child, denial of his federal rights, denial of justice in various judicial and other proceedings arising out of the abduction, unbearable grief, anxiety, humiliation, embarrassment, continuing estrangement from his abducted son, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial. These Defendants have taken Plaintiff's entire life away.

436. Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes the commission of multiple criminal offenses.

437. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs throughout the past 24 years, the precise amount of which will be proven at trial.

438. As a further direct, foreseeable, and proximate result of Defendants' conduct,

138

Plaintiff has incurred actual damages, loss of earnings and opportunity costs throughout the past 24 years, the precise amount of which will be proven at trial.

439. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's rights as well as Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

440. Plaintiff prays the Court to grant relief for this Cause of Action by granting Plaintiff general, actual, punitive, special and exemplary damages, and any other compensatory and non-compensatory damages as appropriate.

441. Plaintiff further claims that actions of individual coconspirators under this Cause of Action have been enabled and encouraged by the USDOS's and/or other federal agencies' discriminatory practices, deliberate ignoring of statutes pertaining to child abduction, official and quasi-official customs and policies of denying victims of child abduction their due process and equal protection rights, and deliberate dereliction of duties under various federal statutes enacted to enforce international treaties.

442. Plaintiff therefore prays the Court to grant appropriate injunctive and declaratory relief, pursuant to 28 U.S.C. § 2201(a), against the USDOS and other federal agencies in the interest of justice in this case as well as other cases of child abduction.

### *TWENTY-SECOND CAUSE OF ACTION*

**(Aiding and Abetting the Conspiracy to Deprive Federal Constitutional and Statutory Rights by Federal Officials and Agencies)**

139

443. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Twenty-First Cause of Action as if fully set forth herein.

444. Plaintiff alleges this cause of action against unnamed federal Defendants in their individual capacity, Meera, Mohan, Sunila, Madhavi, and other unnamed private parties. All Defendants are jointly and severally liable for damages sought.

445. Plaintiff alleges that each Defendant knowingly aided and abetted denial of Plaintiff's federal rights as well as the conspiracy to do so. Each Defendant had a duty and was in a position to prevent denial of Plaintiff's rights.

446. Plaintiff prays the Court to grant relief for this Cause of Action by granting Plaintiff general, actual, punitive, special and exemplary damages, and any other compensatory and non-compensatory damages as appropriate.

### *TWENTY-THIRD CAUSE OF ACTION*

#### (Negligence Per Se For Violations of Law)

447. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Twenty-First and Twenty-Second Causes of Action as if fully set forth herein.

448. Plaintiff alleges this cause of action against unnamed federal Defendants in their individual capacity, Meera, Mohan, Sunila, Madhavi, and other unnamed private parties. All Defendants are jointly and severally liable for damages sought.

449. Defendants, and each of them, had a duty to not commit or facilitate the deprivation of Plaintiff's federal rights. Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes violation of statutes and Plaintiff's rights, causing

140

general, economic, compensatory, and special damages as alleged herein and in an amount to be established at trial.

450. At all times mentioned herein, Plaintiff  was amongst the class of persons sought to be protected from Defendants' transgressions and violation of statutes.  The harm suffered by Plaintiff, as alleged herein, as a direct and proximate result of the acts of Defendants, as alleged herein, was the type of harm Defendants had an obligation and duty not to inflict.

451. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered the abduction of and alienation from his only child, deprivation of his most fundamental federal rights, humiliation, embarrassment, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

452. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs, the precise amount of which will be proven at trial.

453. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship.  Defendants, and each of them,  further acted with willful and conscious disregard for Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### *TWENTY-FOURTH CAUSE OF ACTION*
### (Intentional Infliction of Emotional Distress)

454. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates

FAC                                          Case No. 13-CV-2857-JLS-KSC

by reference all allegations made in the Twenty-First and Twenty-Second Causes of Action as if fully set forth herein.

455. Plaintiff alleges this cause of action against unnamed federal Defendants in their individual capacity, Meera, Mohan, Sunila, Madhavi, and other unnamed private parties. All Defendants are jointly and severally liable for damages sought.

456. The actions of Defendants, and each of them, as alleged herein, constitute outrageous conduct which is so beyond the bounds of human decency that no reasonable person in the place of Plaintiff could reasonably be expected to bear it.

457. In doing the acts alleged herein, Defendants, and each of them, acted with the intent to cause Plaintiff severe emotional distress, or acted with reckless disregard as to the probability of causing severe emotional distress to Plaintiff.

458. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

459. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses and litigation costs, the precise amount of which will be proven at trial.

460. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's rights, and

142

Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### TWENTY-FIFTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress)

461. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Twenty-First and Twenty-Second Causes of Action as if fully set forth herein.

462. Plaintiff alleges this cause of action against unnamed federal Defendants in their individual capacity, Meera, Mohan, Sunila, Madhavi, and other unnamed private parties. All Defendants are jointly and severally liable for damages sought.

463. Defendants, and each of them, had a duty to not cause, aid, abet, conspire in or facilitate denial of Plaintiff's federal rights.

464. Plaintiff believes and thereupon alleges that Defendants, and each of them, knew or should have known that their failure to perform their obligations, as set forth herein, would cause Plaintiff severe emotional distress, and with that knowledge Defendants, and each of them, negligently performed their duties and obligations owed to Plaintiff, thus directly and proximately resulting in severe emotional distress to Plaintiff.

465. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

466. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses and litigation costs, the precise amount of which will be proven at trial.

## XII.   42 U.S.C. § 1983 CAUSES OF ACTION FOR DEPRIVATION OF PLAINTIFF'S CIVIL RIGHTS

### *TWENTY-SIXTH CAUSE OF ACTION*

**(Deprivation of and Conspiracy to Deprive Plaintiff's Civil Rights by State Officials, Agencies and Private Coconspirators)**

467. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.

468. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP.  Plaintiff claims the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. § 1983 claims.  Plaintiff joins each law firm under the *respondeat superior* doctrine.  Plaintiff joins the state agency for *Monell*-type claims.  All Defendants are jointly and severally liable for damages sought.

469. Plaintiff alleges that employees of various state agencies (e.g. OCP and OCSSA) have deprived and/or conspired to deprive his federally protected rights (i.e. parental rights under the First and Ninth Amendments, and due process and equal protection rights under the Fourteenth Amendment) at various times over the past 24 years.  They have deprived Plaintiff his rights under various state statutes.  Their violations include, but are not limited to, misuse of the CPS records at various times, exclusion of Plaintiff during the AP's criminal prosecution and denial of proper 827 disclosure to Plaintiff in the instant action.  These state actors were acting under the color of state law.

144

Various private coconspirators who have participated in the ongoing conspiracy have therefore acted under the color of state law.

470. Plaintiff submits that further discovery, including discovery of federal and state agencies' records, and state agencies' policies, customs and procedures, is necessary for him to identify all facts, to fully state his claims and to name all Defendants. The latter discovery is also necessary to fully state Plaintiff's *Monell*-type claims against state agencies.

471. Plaintiff alleges that Defendants (named and unnamed), knowingly, willfully and maliciously conspired and agreed with the other Defendants, and each of them, to deprive Plaintiff's civil rights.

472. Pursuant to their conspiracy and agreement, and in furtherance thereof, Defendants performed unlawful acts to the detriment of Plaintiff. In this regard, Defendants knew that their actions would deprive Plaintiff of his civil rights. In spite of this knowledge, Defendants continued to actively participate in their unlawful acts and scheme to deny Plaintiff his civil rights; and gave the other Defendants, and each of them, substantial assistance and encouragement to so act.

473. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered abduction of his only child, denial of his federal constitutional and statutory rights, denial of his state constitutional and statutory rights, denial of justice in various judicial and other proceedings arising out of the abduction, unbearable grief, anxiety, humiliation, embarrassment, continuing estrangement from his abducted son, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

474. Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes the commission of multiple criminal offenses.

145

FAC                                                    Case No. 13-CV-2857-JLS-KSC

475. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs throughout the past 24 years, the precise amount of which will be proven at trial.

476. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has incurred actual damages, loss of earnings and opportunity costs throughout the past 24 years, the precise amount of which will be proven at trial.

477. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's rights as well as Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

478. Plaintiff prays the Court to grant relief for this Cause of Action by granting Plaintiff general, actual, punitive, special and exemplary damages, and any other compensatory and non-compensatory damages as appropriate.

479. Plaintiff further claims that actions of individual coconspirators under this Cause of Action have been enabled and encouraged by the state agencies' discriminatory practices, deliberate ignoring of statutes, official and quasi-official customs and policies of denying victims of child abduction their due process and equal protection rights, and deliberate dereliction of duties under various state and federal statutes.

480. Plaintiff therefore prays the Court to grant appropriate injunctive and declaratory relief, against such state federal agencies in the interest of justice in this case as well as other cases of child abduction.

### *TWENTY-SEVENTH CAUSE OF ACTION*

**(Aiding and Abetting the Conspiracy to Deprive Plaintiff's Civil Rights)**

481. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Twenty-Sixth Cause of Action as if fully set forth herein.

482. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. § 1983 claims. Plaintiff joins each law firm under the *respondeat superior* doctrine. Plaintiff joins the state agency for *Monell*-type claims. All Defendants are jointly and severally liable for damages sought.

483. Plaintiff alleges that each Defendant knowingly aided and abetted denial of Plaintiff's civil rights as well as the conspiracy to do so. Each Defendant had a duty and was in a position to prevent denial of Plaintiff's rights.

484. Plaintiff prays the Court to grant relief for this Cause of Action by granting Plaintiff general, actual, punitive, special and exemplary damages, and any other compensatory and non-compensatory damages as appropriate.

### *TWENTY-EIGHTH CAUSE OF ACTION*

**(Negligence Per Se For Violations of Law)**

485. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Twenty-Sixth and Twenty-Seventh Causes of Action as if fully set forth herein.

486. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan,

147

FAC                                                        Case No. 13-CV-2857-JLS-KSC

Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. § 1983 claims. Plaintiff joins each law firm under the *respondeat superior* doctrine. Plaintiff joins the state agency for *Monell*-type claims. All Defendants are jointly and severally liable for damages sought.

487. Defendants, and each of them, had a duty to not commit or facilitate the deprivation of Plaintiff's civil rights. Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes violation of statutes and Plaintiff's rights, causing general, economic, compensatory, and special damages as alleged herein and in an amount to be established at trial.

488. At all times mentioned herein, Plaintiff was amongst the class of persons sought to be protected from Defendants' transgressions and violation of statutes. The harm suffered by Plaintiff, as alleged herein, as a direct and proximate result of the acts of Defendants, as alleged herein, was the type of harm Defendants had an obligation and duty not to inflict.

489. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered the abduction of and alienation from his only child, deprivation of his most fundamental civil rights, humiliation, embarrassment, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

490. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs, the precise amount of which will be proven at trial.

491. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully

148

engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard for Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### TWENTY-NINTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress)**

492. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Twenty-Sixth and Twenty-Seventh Causes of Action as if fully set forth herein.

493. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. § 1983 claims. Plaintiff joins each law firm under the *respondeat superior* doctrine. Plaintiff joins the state agency for *Monell*-type claims. All Defendants are jointly and severally liable for damages sought.

494. The actions of Defendants, and each of them, as alleged herein, constitute outrageous conduct which is so beyond the bounds of human decency that no reasonable person in the place of Plaintiff could reasonably be expected to bear it.

495. In doing the acts alleged herein, Defendants, and each of them, acted with the intent to cause Plaintiff severe emotional distress, or acted with reckless disregard as to the probability of causing severe emotional distress to Plaintiff.

149

FAC                                                    Case No. 13-CV-2857-JLS-KSC

496. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

497. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses and litigation costs, the precise amount of which will be proven at trial.

498. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship.  Defendants, and each of them,  further acted with willful and conscious disregard of Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

## ***THIRTIETH CAUSE OF ACTION***
### **(Negligent Infliction of Emotional Distress)**

499. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates by reference all allegations made in the Twenty-Sixth and Twenty-Seventh Causes of Action as if fully set forth herein.

500. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP.  Plaintiff claims the

FAC                                                    Case No. 13-CV-2857-JLS-KSC

Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. § 1983 claims.  Plaintiff joins each law firm under the *respondeat superior* doctrine.  Plaintiff joins the state agency for *Monell*-type claims.  All Defendants are jointly and severally liable for damages sought.

501. Defendants, and each of them, had a duty to not cause, aid, abet, conspire in or facilitate denial of Plaintiff's civil rights.

502. Plaintiff believes and thereupon alleges that Defendants, and each of them, knew or should have known that their failure to perform their obligations, as set forth herein, would cause Plaintiff severe emotional distress, and with that knowledge Defendants, and each of them, negligently performed their duties and obligations owed to Plaintiff, thus directly and proximately resulting in severe emotional distress to Plaintiff.

503. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

504. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses and litigation costs, the precise amount of which will be proven at trial.

## XIII.   42 U.S.C. §§ 1985, 1986 CAUSES OF ACTION FOR DEPRIVATION OF PLAINTIFF'S CIVIL RIGHTS

### *THIRTY-FIRST CAUSE OF ACTION*

**(Deprivation of and Conspiracy to Deprive Plaintiff's Civil Rights by Private Coconspirators, State Officials and Agencies - 42 U.S.C. § 1985)**

505. Plaintiff hereby incorporates by reference paragraphs 32 through 274,

151

1  inclusive, of this FAC as if fully set forth herein.

2  506. Plaintiff alleges this cause of action against unnamed state Defendants in their

3  individual and official capacity, OCSSA (a state agency), Defendants Mohan,

4  Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms

5  of Rutan & Tucker, LLP, and Nicholas & Butler, LLP.  Plaintiff claims the

6  Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. §

7  1985 claims.  Plaintiff joins each law firm under the *respondeat superior*

8  doctrine.  Plaintiff joins the state agency for *Monell*-type claims.  All

9  Defendants are jointly and severally liable for damages sought.

10  507. Plaintiff alleges that all Defendants, and each of them, conspired to deny

11  Plaintiff justice in state courts; and to impede, hinder, obstruct and defeat

12  justice in those courts based on advocacy of stereotyping of and discrimination

13  against Plaintiff based on his race, ethnicity, nationality and gender.  They also

14  conspired to deny Plaintiff his constitutionally guaranteed rights (First, Ninth,

15  Fifth and Fourteenth Amendments) and various federal and state statutory

16  rights during exercise and assertion of his parental rights.  They deprived

17  Plaintiff due process and equal protection of the laws.

18  508. Plaintiff submits that further discovery, including discovery of federal and

19  state agencies' records, and state agencies' policies, customs and procedures, is

20  necessary for him to identify all facts, to fully state his claims and to name all

21  Defendants.  The latter discovery is also necessary to fully state Plaintiff's

22  *Monell*-type claims against state agencies.

23  509. Plaintiff alleges that Defendants (named and unnamed), knowingly, willfully

24  and maliciously conspired and agreed with the other Defendants, and each of

25  them, to deprive Plaintiff's civil rights.

26  510. Pursuant to their conspiracy and agreement, and in furtherance thereof,

27  Defendants  performed unlawful acts to the detriment of Plaintiff.  In this

28  regard, Defendants knew that their actions would deprive Plaintiff of his civil

152

rights.  In spite of this knowledge, Defendants continued to actively participate in their unlawful acts and scheme to deny Plaintiff his civil rights; and gave the other Defendants, and each of them, substantial assistance and encouragement to so act.

511. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered abduction of his only child, denial of his federal constitutional and statutory rights, denial of his state constitutional and statutory rights, denial of justice in various judicial and other proceedings arising out of the abduction, unbearable grief, anxiety, humiliation, embarrassment, continuing estrangement from his abducted son, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

512. Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes the commission of multiple criminal offenses.

513. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs throughout the past 24 years, the precise amount of which will be proven at trial.

514. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has incurred actual damages, loss of earnings and opportunity costs throughout the past 24 years, the precise amount of which will be proven at trial.

515. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which continues to subject Plaintiff to cruel and unjust hardship.  Defendants, and each of them,  further acted with willful and conscious disregard of Plaintiff's rights as well as Defendants' duties and

153

obligations under various statutes cited herein.  Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

516. Plaintiff prays the Court to grant relief for this Cause of Action by granting Plaintiff general, actual, punitive, special and exemplary damages, and any other compensatory and non-compensatory damages as appropriate.

517. Plaintiff further claims that actions of individual coconspirators under this Cause of Action have been enabled and encouraged by the state agencies' discriminatory practices, deliberate ignoring of statutes, official and quasi-official customs and policies of denying victims of child abduction their due process and equal protection rights, and deliberate dereliction of duties under various state and federal statutes.

518. Plaintiff therefore prays the Court to grant appropriate injunctive and declaratory relief, against such state federal agencies in the interest of justice in this case as well as other cases of child abduction.

### ***THIRTY-SECOND CAUSE OF ACTION***

**(Aiding and Abetting the Conspiracy to Deprive Plaintiff's Civil Rights)**

519. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates by reference all allegations made in the Thirty-First Cause of Action as if fully set forth herein.

520. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. § 1985 claims.  Plaintiff·joins each law firm under the *respondeat superior* doctrine.  Plaintiff joins the state agency for *Monell*-type claims.  All

Defendants are jointly and severally liable for damages sought.

521. Plaintiff alleges that each Defendant knowingly aided and abetted denial of Plaintiff's civil rights as well as the conspiracy to do so. Each Defendant had a duty and was in a position to prevent denial of Plaintiff's rights.

522. Plaintiff prays the Court to grant relief for this Cause of Action by granting Plaintiff general, actual, punitive, special and exemplary damages, and any other compensatory and non-compensatory damages as appropriate.

### THIRTY-THIRD CAUSE OF ACTION

### (Neglect to Prevent the Conspiracy to Deprive Plaintiff's Civil Rights - 42 U.S.C. § 1986)

523. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Thirty-First and Thirty-Second Causes of Action as if fully set forth herein.

524. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. § 1985 claims. Plaintiff joins each law firm under the *respondeat superior* doctrine. Plaintiff joins the state agency for *Monell*-type claims. All Defendants are jointly and severally liable for damages sought.

525. Plaintiff alleges that these Defendants, and each of them, had knowledge of violation of Plaintiff's civil rights was about to be committed. They also had power to prevent or aid in preventing the commission of those violations, but neglected or refused to do so.

526. Plaintiff prays the Court to grant relief for this Cause of Action by granting Plaintiff general, actual, punitive, special and exemplary damages, and any

155

other compensatory and non-compensatory damages as appropriate.

### ***THIRTY-FOURTH CAUSE OF ACTION***

**(Negligence Per Se For Violations of Law)**

527. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein.  Plaintiff further incorporates by reference all allegations made in the Thirty-First, Thirty-Second and Thirty-Third Causes of Action as if fully set forth herein.

528. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP.  Plaintiff claims the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. §§ 1985, 1986 claims.  Plaintiff joins each law firm under the *respondeat superior* doctrine.  Plaintiff joins the state agency for *Monell*-type claims.  All Defendants are jointly and severally liable for damages sought.

529. Defendants, and each of them, had a duty to not commit or facilitate the deprivation of Plaintiff's civil rights.  Defendants' conduct as alleged herein and/or to be established through discovery, and upon which this Cause of Action is based, constitutes violation of statutes and Plaintiff's rights, causing general, economic, compensatory, and special damages as alleged herein and in an amount to be established at trial.

530. At all times mentioned herein, Plaintiff  was amongst the class of persons sought to be protected from Defendants' transgressions and violation of statutes.  The harm suffered by Plaintiff, as alleged herein, as a direct and proximate result of the acts of Defendants, as alleged herein, was the type of harm Defendants had an obligation and duty not to inflict.

531. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered the abduction of and alienation from his only child, deprivation of

156

his most fundamental civil rights, humiliation, embarrassment, financial hardship, and great mental and emotional distress, all to his damage in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

532. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has been forced to incur additional expenses and litigation costs, the precise amount of which will be proven at trial.

533. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard for Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### *THIRTY-FIFTH CAUSE OF ACTION*

**(Intentional Infliction of Emotional Distress)**

534. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Thirty-First, Thirty-Second and Thirty-Third Causes of Action as if fully set forth herein.

535. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. §§ 1985, 1986 claims. Plaintiff joins each law firm under the *respondeat superior* doctrine. Plaintiff joins the state agency for *Monell*-type claims. All

157

Defendants are jointly and severally liable for damages sought.

536. The actions of Defendants, and each of them, as alleged herein, constitute outrageous conduct which is so beyond the bounds of human decency that no reasonable person in the place of Plaintiff could reasonably be expected to bear it.

537. In doing the acts alleged herein, Defendants, and each of them, acted with the intent to cause Plaintiff severe emotional distress, or acted with reckless disregard as to the probability of causing severe emotional distress to Plaintiff.

538. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

539. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages, opportunity costs, additional expenses and litigation costs, the precise amount of which will be proven at trial.

540. Defendants further committed the actions alleged herein with malice and oppression, in that Defendants, and each of them, intentionally and willfully engaged in despicable conduct which subjected and continues to subject Plaintiff to cruel and unjust hardship. Defendants, and each of them, further acted with willful and conscious disregard of Plaintiff's rights, and Defendants' duties and obligations under various statutes cited herein. Defendants' conduct warrants the assessment of punitive damages from Defendants in an amount according to proof.

### *THIRTY-SIXTH CAUSE OF ACTION*

### **(Negligent Infliction of Emotional Distress)**

158

FAC                                    Case No. 13-CV-2857-JLS-KSC

541. Plaintiff hereby incorporates by reference paragraphs 32 through 274, inclusive, of this FAC as if fully set forth herein. Plaintiff further incorporates by reference all allegations made in the Thirty-First, Thirty-Second and Thirty-Third Causes of Action as if fully set forth herein.

542. Plaintiff alleges this cause of action against unnamed state Defendants in their individual and official capacity, OCSSA (a state agency), Defendants Mohan, Meera, Sunila, Madhavi, Neal, Epps, Nicholas, Jones as well as the law firms of Rutan & Tucker, LLP, and Nicholas & Butler, LLP. Plaintiff claims the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 for his 42 U.S.C. §§ 1985, 1986 claims. Plaintiff joins each law firm under the *respondeat superior* doctrine. Plaintiff joins the state agency for *Monell*-type claims. All Defendants are jointly and severally liable for damages sought.

543. Defendants, and each of them, had a duty to not cause, aid, abet, conspire in or facilitate denial of Plaintiff's civil rights.

544. Plaintiff believes and thereupon alleges that Defendants, and each of them, knew or should have known that their failure to perform their obligations, as set forth herein, would cause Plaintiff severe emotional distress, and with that knowledge Defendants, and each of them, negligently performed their duties and obligations owed to Plaintiff, thus directly and proximately resulting in severe emotional distress to Plaintiff.

545. As a direct and proximate result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered, and continues to suffer, anxiety, grief, and mental anguish, and has further suffered great psychological and emotional pain, all to Plaintiff's general damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined according to proof at the time of trial.

546. As a further direct, foreseeable, and proximate result of Defendants' conduct, and each of them, Plaintiff has been forced to incur actual damages,

FAC                                         Case No. 13-CV-2857-JLS-KSC

opportunity costs, additional expenses and litigation costs, the precise amount of which will be proven at trial.

### XIV.  CONCLUSION

WHEREFORE Plaintiff Avinash B. Kulkarni prays for judgment against Defendants, and each of them, as follows:

1.  For damages identified in each claim above against Defendants identified for that claim according to proof;

2.  For declaratory or injunctive relief identified in each claim above against Defendants identified for that claim;

3.  For costs of suit herein incurred; and

4.  For such other and further relief as the Court deems proper.

Respectfully submitted,

DATED:  June 19, 2014

AVINASH B. KULKARNI

PLAINTIFF PRO SE

160

1   //   **THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.**

2   //

3   //

4   //

5   //

6   //

7   //

8   //

9   //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

FAC   Case No. 13-CV-2857-JLS-KSC

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
## ADVISEMENT AND WAIVER OF RIGHTS FOR A FELONY GUILTY PLEA

Case No. _08CF1764_ People v. _Neelam Ramakant Thakur_

1. ___ My true full name is _Neelam Ramankant Thakur_

   I am represented by _____

2. ___ I understand that I am pleading guilty, and admitting the following offenses, special punishment allegations, and prior convictions, carrying the possible penalties as follows:

| Ct. | Charge | Sentence Range | Enhancements | Yrs. | Term for Priors | Yrs. | Total Penalty Years |
|-----|--------|----------------|--------------|------|-----------------|------|---------------------|
| 1 | 278.5(a)PC | 16-2-3 | | | | | 3 |
| | | | | | | | |
| | | | | | | | |

Maximum Total Punishment: 3

3. ___ In addition to time in custody, I understand the court may also order me to pay a fine as follows: up to $10,000 for most felonies [P.C. 672]; up to $20,000 for selected drug offenses [H&S 11372]; up to $50,000 for selected drug offenses [H&S 11352.5]; or other:

4. ___ I understand it is absolutely necessary that all plea agreements, promises of a particular sentence, and sentence recommendations be completely disclosed to the court on this form.

5. ___ **Right to an attorney:** I understand I have the right to be represented by an attorney at all stages of the proceedings until my case is completed. If I cannot afford an attorney, one will be appointed for me free of charge. However, I understand that at the conclusion of my case, the court may order me to reimburse the County of Orange for the cost of my attorney, according to my ability to pay.

6. ___ **Right to a preliminary hearing:** I understand I have the right to a preliminary hearing at which a judicial officer will determine if there is sufficient evidence to justify setting my case for trial. At this hearing, I have the right to be represented by an attorney as described in paragraph 5 above, the right to confront and cross-examine witnesses against me, the right to present evidence on my behalf, and the right to remain silent and not testify; but I may testify if I want to. I waive and give up my right to a preliminary hearing.

7. ___ **Jury trial rights:** I understand I have the right to a speedy and public trial by a jury. I waive and give up these rights.

8. ___ **Rights to confront and cross-examine witnesses:** I understand I have the right to confront the witnesses against me and to cross-examine them myself or have my attorney cross-examine them. I waive and give up these rights.

9. ___ **Right to testify or remain silent:** I understand I have the right to testify on my behalf. I also understand I have the right to remain silent, and I cannot be compelled to testify against my will. I waive and give up these rights.

10. ___ **Right to present evidence:** I understand I have the right to present evidence and to call witnesses to testify on my behalf. I further understand I have the right to invoke the compulsory process of the court to subpoena evidence and witnesses at no cost to me. I waive and give up these rights.

11. ___ **Immigration consequences:** I understand if I am not a citizen of the United States, my conviction for the offense charged will have the consequence of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States.

Case No. _08CF-1764_      People v. _Thakur_

12. **Fourth Amendment waiver:** I understand under the Fourth and Fourteenth Amendments to the United States Constitution, I have a right to be free from unreasonable searches and seizures. I waive and give up this right, and further agree that for the period during which I am on probation I will submit my person and property, including any residence, premises, container or vehicle under my control to search and seizure at any time of the day or night by any law enforcement officer or probation officer, with or without a warrant, probable cause, or reasonable suspicion.

13. **Sentencing waiver:** I understand I have the right to a jury or court trial as to certain factors that may be used to increase my sentence on any count, sentencing enhancement, or allegation, to the upper or maximum term provided by law. I waive and give up the right to a jury or court trial on all of these factors. I agree the judge will determine the existence of any of these factors, within the judge's discretion, as allowed by law. I agree this waiver shall apply to any future sentence imposed following a probation revocation.

14. **Appeal waiver:** I understand I have the right to appeal from decisions and orders of the Superior Court. I waive and give up my right to appeal from any and all decisions and orders made in my case, including motions to suppress evidence brought pursuant to Penal Code section 1538.5. I waive and give up my right to appeal from my guilty plea. I waive and give up my right to appeal from any legally authorized sentence the court imposes which is within the terms and limits of this plea agreement.

15. **Parole after prison:** I understand if I am sentenced to state prison, upon my release I will be on parole for a period of time ranging from 3 years to life. I further understand I could be sent back to state prison for a period of up to one year for each violation of any term or condition of my parole.

16. **Mandatory state prison:** I understand I am not eligible for probation, and I will be sentenced to state prison in this case.

17. **Proposed disposition:** I understand the court will: (Circle and initial all that apply)

    (a) Sentence me to state prison for a period of _____ years and _____ months, credit for time served of _____ days actual custody and _____ days of good time/work time for a total credit of _____ days. I waive and give up my right to make application for probation and request immediate sentence.

    (b) Consider my application for probation before pronouncing sentence. I understand the court may deny my application for probation and sentence me to state prison for a maximum period of _____ years and _____ months.

    (c) Grant me probation under the terms and conditions set forth on the attached page 5 that I have initialed and signed. I understand I have the right to reject probation and have the court impose a final sentence. However, I agree to accept probation on the terms and conditions set forth on the attached page 5. I further understand that if I am found in violation of any of the terms or conditions of probation, the court may sentence me to state prison on this case for a maximum period of __3__ years and __0__ months.

    (d) Order me to pay restitution on counts _____, even if any of these counts have been dismissed as part of the plea agreement, in the amount of _____, or in an amount to be determined by the Probation Department. If I disagree with the amount of restitution determined by the Probation Department, I may request a court hearing to determine the amount of restitution.

    (e) Order me to pay the mandatory state restitution fine between $200 and $10,000 [P.C. 1202.4]. A second restitution fine in the same amount will also be ordered if I receive a sentence that includes probation, a conditional sentence, or parole. This second fine will be suspended and I will only have to pay it if the court later finds that I have violated the terms of my probation, conditional sentence, or parole [P.C. 1202.44 & 1202.45]. A twenty dollar court security fee must also be paid [P.C. 1465.8] as well as a thirty dollar court facility fee [G.C. 70373] on each count convicted.

    (f) Order me to provide samples of my saliva, blood, and prints pursuant to P.C. 296 and P.C. 296.1.

    (g) Order me to provide a DNA buccal sample, fingerprints and photograph to OCDA for analysis and retention in any law enforcement DNA database for law enforcement purposes.

Case No. 08 CF 1764 _____   People v. ___Thakur_____

☒ (h) Order me to register pursuant to the following: (Circle and initial all that apply)

    (1)_____ H&S 11590 – (narcotics offense)

    (2)_____ P.C.186.30 – (gang-related offense)

    (3)_____ P.C. 457.1 – (arson-related offense) I understand I will have to register for the rest of my life.

    (4)_____ P.C. 290 – (sex offense) I understand I will have to register for the rest of my life if I work,

               attend school, or reside in California.

☒ (i) Order that my driver's license or driving privilege be suspended or revoked for a period of
_____

☒ (j) The court will order that all monies paid will first be applied to restitution; and that the following terms are also part of this plea:

    NONE

18. ☒ I acknowledge all other cases pending against me in Orange County and the proposed disposition:

    NONE

19. ☒ I understand a plea of guilty in this case may constitute and admission I violated a previous grant of probation or parole in other cases and may result in additional penalties being imposed in those cases.

20. ☒ I offer my plea of guilty freely and voluntarily, and with full understanding of all matters set forth in the accusatory pleading and this advisement and waiver of rights form. No one has made any threats or used any force against me, my family, or anyone else I know, in order to convince me to plead guilty in this case. Further, all promises that have been made to me to convince me to plead guilty are on this advisement and waiver of rights form.

21. ☒ I offer the following facts as the basis for my guilty plea:

In Orange County, California, on + between October 15, 1990 + March 25, 2008, I unlawfully took, kept + withheld Saumitra K., a child, maliciously + unlawfully depriving Avinash Kulkarni, a lawful custodian, of his right to custody.

Case No. _08CF1764_   People v. _Thakur_

22. ☑ I understand each and every one of the rights set forth above in this advisement and waiver of rights form. I waive and give up each of those rights in order to enter my guilty plea. I am entering a guilty plea because I am in fact guilty and for no other reason. I declare under penalty of perjury I have read, understood, and personally initialed each numbered item above, and I have discussed them with my attorney. I declare under penalty of perjury everything on this form is true and correct. I understand the signing and filing of this form is conclusive evidence I have pled guilty to the charges listed on this advisement and waiver of rights form.

Executed in Orange County, California.

Dated: _29 July 2008_   Signed: _Nikulkov_

Defendant

23. **DEFENSE ATTORNEY'S STATEMENT:** I am the attorney of record for defendant. I have explained to defendant each of the rights set forth on this form. I have discussed the charges and the facts with defendant. I have studied the possible defenses to the charges and discussed those possible defenses with defendant. I have discussed the possible sentence ranges and immigration consequences with defendant. I also have discussed the contents of this form with defendant. I concur with defendant's decision to waive the rights set forth on this form and to plead guilty. No promises of a particular sentence or sentence recommendation have been made to defendant by me, or to my knowledge by the prosecuting attorney or the court, which have not been fully disclosed on this form. I agree that this form may be received by the court as evidence of defendant's advisement and voluntary, intelligent, knowing, and express waiver of the rights set forth on this form.

Dated: _3/24/09_   Signed: _____

Attorney

24. **INTERPRETER'S STATEMENT:**

I, _____, having been duly sworn as a court certified interpreter, state that I am fluent in the _____ language. I translated the contents of this form to defendant in that language. The defendant told me he/she understood the contents of this form and initialed and signed it in my presence.

Dated: _____   Signed: _____

Interpreter

25. **FOR THE PEOPLE:**

Dated: _____   Signed: _____

Deputy District Attorney

Plea to the Court ___✓___

_(appearing: James F. Bacin)_

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
**TERMS AND CONDITIONS OF FELONY PROBATION**

Case No. 08CF1764                     People v. Neelam Ramakant Thakur

1. __X__ Sentenced to State Prison for _____ years and _____ months. Execution of sentence suspended. Placed on probation for _____ years.

2. __NU__ Imposition of sentence suspended. Placed on probation for __2__ years.

3. __X__ ~~Supervised Probation -OR-~~ [ _____ Probation Department relieved of supervision. (Initial one) ]  = 15

4. __NU__ Serve __180 days__ in County Jail. Credit for __11__ days actual time served and __4__ days good time/work time. Stay granted until _____ ✻

5. __X__ Pay fine of _____ plus penalty assessment.

6. __NU__ Pay mandatory fee of $50.00 for each count convicted. [Court Safety- $20.00- P.C. 1465.8 and Facilities-$30.00-G.C. 70373].

7. __X__ Pay mandatory laboratory analysis fee of $50 for each specified drug offense plus penalty assessment [H&S 11372.5 & P.C. 1464].

8. __NU__ Pay mandatory state restitution fine of __$1,000__ [Min: $200; Max: $10,000 P.C. 1202.4]. If your sentence includes probation, a conditional sentence, or parole, the court will order you to pay a second restitution fine in the same amount, but it will be suspended and you will only have to pay the second fine if you are later found in violation of your probation, conditional sentence, or parole [P.C. 1202.44 & 45]. All monies paid by defendant for any purpose will first be applied to restitution until it is paid in full.[Cal.Const.]

9. __NU__ Pay restitution on counts _____, even if any of these counts have been dismissed as part of a plea agreement, ~~in the amount of _____~~ or in an amount to be determined by the Court and as directed by the Probation Department. You are also ordered to make all financial disclosures required by law to fulfill your responsibility to pay full restitution [P.C. 1202.4].

10. __X__ Register pursuant to: (Initial all those that apply)
    (a) _____ H&S 11590 [narcotics offense]       (c) _____ P.C. 290  [sexual offense-lifetime registration]
    (b) _____ P.C. 186.22 [gang related offense]   (d) _____ P.C. 457.1 [arson offense-lifetime registration]

11. __NU__ Provide samples of your saliva, blood, and prints pursuant to P.C. 296 and P.C. 296.1.

12. __NU__ Provide a DNA buccal sample, fingerprints & photograph to OCDA immediately or within 72 hours of your release if in custody.

13. __X__ Do not be in the presence of children under the age of 18, unless accompanied by a responsible adult 21 years of age or older and approved in advance by your probation officer.

14. __NU__ ~~Use no unauthorized drugs, narcotics, or controlled substances, and submit to drug or narcotic testing as directed by your probation officer or any peace officer.~~  stricken by court

15. __NU__ ~~Submit your person and property, including any residence, premises, container or vehicle under your control, to search and seizure at any time of the day or night by any law enforcement officer or without a warrant, probable cause, or reasonable suspicion.~~  stricken by crt.

16. __NU__ ~~Cooperate with your probation officer in any plan for psychological, psychiatric, alcohol, and/or drug treatment. Seek training, schooling, or employment, and maintain residence as approved by your probation officer.~~ Do not associate with persons known to you to be parolees, convicted felons, users or sellers of illegal drugs, or otherwise disapproved of by probation.

17. __X__ Do not possess any blank checks, write any portion of any checks, have any checking account, nor use or possess any credit cards or open credit accounts, unless approved in advance by your probation officer. Use only your true name. Do not possess any other persons' personal identifying information or personal financial information unless approved in advance by your probation officer.

18. __NU__ Do not own, use, or possess any type of dangerous or deadly weapon, including any firearm or ammunition.

19. __NU__ Obey all orders, rules, regulations, and directives of the Court, ~~Probation Department,~~ and jail.

20. __NU__ Violate no law.

21. __X__ Driver's license or driving privilege is suspended or revoked for a period of _____

22. __X__ All of the below apply unless lined out:
    a.  Do not drive a motor vehicle with a measurable amount of alcohol in your blood.
    b.  Submit to a chemical test of your blood on demand of any peace officer or probation officer.
    c.  Do not be present in any establishment where the primary items for sale are alcoholic beverages.
    d.  Do not consume any alcoholic beverages.
    e.  Do not drive a motor vehicle without a valid California Driver's License on your person.

23. __X__ Do not, in any manner, directly or indirectly, initiate contact with, nor have any communication with: _____

24. __X__ CVC 23593 Advisement:  You are hereby advised that being under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, you can be charged with murder.

25. __NU__ Disclose your probation status and terms upon the request of any peace officer.

26. __NU__ Other conditions: ✻ 90 days (of 180) may be served on electronic home confinement, before jail.

27. __NU__ ~~Pay cost of probation, according to ability to pay, as directed by your probation officer~~ Stricken by court.

28. __NU__ I understand that the Court ultimately determines the conditions of probation, and I have the right to request the Court to modify or eliminate any condition imposed by the Probation Department that I believe is unreasonable.
    I have read and agree to all the terms and conditions of probation I have initialed above.

Dated: 7/24/09                     Defendant's Signature: _Neelam_

Defendant

F026-412.6 (R2/09) Page 5 of 5 DW

White—Court File; Yellow—District Attorney; Pink—Defendant

Ex. 01, P166

# PENAL CODE
# SECTION 277-280

277.  The following definitions apply for the purposes of this
chapter:
   (a) "Child" means a person under the age of 18 years.
   (b) "Court order" or "custody order" means a custody determination
decree, judgment, or order issued by a court of competent
jurisdiction, whether permanent or temporary, initial or modified,
that affects the custody or visitation of a child, issued in the
context of a custody proceeding.  An order, once made, shall continue
in effect until it expires, is modified, is rescinded, or terminates
by operation of law.
   (c) "Custody proceeding" means a proceeding in which a custody
determination is an issue, including, but not limited to, an action
for dissolution or separation, dependency, guardianship, termination
of parental rights, adoption, paternity, except actions under Section
11350 or 11350.1 of the Welfare and Institutions Code, or protection
from domestic violence proceedings, including an emergency
protective order pursuant to Part 3 (commencing with Section 6240) of
Division 10 of the Family Code.
   (d) "Lawful custodian" means a person, guardian, or public agency
having a right to custody of a child.
   (e) A "right to custody" means the right to the physical care,
custody, and control of a child pursuant to a custody order as
defined in subdivision (b) or, in the absence of a court order, by
operation of law, or pursuant to the Uniform Parentage Act contained
in Part 3 (commencing with Section 7600) of Division 12 of the Family
Code.  Whenever a public agency takes protective custody or
jurisdiction of the care, custody, control, or conduct of a child by
statutory authority or court order, that agency is a lawful custodian
of the child and has a right to physical custody of the child.   In
any subsequent placement of the child, the public agency continues to
be a lawful custodian with a right to physical custody of the child
until the public agency's right of custody is terminated by an order
of a court of competent jurisdiction or by operation of law.
   (f) In the absence of a court order to the contrary, a parent
loses his or her right to custody of the child to the other parent if
the parent having the right to custody is dead, is unable or refuses
to take the custody, or has abandoned his or her family.  A natural
parent whose parental rights have been terminated by court order is
no longer a lawful custodian and no longer has a right to physical
custody.
   (g) "Keeps" or "withholds" means retains physical possession of a
child whether or not the child resists or objects.
   (h) "Visitation" means the time for access to the child allotted
to any person by court order.
   (i) "Person" includes, but is not limited to, a parent or an agent
of a parent.
   (j) "Domestic violence" means domestic violence as defined in
Section 6211 of the Family Code.
   (k) "Abduct" means take, entice away, keep, withhold, or conceal.


278.  Every person, not having a right to custody, who maliciously
takes, entices away, keeps, withholds, or conceals any child with the
intent to detain or conceal that child from a lawful custodian shall
be punished by imprisonment in a county jail not exceeding one year,
a fine not exceeding one thousand dollars ($1,000), or both that
fine and imprisonment, or by imprisonment in the state prison for
two, three, or four years, a fine not exceeding ten thousand dollars

($10,000), or both that fine and imprisonment.

278.5. (a) Every person who takes, entices away, keeps, withholds, or conceals a child and maliciously deprives a lawful custodian of a right to custody, or a person of a right to visitation, shall be punished by imprisonment in a county jail not exceeding one year, a fine not exceeding one thousand dollars ($1,000), or both that fine and imprisonment, or by imprisonment in the state prison for 16 months, or two or three years, a fine not exceeding ten thousand dollars ($10,000), or both that fine and imprisonment.
   (b) Nothing contained in this section limits the court's contempt power.
   (c) A custody order obtained after the taking, enticing away, keeping, withholding, or concealing of a child does not constitute a defense to a crime charged under this section.


278.6. (a) At the sentencing hearing following a conviction for a violation of Section 278 or 278.5, or both, the court shall consider any relevant factors and circumstances in aggravation, including, but not limited to, all of the following:
   (1) The child was exposed to a substantial risk of physical injury or illness.
   (2) The defendant inflicted or threatened to inflict physical harm on a parent or lawful custodian of the child or on the child at the time of or during the abduction.
   (3) The defendant harmed or abandoned the child during the abduction.
   (4) The child was taken, enticed away, kept, withheld, or concealed outside the United States.
   (5) The child has not been returned to the lawful custodian.
   (6) The defendant previously abducted or threatened to abduct the child.
   (7) The defendant substantially altered the appearance or the name of the child.
   (8) The defendant denied the child appropriate education during the abduction.
   (9) The length of the abduction.
   (10) The age of the child.
   (b) At the sentencing hearing following a conviction for a violation of Section 278 or 278.5, or both, the court shall consider any relevant factors and circumstances in mitigation, including, but not limited to, both of the following:
   (1) The defendant returned the child unharmed and prior to arrest or issuance of a warrant for arrest, whichever is first.
   (2) The defendant provided information and assistance leading to the child's safe return.
   (c) In addition to any other penalties provided for a violation of Section 278 or 278.5, a court shall order the defendant to pay restitution to the district attorney for any costs incurred in locating and returning the child as provided in Section 3134 of the Family Code, and to the victim for those expenses and costs reasonably incurred by, or on behalf of, the victim in locating and recovering the child. An award made pursuant to this section shall constitute a final judgment and shall be enforceable as such.


278.7. (a) Section 278.5 does not apply to a person with a right to custody of a child who, with a good faith and reasonable belief that the child, if left with the other person, will suffer immediate bodily injury or emotional harm, takes, entices away, keeps,

withholds, or conceals that child.

(b) Section 278.5 does not apply to a person with a right to custody of a child who has been a victim of domestic violence who, with a good faith and reasonable belief that the child, if left with the other person, will suffer immediate bodily injury or emotional harm, takes, entices away, keeps, withholds, or conceals that child. "Emotional harm" includes having a parent who has committed domestic violence against the parent who is taking, enticing away, keeping, withholding, or concealing the child.

(c) The person who takes, entices away, keeps, withholds, or conceals a child shall do all of the following:

(1) Within a reasonable time from the taking, enticing away, keeping, withholding, or concealing, make a report to the office of the district attorney of the county where the child resided before the action. The report shall include the name of the person, the current address and telephone number of the child and the person, and the reasons the child was taken, enticed away, kept, withheld, or concealed.

(2) Within a reasonable time from the taking, enticing away, keeping, withholding, or concealing, commence a custody proceeding in a court of competent jurisdiction consistent with the federal Parental Kidnapping Prevention Act (Section 1738A, Title 28, United States Code) or the Uniform Child Custody Jurisdiction Act (Part 3 (commencing with Section 3400) of Division 8 of the Family Code).

(3) Inform the district attorney's office of any change of address or telephone number of the person and the child.

(d) For the purposes of this article, a reasonable time within which to make a report to the district attorney's office is at least 10 days and a reasonable time to commence a custody proceeding is at least 30 days. This section shall not preclude a person from making a report to the district attorney's office or commencing a custody proceeding earlier than those specified times.

(e) The address and telephone number of the person and the child provided pursuant to this section shall remain confidential unless released pursuant to state law or by a court order that contains appropriate safeguards to ensure the safety of the person and the child.


279. A violation of Section 278 or 278.5 by a person who was not a resident of, or present in, this state at the time of the alleged offense is punishable in this state, whether the intent to commit the offense is formed within or outside of this state, if any of the following apply:

(a) The child was a resident of, or present in, this state at the time the child was taken, enticed away, kept, withheld, or concealed.

(b) The child thereafter is found in this state.

(c) A lawful custodian or a person with a right to visitation is a resident of this state at the time the child was taken, enticed away, kept, withheld, or concealed.


279.1. The offenses enumerated in Sections 278 and 278.5 are continuous in nature, and continue for as long as the minor child is concealed or detained.


279.5. When a person is arrested for an alleged violation of Section 278 or 278.5, the court, in setting bail, shall take into consideration whether the child has been returned to the lawful custodian, and if not, shall consider whether there is an increased risk that the child may not be returned, or the defendant may flee the jurisdiction, or, by flight or concealment, evade the authority

of the court.


279.6.    (a) A law enforcement officer may take a child into protective custody under any of the following circumstances:
    (1) It reasonably appears to the officer that a person is likely to conceal the child, flee the jurisdiction with the child, or, by flight or concealment, evade the authority of the court.
    (2) There is no lawful custodian available to take custody of the child.
    (3) There are conflicting custody orders or conflicting claims to custody and the parties cannot agree which party should take custody of the child.
    (4) The child is an abducted child.
    (b) When a law enforcement officer takes a child into protective custody pursuant to this section, the officer shall do one of the following:
    (1) Release the child to the lawful custodian of the child, unless it reasonably appears that the release would cause the child to be endangered, abducted, or removed from the jurisdiction.
    (2) Obtain an emergency protective order pursuant to Part 3 (commencing with Section 6240) of Division 10 of the Family Code ordering placement of the child with an interim custodian who agrees in writing to accept interim custody.
    (3) Release the child to the social services agency responsible for arranging shelter or foster care.
    (4) Return the child as ordered by a court of competent jurisdiction.
    (c) Upon the arrest of a person for a violation of Section 278 or 278.5, a law enforcement officer shall take possession of an abducted child who is found in the company of, or under the control of, the arrested person and deliver the child as directed in subdivision (b).

    (d) Notwithstanding any other law, when a person is arrested for an alleged violation of Section 278 or 278.5, the court shall, at the time of the arraignment or thereafter, order that the child shall be returned to the lawful custodian by or on a specific date, or that the person show cause on that date why the child has not been returned as ordered.  If conflicting custodial orders exist within this state, or between this state and a foreign state, the court shall set a hearing within five court days to determine which court has jurisdiction under the laws of this state and determine which state has subject matter jurisdiction to issue a custodial order under the laws of this state, the Uniform Child Custody Jurisdiction Act (Part 3 (commencing with Section 3400) of Division 8 of the Family Code), or federal law, if applicable.  At the conclusion of the hearing, or if the child has not been returned as ordered by the court at the time of arraignment, the court shall enter an order as to which custody order is valid and is to be enforced.  If the child has not been returned at the conclusion of the hearing, the court shall set a date within a reasonable time by which the child shall be returned to the lawful custodian, and order the defendant to comply by this date, or to show cause on that date why he or she has not returned the child as directed.  The court shall only enforce its order, or any subsequent orders for the return of the child, under subdivision (a) of Section 1219 of the Code of Civil Procedure, to ensure that the child is promptly placed with the lawful custodian. An order adverse to either the prosecution or defense is reviewable by a writ of mandate or prohibition addressed to the appropriate court.


280.  Every person who willfully causes or permits the removal or

concealment of any child in violation of Section 8713, 8803, or 8910 of the Family Code shall be punished as follows:

   (a) By imprisonment in a county jail for not more than one year if the child is concealed within the county in which the adoption proceeding is pending or in which the child has been placed for adoption, or is removed from that county to a place within this state.

   (b) By imprisonment in the state prison, or by imprisonment in a county jail for not more than one year, if the child is removed from that county to a place outside of this state.

**AVINASH B KULKARNI**
**NEELAM A KULKARNI**
714 855-4377
21141 CANADA ROAD #13D
EL TORO CA 92630

$

6/19 10

368

16-66/1220

BAL.
FOR'D

AMOUNT
WRITTEN

11 10/100

HEALTH CARE AGENCY

BALANCE

ELEVEN AND 00/100

DEPOSIT

OTHER

BAL.
FOR'D

**Bank of America** NT & SA
El Toro Branch 0735
P.O. Box 129
El Toro, CA 92630

NOT NEGOTIABLE

⑈122000661⑈0368 ⑈07356 ⑈08038⑈

# International Parental Child Abduction India

**GENERAL INFORMATION:** India is not a signatory of the Hague Convention on the Civil Aspects of International Parental Abduction; therefore, left-behind parents must rely on other avenues to recover their children from India. Once a child has been abducted to India, remedies are very few. India does not consider international parental child abduction a crime, and the Indian courts rarely recognize U.S. custody orders, preferring to exert their own jurisdiction in rulings that tend to favor the parent who wants to keep the child in India. For these reasons, it is often very difficult for left-behind parents in the United States to obtain any access to a child who has been abducted to India. In the rare scenario that a case is resolved, it is usually due to an agreement between the parents, rather than the result of court orders or arrest warrants. The State Department can help by attempting welfare and whereabouts visits; however, these visits may only be conducted with the consent of the child's physical guardian.

Cultural factors often impact child custody decisions in India. For example, Indian courts rarely grant custody to a parent residing outside of India, even if both the child and the taking parent are American citizens. Additionally, many fathers complain that the courts tend to favor mothers when determining custody.

India does require the signature of both parents for an Indian passport to be issued to children younger than 18 years. India also requires exit permits for children.

For information concerning travel to India, including information about the location of the U.S. Embassy and Consulates, health conditions, currency and entry regulations, and crime and security, please see the Department of State's Country Specific Information.

**LEGAL SYSTEM:** India uses a Common Law legal system. In this type of system, a court's decision on a legal principle becomes the controlling authority for future, similar cases heard by the same court and courts of equal or lower rank.

Searches for missing children in India generally begin with the local senior police officers. The Ministry of Home Affairs (MHA) Foreigners Division takes an interest in cases involving non-Indian citizen children or parents.

Absent a court order, married parents have equal rights of custody to their minor children. Absent a court order, the rights of either parent to custody of children born out-of-wedlock is based on the courts' determination of the welfare of the child, though mothers are generally given custody of children under the age of five.

Bangalore and Mumbai have designated family courts that handle divorce and custody. In other areas, the regular sessions or lower courts handle divorce and custody. India uses the term "custody order," but the term "sole custody" is not used or accepted.

**RETAINING AN ATTORNEY:** A list of attorneys in India is available from the U.S. Embassy or a

Ex. 04, P173

U.S. Consulate in India. The attorneys list will include those who specialize in family law.

India offers free or reduced fee legal aid services to those who qualify. The Legal Aid Cells throughout the country determine whether a person qualifies for assistance. Lawyers for those who qualify are selected from a group of attorneys who volunteer to provide their services pro bono. Read more information about Legal Aid services in India.

**CITIZENSHIP & PASSPORT MATTERS:** According to a provision of the Citizen Act of 1955, Indian citizenship can be acquired by birth, naturalization or descent. Normally, children automatically acquire Indian citizenship at birth, regardless of where they are born, if one parent is a citizen of India, though India does not recognize dual citizenship. A child born in a country where citizenship is automatically conferred at birth, such as the United States, could not claim Indian citizenship. The gender of the Indian parent does not make a difference.

Because India does not recognize dual nationality, as soon as a child is documented as a U.S. citizen, that child has no claim to Indian citizenship unless he or she renounces the U.S. citizenship upon reaching the age of eighteen.

A parent can prevent issuance of an Indian passport to their child by lodging a complaint with the passport office. However, the ultimate decision lies with the passport officer who will substantiate the grounds for the complaint. India does not allow a child to be entered on a parent's passport. Also, a child cannot travel through the region on a national ID card without processing through customs (i.e. travel through the EU).

**Exit Permits:** An Indian visa covers both entry and exit. The stamp placed in the passport by immigration authorities upon arrival indicates the amount of time that can be spent in India for a particular visit. If the time limit is exceeded, the visitor must appear at the Ministry of Home Affairs and the Foreigners' Regional Registration Office (FRRO) to resolve payment of a fine and to request an extension that will permit exit from the country.

The consent of a non-traveling parent is not required for the child to depart India. Likewise, the father does not have to approve the children's departure from India.

**MEDIATION:** Mediation is not a term or process used in custody disputes, though occasionally the court will appoint a non-governmental organization or a social agency to work with the families.

**HAGUE ABDUCTION CONVENTION:** India is not a party to the Hague Abduction Convention.

**CIVIL REMEDIES:** There is no formal process for registering a foreign custody order with the courts, and U.S. custody orders are not automatically enforced in India. If one is presented, the Indian court is likely to take it into consideration; however, in practice, U.S. court decisions are almost never upheld in Indian courts.

With respect to conditions of custody, custody decisions are made "in the best interests of the child," using as the primary consideration the welfare of the child: the ability to support the child

financially, any history of abuse, etc. If a citizen of India marries an American citizen in a civil ceremony outside of India, a religious court does not have jurisdiction over custody matters. Hindus have no religious courts.

India has laws authorizing courts to award custody in the case of divorce, but the laws do not contain substantive guidance for custody determinations – case law does (see Sharma v. Sharma, Supreme Court of India – February 16, 2000). For the laws related to custody, please see the India Code Legislation Web site  and search for "The Guardians and Wards Act" and "Hindu Minority and Guardianship Act" under "short title."

**CRIMINAL REMEDIES:**  Parental child abduction is not a criminal offense in India. Although India will extradite its own citizens subject to an Interpol arrest notice if the crime is covered by the U.S. Extradition Treaty with India, which was signed in 1997 and went into effect in 1999, this is not an available remedy in parental child abduction cases because India does not recognize it as a crime. Interpol India indicates that it will search for a missing child based on a yellow notice.

**VISITATION RIGHTS:**  Family courts in Mumbai and Bangalore and sessions (or lower) courts in the other parts of India determine visitation/access rights. The safety and security of the child are taken into consideration in determining visitation/access rights. If a parent is denied visitation rights which have been authorized, he/she can approach the court and will be supported.

**EMBASSY CONTACT INFORMATION:**

U.S. Embassy in New Delhi : http://newdelhi.usembassy.gov/

U.S. Consulate in Chennai: http://chennai.usconsulate.gov/

U.S. Consulate in Kolkata: http://kolkata.usconsulate.gov/

U.S. Consulate in Mumbai: http://mumbai.usconsulate.gov/

Embassy of India in Washington, DC: http://www.indianembassy.org

Ex. 04, P175

26th March,1992.

To,

The Consulate General of The United States
Immigrant & Visa Branch
78, Bhulabhai Desai Road,
BOMBAY - 400 026.

Sub :    Objection on Issue of Green Card
         to Mr. Avinash B. Kulkarni.

Sir,

    I am attaching an affidavit dated 26.3.92 giving
true and correct facts.

    Requesting you to take proper action at earliest.

    Thanking you, for this act of kindness.

                        Yours faithfully,

                        (MRS.NEELAM AVINASH KULKARNI)

Please confirm on Fax ~~on 00 91 22 6271992~~
00-91-22-6271992



5 R$

21 MAR 1992

PRAK⋯ ⋯ S. C.
PETITION WRITER
Dadar Court, Bombay-400 012.

### AFFIDAVIT

I, MRS. NEELAM AVINASH KULKARNI at present residing at
Manorath 85, Jayprakash Nagar, Goregaon (E), Bombay - 400 063,
solemnly affirm and state as under on declaration

I was married to Mr. Avinash B. Kulkarni of Bombay, who has
passed graduation M.Sc., Pilloni from India. Our marriage was
settled in the year 1988, through good offices . my father,
inspite/fact, that, he was refused US Visa for higher studies
before settlement of our marriage. He was able to get US visa
only because of the bond given, to the Consulate General at Bombay,
in US Consulate, with condition, that, he shall return back to
India on completion of higher studies. My marriage was also agreed
upon   condition that I shall accompany him to USA and after his
studies are over he shall come back to India.

In the beginning, the life in USA was dream for us and my
husband lured me for applying for Green Card. At that time every
thing was normal of a young happy couple. I fell prey to his
lurrying and signed application for Green Card, which I do not
desire to have at all.

I delivered a son in USA on 25th March 1990 and some how other
without getting the real cause, my husband and his parents who had
come for temporary stay in USA and his sister (Mrs. Shalaka S. Limaye)
and his brother-in-law (Mr. Santosh Limaye ) residing at Salt Lake
City, Utah, Tel.No.801-277-6940 ) started abusing me by harassing

inflicting cruelties thrust upon me, thereafter even abuse of my body, mind too and now a child. Thus there was torture to me and my child by my husband personally and with help of his parents and sister and brother-in-law. The torture was unbearable at that time when my in-laws were in USA. With very great difficulties and with help of some well wishers, I had to flee away from my US Matrimonial home and till the time, I boarded International Flight to Bombay, I was very much scared of being pulled out from my fleeing away plans and stuck for further torture in USA. Because of the good wishes of my well wishers, I could come back. The factual aspect of torture to me and my son is known to the social services organisation in USA also.

The parents of my husband have come back to India since then. I say that not only my husband Mr. Avinash B. Kulkarni, has jumped the guarantee bond given to US Consulate and he is now trying to explain (as is done by the Patels of Saurashtra) breach of faith, and so though he accepts me as a wife and son as his son, he insists upon me and my son to go back to USA, which is not possible because of threat to my life and son's life.

I have seen what is life in the United States of the people going from India with Indian culture. I am sure if no Green Card is given to Mr. Avinash B. Kulkarni, he will come back and if he come to India, he will forget the life of status and may not idea of reality of life in India.

Therefore in my view Mr. Avinash B. Kulkarni, residing at Eltoro, CA 92630, Tel.No.714-859-3497, does not deserve Green Card to be given to him. And if at all given, same required to be cancelled.

This will be doing justice to the matter and to the individuals for their respective moral values. I am most sincerely praying for justice.

Thanking you,                                                              Yours faithfully,

B. N. AGARWAL
NOTARY, GREATER BOMBAY

Case Continued
due to allegations
of spousal abuse from
an Orange County
Shelter.

To:                                             Date: June 3, 1994
      **Hon'ble Judge**
      **Family Court at Bombay**

From:
      **Avinash Balasaheb Kulkarni**
      22995 Arden Street,
      Lake Forest, CA 92630,
      U. S. A.

Subject:
      **Child Custody and M.J. Petition No. A-43 of 1993**

Hon'ble Judge,

This petition is a follow-up to my response to M.J. Petition No. A-43 of 1993 submitted last year.

As stated in my response, my wife Neelam Avinash Kulkarni has deserted me and taken my son away from me without my knowledge. She has clearly stated her lack of interest to continue a marital relationship with me. She has filed for a divorce with this court in February 1993. I have been patiently waiting for a fair and just decision by this court based on the facts mentioned in my written statement.

I have explained in the past my inability to visit India at this time. I get a very short period of vacation every year in my current job. I am convinced that if I visit India for such a short duration, my wife would lodge false complaints against me just to harass me. She would not hesitate to perjure herself just so that she can have me detained in India. I have no doubt that I would be subsequently vindicated from all such allegations. But, in the process, I might lose my job. My fears have so far been substantiated by her actions as well as statements. In the meanwhile, I have to suffer the anguish of staying away from my son. I would like to bring to your notice that **I have not seen my son Soumitra for over three years.** I have never seen him teeth, talk or walk. I have missed out on many important developments in his life. Every person has a right to be a part of his/her child's life and to contribute to that child's upbringing. I have been denied this basic right for a long time and the injustice continues to prevail.

---

Avinash B. Kulkarni                                             page 1 of 2

More important than my feelings and needs are the emotions and necessities of my child. How emotionally traumatic it must be for him to grow without a father? He has been denied the love and care of his own father since he was six months old. He does not even know what a father is. I do not know any law or social norm that upholds such an uncivilised conduct. The treatment being meted out to me and my son is inhumane, immoral and illegal.

I would like to inform the Hon'ble Court that my wife has clearly abducted the child from his father under **California Civil Code Section 49** and **Penal Code Sections 277 & 278**. This is a criminal violation and hence be prosecuted accordingly. I very humbly request the Hon'ble Court to pass an order to return my child to the U. S. A. of which he is a **citizen by birth**.

Based on the reasons explained in the previous paragraph, I urge the Hon'ble Court to rule that any decision about child custody be made by a court in California. Only such a court could conduct an investigation of facts as they happened on and before October 15, 1990 (when my wife deserted me).

In the past, I have very humbly requested the Hon'ble Court in writing to allow my parents to visit my son. I am afraid that my wife and her family are poisoning my son's mind. This belief is justified by her written statements so far. I trust only my parents to represent me to my son at this time. He needs to be told about his father and to be assured that his father loves him. Also, my parents alone can assure me of the well-being of my son. Hence I sincerely urge the Hon'ble Court to allow my parents to visit my son Soumitra on a regular basis.

I would like to point out that only I and my son pay the price for the current situation. There is absolutely no way to compensate for the time the two of us have lost and continue to lose. I urge the Hon'ble Court to consider the problems faced by my son and me and grant his custody to me.

Yours sincerely,

*Avinash Balasaheb Kulkarni*

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ..3.. DAY OF ..June.. 19.94.. BY
Avinash Balasaheb Kulkarni
................................................

NOTARY PUBLIC

CHARLES WES HOWREY III
COMM... 899773
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Exp. Sept. 3, 1994

http://us.f48.mail.yahoo.com/ym/ShowLetter?box=Inbox&MsgId...&bodyPos=0&box=Inbox

Yahoo! - My Yahoo!    Options - Sign Out - Help

✉ Mail    📇 Addresses    📅 Calendar    📝 Notepad

## Shopping sprees



| Reply | Reply All | Forward | as attachment ▾ |

Download Attachments

| Delete | Prev | Next | Inbox |    Choose Folder ▾ | Move |

**From:** "soumitra kulkarni" <imsoumi@hotmail.com> | **Block address** | **Add to Address Book**
**To:** avi_kulkarni_us@yahoo.com
**CC:** imsoumi@hotmail.com
**Subject:** Re: Message for Neelam
**Date:** Fri, 02 Mar 2001 11:45:16 -0000

A poem by Soumitra


FATHER

A father is someone,
Who can take care of his kid,
Who is always there,
In child's every need.

He is someone with whom
A child can share his thought,
For he is the person,
Who thinks of his kid a lot.

When you want to harass your mom,
He can be your partner
And when you have to face angry mom,
He can be the safest shelter.

A father is a person of whom,
A child thinks very high,
And for a father, of course,
His child is the apple of his eye.

Though I don't have a father,
I can surely say this,
When your grandpa becomes your father,
Your father, you never miss!

Ex. 08, P182

3/6/01 11:23 AM

```
>From: Avi Kulkarni <avi_kulkarni_us@yahoo.com>
>To: imsoumi@hotmail.com
>CC: avi_kulkarni_us@yahoo.com
>Subject: Message for Neelam
>Date: Mon, 26 Feb 2001 17:00:35 -0800 (PST)
>
>Neelam:
>
>What is your current mailing address?  Let me know if
>you are interested in a child support check.
>
>Avinash
>
>
>
>_____
>Do You Yahoo!?
>Get email at your own domain with Yahoo! Mail.
>http://personal.mail.yahoo.com/
```

Get Your Private, Free E-mail from MSN Hotmail at
http://www.hotmail.com.

---

| Delete | Prev | Next | Inbox | | - Choose Folder | ▼ | Move |

| Reply | Reply All | Forward | as attachment ▼ | **Download** Attachments

**Yahoo! Messenger** - Send instant messages to friends!

Address Book · Alerts · Auctions · Bill Pay · Bookmarks · Briefcase · Broadcast · Calendar · Chat · Classifieds · Clubs · Companion · Domains · Experts · Games · Greetings · Home Pages · Invites · Mail · Maps · Member Directory · Messenger · My Yahoo! · News · PayDirect · People Search · Personals · Photos · Shopping · Sports · Stock Quotes · TV · Travel · Weather · Yahooligans · Yellow Pages · more...

Privacy Policy - Terms of Service - Guidelines
*Copyright © 1994-2001 Yahoo! Inc. All rights reserved.*

Ex. 08, P183

RE: Follow up on Kulkarni Matter - Yahoo! Mail    Page 1 of 2

Case 3:13-cv-02857-JLS-KSC   Document 16   Filed 06/19/14   Page 190 of 230

 **YAHOO! MAIL** Classic

**RE: Follow up on Kulkarni Matter**                    Sunday, September 14, 2008 8:42 PM

**From:** "Avi Kulkarni" <avik_101@yahoo.com>
**To:** "Litchenberg, Paul" <Paul.Litchenberg@da.ocgov.com>
**Cc:** "Jim Bacin" <Jim.Bacin@da.ocgov.com>

Hi Paul,

I talked to Ms. Lanae Jones from the NCMEC on Thursday last week. She arranged for me to talk to Ms. Karen Strickland who is the Director of the organization Find The Children in Los Angeles. Ms. Strickland seemed to think that I can't do much at this time, especially since my son is already eighteen.

In the meanwhile, I talked to my son on Thursday. He was to leave for San Jose in a day or two, definitely by the weekend. He refused to see me before he left. So I do not have any way of contacting him today -- just the way things were for the majority of last eighteen years. He mentioned that he might contact me in November when he visits his aunt in Orange County. This aunt was very much involved in the abduction eighteen years ago. How should I accept this situation? That is why I keep talking about prosecution of those who aided and abetted the abduction. That would only be fair.

Thanks for your help,

Avi


---- On **Wed, 9/10/08, Litchenberg, Paul <Paul.Litchenberg@da.ocgov.com>** wrote:

> From: Litchenberg, Paul <Paul.Litchenberg@da.ocgov.com>
> Subject: RE: Follow up on Kulkarni Matter
> To: avik_101@yahoo.com
> Date: Wednesday, September 10, 2008, 12:23 PM
>
> Hello Avi,
> I have already made arrangements for counselor intervention. You should be contacted soon (if not
> already) by a representative of NCMEC to arrange some help for you and your son.
> At this point we are concentrating only on Neelam. The decision to pursue anyone else in this matter
> would rely on DDA Jim Bacin.
> Keep me informed of the counseling arrangements. If you have not heard from them by tomorrow,
> please let me know.
> Paul
>
> Paul Litchenberg
> Investigator
> Family Protection/Child Abduction
> (714)347-8832
>  Think before you print
>
>
> ---------------------------------------------------------------
> **From:** Avi Kulkarni [mailto:avik_101@yahoo.com]
> **Sent:** Tuesday, September 09, 2008 9:40 PM
> **To:** Litchenberg, Paul

RE: Follow up on Kulkarni Matter - Yahoo! Mail    Page 2 of 2

Case 3:13-cv-02957-JLS-KSC   Document 16   Filed 06/19/14   Page 191 of 230

**Subject:** Follow up on Kulkarni Matter

Hi Paul,

A quick follow up on two items...

You had mentioned that you would arrange for a counselor for my son and I. I find very little chance for any progress on that front at this time. My son has been avoiding me. If I call his aunt's place and he actually answers the phone, he gets rid of me in a couple of minutes. He says he would call back, but never does. Or if his aunt answers the phone, she tells me that he isn't there. The only time he has called me is when he thought I might be able to help his mother. He has refused to see me. He'll be leaving for Stanford over the weekend. I do not expect to have any contact with him or even have his contact info (such as phone number or e-mail address). I'll still try my best to work on it. But I'm going to need some help.

On a different note... I have been mentioning to you the involvement of other people in my child's abduction. When you got a warrant for my ex-wife's arrest, you told me that you won't pursue any of them at the time. You were of the opinon that they would come out of the woodwork if and when she was arrested. Now that she has been arrested, would you be pursuing that angle? I believe that it will be important to do so in order to establish the truth. I truly need that to happen.

I appreciate your attention to this matter.

Thanks,
Avi

**CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.**

RE: Contact my son - Yahoo! Mail    Page 1 of 1

Case 3:13-cv-02857-JLS-KSC   Document 16   Filed 06/19/14   Page 192 of 230


**YAHOO! MAIL** Classic

**RE: Contact my son**                                    Monday, December 8, 2008 10:46 AM
**From:** "Litchenberg, Paul" <Paul.Litchenberg@da.ocgov.com>
   **To:** avik_101@yahoo.com


Avi,
At this point I really don't have any resources to assist you. I only have the same contact information you have.
I will have Jim ask the defense attorney for updated info.
Paul

*Paul Litchenberg*
*Investigator*
*Family Protection/Child Abduction*
*(714)347-8832*

**From:** Avi Kulkarni [mailto:avik_101@yahoo.com]
**Sent:** Thursday, December 04, 2008 5:59 AM
**To:** Litchenberg, Paul
**Subject:** Contact my son

Hi Paul,

Have you talked to my son as part of your investigation?  Would you hapen to have contact info for him?  And could you help me to contact him?

Since our interaction back in September, there has been no contact between us.  He had told me that once he settles down at Stanford, he would contact me to tell me about his new contact info.  He hasn't.  He also had told me that he would be visiting his aunt in Orange County in November (Thanksgiving, I suppose) and that he would call me then.  He didn't.

I sent an e-mail to his old e-mail address -- the one he used when he lived in India.  There was no response. The e-mail didn't bounce, so the address still exists.

I just want to check on him.  Can you help?

Thanks,
Avi


***CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.***

| Subject: | Meeting |
| --- | --- |
| From: | Fred Thiagarajah (fred@fredthia.com) |
| To: | Avik_101@yahoo.com; |
| Date: | Thursday, January 29, 2009 4:29 PM |

Dear Mr. Kulkarni,
My name is Fred Thiagarajah.  I am the new attorney for your ex-wife, Neelam Kulkarni.  My client has informed me that you may want to set up a meeting between you, your attorney, her and her attorney, to discuss the pending case and the future of your relationship with your son.  If this is still your wish, then please notify me, either via email or phone (949-475-6800).  If this is not your wish, then disregard this email.
Sincerely,
Fred Thiagarajah

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. LAW OFFICES OF FRED THIAGARAJAH Please visit our website at www.fredthia.com

Case 3:13-cv-02857-JLS-KSC   Document 16   Filed 06/19/14   Page 194 of 230

Re: How are you? - Yahoo! Mail                                    Page 1 of 1


MAIL
Classic

**Re: How are you?**                                    Monday, February 9, 2009 2:06 AM
From: "soumitra kulkarni" <soumitra_90@yahoo.com>
To:  avi_kulkarni_us@yahoo.com

Henceforth, please communicate through my mother's attorney.

--- On Sat, 2/7/09, Avi Kulkarni *avi_kulkarni_us@yahoo.com* wrote:

> From: Avi Kulkarni <avi_kulkarni_us@yahoo.com>
> Subject: How are you?
> To: "soumitra kulkarni" <soumitra_90@yahoo.com>
> Date: Saturday, February 7, 2009, 1:37 AM
>
> Hi Soumitra,
>
> How are you doing?  How is college?
>
> If you want to talk to me, give me a call.  I would like to talk to you, too.
>
> Take care.

RE: Victim's Statement in Case #08CF1764 - Yahoo! Mail

Case 3:13-cv-02897-JLS-RSC    Document 10    Filed 06/19/14    Page 195 of 230

Page 1 of 2


**YAHOO! MAIL**
Classic

---

**RE: Victim's Statement in Case #08CF1764**                    Tuesday, May 12, 2009 2:43 PM
**From:** "Lindsay, Teri L." <Teri.Lindsay@prob.ocgov.com>
**To:** "Avi Kulkarni" <avik_101@yahoo.com>

---

Sure, not a problem. Could you get me the statement by May 22nd? I will send a new packet out to you, the address we had was wrong and I may have dropped the ball if you gave me your current address when we spoke before. The format as yes will be when you get it is basically three questions. How the offense impacted you and or your family emotionally. What you think should happen as a punitive consequence if the defendant (in this case your mother) is convicted, if anything. There is also a section to claim restitution due to financial loss.
Due to the unusual circumstances in this case, I am sure the only section you will be responding to is the emotional implications of the crime and how you have been impacted. You may wish to address your relationship with your father as well as your mother and any efforts you may have put forth to have contact with him in the past nineteen years. Was he aware of your whereabouts, were there efforts by either party to make contact/visit, etc.
Call me if you have any questions.
Teri Lindsay
Deputy Probation Officer
(714)569-2082
fax (714)558-3123
email: teri.lindsay@prob.oc.gov.com

---

**From:** Avi Kulkarni [mailto:avik_101@yahoo.com]
**Sent:** Sunday, May 10, 2009 9:31 PM
**To:** Lindsay, Teri L.
**Cc:** Avi Kulkarni
**Subject:** Victim's Statement in Case #08CF1764

Hello Ms. Lindsay:

As per our phone conversation about two weeks ago, I owed you my statement by Monday, 5/11.  I have mostly completed it.  However, due to a lingering sickness as well as work-related travel, I haven't been able to finish and send it yet.  Would it be possible to get an extension until later in the week?

Also, I haven't yet received the letter from your office that you had mentioned.  Are there any instructions or guidelines in that letter that I should be aware of?

I apologize for any inconvenience due to this delay.

Sincerely,

Avi Kulkarni

Address:  826 Applewilde Drive
          San Marcos , CA 92078

---

Case 3:13-cv-02857-JES-RSC   Document 16   Filed 06/19/14   Page 196 of 230

e-mail:    avik_101@yahoo.com
Phone:    858.344.0237 ( Mobile )



ORANGE COUNTY

**OC Probation**

*Celebrating 100 years*
*1909-2009*

**COLLEENE PRECIADO**
CHIEF PROBATION OFFICER

TELEPHONE: (714) 569-2000

1535 E. ORANGEWOOD AVENUE
ANAHEIM, CA

MAILING ADDRESS:
P.O. BOX 10260
SANTA ANA, CA 92711-0260

July 21, 2009

Avinash B. Kulkarni
826 Applewilde Drive
San Marcos, CA 92078

Re:   Request for a Copy of Pre-Plea Report
      People v. Neelam Thakur
      Case No: 08CF1764

Dear Mr. Kulkarni:

This is in response to your request regarding People v. Neelam Thakur, Case No. 08CF1764.

Unfortunately we are unable to comply with your request. The report you requested is not a pre-sentence report. Therefore, the Orange County Probation Department is unable to release the report to you pursuant to Marsy's Law Article 1, Section 28(b)(11).

If you have any additional questions, then please do not hesitate to contact me at the number listed below.

Sincerely,

Barbara A. Lee
Supervising Probation Officer /
Custodian of Records
Ph: (714) 937-4559

BAL:tcb

Date:   July 01, 2009

From:   Avinash B. Kulkarni
      826 Applewilde Drive
      San Marcos, California 92078
      Phone: 858.344.0237 (Mobile)
      E-mail:avik_101@yahoo.com

To:   Ms. Barbara Lee
      Custodian of Records
      Orange County Probation Department
      P.O. Box 10260
      Santa Ana, California 92711

RE:   **Request for a Copy of Pre-Plea Report in Case # 08CF1764**

Dear Ms. Lee:

Your office has recently submitted a pre-plea report for this case to the Honorable Court.  (The defendant's name is Ms. Neelam Thakur.)  I am a victim (left-behind parent) in this case of child abduction.

Based on my discussions with the Deputy District Attorney as well as statements made by the Honorable Judge in a pre-trial hearing, I understand that the defendant and other people have made allegations against me.  I also understand that their statements were included in the pre-plea report.

I would like to know complete details of these allegations as well as of the contents of the pre-plea report.  I request you to provide me a copy of the same at your earliest convenience.  I have enclosed a postage pre-paid envelope for your return correspondence.

Sincerely,

Avinash B. Kulkarni

Law Offices of

# FRED THIAGARAJAH

5000 Birch Street • West Tower, Suite 3000
Newport Beach, CA 92660
www.fredthia.com

Fred Thiagarajah
Principal
(949) 475-6800
Fax (866) 817-7238
E-mail: fred@fredthia.com

Kiran Nair
Associate
(949) 475-6802
Fax (866) 817-7238
E-mail: kiran@fredthia.com

January 20, 2010

Attn: Mr. Rodney L. Donohoo, Esq.
Law Offices of Rodney L. Donohoo
3110 Camino Del Rio South, Suite 314
San Diego, CA 92108

Re: *Avinash Kulkarn, Case No.: 30-2009-00322804*
Neelam Kulkarni's - Deposed Dec 29, 2009 – Transcript

Dear Mr. Donohoo:

      With respect to the above matter, please see enclosed original transcript of
Neelam Kulkarni's deposition conducted on Dec 29, 2009.

      The front page documents states to return after review and signing within 5 days
of date of the memo.  However, it was received at my office on Jan 18, 2010 but our
office is closed on national holidays.  The earliest I could visit Ms. Kulkarni in custody
was the following day, Jan 19, 2010.  Therefore, it was mailed overnight on Jan 20,
2010.  Thank you.

Yours truly,

Kiran Nair, Esq.

Cc:    Client

1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

AVINASH KULKARNI, an individual,

          Plaintiff,

vs.                    CASE NO.
                        30-2009-00322804

DOES 1 through 20, inclusive,

          Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

NEELAM AVINASH KULKARNI

VOLUME I

December 29, 2009

10:20 a.m.

550 North Flower Street

Santa Ana, California

Traci K. Turner, CSR No. 7123



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

2

1                    APPEARANCES OF COUNSEL

2        For Plaintiff:

3            LAW OFFICES OF RODNEY L. DONOHOO
             RODNEY L. DONOHOO, ESQ.
4            3110 Camino Del Rio South, Suite 314
             San Diego, California 92108
5            619.295.3200

6

7        For Witness Neelam Avinash Kulkarni:

8            LAW OFFICES OF FRED THIAGARAJAH
             KIRAN NAIR, ESQ.
             5000 Birch Street, West Tower, Suite 3000
9            Newport Beach, California 92660
             949.475.6802
10           949.817.7238 Fax
             kiran@fredthia.com

11

12       Also Present:

13           Avinash Kulkarni

14

15

16

17

18

19

20

21

22

23

24

25

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

53

1      A     Yes.

2      Q     You recall that your attorney was present,

3  Mr. Kulkarni was present?

4      A     Uh-huh.

5      Q     "Yes"?

6      A     Yes, uh-huh.

7      Q     And I asked you a series of questions about

8  debt.

9            Do you recall that?

10     A     Yes.

11     Q     Okay.  We're not going to go into your personal

12  assets.

13           I also asked you whether anyone assisted you in

14  helping bring Soumitra out of the country.

15           Do you recall that?

16     A     Yes.

17     Q     Your testimony was you refused to tell me.

18           Do you recall that?

19     A     Yes.

20     Q     Okay.

21           I'm asking you now who those people are.

22     A     No, I don't -- I don't think -- Only my parents

23  helped.  Other than that, I really don't recall anybody

24  helping me.

25     Q     All right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

54

1          My question to you, ma'am -- and this is a

2    question of credibility.  It'll have to go back before

3    the judge.

4          When I asked you the question, you said, "I

5    won't tell you."  You were polite, but that was -- that

6    was the gist of it.

7          Do you agree with me?

8    A     Yeah, first I said that, yes --

9    Q     Okay.

10   A     -- uh-huh.

11   Q     If you didn't know the names, why would you

12   have told me that?

13   A     I didn't want to discuss that part.

14   Q     Oh.

15   A     I really don't want to discuss this part,

16   whatever happened 20 years back.

17   Q     I understand that you don't want to; but you

18   understand I'm here to take your deposition?

19   A     Yes.  So now I'm answering you.

20         And to tell you the truth, it has been

21   20 years, and I don't really remember many things.

22   Q     So now you're telling me -- When you told me at

23   the debtor's examination, you said that you refused to

24   give their identity.  Now you're telling me you don't

25   know their identity; is that right?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

55

1    A    I don't remember.  I really don't remember.

2    Q    Okay.

3        Is there any reason why you want to protect

4  these people?

5    A    No.  I'm not protecting anybody.  I just don't

6  remember.

7        I was under a lot of stress when it happened;

8  and right now, I'm also going through a lot of stress.

9    Q    Okay.

10       Are you aware that your attorney advised me

11 that you didn't want to discuss that because they've --

12 you feared that they would be criminally prosecuted?

13 Are you aware of that?

14       MS. NAIR:  That's off the record, Counsel;

15 that's improper.

16 BY MR. DONOHOO:

17   Q    Are you aware of that?

18   A    No, I'm not aware of that, no.

19       MR. DONOHOO:  Kiran, I'm glad you admit that

20 you said that to me, whether it was on the record or off

21 the record.  My concern is that we're harboring people

22 who assisted you.

23       So now we're going --

24       MS. NAIR:  It's irrelevant to the scope of your

25 examination for a debtor's examination.



## ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

Neelam Avinash Kulkarni - Volume I     December 29, 2009

103

1      A     I don't really remember.

2      Q     Okay.

3            Do you know where the tickets were sent?

4      A     I don't remember.

5      Q     Do you know how you picked up the tickets?

6      A     No, I don't remember.

7      Q     Do you know how many tickets were there?

8      A     Only two -- There must be only two tickets.

9      Q     That's makes sense.

10           One for you and one for Soumitra; correct?

11     A     Yes.

12     Q     When you sought to obtain the passport for

13     Soumitra, when you did that, had you intended on leaving

14     at that time?

15     A     When I obtained the passport?

16     Q     Yes, ma'am.

17     A     Yes, uh-huh.

18     Q     Okay.

19           Did you rush the passport?  I know there's a

20     procedure where you pay more money and you rush it.

21     A     No, I don't remember that.  I don't -- I

22     actually don't remember the whole procedure now.

23     Q     So you don't remember whether you rushed it?

24     A     I don't remember.

25     Q     You don't remember whether you requested an



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

Neelam Avinash Kulkarni - Volume I          December 29, 2009

104

1   accelerated or rushed passport?

2       A    No, I really don't remember.

3       Q    Okay.

4            Do you remember where you applied?

5       A    No.

6       Q    You don't?

7       A    I don't.

8       Q    Do you remember whether you went down there in

9   person or did it by mail?

10      A    No, I don't remember.

11      Q    Do you know whether anybody went with you to

12  obtain the passport?

13      A    No, I don't remember.

14      Q    Could you drive?

15      A    No.

16      Q    So it's possible that you went down there; is

17  that right?

18      A    I don't remember --

19      Q    Okay.

20      A    -- but I don't recall going anywhere.

21           I -- I just -- Whenever I went out of the

22  house, it was always with my ex-husband.

23      Q    You didn't want -- It's fair to say that you

24  did not want your husband to know you were obtaining a

25  passport; right?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

105

1      A   Yes --

2      Q   Okay.

3      A   -- uh-huh.

4      Q   So it's also fair to say that you can't go get

5  a passport usually -- I mean, that I know of -- on site.

6  Usually you've got to fill out some paperwork, get a

7  photo; right?

8      A   Uh-huh, yes.

9      Q   And submit that to the United States --

10     A   Uh-huh.

11     Q   This was a U.S. passport?

12     A   Right.

13     Q   And they send you back a passport; right?

14     A   Yes.

15     Q   Okay.

16         Usually you can't do that in person; usually

17  not -- I'm not a passport expert.  In fact, your lawyer

18  probably knows much more about this than I do.

19         Do you recall whether or not that passport --

20  My assumption is you would not have had that passport

21  mailed to your house because you wouldn't want your

22  husband to know; right?

23     A   I don't remember.  I don't remember.

24     Q   Do you think that's possible that you would

25  have had it mailed to your house?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

106

1    A    I don't remember what I thought at that point

2  of time.

3    Q    So is it possible?  Yes or no.  I'm looking for

4  a yes or no.

5    A    What's the question again?

6    Q    That you had the passport mailed to your house.

7    A    Yeah, it is possible.  I don't remember.

8    Q    Thank you.

9    A    The answer is I don't remember, because I --

10    Q    New question:  Wouldn't that have been very

11  risky?  He comes home, opens the mail and sees a

12  passport and says what the heck's going on?

13    A    Uh-huh, yes.

14    Q    That would be risky; right?

15    A    Yes.

16    Q    Does that refresh your recollection as to

17  whether or not you had the passport mailed to a friend's

18  location?

19    A    No, I don't remember that.

20    Q    Okay.

21        Does this deposition that we've taken refresh

22  your recollection that, in fact, you did not take a taxi

23  to the airport or is that still your best recollection,

24  it was a taxi?

25    A    Yes, I took a cab to airport.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

Neelam Avinash Kulkarni - Volume I                    December 29, 2009

142

1        DECLARATION UNDER PENALTY OF PERJURY

2

3        I, Neelam Avinash Kulkarni, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken December 29, 2009;

6    that I have made such corrections as appear noted

7    herein, in ink, initialed by me; that my testimony as

8    contained herein, as corrected, is true and correct.

9

10        Dated this 19 day of January , 2010

11    at Santa Ana , California.

12

13

14

15

16                              _____

17                              Neelam Avinash Kulkarni

18

19

20

21

22

23

24

25



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

143

REPORTER'S CERTIFICATION

1

2

3      I, Traci K. Turner, a Certified Shorthand Reporter,

4   in and for the State of California, do hereby certify:

5

6      That the foregoing witness was by me duly sworn;

7   that the deposition was then taken before me at the time

8   and place herein set forth; that the testimony and

9   proceedings were reported stenographically by me and

10   later transcribed into typewriting under my direction;

11   that the foregoing is a true record of the testimony and

12   proceedings taken at that time.

13

14      IN WITNESS WHEREOF, I have subscribed my name this

15   13th day of January, 2010.

16

17

18

19   /s/ 

20        Traci K. Turner, CSR No. 7123

21

22

23

24

25

# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

**Neelam Avinash Kulkarni - Volume I**      December 29, 2009

144

1      DEPOSITION ERRATA SHEET

2      RE:              Esquire Deposition Solutions

3      File No. 41620

4      Case Caption: AVINASH KULKARNI

5      vs. DOES 1 through 20, inclusive

6      Deponent: NEELAM AVINASH KULKARNI

7      Deposition Date: December 29, 2009

8      To the Reporter:

9      I have read the entire transcript of my Deposition taken

10     in the captioned matter or the same has been read to me.

11     I request that the following changes be entered upon the

12     record for the reasons indicated. I have signed my name to

13     the Errata Sheet and the appropriate Certificate and

14     authorize you to attach both to the original transcript.

15

16     Page No. 51 Line No. 8 Change to: Meera

17     Correct spelling name is Meera

18     Reason for change: _____

19     Page No. 54 Line No. 4-8 Change to: I meant to say

20     "I don't need to tell you. *b/c it's not relevant."

21     Reason for change: _____

22     Page No. 81 Line No. 3 Change to: with help of both

23     my parents.

24     Reason for change: _____

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

Neelam Avinash Kulkarni - Volume I                    December 29, 2009

145

1   Deposition of NEELAM AVINASH KULKARNI

2

3   Page No. 82 Line No. 13 Change to: Counsel Nair stated

4   No. 13

5   Reason for change: _____

6   Page No. 122 Line No. 4 Change to: did not sign this

7   petition, 72 pages long & filed in 1992, don't recall its contents.

8   Reason for change: _____

9   Page No. ____ Line No. ____ Change to: _____

10  _____

11  Reason for change: _____

12  Page No. ____ Line No. ____ Change to: _____

13  _____

14  Reason for change: _____

15  Page No. ____ Line No. ____ Change to: _____

16  _____

17  Reason for change: _____

18  Page No. ____ Line No. ____ Change to: _____

19  _____

20  Reason for change: _____

21

22

23

24  SIGNATURE: _____ DATE: 01/19/2010

25          NEELAM AVINASH KULKARNI



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 111
555 West Beech Street
San Diego, CA 92101
www.esquiresolutions.com

# Affidavit of Rajesh Nerurkar

I, Rajesh Nerurkar, declare as follows:

1. I am over the age of 18, am competent to testify and if called to testify, would testify the statements contained. I agree to make myself available and to testify at deposition and trial concerning the topics contained herein.

2. I met Ms. Madhavi Thakur in September 1996 in Mumbai, India. We were soon engaged to be married. While Madhavi and I were dating in India, I came to know her family -- her parents Mrs. Urmila and Mr. Ramakant Thakur as well as her sister, Ms. Neelam Thakur a.k.a. Ms. Neelam Kulkarni. I met the Thakurs on multiple occasions. I also came to know Neelam's son, Soumitra. Soumitra lived with Neelam and the Thakur family. Madhavi lived with them as well. I came to know that Neelam used to live in Orange County, California when she was married to Mr. Avinash Kulkarni and that Soumitra was born in Orange County in 1990. During this time, I came to know that Neelam was divorced from Avinash Kulkarni.

3. I specifically recall a meeting with Madhavi and Neelam in a restaurant in Mumbai in or about October 1996. At that time, in the presence of Madhavi, I asked Neelam about her divorce. She told me, with Madhavi present, that she left her marital home in Orange County for India in October 1990 without her husband's knowledge and that she brought with her their six-month old son, Soumitra. Neelam told me that she got help from her friends in Orange County during her return to India. Neelam identified Mrs. Meera Upasani and Mrs. Sunila Kulkarni of Orange County as very good friends. She identified those two women as friends who aided her during her return to India from Orange County with Soumitra. During this meeting in the restaurant, Neelam also told me that Mrs. Meera Upasani helped her in acquiring a passport for the infant son. Neelam told me that Mrs. Meera Upasani provided transportation to her while applying for Soumitra's passport. As per Neelam's account, Mrs. Meera Upasani provided her own address for the passport to be delivered and then handed it to Neelam after receiving it in mail. Neelam also told me that her parents and Mrs. Meera Upasani arranged for one-way airline tickets to India for Neelam and the infant son, Soumitra. Neelam also told me that, on October 15, 1990, Mrs. Sunila Kulkarni picked up Neelam and the infant son from their residence after Avinash had left for work. Neelam

informed me that Mrs. Sunila Kulkarni drove her to the Los Angeles International Airport for her flight to India. Neelam also stated that Mrs. Meera Upasani and Mrs. Sunila Kulkarni were knowledgeable of her return described above. Neelam told me that the two women were aware that Neelam was leaving without her husband's knowledge or consent. Neelam told me that her parents, Mrs. Meera Upasani and Mrs. Sunila Kulkarni had planned not to let Avinash know about Neelam's whereabouts until she was half way through her journey to India.

4. Madhavi was present during the entire October 1996 conversation with Neelam and was in a position to hear all of Neelam's statements.

5. Madhavi and I were married in December 1996 and lived in Mumbai, India for a month. My employment brought me to Orange County, California in January 1997. Madhavi followed me to Orange County in April 1997. Before we came to the U.S., Neelam gave us contact information for Mrs. Meera Upasani and Mrs. Sunila Kulkarni. She asked us to get in touch with the two women for social purposes as they were her friends.

6. Soon after I arrived in Orange County, I contacted Mrs. Meera Upasani and Mrs. Sunila Kulkarni over the phone. I introduced myself as Neelam's brother-in-law. I met the Upasani and the Kulkarni families in person. After Madhavi arrived in the U.S. in April 1997, we started interacting with those two families socially. We met them separately on several occasions.

7. In one of our meeting at the Upasani's home, Mrs. Meera Upasani confirmed that Neelam was a very good friend of hers. Mrs. Upasani told me that, when Neelam lived in Orange County in 1989-1990, the Upasanis and Neelam and her husband interacted and met regularly. According to Mrs. Upasani, all of them were part of a social group that got together on social events.

8. In one of our get-togethers in 1997, Mrs. Meera Upasani confirmed Neelam's entire account of how Neelam returned to India in 1990. Mrs. Upasani confirmed her role as well as Mrs. Sunila Kulkarni's role in helping Neelam and Soumitra to leave the United States for India without Avinash finding out. She specifically discussed her role in acquiring a U.S. passport for the infant son, in helping to get one-way airline tickets for Neelam and the infant son, and Sunila Kulkarni's role in arranging transportation to drive Neelam to the LAX airport on the day of Neelam's departure. Mrs. Upasani also told me that she helped Neelam obtain

Soumitra's passport and had the passport sent to her own home. Mrs. Upasani also told me that she later delivered the passport to Neelam without Avinash's knowledge as the plan was not to inform Avinash about Neelam's intention to return to India with Soumitra. Madhavi as well as Mr. Mohan Upasani were present at this 1997 get-together.

9. Neelam and Soumitra visited us in Orange County for about two months in 1998. Madhavi and I were living in Mission Viejo at the time.

10. Soon after she left for India in 1998, Neelam asked Madhavi and me to assist her in executing the divorce decree she got from an Indian court in a U.S. court. Avinash was paying her child support at the time, but Neelam wanted to collect alimony retroactively and permanently as well. I wanted to help Madhavi's family and agreed to be Neelam's attorney-in-fact. I arranged for an attorney (Ms. Bette Adelman) to represent Neelam in the Superior Court of Arizona. Avinash was a resident of Phoenix, Arizona at the time. Neelam executed a power of attorney in September 1999 and we filed the lawsuit in Arizona in February 2000. That lawsuit lasted about one year.

11. During the time lawsuit in Arizona was pending, I contacted Mrs. Meera Upasani, to assist in the lawsuit as she had supposedly witnessed Neelam's alleged mistreatment by Avinash. I expected her to help Neelam. But Mrs. Meera Upasani stayed away from this case.

12. Madhavi was aware of the Arizona lawsuit. She discussed its details regularly with Neelam as well as with me. She reviewed various documents filed on behalf of Neelam as well as documents filed by Avinash. Madhavi was in possession of some documents related to the lawsuit until 2007. I am not sure if she currently has those documents. The Superior Court of Arizona dismissed Neelam's petition with prejudice.

13. I learned that Mrs. Sunila Kulkarni visited Neelam in India between 1997 and 1998 and stayed with her.

14. I separated from Madhavi in 2007 and we were divorced in 2008.

15. On various occasions between 1998 and 2001, I have seen how Soumitra was kept away from his father. Neelam claimed that she did so because Avinash did not pay alimony and child support retroactively. Neelam and her parents have accused Avinash of abusing Neelam while she was living in the U.S with him in 1990. They have repeatedly told Soumitra that his father had mistreated Neelam. Soumitra has always called his grandparents "Jai" (Mom) and "Baba" (Dad).

I declare under the penalty of perjury under the laws of the states of California and North Carolina, and under the laws of the United States that the foregoing is true and correct.

VRajesh   03/25/2011

Rajesh Nerurkar

| | |
|---|---|
| **Subject:** | Status of your FOIA Request |
| **From:** | Mehta, Jason P (MehtaJP@state.gov) |
| **To:** | avik_101@yahoo.com; |
| **Cc:** | David.Pinchas@usdoj.gov; |
| **Date:** | Monday, November 14, 2011 10:03 AM |

Mr. Kulkarni –

In response to your voicemail from last week seeking an update on the FOIA processing of your case, please note that we have received your correspondence of October 28 and November 2. We note that you have not provided a third party authorization for the release of records. Accordingly, we will process your request to the maximum extent we can, but we may be required to withhold any personally identifiable information as appropriate under the Privacy Act. I will advise you when there is an update.

Thank you!
Jason

**Jason Mehta**

Office of the Legal Adviser

U.S. Department of State

+1 (202) 647-2227

MehtaJP@state.gov

SBU
This email is UNCLASSIFIED.

Ex. 17, P211



United States Department of State

*Washington, D.C. 20520*

DEC 19 :

Case No.: 201108461

Mr. Avinash B. Kulkarni
826 Applewilde Drive
San Marcos, CA  92078

Dear Mr. Kulkarni:

I refer to your request dated October 8 and 19, 2011, under the Freedom of Information Act (Title 5 USC Section 552), and to Mary Therese Casto's letter to you dated October 25, 2011.

After carefully reviewing your request, the Department has determined that the information you seek about Soumitra Avinash Kulkarni cannot be given to third parties absent his written consent. The release of such material (if any existed) would constitute a clearly unwarranted invasion of personal privacy. See Department of State v. Washington Post Co., 456 U.S. 595, 601 (1982). As such, the material, would be exempt from release under subsection (b)(6) of the Freedom of Information Act, Department of State Regulation (22C.F.R.§171.12(a), and possibly the Privacy Act (Title 5 USC Section 55a.) Therefore, we are closing the case pending receipt of an authorization from Soumitra Avinash Kulkarni.

Sincerely,

Sheryl Walter
Director
Office of Information Programs and Services

1  RUTAN & TUCKER, LLP
   Lisa N. Neal (State Bar No. 205465)
2  lneal@rutan.com
   Chelsea A. Epps (State Bar No. 261026)
3  cepps@rutan.com
   611 Anton Boulevard, Fourteenth Floor
4  Costa Mesa, California 92626-1931
   Telephone:  714-641-5100
5  Facsimile:  714-546-9035

6  Attorneys for Defendants
   MEERA UPASANI, MOHAN UPASANI and
7  MADHAVI NERURKAR

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

| 11 | AVINASH KULKARNI, an individual, | Case No. 30-2009-00322804 |
|---|---|---|
| 12 | Plaintiff, | Assigned to: |
| 13 | v. | Judge David T. McEachen Department C21 |
| 14 | MEERA UPASANI, an individual, MOHAN UPASANI, an individual, MADHAVI | **DEFENDANTS MOHAN UPASANI, MEERA UPASANI AND MADHAVI** |
| 15 | NERURKAR a.k.a. MAHDAVI THAKUR, RAJESH NERURKAR, and DOES 5 through | **NERURKAR'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4** |
| 16 | 20, inclusive, | **TO EXCLUDE TESTIMONY OR REFERENCE BY DEFENDANTS OF** |
| 17 | Defendants. | **ALLEGED ABUSE BY AVINASH KULKARNI** |

18                                        Date Action Filed:  November 23, 2009
19                                        Trial Date:            June 20, 2011

20

21  I.    **INTRODUCTION.**

22       Defendants Mohan Upasani, Meera Upasani and Madhavi Nerurkar (collectively,

23  "Defendants") hereby oppose Plaintiff Avinash Kulkarni's ("Plaintiff") Motion in Limine No. 4,

24  in which Plaintiff seeks to preclude Defendants from introducing any evidence, testimony or

25  reference to the alleged abuse of Plaintiff's ex-wife Neelam Kulkarni ("Neelam") by Plaintiff.

26       Plaintiff's motion asks the Court to issue an order precluding Defendants from making

27  *any* reference at trial to the fact that Plaintiff's abuse of Neelam was the catalyst that forced her to

28  escape to India with their son Soumitra in the first place; yet in the same breath, Plaintiff asks that

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

-1-
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF
Ex. 19, P213

1  the Court permit him unfettered use of Neelam's abuse allegations to support his defense that he

2  was unable to visit Soumitra for over 20 years.  Plaintiff's contradictory and incoherent position

3  merely highlights the importance of this evidence at trial to the key issues raised by Plaintiff in

4  this frivolous lawsuit.  In addition, it underscores the fact that it would be impossible and

5  incongruous for the Court to grant Plaintiff's requested amorphous and overbroad order, which

6  would deprive Defendants of the tools necessary to probe, test, and discredit Plaintiff's theory of

7  the case, and would further prevent the jury from hearing and weighing evidence that is material to

8  the context and just determination of this dispute.

9       While it comes as no surprise that Plaintiff is desperate to shield the jury from evidence

10 that he abused his wife which may be embarrassing, uncomfortable and damaging to his case,

11 unfortunately for Plaintiff, this is not the standard for excluding evidence at trial.  Evidence is not

12 unduly prejudicial merely because it casts a party in a bad light, or because the party contests the

13 evidence.  (*See People v. Robinson* (2005) 37 Cal.4th 592.)  Rather, exclusion of evidence under

14 section 352 is reserved for those cases where the proffered evidence has little evidentiary value

15 and creates an emotional bias against the defendant.  (*Ajaxo Inc. v. E\*Trade Group*, Inc. (2005)

16 135 Cal.App.4th 21.)

17      Here, evidence of the abuse is extremely relevant and probative to, among other things,

18 determination of Plaintiff's credibility and his motives for bringing suit, Defendants' defenses, and

19 Plaintiff's punitive damages claims.  Given the overwhelming probative value of the evidence,

20 excluding or limiting Defendants' use of such evidence at the pre-trial stage would be highly

21 improper and prejudicial to Defendants, especially when Plaintiff himself intends to utilize the

22 evidence to argue his theory of the case to the jury.  For all of these reasons and as explained in

23 more detail below, Plaintiff's Motion should be denied in its entirety.

24 **II.    PLAINTIFF SEEKS AN OVERBROAD, ONE-SIDED, EXCLUSIONARY ORDER**

25 **THAT IS DEVOID OF ANY EVIDENTIARY SUPPORT OR CONTEXT.**

26      Plaintiff argues that *only he* should be entitled to reference the abuse because "it is central

27 to Plaintiff's 'defense' to Defendants' claims that Plaintiff could have gone at any time to India to

28 obtain or visit his son."  (Plaintiff's Motion at 4:10-16.)  Plaintiff cannot have it both ways.  He

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

-2-
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF

Ex. 19, P214

1  cannot bar Defendants from broaching this topic altogether at trial, yet simultaneously, argue that

2  it is relevant to his theory of the case and thus only he should be able to reference Neelam's abuse

3  claims to justify his complete failure to reunite with his son for a twenty year period.

4         Plaintiff's request is also overbroad and would preclude Defendants from presenting

5  admissible, probative evidence bearing on Plaintiff's claims and their defenses. A motion *in*

6  *limine* is inappropriate where it is difficult to specify exactly what evidence is the subject of the

7  motion:

8              No matter how logical a moving party's motion may sound, a judge
               generally should not be weighing the evidence on a motion in
9              limine. A judge is in the ticklish situation of needing to be efficient,
               on the one hand, while needing, on the other hand, to give the
10             parties their day in court and <u>let the jury weigh the evidence</u>. While
               it may be tempting to look at a case in the macro sense, the devil is
11             in the details. The moving party's <u>concerns that the other party may</u>
               <u>be trying to use evidence for an improper purpose or in a way that</u>
12             <u>may be unduly prejudicial can be addressed by limiting instructions,</u>
               <u>without taking away the other party's hallowed right to a jury trial.</u>

13

14 (*R&B Auto Center v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 333 [emphasis added].)

15 Here, Plaintiff's Motion, which seeks to exclude *only* Defendants from introducing unspecified

16 evidence of Plaintiff's abuse of Neelam is a "moving target," raising the danger that probative

17 evidence will be swept up in any order this Court might make, or that the parties will simply have

18 to re-argue this issue as testimony is offered, requiring duplication of the effort and unnecessary

19 use of the Court's (and the jury's) time. (*Kelly v. New West Federal Savings* (1996) 49 Cal. App.

20 4th 659, 677 [holding that unintentionally overbroad rulings are a "danger inherent in motions *in*

21 *limine* if they are not carefully scrutinized and controlled by the trial judge"].) For these reasons

22 alone, Plaintiff's Motion should be denied.

23 **III.    EXCLUSION OF THE EVIDENCE IS PREMATURE.**

24         Plaintiff's request to exclude relevant and admissible evidence is premature – it remains to

25 be determined how Defendants will use any of this information at trial, and Plaintiff has not ruled

26 out all potential and proper uses of the evidence he now seeks to exclude. This Court cannot

27 intelligently rule on this motion without the context of the testimony and evidence Plaintiff

28 "anticipates" Defendants may offer. As the California Supreme Court has explained:

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

-3-

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF

Ex. 19  P215

1    Under appropriate circumstances, a motion *in limine* can serve the
     function of a "motion to exclude" under Evidence Code section 353
2    by allowing the trial court to rule on a specific objection to
     particular evidence. . . . [¶]  In other cases, however, a motion *in*
3    *limine* may not satisfy the requirements of Evidence Code section
     353.  For example, *it may be difficult to specify exactly what*
4    *evidence is the subject of the motion until that evidence is offered.*
     Actual testimony sometimes defies pretrial predictions of what a
5    witness will say on the stand.  *Events in the trial may change the*
     *context in which the evidence is offered* to extent that a renewed
6    objection is necessary to satisfy the language and purpose of
     Evidence Code section 353.  As we observed in *People v. Jennings*
7    (1988) 46 Cal.3d 963, "*Until the evidence is actually offered, and*
     *the court is aware of its relevance in context, its probative value,*
8    *and its potential for prejudice, matters related to the state of the*
     *evidence at the time an objection is made, the court cannot*
9    *intelligently rule on admissibility.*"  [Citation.]  In these kinds of
     circumstances, an objection at the time the evidence is offered
10   serves to focus the issue and to protect the record.

11   (*People v. Morris* (1991) 53 Cal. 3d 152, 188-90 [emphasis added], overruled on other grounds in

12   *People v. Stansbury* (1995) 9 Cal. 4th 824, 830.)  Because the evidence has not been sufficiently

13   developed for the Court to make an informed decision on its admissibility, the Court should

14   refrain from excluding all such evidence to avoid precluding the admission of relevant, probative

15   evidence.

16   **IV.   THE EVIDENCE PLAINTIFF SEEKS TO EXCLUDE IS RELEVANT AND**

17   **IMPORTANT TO THE JURY'S DETERMINATION OF PLAINTIFF'S**

18   **CREDIBILITY AND MOTIVES.**

19       A party is entitled to admission of all competent, material and relevant evidence tending to

20   prove or disprove any material issue raised by the pleadings.  (*Bole v. Bole* (1946) 76 Cal. App. 2d

21   344, 345-46.)  It is black letter law that evidence relating to the credibility of witnesses is relevant

22   evidence. (Evid. Code, § 210.)  Moreover, in determining a witness' credibility the jury may

23   consider "any matter that has any tendency in reason to prove or disprove the truthfulness of the

24   witness's testimony at the hearing." (Evid. Code, § 780; *see also People v. Bugg* (1962) 204

25   Cal.App.2d 811, 818 [evidence regarding the witness' general reputation for veracity is admissible

26   to impeach the witness].)

27       By bringing this unmeritorious lawsuit against Defendants, Plaintiff has put his credibility

28   directly at issue.  He has maintained throughout this action that he never abused Neelam and that

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

-4-

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF

Ex. 19, P216

1   he was "completely shocked" when he discovered that Neelam had left with Soumitra to India.  In

2   the instant Motion, Plaintiff even states that he "has gone so far as to submit himself to a

3   polygraph examination prior to this litigation ever being filed" on the subject of the abuse, yet

4   curiously, Plaintiff never produced the results of this alleged polygraph test to Defendants during

5   discovery nor did he make any mentioning of this fact at his deposition.

6         Defendants intend to present testimony and evidence at trial to expose the falsity of

7   Plaintiff's claims that he never abused Neelam and to demonstrate that Plaintiff is responsible for

8   causing Neelam and Soumitra to leave for India in the first place.  Defendants are unquestionably

9   entitled to introduce proper rebuttal evidence to test the strength of Plaintiff's case and his

10  veracity.  Evidence contradicting and undermining Plaintiff's testimony that he never abused

11  Neelam, and that he was shocked when Neelam and Soumitra left is surely relevant and Plaintiff's

12  attempt to bar Defendants from mentioning the abuse or submitting evidence to impeach

13  Plaintiff's testimony is improper.

14        Additionally, Neelam's abuse allegations against Plaintiff are also relevant to show the

15  existence of Plaintiff's bias, interest or other motive in bringing the instant suit against

16  Defendants.  (Evid. Code, § 780(f); *People v. Allen* (1978) 77 Cal.App.3d 924, 931 [party may

17  offer evidence to attack credibility of a witness, if such evidence tends reasonably to establish that

18  witness has a motive to fabricate, or some other motive, that tends to cause giving of untruthful

19  testimony]; *People v. Avelar* (1961) 193 Cal.App.2d 631, 634 [counsel afforded wide latitude in

20  developing facts that show bias, prejudice or interest on part of a witness and that would affect the

21  witness' credibility].)

22        It is Defendants' position that Plaintiff commenced this action not because he experienced

23  any compensable emotional distress due to being separated from his son, but rather because he

24  desired to seek revenge against his ex-wife Neelam, and anyone who was acquainted with Neelam,

25  in order to punish Neelam for accusing Plaintiff of abuse and escaping from his control.  Hence,

26  evidence of the abuse is also relevant to show Plaintiff's motive to fabricate the claims he is now

27  asserting against Defendants and to maliciously prosecute this action.  ·

28  ///

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

-5-

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF

**V.    EVIDENCE OF THE ABUSE IS DIRECTLY RELEVANT TO DEFENDANTS' AFFIRMATIVE DEFENSES.**

In Defendants' Answer to Plaintiff's FAC, they assert among other defenses, the defense that Plaintiff is Responsible for Alleged Damages and that "any damages sought by Plaintiff are due in whole or in part to Plaintiff's own negligent, deliberate, intentional, reckless, or unlawful acts or omissions." (Answer to Unverified Complaint, Tenth Affirmative Defense.) Defendants also assert the defense of Comparative Fault and state that in the event they "are found liable for any tortuous conduct, including negligence, which liability is denied, Plaintiff's recovery, if any, must be reduced in proportion to Plaintiff's comparative fault." (Answer to Unverified Complaint, Fourteenth Affirmative Defense.) Accordingly, evidence that Plaintiff abused his wife is directly relevant to both of these defenses.

It is axiomatic that Plaintiff's damages are not recoverable to the extent his own conduct contributed to the injuries. Rather, awardable damages must be proportionately reduced to reflect the percentage of Plaintiff's "fault." (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 828-829; *see also* CACI 405, 3960.) Moreover, a plaintiff's negligence or other culpable conduct need not be a "proximate" ("legal") cause of the injury. Instead, comparative fault principles are properly invoked whenever plaintiff's conduct contributes to the overall harm emanating from the injury. (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1011.)

Here, the evidence will show that Plaintiff's abuse of Neelam directly contributed to and/or was the sole cause of Plaintiff's injuries because Plaintiff's mistreatment of Neelam is what drove her to leave Plaintiff and take Soumitra to India in the first place. If Plaintiff had treated Neelam with love and respect, she would have never been forced to leave for India in 1990 and Plaintiff would not have suffered the alleged damages he is now improperly blaming on Defendants. Thus, evidence of the abuse is undeniably relevant and important to Defendants' affirmative defenses that Plaintiff caused and/or is at fault for any purported injuries he claims to have suffered for Neelam taking Soumitra to India, and that Plaintiff's recovery, if any, should therefore be barred.

///

///

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF

1   ///

2   **VI.**    **EVIDENCE OF THE ABUSE IS DIRECTLY RELEVANT TO REBUT**

3         **PLAINTIFF'S CONTENTION THAT DEFENDANTS CONCEALED SOUMITRA**

4         **FROM PLAINTIFF AND THAT THEY ACTED MALICIOUSLY.**

5        Neelam was granted sole custody of Soumitra by the court in India based on her statements

6   that Plaintiff had abused her during their marriage.  When Neelam and Soumitra visited the United

7   States in 1998 and stayed with Neelam's sister Madhavi, they were in the United States on valid

8   Visas and Neelam had full custody of Soumitra as provided for in Neelam's divorce decree.

9   Madhavi testified during her deposition that she was specifically aware of Neelam's claims that

10   Plaintiff had abused her and that she was fearful for Soumitra's safety.  Madhavi understood the

11   abuse to be the reason why Neelam left for India with Soumitra, and why Neelam was eventually

12   granted sole custody of Soumitra.

13        Plaintiff has accused Madhavi and the other Defendants of helping to "conceal" Soumitra

14   from Plaintiff from 1990 to 2008.  Thus, the fact that Neelam was granted sole custody of

15   Soumitra based in part on Plaintiff's abuse of Neelam is extremely relevant and important to

16   establish that Defendants did not act to conceal Soumitra from Plaintiff.  First, they were not even

17   living in India during this time period.  Second, Plaintiff was well aware of where Neelam and

18   Soumitra were living while they were in India.  Third and finally, Defendants were informed and

19   believed that Neelam had been granted full custody of Soumitra due in part to Plaintiff's abuse and

20   that Plaintiff had no parental rights after April 1995.

21        In addition, Plaintiff is specifically seeking punitive damages against Defendants for their

22   purported participation in a conspiracy with Neelam to abduct and conceal Plaintiff's son.  In

23   order to receive an award of punitive damages, Plaintiff must prove by clear and convincing

24   evidence that Defendants acted with malice, oppression or fraud.  (See CACI No. 3941.)  Whether

25   Defendants acted with an intent to cause harm to Plaintiff, and therefore, their state of mind at the

26   time the alleged abduction took place and during the last twenty years when Soumitra was staying

27   in India with his mother, will be at issue during this trial.  In order to rebut Plaintiff's contention

28   that Defendants acted maliciously, Defendants are well within their rights to introduce evidence of

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

-7-

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF

Ex. 19, P219

1  Plaintiff's abuse of Neelam to show that any purported assistance given by any of the Defendants

2  to Neelam under the circumstances of her departure was not malicious, and was justifiable.

3  **VII.   THE DAMAGING NATURE OF THE ABUSE BY PLAINTIFF DOES NOT**

4  **EQUATE TO UNFAIR PREJUDICE OR JUSTIFY EXCLUSION UNDER**

5  **EVIDENCE CODE SECTION 352.**

6       Under Evidence Code section 352, relevant evidence can be excluded only if the danger of

7  prejudice **substantially outweighs** the probative value of the evidence.  In this case, it is

8  understandable that Plaintiff may want to exclude evidence that is embarrassing or uncomfortable,

9  and damaging to his case.  Unfortunately for Plaintiff, that is not the legal standard to be applied.

10  The mere fact that such evidence may be unfavorable to Plaintiff's case does not make the

11  evidence prejudicial or justify exclusion under Evidence Code section 352.  (Wegner, et al.,

12  California Practice Guide:  Civil Trials and Evidence (The Rutter Group 2005) ¶ 8:3209.)

13       "Most evidence is 'prejudicial' to the party against whom it is offered.  But that is not

14  enough to exclude it under § 352."  (*Ibid.*, citing *People v. Coddington*, (2000) 23 Cal.4th 529,

15  588 ["prejudicial" not synonymous with "damaging"]; *People v. Ortiz* (1995) 38 Cal. App. 4th

16  377, 394 [prejudice contemplated by Section 352 is not merely evidence unfavorable to party];

17  *People v. Harris* (1998) 60 Cal.App.4th 727, 737 ["(p)ainting a person faithfully is not, of itself,

18  unfair"].)  "Prejudicial" in the statute allowing exclusion of relevant evidence if its probative value

19  is outweighed by its prejudicial effect does not mean "damaging" to a party's case; it means

20  evoking an emotional response that has very little to do with the issue on which the evidence is

21  offered.  (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal. App. 4th 860; *Vorse v.*

22  *Sarasy* (1997) 53 Cal.App.4th 998, 1008-0 [evidence is not prejudicial merely because it

23  undermines a party's position].)

24       Even if evidence concerning the abuse was unduly prejudicial within the meaning of the

25  Code, which it is not, it is sufficiently probative to outweigh any prejudice that might occur.  To

26  exclude relevant evidence under Evidence Code section 352, its probative value must be

27  "substantially outweighed" by risk of undue consumption of time, undue prejudice, confusing the

28  issues, or misleading the jury.  (Evid. Code § 352; *see also People v. Jablonski* (2006) 37 Cal. 4th

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

-8-

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF

Ex. 19, P.220

1   774 [admission of relevant evidence will not offend due process unless evidence is so prejudicial

2   as to render the defendant's trial fundamentally unfair].)  A balancing test is thus required -- i.e.,

3   the more substantial the probative value of the evidence, the greater the danger that must be shown

4   of one of these excluding factors to justify exclusion under section 352.  (*People v. Cudjo* (1993) 6

5   Cal.4th 585, 609 ["Unless these dangers 'substantially outweigh' probative value, the objection

6   must be overruled"].)

7           Here, as explained above, evidence relating to the abuse is extremely probative.  The abuse

8   of Neelam by Plaintiff and Neelam's subsequent departure to India with Soumitra cannot be neatly

9   and surgically separated from one another.  They are inextricably intertwined.  The abuse will put

10  Neelam's decision to take her son to India in context as an understandable act of a vulnerable and

11  desperate mother looking out for the best interest of her child.  It also explains why Neelam was

12  awarded sole custody of Soumitra, and why no acts of Defendants can possibly be characterized as

13  helping to "conceal" Soumitra from Plaintiff, much less be motivated by malice so as to support

14  Plaintiff's punitive damages claims.  Additionally, the abuse is directly relevant to multiple

15  affirmative defenses asserted by Defendants.

16          In sum, precluding Defendants from introducing any evidence or testimony on the abuse

17  issue, while at the same time, permitting Plaintiff to utilize Neelam's abuse allegations for his own

18  benefit, is not only fundamentally unfair, but it would deprive the jury of hearing and weighing

19  evidence that is highly probative to determining the credibility of Plaintiff, and would further

20  deprive Defendants of their entitlement to present proper rebuttal evidence, and evidence that is

21  directly relevant to their defenses in this action.  (*See Kelly, supra*, 49 Cal. App. 4th at 664 [absent

22  highly unusual circumstances, evidence that relates to a critical issue must be received over a

23  Section 352 objection]; *People v. Basuta* (2001) 94 Cal.App.4th 370, 384-87 [trial court abused its

24  discretion by excluding evidence, that was important for the defense theory, on the basis that it

25  was confusing and time-consuming and would create a mini-trial]; *People v. Valencia* (2008) 43

26  Cal.4th 268 [trial court's discretion in weighing prejudicial effect of proffered evidence against its

27  probative value is not unlimited, especially when its exercise hampers the ability of the defense to

28  present evidence].)  It is essential that the jury be informed of the factual background which

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

-9-

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF

Ex. 19, P221

1 | triggered Plaintiff's separation from his son and this dispute in the first place, not merely

2 | Plaintiff's selective and inaccurate version of events.

3 | **VIII.   CONCLUSION**

4 |      For all of the reasons set forth above, Defendants respectfully request that this Court deny

5 | Plaintiff's Motion *in Limine* No. 4 in its entirety.

6 | Dated:  June 17, 2011

RUTAN & TUCKER, LLP
LISA N. NEAL
CHELSEA A. EPPS

By: _____
Chelsea A. Epps
Attorneys for Defendants and Cross-Complainants
MEERA UPASANI, MOHAN UPASANI
and MADHAVI NERURKAR

Rutan & Tucker, LLP
attorneys at law

2400/028371-0001
2166931.2 a06/17/11

-10-

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4
TO EXCLUDE TESTIMONY OR REFERENCE TO ABUSE BY PLAINTIFF

1
### PROOF OF SERVICE BY E-MAIL

2

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

3

4       I am employed by the law office of Rutan & Tucker, LLP in the County of Orange, State of California.
I am over the age of 18 and not a party to the within action.  My business address is 611 Anton Boulevard, Suite

5    1400, Costa Mesa, California 92626-1931.  My electronic notification address is ctennell@rutan.com.

6       On June 17, 2011, at  I served on the interested parties in said action the within:

7    **DEFENDANTS MOHAN UPASANI, MEERA UPASANI AND MADHAVI
NERURKAR'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO**

8    **EXCLUDE TESTIMONY OR REFERENCE BY DEFENDANTS OF ALLEGED ABUSE
BY AVINASH KULKARNI**

9
by transmitting a true copy of the foregoing document(s) to the e-mail addresses set forth as stated below:

10

11       ### SEE ATTACHED SERVICE LIST

12       Executed on June 17, 2011, at Costa Mesa, California.

13       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and
correct.

14

15       _____          _____
         Nancy Bush                               (Signature)
16       (Type or print name)

17

18

19

20

21

22

23

24

25

26

27

28

2303/028371-0001
1169813.1 a06/17/11

## SERVICE LIST

| | |
|---|---|
| *Attorneys for Plaintiff*<br>Rodney L. Donohoo, Esq.<br>Law Offices of Rodney L. Donohoo, APC<br>3110 Camino Del Rio South, Suite 314<br>San Diego, CA 92108<br>Email: rdonohoo@donohoolaw.com | *Attorneys for Defendant Rajesh Nerurkar*<br>Bradford Calvin, Esq.<br>Attorney at Law<br>2070 North Tustin Ave.<br>Santa Ana, CA 92705<br>Email: bradcalvin@earthlink.net |
| *Attorneys for Sunila Kulkarni*<br>Craig M. Nicholas, Esq.<br>Nicholas & Butler, LLP<br>225 Broadwaey, 19th Floor<br>San Diego, CA 92101<br>Email: cnicholas@nblaw.org | |

2303/028371-0001
1169813.1 a06/17/11

Ex. 19, P224